**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | | |
|---|---|---|
| **CURTIS LEVAR WELLS, JR.,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 1:22-cv-00140-MSN-IDD** |
| | ) | |
| **JAVIER FUENTES,** | ) | |
| **SCOTT WANEK,** | ) | |
| **MICHAEL P. ARMSTRONG,** | ) | |
| **ASHLEY BARNICKLE,** | ) | |
| **LAUREN LUGASI,** | ) | |
| **KIMBERLY SOULES,** | ) | |
| **AUSTIN KLINE,** | ) | |
| **JOHN VANAK,** | ) | |
| **KEITH SHEPHERD,** | ) | |
| **COUNTY OF ARLINGTON,** | ) | |
| **JOHN AND JANE DOES 1-10,** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## SECOND AMENDED COMPLAINT

COMES NOW Plaintiff, Curtis Wells, by and through counsel, and, pursuant to Fed. R. Civ. P. 15(a)(2), for his Second Amended Complaint against Defendants Javier Fuentes (Badge #1666), Scott Wanek (Badge #1137), Michael P. Armstrong (Badge #331), Ashley Barnickle (Badge #1574), Lauren Lugasi (Badge #1625), Kimberly Soules (Badge #1630), Austin Kline (Badge #1720), John Vanak (Badge #1399), Keith Shepherd, County of Arlington, and John and Jane Does 1-10, and the United States of America, and, therefore, respectfully alleges the following:

1. On February 9, 2020, Mr. Wells was sitting in his car legally parked in a parking lot

1

outside of Arlington Cemetery, Arlington County, Virginia after going for a jog.  He was not threatening any person, causing a disturbance, making any illegal movements or gestures, or conducting himself if any manner that would give anyone a reasonable belief that he was doing anything other than drinking his strawberry-banana smoothie, in peace.

2.  A veteran who served in the Honor Guard at Ft. Myer, Mr. Wells was familiar with the area around Arlington Cemetery and stopped in an out-of-the way parking spot to take a phone call and drink his smoothie.

3.  Notwithstanding the fact that he was doing absolutely nothing that would draw the attention of a reasonable police officer, Mr. Wells was handcuffed, searched, harassed, and had his property unlawfully seized by several of the Defendants.

4.  As the encounter was ending, the officers removed the handcuffs from Mr. Wells and staged three photographs directing him to take one photograph smiling, and another two not smiling; the following photograph depicts Mr. Wells' attire, demeanor, and location on February 9, 2020:



IMG 4.1

5.  A person of easy-going temperament, as depicted above, Mr. Wells was shockingly subjected to a seven-month period of illegal detention and multiple violations of his constitutional rights as a result of his encounter with federal and local law enforcement officers that afternoon.

6.  Through this suit, Mr. Wells seeks justice for the wrongs done to him by Defendants.

## PARTIES

7.  Plaintiff Curtis Wells is an African American man and a veteran of the United States Army.  He resides in Alexandria, Virginia; and at the time of the events herein described, he was 21 years of age.  He had no prior criminal record.

8.  On February 9, 2020, Defendant Officer Javier Fuentes was an officer in the Arlington County Police Department, Badge #1666; by approximately March 2020, Officer Fuentes was no longer employed by the Arlington County Police Department and, on information and belief, had moved to Broward, Florida.

9.  At the time of the events herein described, Defendant Detective Scott Wanek was an officer in the Arlington County Police Department, Badge #1137.

10.  At the time of the events herein described, Defendant Michael P. Armstrong was a military police officer with the Department of Defense at Fort Myer, Badge #331.

11.  At the time of the events herein described, Defendant Ashley Barnickle was an officer in the Arlington County Police Department, Badge #1574.

12.  At the time of the events herein described, Defendant Lauren Lugasi was an officer in the Arlington County Police Department, Badge #1625.

13.  At the time of the events herein described, Defendant Kimberly Soules was an officer in

the Arlington County Police Department, Badge #1630.

14. At the time of the events herein described, Defendant Austin Kline was an officer in the Arlington County Police Department, Badge #1720.

15. At the time of the events herein described, Defendant John Vanak was an officer in the Arlington County Police Department, Badge #1399.

16. At the time of the events herein described, Defendant Keith Shepherd was a detective working for the Department of the Army.

17. At the time of the events herein described Defendants John and Jane Does 1-10 were individuals, whose identity is presently unknown to Plaintiff, within the Arlington County Police Department, or associated therewith, who acted in concert with the named Defendants to deprive Plaintiff of his rights as described herein.

18. The foregoing Defendants, including John and Jane Does, were, as used in 42 U.S.C. § 1983, each individual persons acting under color of law and within the scope of their employment and authority of the United States federal government or the County of Arlington or the Arlington County Police Department, as applicable, and abused the same authority, as alleged herein, in violation of Plaintiff's rights, as stated herein.

19. Each Defendant is sued in his or her individual capacity, as described in more detail herein.

20. The County of Arlington Defendant is a municipal subdivision of the Commonwealth of Virginia and liable for the injuries caused to Plaintiff, as described herein, pursuant to the holding in *Monell v. Department of Soc. Svcs.*, 436 U.S. 658 (1978).

21. The United States of America Defendant is liable for the torts committed by Defendant Armstrong and Defendant Shepherd, as described herein.

4

## **JURISDICTION AND VENUE**

22. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, 28 U.S.C. 1343(a)(3) because Mr. Wells' claims arise under 42 U.S.C. § 1983, and the Second, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

23. Jurisdiction is proper in this Court over the state law claims pursuant to 28 U.S.C. § 1367.

24. Jurisdiction is proper in this Court over the claims against the United States pursuant to 28 U.S.C. § 1346 and under 28 U.S.C. § 2674.

25. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the primary facts related to this matter took place within this judicial district, particularly, in Arlington County, Virginia.

## **FACTS**

26. The course of events that gives rise to this action begins on February 9, 2020, when Military Police Officer Armstrong, ACPD Officer Fuentes, and several other Arlington County police officers removed Mr. Wells from his Ford Mustang, handcuffed him, and removed and seized certain items of personal property from his vehicle; Mr. Wells was not arrested at this first encounter.

27. Mr. Wells was being investigated for an expired temporary registration tag and driving without a driver's license; Mr. Wells was legally parked in a public parking lot when Armstrong first approached Mr. Wells; no officer observed Mr. Wells driving on February 9, 2020.[1]

---

[1] The fact that his Mustang's temporary tag had expired does not justify the treatment and unreasonable nature of the Defendants described herein and does not imply he was *not legally parked*.

28. Between February 9, 2020, and February 18, 2020, Mr. Wells reached out to the property retrieval department of the ACPD and attempted get his property back.

29. On February 18, 2020, Mr. Wells believed he was going to meet with Detective Wanek to retrieve his property; he parked his second car, a 2008 Pontiac that was ultimately destroyed while Mr. Wells was incarcerated, in the courthouse parking lot and met with Detective Wanek as instructed.

30. Instead of receiving his property, Mr. Wells was arrested on February 18, 2020.

31. Mr. Wells was incarcerated on suspicion that he stole a practically worthless Rifle Plate; based upon that baseless charge, Defendants applied for and received search warrants for Mr. Wells' home, second vehicle, and he was incarcerated during the beginning of the COVID crisis.

32. Judge Wheat of the Arlington County Circuit Court granted Mr. Wells' motion to suppress the Rifle Plate, but Defendants happened to find a small black bag in Mr. Wells' Pontiac with small amounts of powder; Mr. Wells had never seen that bag, never possessed it, and the vehicle was searched and seized by Defendant Barnickle prior to a search warrant issuing and prior to photographs of the vehicle being taken.

33. The Defendants scoured all aspects of Mr. Wells' life; his home, his two cars, his computers, phones – ***everything*** – and they could not find any inculpatory evidence showing Mr. Wells was a drug user or dealer; they found he was involved in personal fitness, physical and tactical training to work in the force protection field, health and first aid, vitamins, self-improvement, AV installation, and sports.

34. Ultimately, Mr. Wells was incarcerated from February 18, 2020, to September 9, 2020;

some of his personal property was held until April 16, 2021.[2]

## FEBRUARY 9, 2020
## UNLAWFUL DETENTION AND
## SEARCH AND SEIZURE OF PLAINTIFF AND HIS VEHICLE (MUSTANG)

### Initial Contact from Ft. Myer Military Police Officer

35.   While Mr. Wells was sitting in his car, lawfully parked in a parking lot, and drinking his

smoothie peacefully outside of Arlington Cemetery, Defendant Officer Michael

Armstrong, Badge #331 ("Armstrong"), a Fort Myer military police officer assigned to

Arlington Cemetery, left the premises of Fort Myer and Arlington Cemetery, and parked

his cruiser behind Mr. Wells, impeding Mr. Wells from leaving.

36.   Armstrong had no reasonable suspicion, no articulable facts, and no probable cause to

believe any crime had been committed by Mr. Wells, and his actions in preventing Mr.

Wells from leaving were an unlawful detention in fact and in law.

37.   Armstrong, as a U.S. military police officer, had no authority or jurisdiction to detain Mr.

Wells when Armstrong parked his cruiser behind Wells' vehicle, which was not on the

premises of Fort Myer or Arlington Cemetery at the time.

38.   In response to later questioning regarding why he detained Mr. Wells, and contacted the

Arlington County Police Department, Armstrong said, *inter alia*:

> Again, when I first got out of the vehicle and made eye contact with
> him through his side view mirror, it was not, I would say his posture
> changed, but there was just maybe you've been pulled over, maybe
> you haven't, how do I put this?

---

[2] Some of his personal property was destroyed, such as his 2008 Pontiac, or otherwise not
returned.

You know when your kid does something wrong and you just kind of get the feeling that something is off, you don't know quite what they did yet?

That's the kind of feeling I had with that kind of look that something was just off that the individual did not appreciate a police officer being in his space at that time.

…

It's the demeanor, the excited mannerisms, the temporary tag, the location, the fact that he - I believe he said he was a prior servicemember.

One of those things alone doesn't necessarily mean that there's criminal activity afoot.

It's a combination of those factors that led me to believe that there was something more egregious.

…

Again, it's not just the demeanor.  It's the combination of all the factors and putting them together that led me to believe that something else more egregious was taking place, about to take place, or had taken place.

…

Again, it was just that feeling that you look at somebody and they are not very appreciative of having a law enforcement or a police officer in their presence.[3]

39. Armstrong approached Mr. Wells' vehicle and placed him in apprehension of the reasonable belief that he was being detained and was not free to leave.

40. While unlawfully detaining Plaintiff, Armstrong contacted the Arlington County Police Department and requested assistance because Armstrong had no jurisdiction to detain Mr. Wells at that place and time.

---

[3] Armstrong's quoted testimony was given on August 17, 2020, in the Arlington County Circuit Court before Judge Judith Wheat.  Mot. To Suppress Hrn'g. Tr. 43:3 – 46:12, August 17, 2020.

41. ACPD dispatched at least five officers in response.

42. Armstrong, without a warrant, without probable cause, without jurisdiction, and without reasonable or articulable suspicion, searched Mr. Wells' vehicle, searched and seized his effects including his soft armor carrier, opened his soft armor carrier and extracted the Rifle Plate, and otherwise searched and seized items from Mr. Wells' vehicle.

43. A reasonable officer in Armstrong's circumstances would have known that he did not have authority to detain Mr. Wells, would not have detained him, and would not have searched or seized Mr. Wells' person, vehicle, or effects therein.

44. Armstrong's conduct was grossly negligent, in reckless disregard for Plaintiff's rights, or was an intentional deprivation of Mr. Wells' rights.

### Initial Contact from Arlington County Police

45. Defendant Officer Javier Fuentes ("Fuentes") from the Arlington County Police Department responded to Armstrong's call to ACPD.

46. Upon arriving at the scene, Fuentes also pulled his vehicle behind Mr. Wells' vehicle – at that place and time, Fuentes had no obligation to believe any report given by Armstrong, and the reasonable police officer would have conducted his own investigation before behaving as Fuentes did.

47. Mr. Wells was cited for driving without having his driver's license in his possession, despite the fact that, while Mr. Wells was being handcuffed on February 9, 2020, one of the officers stated he was in possession of Mr. Wells' driver's license.[4]

---

[4] An ACPD officer, believed to be Soules, recorded a portion of the events on February 9, 2020. The recording was produced pursuant to a FOIA request, and the visual portion of the recording is stationary and does not capture the primary events; the audio portion of the recording is referenced herein as, "the February 9, 2020, Recording." The timestamp on the February 9, 2020, Recording will be referenced herein according to the time indicated on the ACPD

48. No item of Mr. Wells' property searched or seized on February 9, 2020, had any relation to or any evidentiary value to the citations issued by Fuentes.

49. Plaintiff was not arrested on February 9, 2020, in the sense that he was not taken to a police facility; however, he was placed in handcuffs, he was detained, his vehicle was searched without his consent, reasonable suspicion, probable cause, or a warrant, and numerous items of his personal property were taken by the Arlington County Police Department ("ACPD") with no valid legal reason or justification whatsoever.

50. Despite the lack of any suspicion of any conduct or activity by Mr. Wells more serious than a minor traffic infraction, Fuentes removed Mr. Wells from his vehicle and asked whether there were any firearms in the vehicle.

51. Mr. Wells was amiable, friendly, jovial, and cooperative with every police officer throughout his interactions with them on February 9, 2020.

52. Fuentes removed the pistol and rifle without any reasonable suspicion that the firearms were used in any criminal act, without any suspicion that the firearms would lead to evidence of the motor vehicle citations for which Mr. Wells was supposedly being investigated, and without any reason to believe that Mr. Wells was in unlawful possession of them under any law, local, state, or federal.

53. Fuentes nevertheless seized, and the ACPD held, Mr. Wells' firearms in violation of his rights under the Second Amendment to the United States Constitution; the firearms were not returned to Plaintiff until April 16, 2021.

54. By seizing, without permission, and not returning, Mr. Wells' firearms, Fuentes, Wanak,

---

Officer's dashcam program.  At approximately 4:47:50 PM, an officer, believed to be Fuentes, is heard stating that he was in possession of Mr. Wells' active and then-valid Texas license.

presently-unknown John or Jane does, and the County of Arlington violated Mr. Wells' clearly established rights protected by the Second Amendment to the United States Constitution; such unlawful seizure and holding of his firearms was grossly negligent, in reckless disregard for his rights, or was an intentional deprivation of Mr. Wells' rights.

55. Mr. Wells did not consent to the searches and seizures; Mr. Wells did not voluntarily allow his firearms, or any other property, to be taken from him or placed in "safekeeping."

56. On February 9, 2020, ACPD officers, suspected to be Fuentes and Soules, falsely stated to Mr. Wells that he was not permitted to open carry his firearms; such orders were independent violations of his rights under the Second Amendment and demonstrated an omission of policy by the ACP in the way of grossly inept training and supervision by the County of Arlington.[5]

57. Fuentes later turned over the invalid, unconsented to, and unlawful inventory of Mr. Wells' vehicle to other ACPD officers.

58. Ultimately, Fuentes issued Mr. Wells citations for Improper Registration in violation of Virginia Code § 46.2-612 and Driving Without Driver's License in Possession in violation of Virginia Code § 46.2-104.

59. Fuentes, the Arlington County Police Department, the Commonwealth's Attorney's office, and Wanek knew that on February 18, 2020, Plaintiff was arrested and incarcerated and, shortly thereafter, was represented by defense counsel.

60. While Mr. Wells was in custody, on February 28, 2020, the citations issued by Fuentes

---

[5] February 9, 2020, Recording, these orders can be heard at approximately 4:39:30 P.M. through 4:42 PM.

went to trial before a judge in the Arlington County General District Court and the Commonwealth did not produce Mr. Wells to defend against the citations.

61. Because Mr. Wells was in custody from February 18, 2020, to September 9, 2020, he could not have defended against the citations and was found guilty in absentia – someone, presumably the judge who found Mr. Wells guilty, checked and crossed out the sections that reads, "THE ACCUSED WAS THIS DAY: TRIED IN ABSENCE" and "PRESENT."

62. Fuentes was obligated to, and, on information and belief, failed to inform the judge that Mr. Wells was in the custody of the Commonwealth about 100 yards away. ***See* Exhibits 1 and 2**.

<u>Contact from Additional Arlington County Police</u>

63. Lauren Lugasi ("Lugasi") Badge #1625, Kimberly Soules ("Soules") Badge #1630, Austin Kline ("Kline") Badge #1720, John Vanak ("Vanak") Badge #1399, and other officers, each individually worked in concert of action or unlawfully aided and abetted the other Defendants to unlawfully search, without legal justification or permission, Mr. Wells' Ford Mustang and seize, without legal justification or permission, numerous items from the vehicle on February 9, 2020.

64. Such conduct by Lugasi, Soules, Kline, and Vanak was grossly negligent, in reckless disregard of Plaintiff's rights, or was an intentional deprivation of his rights.

65. At a later hearing pursuant to the criminal charges filed against Plaintiff, when asked about the bases for the stop, searches, and seizures, Fuentes and Lugasi were unable to state any specific or articulable facts that reasonably warranted their violations of Mr.

Wells' rights.

66. Plaintiff was handcuffed and detained outside of his vehicle; nothing in the vehicle could have had any evidentiary value to the suspected traffic citations that were the initial basis of the stop; Armstrong, Lugasi, Soules, Kline, and Vanak opened numerous closed containers, to include opening a soft body armor carrier that contained a particular Rifle Plate, discussed *infra*, that would be the subject of the false charge against Plaintiff.

67. On February 9, 2020, Mr. Wells' Ford Mustang was not towed to a police impound lot but was towed by Redman's Towing to Mr. Wells' home.

68. That is, it was <u>not</u> impounded, the searches and seizures of it were therefore not incident to arrest nor were they "inventory" or "safety" searches incident to impoundment.

69. No impound form was created by any ACPD officer for the February 9, 2020, event, in violation of the standard ACPD departmental policy, custom, or standard practice during the process of impounding a vehicle.

70. All the ACPD officers interacting with Mr. Wells failed to fill out, properly circulate, or retain the "ARLINGTON COUNTY POLICE IMPOUNDING/30-DAY IMMOBILIZATION/BOOT FORM" ("Impound Form") and failed to direct the tow-truck driver to tow the vehicle to the police impound lot.

71. One officer, believed to be Fuentes, explicitly stated[6] to Mr. Wells that he could pay the tow-truck driver to deliver Plaintiff and his vehicle to his home.

72. The officers on the scene on February 9, 2020, did not conduct the searches and seizures on that day pursuant to an inventory or impound exception to the Fourth Amendment, and they knew that they did not.

---

[6] The conversation begins at approximately 5:15 PM in the February 9, 2020, Recording.

73. The ACPD officers on the scene on February 9, 2020, particularly Fuentes and Soules, knew that the Mustang was not going to be towed to the impound lot and that they were not conducting an inventory or safety search of the vehicle and that they did not have a warrant to conduct any search of Mr. Wells' vehicle or probable cause to otherwise justify a search or seizure, and despite that knowledge, Mr. Wells' property was searched and seized by them anyway.

74. Plaintiff's Mustang was never in police custody, it was not impounded by the police, and, thus, the vehicle, the search incident to arrest, or the safekeeping exceptions to the requirements of the Fourth Amendment do not apply to the search and seizure of Mr. Wells, his vehicle, or his other property on February 9, 2020.

75. No reasonable police officer in the circumstances of Armstrong, Lugasi, Soules, Fuentes, Kline, and Vanak on February 9, 2020, would believe that Mr. Wells' Ford Mustang was impounded, that the searches, seizures, or towing of it were conducted according to standard departmental policies, and, therefore, a reasonable officer would know the search on February 9, 2020, was nothing more than a mere ruse to impermissibly search Mr. Wells' vehicle and equipment for evidence of a crime.

76. That conclusion is further supported by the fact that Wanek immediately reclassified Mr. Wells' personal property from "Safekeeping" to "Evidence," with no reasonable suspicion, probable cause, warrant, and no applicable Fourth Amendment exception on the next day, February 10, 2020.  *See* **Exhibits 3 and 4**.

77. On February 9, 2020, the officers' searches and seizures of Mr. Wells' property were not conducted pursuant to an impound inventory or safety screening standard procedure; the officers were unable to articulate any valid legal basis for the searches and seizures on

February 9, 2020; and no warrant had issued for such searches and seizures.

78. A conversation between two officers[7] can be heard on the February 9, 2020, Recording at approximately 5:21 PM, discussing whether Plaintiff should be permitted to take with him a piece of his property that was not a weapon, because they were going to release him.

79. One officer can be heard proposing that Mr. Wells should <u>not</u> be prohibited from taking home his property, however, that officer was overruled, and Mr. Wells' property was seized.

<u>Further Searches of Mr. Wells' Seized Property By Arlington County Police</u>

80. On February 10, 2020, Wanek opened numerous sealed containers, to include the soft body armor, taken from Mr. Wells' car without a warrant and in violation of the Fourth Amendment to the United States Constitution and Va. Code § 19.2-59.

81. Wanek stated in his February 10, 2020, notes, and Detective Shepherd also unreasonably believed, based upon bare assumption and speculation, that one Medium Ceradyne Rifle Plate with Serial Number 2923205 ("Rifle Plate")[8] was stolen from the United States government by Mr. Wells.

82. Based upon Wanek's own investigation notes and statements in Court by Wanek and Shepherd, the Rifle Plate would, most likely, have been removed from service in approximately 2016; approximately four years prior to the time that Detective Wanek

---

[7] Believed to be Officers Soules and Lugasi.
[8] The rifle plates manufactured by Ceradyne Inc. is a hard piece of ceramic that is inserted inside soft body armor to protect against rifle rounds such as the 5.56 NATO and 7.62 NATO rifle cartridges.

guessed Mr. Wells stole the Rifle Plate from the United States government.

83. Wanek unreasonably speculated that items like the Rifle Plate were not commonly sold in civilian markets and based upon such unreasonable speculation, he concluded that Mr. Wells must have stolen it from the United States government.

84. A cursory glance through civilian markets such as www.ebay.com, www.armslist.com, and others, would have demonstrated to Wanek that virtually identical used plates were for sale from as little as $65.00 per plate and historically being sold in civilian markets going back to, at least, 2015.

85. On information and belief, the manufacturer of the Rifle Plate also sold similar plates directly to civilians as supplier overrun.

86. Furthermore, Wanek falsely stated that he received evidence that the particular Rifle Plate in question was shipped to Ft. Myer and was at Ft. Myer at the same time that Mr. Wells was at Ft. Myer; in reality, Wanek was operating based upon bare assumption and speculation.

87. With no evidence and no reasonable, articulable suspicion that the Rifle Plate was stolen, no evidence and no reasonable, articulable suspicion that the Rifle Plate ever made it to Ft. Myer, no evidence and no reasonable, articulable suspicion that Mr. Wells stole the Rifle Plate or received the Rifle Plate knowing it was stolen property, and no evidence and no reasonable, articulable suspicion as to the value of the Rifle Plate, Wanek made false statements to the magistrate to seek and receive an arrest warrant; such warrant issued on or about February 14, 2020, to arrest Mr. Wells for receipt of stolen property

pursuant to Va. Code § 18.2-108.[9]

88. Additionally, when cross-examined by Mr. Wells' former criminal defense counsel Andrew Clarke, Detective Shepherd admitted the whole basis for arresting Mr. Wells for receiving stolen property regarding this particular Rifle Plate and the conclusion that this Rifle Plate was at Ft. Myer when Mr. Wells was at Ft. Myer was based upon bare assumption and speculation:

> Question: So, did you tell Detective Wanek, around February 13, 2020, that this particular shipment of rifle plates were received by the U.S. Army at Aberdeen Proving Ground and, then, subsequently, transferred to the U.S. Army at Ft. Myer?
>
> Answer: That was the belief.  So, they were received by the United States Army at Aberdeen Proving Ground and, then, believed to have been shipped to Fort Meyer.
>
> Question: What are you basing that belief on?
>
> Answer: Assumption.
>
> Question: So, you're speculating?
>
> Answer: Yes.[10]

89. The reasonable police officer operating in the circumstances in which Wanek and Shepherd operated would have known that operating based upon such bare assumption and speculation was a violation of Mr. Wells' constitutionally protected rights and would result in his false arrest, false imprisonment, malicious prosecution, and the other harms and injuries described herein.

---

[9] On information and belief, no written warrant affidavit or written supporting statement was made by Wanek on February 14, 2020, to the Magistrate; or, in the alternative, no such affidavit or statement was preserved in the records.

[10] Shepherd's quoted testimony was given in the General District Court of the County of Arlington on March 16, 2020.  Prelim. Hrn'g Tr. 43:17 – 44:8, March 16, 2020.

90. On information and belief, Wanek lied under oath or omitted material exculpatory information in his statements to Magistrate Allison Arnold to receive the arrest warrant on or about February 14, 2020.

91. In the alternative, Wanek hid or failed to inform Magistrate Allison Arnold of exculpatory information and that the conclusion that the Rifle Plate could have been at Ft. Myer at the relevant time was based upon bare assumption and speculation.

92. If Wanek had informed Magistrate Allison Arnold of the facts known to him at the time and that his conclusions were based upon bare assumption and speculation, it is more likely than not that no warrant would have issued.

93. A reasonably competent officer acting in Wanek's circumstances would have concluded that no warrant should have issued on these facts for the arrest of Mr. Wells.

94. Additionally, Detective Shepherd testified that he contacted someone from Ceradyne Industries in February 2020; however, Ceradyne closed in January 2020 when it was purchased by Avon and is now known as Avon Protection Ceradyne; on information and belief, Avon Protection Ceredyne has no records of any communications with Detective Shepherd, or anyone else investigating the cases against Mr. Wells.

95. On August 31, 2020, Judge Judith L. Wheat of the Circuit Court of Arlington County granted a motion to suppress the evidence collected on February 9, 2020; subsequently the charge related to receipt of stolen property was dismissed in Mr. Wells' favor.

96. Additionally, as but one example of the patently unreasonable nature of how Kline, Soules, and Wanek viewed Mr. Wells and his property: Kline, Soules, and later, Wanek, noted that part of the items seized included "a handwritten list of chemical compounds

that have potential to make the human body bulletproof or even invincible."[11]

97.  Such statement is facially absurd and no reasonably competent officer would utilize such

assertion in determining whether to arrest, search, detain, or to further investigate a

suspect and would not use such absurdities in a warrant affidavit.

98.  Mr. Wells has made no such list and has no knowledge of any chemical compounds that

have the potential to make the human body bulletproof or invincible; such unreasonable

conduct of, at least, Soules, Kline, and Wanek is indicative of how irrational,

unreasonable, and reckless they were when investigating Mr. Wells.

99.  Defendants Kline, Soules, Wanek, and, later, Barnickle and other officers, recklessly

interpreted or intentionally misreported on Warrant applications Mr. Wells' handwritten

notes depicted below:



IMG 99.1[12]

100.  The foregoing image depicts Mr. Wells' notes regarding a brand of vitamins produced by

the company named "Bulletproof" and, specifically, Mr. Wells referenced a product

named "Bulletproof Choline Force" which is a bottle of 120 capsules of vitamins sold for

---

[11] This statement is a direct quote from numerous warrant applications, affidavits, and
investigative notes; the documents are too voluminous to be attached as exhibits.
[12] This image is an extract from a photograph that was taken by an ACPD officer on February 9,
2020, and produced in response to a FOIA request.

$32.95 on "www.yeswellness.com"; "Bulletproof" also produces coffee and other products.



IMG 100.1

<u>Wanek Fabricated the Value of the Rifle Plate</u>

101.  On or before February 18, 2020, the day that Plaintiff was arrested, but possibly as early as February 13, 2020, Defendant Detective Wanek learned that the original purchase price in 2009 of the Rifle Plate was $471.38, below the threshold for charging felonious receipt of stolen goods; Detective Wanek falsely stated the value of the Rifle Plate in order to cause the arrest and search warrants to issue, to keep Mr. Wells incarcerated as described herein, and to ensure Mr. Wells would not be released because, if Wanek told the truth to the Magistrate, the Commonwealth's Attorney's office, and the Grand Jury, the false charge would have been a misdemeanor at most and Mr. Wells would have been released and no warrants would have issued.

102.  On information and belief, Wanek withheld from the Magistrate the fact that he was only unreasonably guessing that the Rifle Plate was stolen, unreasonably guessing that Wells took possession of the Rifle Plate knowing it to be stolen, unreasonably guessing as to the value of the Rifle Plate, and that Wanek and the ACPD officers violated the Fourth Amendment to obtain the Rifle Plate.

103.  The Ceradyne Receiving Report ("CRR") received by Detective Wanek stated the value

of the Rifle Plate as $471.38 on March 30, 2009; such evidence was, initially, withheld from Plaintiff's criminal defense counsel in violation of *Brady* disclosure requirements.

104. Prior to receiving the CRR, Wanek had no evidence of the value of the Rifle Plate other than the fact that on the Rifle Plate's face, it was obviously unserviceable and in extremely bad condition, as discussed *infra*.

105. The purchase price of $471.38 was improperly, unreasonably, and capriciously increased by Wanek to attempt to show the Rifle Plate's value was in excess of the felony level at the time of $500.00, however, the value of a ten-year-old Rifle Plate in unserviceable condition should have been reduced to practically $0.00; the fact that Wanek withheld the age and condition from the Magistrate and the Grand Jury, which would have demonstrated the value of the plate was near $0.00, is another exculpatory fact withheld from the Magistrate and Grand Jury which, if presented accurately, would have more likely than not resulted in the arrest warrant and search warrants not issuing, and would have precluded the Grand Jury from returning a true bill.

106. Furthermore, the County of Arlington's training omitted the correct methodology to properly evaluate the value of allegedly stolen items so that officers in Wanek's position would be able to provide competent testimony to Magistrates and the Grand Jury, that is, it was an omission not to take into consideration the fair market value of the Rifle Plate at the time and place of the alleged theft. *See Berryman v. Moore*, 619 F. Supp. 853, 856 (E.D. Va. 1985).

107. Defendants expended great effort after the fact to attempt to show that the Rifle Plate in Plaintiff's possession was stolen, however, Wanek was not in possession of a scintilla of evidence that Mr. Wells knew or believed it was stolen or that the value was in excess of

$500.00 when he applied for the Arrest Warrant on February 14, 2020.

108.   Furthermore, had Defendants Shepherd and Wanek read the face of the Rifle Plate, they would have found it explicitly stated that the plate was unserviceable if the Outer Cover is damaged, exposing the tile material inside; the following image is an extract from the photographs taken by the ACPD officers on February 9, 2020, and produced pursuant to a FOIA request.



IMG 108.1

109.   The photographs taken of the rear side of the Rifle Plate demonstrate that the edges of the Outer Cover are damaged, exposing the tile material, and it appears the backing is delaminating:



IMG 109.1



IMG 109.2



IMG 109.3



IMG 109.4

110.   A far more reasonable explanation is that Mr. Wells was telling the truth – he purchased the Rifle Plate from a guy he met at an airsoft facility, a wholly innocent and legal transaction.

111.   The value of the Rifle Plate that was approximately 10 years old, with facially obvious signs that it was unserviceable, was falsely stated by Detective Wanek to the Magistrate and, ultimately, such false information was presented to the Grand Jury.

112.   The withholding of the foregoing information, or the failure to correct the record, or the reckless disregard of Plaintiff's rights to have such information disclosed to the Magistrate and the Grand Jury, constituted independent violations of Plaintiff's rights, as described herein.

113.   Wanek was in possession of information demonstrating the Rifle Plate's value was at or near $0.00, that the Rifle Plate was unserviceable, he was not in possession of any information demonstrating that Mr. Wells knew or believed the Rifle Plate was stolen, he was not in possession of any information demonstrating that Mr. Wells had any intent to steal the Rifle Plate, and, in fact, Wanek was aware of the fantasy he created and coerced Mr. Wells to recite wherein Mr. Wells explicitly stated he had no intent to steal the Rifle Plate and that Mr. Wells was told by a sergeant to keep the Rifle Plate, and Wanek withheld such information from the Commonwealth's Attorney's office, the relevant Magistrates, and the Grand Jury.[13]

114.   Because of such material omission of the foregoing exculpatory information, false statements, or reckless disregard of Mr. Wells' rights, the Commonwealth's Attorney's office decided to pursue charges, the respective Magistrates issued warrants for Mr. Wells' arrest and the searches described herein, and the Grand Jury returned a True Bill all based upon Wanek's false statements, resulting in Plaintiff's harms herein described.

**FEBRUARY 18, 2020**
**UNLAWFUL ARREST AND**
**UNLAWFUL SEARCH AND SEIZURE OF PLAINTIFF'S PONTIAC**

115.   On February 18, 2020, Mr. Wells met with Detective Wanek under Wanek's false pretense that Wanek was going to return his property to him; Plaintiff parked his 2008 Pontiac in the courthouse parking lot and walked to the property storage area in the

---

[13] According to an email by Assistant Commonwealth Attorney Melanie Wright sent June 2, 2020, to Mr. Wells' former defense counsel, Detective Wanek did not send her the information regarding the purchase contract until approximately the end of May 2020; however, according to Detective Wanek's notes, he received that information on February 13, 2020.

Arlington County Police Department.

116.   Later that day at around 1:17 PM, Mr. Wells' vehicle, a 2008 Pontiac, was seized and, on information and belief, was searched without a warrant and without conditions to satisfy any exception to the Fourth Amendment.  A search warrant was not issued until approximately 4:50 P.M.

117.   Mr. Wells' 2008 Pontiac was legally parked in a public parking lot and there was no probable cause to believe it contained any evidence of any crime.

118.   Corporal Ashley Barnickle Badge #1574 ("Barnickle"), the officer who requested and executed the warrant, had no reasonable, articulable suspicion to believe a crime had been committed in connection with the 2008 Pontiac, had no probable cause to believe that evidence of any crime was in the 2008 Pontiac, and had no probable cause to obtain the warrant to seize the vehicle or search it.

119.   After arresting Mr. Wells, Wanek gave the keys to the 2008 Pontiac to Barnickle; in her notes, she stated that she took custody of the 2008 Pontiac at approximately 1:17 PM, prior to the warrant to search or seize it had issued.  At that time, Barnickle, on information and belief, sat in the vehicle prior to its movement to the police impound lot, prior to the warrant issuing, and, on information and belief, Barnickle searched the vehicle because Barnickle stated in Paragraph 13 of her affidavit attached to the warrant application that the 2008 Pontiac "contained evidence to include a personal communication device."

120.   Paragraph 13 of her Statement of Material Facts in support of her application for a search warrant was written differently from the other paragraphs; instead of stating she had the belief an iPhone "may be present" or that the car "may contain" the evidence, as the other

paragraphs are phrased, she affirmatively stated, in the past tense, the 2008 Pontiac "contained" the iPhone.

121. Barnickle later stated in her supplement that the iPhone was taken from the center console and, therefore, it was not in plain view and, therefore, Barnickle could not have known it was present without conducting an illegal search prior to obtaining the warrant.

122. The photographs of the vehicle taken during the search, ***on the following day***, do not show the location of the iPhone.

123. Barnickle's affidavit fails to state any reasonable, articulable suspicion of any fact sufficient to justify the search or seizure of Plaintiff's 2008 Pontiac.

124. Furthermore, Barnickle's affidavit fails to inform the magistrate that she had already searched the vehicle, prior to the warrant issuing.

125. Furthermore, Barnickle's affidavit contained numerous false statements, material omissions, and otherwise contained errors or bare assumption or speculation.

126. Notably, Barnickle's affidavit falsely stated that Mr. Wells was pointing at Ft. Myer when he was detained on February 9, 2020, falsely stated the Mustang was inventoried for the purposes of towing the Mustang, falsely stated the value of the Rifle Plate, falsely stated or implied that the Rifle Plate was shipped to Ft. Myer, and falsely stated that Plaintiff's vehicle had, "a handwritten list of chemical compounds that have potential to make the human body bulletproof or even invincible."

127. If Barnickle had not made her false or misleading statements to the Magistrate, no warrant would have issued.

128. Thereafter, an ACPD officer allegedly discovered a black bag in Mr. Wells' Pontiac

containing drugs that Mr. Wells had never seen nor possessed.[14]

129. Three new charges for drug possession were filed against Mr. Wells in approximately June 2020, coinciding with the previous charge for receiving stolen property (the Rifle Plate charge) being dismissed.

130. On information and belief, Barnickle, or another officer, had the motive, means, and opportunity to plant the bag of drugs in the map pocket of the vehicle prior to the photographs being taken the day after the vehicle was impounded.

131. The County of Arlington's omissions in its training or supervision of Barnickle resulted in the drug charges being brought against Mr. Wells and to cause Mr. Wells' continued imprisonment because the Pontiac should have been photographed prior to Barnickle seizing the car, and Barnickle should have realized she did not have a warrant to search or seize the Pontiac prior to opening the vehicle at 1:17 P.M.

132. Furthermore, Barnickle's conduct on February 18, 2020, violated Plaintiff's civil rights because there was no emergency or urgency and no exigent circumstances sufficient to excuse Barnickle's search and seizure without a warrant; Barnickle knew that Mr. Wells was under arrest and in Wanek's custody inside the ACPD and that Mr. Wells' Pontiac was under surveillance in the courthouse parking lot by a Tactical Team and not at risk of being interfered with during the time that Barnickle should have gone through the proper warrant procedure.

133. Furthermore, there is a contradiction between the Tactical Team's narrative and Barnickle's Investigative Supplement; the Tactical Team stated they viewed the Pontiac

---

[14] It appears, according to the chain of custody tracking record, the drugs were not entered into the system until February 28, 2020, despite the search of Plaintiff's Pontiac taking place ten days earlier.

until Barnickle and "MPO Meyer"[15] arrived to execute the search warrant, however, Barnickle's notes stated that she took custody of the vehicle at 1:17 P.M., the tow truck did not arrive until 1:50 P.M. to tow the vehicle to the impound lot, and – subsequently – Barnickle went to the Magistrate to receive the warrant which was issued later that day at 4:50 P.M.

134. All charges against Mr. Wells related to drug possession were dismissed.

135. On information and belief, the ACPD officers thoroughly searched Mr. Wells' apartment and electronic devices and found no evidence of any stolen goods, drugs, drug paraphernalia, or any other evidence demonstrating a reasonable basis to believe he possessed any illicit drugs or stolen property.

## FEBRUARY 18, 2020, INTERVIEW OF PLAINTIFF

136. On February 18, 2020, Detective Wanek and a federal agent interviewed Mr. Wells regarding the Rifle Plate.

137. At no time did Mr. Wells admit he intentionally stole the Rifle Plate or that he knowingly received stolen goods.

138. Wanek stated, falsely, to the Court that Mr. Wells, "recognized that it was a serialized piece of issued equipment from Fort Myer, and he indicated that he took it from someone in the barracks."[16]  Presumably, Wanek made similar false statements to the respective Magistrates and the Grand Jury.

139. Mr. Wells stated in the recorded interview that he purchased the Rifle Plate from a man at

---

[15] Plaintiff is unaware who "MPO Meyer" is.
[16] Preliminary Hrn'g. Tr. 67:17-20, March 16, 2020.

an airsoft facility; however, after suffering the stress of being arrested and harassed by Wanek, who did not believe the truth, Wanek stated to Mr. Wells that "the truth will set you free," and Mr. Wells confirmed to Wanek if he admitted the Rifle Plate was in his possessions when he out-processed from the military, then Wanek would take the Rifle Plate and release Mr. Wells.

140. Wanek's actions rose to the level of a promise to Mr. Wells that he would release Mr. Wells if Mr. Wells admitted to taking the Rifle Plate.

141. Wanek's actions rose to the level of a non-prosecution agreement that Wanek breached; Mr. Wells accepted Wanek's offer by falsely stating the Rifle Plate was mixed up with Mr. Wells' property during the extremely disorderly out-processing from the Army when Mr. Wells' property was not in his control and that the Rifle Plate was placed, by other people, with Mr. Wells' property.

142. At no time did Mr. Wells admit he stole the Rifle Plate or knew it was stolen and received it; Plaintiff made a written statement, at Wanek's urging, admitting to the false series of facts that Wanek crafted, practically out of whole cloth.  **Exhibit 5**.

143. Mr. Wells' written statement was not a confession and it expressly stated that he did not have any intent to steal the plate and did not state that he received stolen property, even in the fantasy created by Wanek.

144. Mr. Wells truthfully articulated that, during his out-processing from the military, his personal property was moved out of his barracks room and placed in the hallway in disarray by others in his unit; such series of events were confirmed in text messages that Wanek later obtained.

145. Plaintiff then took Wanek's lead and falsely told Wanek that the Rifle Plate was mixed

into his personal property by someone else and that Plaintiff's former sergeant told Mr.

Wells to keep the Rifle Plate; furthermore, in the fantasy created by Wanek, Mr. Wells

explicitly stated he was unaware of who owned the Rifle Plate.

146.   Despite his promise that "the truth will set you free," Wanek arrested Mr. Wells on

February 18, 2020.

147.   Wanek's later testimony implied he never read Mr. Wells' written statement in

dereliction of his duty, demonstrating Arlington County's omission in its failure to

properly train its officers, such as Wanek, or showing an instance of the regular practices

described herein of ACPD officers recklessly or intentionally disregarding reasonable

conclusions and reasonable facts in favor of wildly unreasonable guessing.


## SUMMARY

148.   Based upon the foregoing violations of Plaintiff's Second Amendment, Fourth

Amendment, Fifth Amendment, and Fourteenth Amendment rights, four charges were

brought against Mr. Wells in cases numbered CR20000235-00, CR20000418-00,

CR20000419-00, and CR20000444-00 in Arlington County.

149.   As a direct and proximate result of Defendants' conduct described herein, Mr. Wells was

falsely imprisoned and suffered unreasonable searches and seizures on February 9, 2020,

and later maliciously prosecuted and falsely imprisoned from February 18, 2020, to

September 9, 2020, and suffered unreasonable searches and seizures on February 18,

2020.

150.   All Defendants described herein acted in a concert of action through a series of

transactions or aided and abetted the other Defendants to deprive Mr. Wells of his

constitutionally and statutorily protected rights, as described herein.

151. All charges against Mr. Wells in the above-listed cases were resolved in Mr. Wells' favor.

152. As a direct and proximate result of Defendants' concerted conduct, as described herein, Mr. Wells suffered the following injuries, losses, or damages:

- $4,000,000.00 because of the loss of Mr. Wells' liberty for the time period of February 18, 2020, through September 9, 2020.

- $2,000,000.00 because of the violations of Mr. Wells' Fourth Amendment rights.

- $500,000.00 because of the violations of Mr. Wells' Second Amendment rights.

## **LEGAL STANDARD**

153. The civil rights claims stated herein against Defendants are based upon 42 U.S.C. § 1983, which states, in relevant part,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

154. The Second Amendment to the United States Constitution provides,

> A well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed.

155. The Fourth Amendment to the United States Constitution provides,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the

place to be searched and the persons or things to be seized[.]

156. The Fifth Amendment to the United States Constitution provides, in relevant part,

No person shall [] be deprived of life, liberty, or property, without due process of law[.]

157. The Fourteenth Amendment to the United States Constitution provides, in relevant part,

[No state shall] deprive any person of life, liberty, or property, without due process of law[.]

158. It was clearly established on February 9, 2020, through February 10, 2020, that it was a violation of Mr. Wells' rights for Fuentes, Soules, Vanak, Lugasi, Armstrong, and Wanak to unreasonably search and seize Plaintiff's vehicle and property not incident to an impound or inventory search, to open closed containers, and to conduct such searches and seizures as a mere ruse to unlawfully rummage through Plaintiff's property to discover incriminating evidence. *Florida v. Wells*, 495 U.S. 1, 3-5 (1990).

159. For the duration of the events herein described, the word "impound" was clearly established to mean: "1. To place (something, such as a car or other personal property) in the custody of the police or the court, often with the understanding that it will be returned intact at the end of the proceeding. 2. To take and retain possession of (something, such as a forged document to be produced as evidence) in preparation for a criminal prosecution."  Impound, Black's Law Dictionary (10th ed. 2014).

160. It was clearly established during the events described herein that, under certain circumstances, a law enforcement officer can be liable for wrongful prosecution even though a prosecutor or grand jury, and presumably, a magistrate, decides to prosecute, returns a true bill, or issues a warrant. *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012); *see also*, *Willis v. Blevins*, 966 F. Supp. 2d 656 (E.D. Va. 2013); *see also*,

*Copenny v. City of Hopewell*, 7 F.Supp.3d 635, 640 (E.D. Va. 2014).

161. It was clearly established during the events described herein that "an officer may not conduct a 'vehicle search incident to a recent occupant's arrest after the arrestee has been secured and cannot access the interior of the vehicle." *Cromartie v. Billings*, 298 Va. 284, 298, 837 S.E.2d 247, 254 (2020) (quoting *Arizona v. Gant*, 556 U.S. 332, 335 (2009)).

162. Furthermore, it was clearly established during the events described herein that it is unreasonable for Defendants Fuentes, Soules, Lugasi, Kline, and Armstrong to search Plaintiff's Mustang on February 9, 2020, because there could be no evidence of the citations issued to Mr. Wells found therein; the *Cromartie* opinion demonstrates that Defendants' conduct was clearly established to be unreasonable since, at least, 2009 with the *Gant* case. *See*, *Cromartie v. Billings*, 298 Va. 284, 298, 837 S.E.2d 247, 255 (2020) ("Because Gant was handcuffed and locked in a patrol car, the Court held that the search was unreasonable. The Supreme Court additionally held that the search could not be justified by the likelihood of discovering offense-related evidence because the officers arrested Gant for driving with a suspended license, 'an offense for which police could not expect to find evidence in the passenger compartment of Gant's car.'")

163. As a direct and proximate result of the concerted unlawful and malicious searches and seizures described herein, Defendants and John and Jane Does 1-10 deprived Mr. Wells of his liberty and property without due process of law in violation of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and *inter alia*, Va. Code § 19.2-59 resulting in Mr. Wells being falsely imprisoned and maliciously prosecuted from February 18, 2020, through September 9, 2020.

**COUNT ONE**
**UNLAWFUL SEARCHES AND SEIZURES**
**Fourth Amendment, 42 U.S.C. § 1983**
**(against Fuentes, Soules, Kline, Lugasi, Armstrong, Vanak, Wanek, Barnickle)**

164. Plaintiff realleges and incorporates the foregoing paragraphs as if restated fully herein.

165. At all times relevant hereto, Mr. Wells possessed the clearly established right under the Fourth Amendment to the United States Constitution to be free from unreasonable searches and seizures and to be secure in his person, personal effects, and property.

166. "At the time a person is arrested, the facts and circumstances within the officer's knowledge must warrant the belief of a prudent person that the arrestee had committed or was committing an offense." *Cromartie v. Billings*, 298 Va. 284, 300, 837 S.E.2d 247, 256 (2020).

167. "The Supreme Court of the United States has held that an officer may not conduct a 'vehicle search incident to a recent occupant's arrest after the arrestee has been secured and cannot access the interior of the vehicle.' In the same case, the Court also concluded that 'circumstances unique to the automobile context justify a search incident to arrest when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle.'" *Cromartie v. Billings*, 298 Va. 284, 298, 837 S.E.2d 247, 254-55 (2020) (quoting *Arizona v. Gant*, 556 U.S. 332, 335, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009)).

168. On February 9, 2020, Mr. Wells was being investigated for expired tags and driving without a license present.

169. On February 9, 2020, under color of law, Armstrong,[17] Fuentes, Soules, Kline, Lugasi, and Vanak, acting in concert of action and through a series of related transactions or

---

[17] Claims against Armstrong are separately stated, *infra*, in accordance with the holding in *Bivens*.

occurrences, deprived and infringed upon Mr. Wells' clearly established rights secured by the United States Constitution in at least the following ways:

a.   Without probable cause, reasonable suspicion, or specific and articulable facts, or any exception to the Fourth Amendment, searched and seized Plaintiff's person and effects on February 9, 2020.

b.   By unlawfully seizing Mr. Wells and holding him against his will on February 9, 2020, during the search of his vehicle, Defendants unreasonably seized Plaintiff's person without a warrant.

c.   By unlawfully searching Mr. Wells and his Ford Mustang as a mere ruse or pretext to rummage through his property to attempt to find evidence of a crime.

d.   By unlawfully searching Mr. Wells' Ford Mustang despite the fact that no evidence of the offenses for which he was being investigated could be found in his vehicle, similar to the *Gant* and *Cromartie* cases.

e.   Making or relaying the patently false and unreasonable statements relating to Mr. Wells being in possession of "a handwritten list of chemical compounds that have potential to make the human body bulletproof or even invincible."

170.   Thereafter, beginning on February 10, 2020, Detective Wanek worked in concert with the above-listed Defendants to reclassify Mr. Wells' property, that was taken as a mere pretext, from "safekeeping" to "evidence" without any warrant, without any exception to the Fourth Amendment, with ample time to apply for a warrant, if there existed good-faith probable cause to do so, and, ultimately, to provide false statements to the Magistrate to obtain the arrest warrant and subsequent search warrants.

171.   Thereafter, Wanek and Barnickle each utilized the facially invalid investigative notes and

36

findings from the February 9, 2020, investigation of Mr. Wells to falsify warrant affidavits or recklessly omit material information that resulted in falsehoods, made those statements or omissions deliberately, or, in the alternative, with a reckless disregard for the truth, and such false statements or omissions were material or necessary to the finding of probable cause for the arrest warrant, the search warrants, necessary to the Commonwealth's Attorney's determination to prosecute, and necessary for the Grand Jury's returning of a True Bill, such falsities include, without limiting:

    a.   Falsely stating that Defendants had information that the Rifle Plate was not available to civilians, or recklessly concluding that the Rifle Plate was not available to civilians.

    b.   Falsely stating the value of the Rifle Plate was in excess of $500.00 when it was actually at or near $0.00 because of its condition and age.

    c.   Knowingly and recklessly relying upon bare assumption and speculation for the finding of probable cause that Mr. Wells stole or received the Rifle Plate knowing it was stolen.

    d.   Falsely stating that the Rifle Plate was documented to be in Ft. Myer at the same time as Mr. Wells; or omitting that bare assumption and speculation were the sole basis for the conclusion that the Rifle Plate was present at Ft. Myer when Mr. Wells was.

    e.   Falsely stating or omitting evidence, or failing to correct the record, regarding the actual value of the Rifle Plate.

172. Furthermore, Wanek intentionally misrepresented to Magistrates, to the Commonwealth's Attorney, and to the Grand Jury the content of his interview with Mr. Wells and the

content of Mr. Wells' written statement made on February 18, 2020.

173. Wanek also intentionally withheld information from the Commonwealth's Attorney that he received on February 13, 2020, until approximately the last week of May 2020.

174. Because of the information Wanek and Shepherd had discovered regarding the value of the Rifle Plate, the fact that they were operating upon bare assumption and speculation, that they were not aware of any fact that the Rifle Plate was stolen, and not aware of any fact that Mr. Wells knew or believed the Rifle Plate was stolen, it was obvious that no reasonably competent officer would have concluded that the warrants described herein should issue.

175. But-for the conduct described above of Fuentes, Soules, Kline, Lugasi, Armstrong, Vanak, Wanek, and Barnickle, in violation of Mr. Wells' rights and but-for Defendants' dishonest statements, material omissions, or reckless disregard for the truth in their statements under oath to Magistrates, to the Commonwealth's Attorney's office, and to the Grand Jury, no warrant would have issued to arrest Mr. Wells and no warrant would have issued to search his Pontiac, home, or Mustang, and to seize his property, the Commonwealth's Attorney's office would have declined to prosecute, and the Grand Jury would not have returned a True Bill.

176. There was no probable cause for warrants described herein.

177. The conduct of the Defendants, described herein, violated clearly established constitutional and statutory rights of the Mr. Wells that were clearly established during the timeframe described herein.

178. No reasonable officer would have thought that the Defendants' actions, described herein, were constitutional; no reasonable officer would have thought that the Defendants'

actions, described herein, were in accord with Mr. Wells' rights, as described herein, during the timeframe described herein.

179.  In the alternative, and without waiving the foregoing, the searches and seizures described herein constituted reckless or callous indifference to Mr. Wells' federally protected rights.


## <u>COUNT TWO</u>
## INFRINGEMENT OF THE RIGHT TO KEEP AND BEAR ARMS
## SECOND AMENDMENT, FOURTEENTH AMENDMENT, 42 U.S.C. § 1983
## (against Fuentes, Wanek, Soules, County of Arlington)

180.  Plaintiff realleges and incorporates the foregoing paragraphs as if restated fully herein.

181.  Fuentes and Wanek, individually and, on information and belief, in concert with presently unknown ACPD officers, unlawfully and unreasonably seized and held Mr. Wells' firearms in violation of the Second Amendment and Fourteenth Amendment to the United States Constitution from February 9, 2020, through April 16, 2021.

182.  In *District of Columbia v. Heller*, the Supreme Court of the United States held that the right to keep and bear arms is an individual right protected by the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570 (2008).

183.  The right to keep and bear arms is not limited to pistols, or any particular set of arms, and does not exclude ArmaLite-style rifles.  *See id* at 581.[18]  Thus, Mr. Wells' right to keep and bear his ArmaLite-15-style rifle, as well as his Glock-brand pistol, was a clearly

---

[18] It is important to note that the AR-15 rifle was not excluded by the *Heller* decision; some popular media and some decisions have popularized a patent error that Justice Scalia's opinion carves out ArmaLite rifles.  Such error stems from the fact, in part, that the *Heller* opinion struck down a law regulating pistols.  Justice Scalia's opinion construes the Second Amendment as protecting the individual right to keep and bear arms; it is undisputed that the AR-15 is an arm and, despite being designed by ArmaLite, it is an arm protected by the Second Amendment.

established individual rights during the time period of February 9, 2020, to April 16, 2021.[19]

184. The Supreme Court of the United States reiterated in a recently-published opinion that "[i]n *Heller* and *McDonald*, we held that the Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." *New York State Rifle & Pistol Association Inc., v. Bruen*, 597 U. S. ___, ___ (2022) (slip op., at 8).  The Court continued, "[i]n keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*.  Thus, Mr. Wells' individual right to keep and bear arms, as he requested to do on February 9, 2020, and was denied by, at least, Fuentes and Soules, and his right to keep and bear his arms from February 9, 2020, through April 16, 2021, has been clearly established for 231 years.

185. The Constitution and the Supreme Court do not make any distinction between rifles and pistols.  Furthermore, Arlington's own ordinances do not make a distinction between rifles and pistols.  ARLINGTON COUNTY, VA. CODE § 13-13.

186. It is clearly established that, in the analogous takings-clause jurisprudence, "[a] property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it." *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2167 (2019).  The takings-clause jurisprudence does not distinguish between whether depriving a property owner of *a particular plot of land deprives the owner of owning some other plot of land* and such principle has been clearly established for centuries.

---

[19] Non-NFA-stamped machine guns are illegal; Plaintiff did not possess an "AR-15 Machine Gun."  Plaintiff's firearms were both lawfully purchased and owned.

40

187.   The Seventh and Eighth Circuits have mentioned, in non-binding dicta, that "[] where the plaintiff had been able to vindicate his interest in 'a meaningful procedural mechanism for return of his lawfully seized firearm,' by way of the due process clause, the seizure of one particular firearm did not otherwise interfere with his Second Amendment interests: 'The defendants' policy and action affected one of Walter's firearms, which was lawfully seized. The defendants did not prohibit Walters from retaining or acquiring other firearms." *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 571 (7th Cir. 2014) (citing *Walters v. Wolf*, 660 F.3d 307 (8th Cir. 2011)).

188.   Squaring practically all other areas of constitutional interpretation with the Second Amendment would imply that when a right is protected by the Constitution, a deprivation of an extension of that right is a violation of the Constitution; the Second Amendment is not *sui generis* in its application to its diminution.  If *Sutterfield's* Second Amendment interpretation were applied to a Fifth Amendment Takings Clause case, then a taking of a piece of real property would not work to trigger a requisite just compensation and thus, when the government does not pay just compensation to the owner, the owner would not have a valid 1983 takings case against the government ***because the government did not take away the property owner's ability to retaining or acquiring some other parcel of land***.  The same analogy can be made to practicing religion (a law prohibiting the practice of the Catholic faith ***does not take away the ability to practice Buddhism***), to free speech (a law prohibiting the criticizing of the president ***does not take away the ability to criticize a senator***), and to practically any other constitutional right.  Such *Sutterfield* and *Walters v. Wolf* types of interpretation of the Second Amendment are facially invalid.

41

189. Thus, Fuentes and Soules' conduct to prohibit Mr. Wells from carrying his firearms and to seize Mr. Wells' firearms on February 9, 2020, in concert with Wanek, the County of Arlington, and, on information and belief, presently-unknown John and Jane Does, to hold the firearms until April 16, 2021, as described herein, was a violation of a federally protected right as described in 42 U.S.C. § 1983; such right was clearly established for the duration of the seizure and continued deprivation and a reasonable officer would have known such right was clearly established in the Defendants' positions described herein.

190. On February 9, 2020, Mr. Wells explicitly asked to take his property and firearms home and, an officer, suspected to be Soules, put Mr. Wells in the reasonable apprehension that he was not permitted to carry his firearms and other personal property home.[20]

191. A reasonable officer in circumstances of Fuentes, Soules, and Wanek would have known that the seizure and continued holding of Mr. Wells' rifle and pistol from February 9, 2020, through April 16, 2021, was a continuing violation of Mr. Wells' clearly established Second Amendment right to keep and bear arms.

192. On information and belief, such Defendants were aware, as early as February 9, 2020, that the firearms were not stolen and that Mr. Wells was the lawful purchaser of both firearms; on information and belief, Defendant Fuentes, or another officer, ran an electronic trace on February 9, 2020, on both firearms and found them to be lawfully purchased by Mr. Wells.

193. There existed no valid legal excuse to seize Mr. Wells' firearms on February 9, 2020; Mr. Wells requested, and was lawfully permitted to have Fuentes and Soules release his firearms to him; Mr. Wells was lawfully able to open carry his firearms on February 9,

---

[20] The conversation can be heard at approximately 4:39 PM on the February 9, 2020, Recording.

2020, and there existed no suspicion that the firearms were related to the motor vehicle

citations for which Mr. Wells was being investigated, and, thus, when Fuentes and Soules

explicitly refused to let Mr. Wells open carry his firearms, they infringed upon his

clearly-established Second Amendment right to keep and bear arms.

194. On September 9, 2020, Mr. Wells was released from his false imprisonment, however,

Wanek and the County of Arlington refused to return Mr. Wells' firearms until April 16,

2021.

195. In the alternative, and without waiving the foregoing, the seizure and holding of Mr.

Wells' rifle and pistol described herein constituted a reckless or callous indifference to

Mr. Wells' Second Amendment rights.


**COUNT THREE**
**FALSE IMPRISONMENT**
**(against Armstrong, Fuentes, Soules, Kline, Vanak, Lugasi, Wanek)**

196. Plaintiff realleges and incorporates the foregoing paragraphs as if restated fully herein.

197. False imprisonment is "the direct restraint by one person of the physical liberty of another

without adequate legal justification." *Jordan v. Shands*, 255 Va. 492, 497, 500 S.E.2d

215, 218 (1998). "If a person is under a reasonable apprehension that force will be used

unless he willingly submits, and he does submit to the extent that he is denied freedom of

action, this, in legal contemplation, constitutes false imprisonment.' Importantly, 'it is

not necessary to show malice, ill will or the slightest wrongful intention,' and the

defendant's good faith will not defeat a false imprisonment claim." *Amisi v. Riverside*

*Reg'l Jail Auth.*, 469 F. Supp. 3d 545, 577 (E.D. Va. 2020) (citations omitted). *Accord*

*Jordan v. Shands*, 255 Va. 492, 497 (1998).

43

198.  At no time on February 9, 2020, did Armstrong, as a military police officer who abandoned his post to harass Mr. Wells, have any authority or legal justification to restrain the physical liberty of Mr. Wells, yet, despite such lack of authority or justification, did so restrain Mr. Wells' physical liberty unlawfully and without adequate legal justification.

199.  On February 9, 2020, when Fuentes, Soules, Kline, Vanak, and Lugasi arrived at the scene, they placed Mr. Wells in the reasonable apprehension that he was not free to leave.

200.  At the same place and time, Fuentes, Soules, Kline, Vanak, and Lugasi lacked an adequate legal justification to hold Mr. Wells for the investigation of the motor vehicle citations issued to him; in the alternative, once Mr. Wells' firearms were secured and it was apparent there was no safety concern, Mr. Wells' liberty should have been restored.

201.  On February 18, 2020, and thereafter until his release on September 9, 2020, Mr. Wells was falsely imprisoned by Wanek without legal justification and with a want of probable cause for such imprisonment because, *inter alia*, Wanek explicitly knew there was no valid reason for Mr. Wells to be imprisoned, as described herein.

### COUNT FOUR
### MALICIOUS PROSECUTION
### (against Wanek, Fuentes, Lugasi, Soules, Shepherd)

202.  Plaintiff realleges and incorporates the foregoing paragraphs as if restated fully herein.

203.  "In an action for malicious prosecution, the plaintiff must prove four elements: that the prosecution was (1) malicious; (2) instituted by or with the cooperation of the defendant; (3) without probable cause; and (4) terminated in a manner not unfavorable to the plaintiff." *Daniczek v. Spencer*, 156 F. Supp. 3d 739, 754 (E.D. Va. 2016) (citing *Lewis*

*v. Kei*, 281 Va. 715, 722, 708 S.E.2d 884 (2011)).

204. "In Virginia, under certain circumstances, the want of probable cause alone can serve as legally sufficient evidence to support an inference of malice." *Daniczek v. Spencer*, 156 F. Supp. 3d 739, 756 (E.D. Va. 2016); *Hudson v. Lanier*, 255 Va. 330, 333 (1998), *Page v. Wilson*, 168 Va. 447, 454 (1937).

205. "[P]robable cause is defined as 'knowledge of such facts and circumstances to raise the belief in a reasonable mind, acting on those facts and circumstances, that the plaintiff is guilty of the crime of which he is suspected. The determination whether a defendant had probable cause to believe that a crime was committed is judged with reference to the time the defendant took the action initiating the criminal charges." *Daniczek v. Spencer*, 156 F. Supp. 3d 739, 754 (E.D. Va. 2016) (citations omitted) (quoting *Andrews v. Ring*, 266 Va. 311, 322, 585 S.E.2d 780, 786 (2003)).

206. "[Probable cause] is an objective standard that asks 'would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?' If an officer knows that the facts on which he bases his probable cause determination are false, then probable cause does not exist." *Daniczek v. Spencer*, 156 F. Supp. 3d 739, 755 (E.D. Va. 2016).

207. Wanek knew that there was no probable cause when he swore out the arrest warrant on or about February 14, 2020.

208. Wanek was specifically invested with knowledge that the Rifle Plate was not sufficiently valued to satisfy the $500.00 threshold, relied on his own bare assumption and speculation absent a scintilla of evidence that the Rifle Plate was stolen or that Mr. Wells knew it was stolen and received it, and Wanek's knowledge of such lack of evidence is

demonstrated by his withholding of certain information or outright falsities, as described *supra*, in his statements to the Magistrate, the Commonwealth's Attorney's office, and the Grand Jury.

209. Subsequently, in reliance upon Wanek's false statements and hiding of evidence, as described herein, from the Magistrate, the Commonwealth's Attorney's office, and the Grand Jury, an arrest warrant was issued, the prosecutor chose to prosecute, and the Grand Jury returned a true bill.

210. Fuentes, Lugasi, Soules, and Shepherd each cooperated in or directly or constructively instituted the prosecution against Mr. Wells.

211. Fuentes, Lugasi, Soules, and Shepherd cooperated in the prosecution of Mr. Wells, provided false statements to the prosecution, and provided reckless statements of fact, relied upon bare assumption or speculation, and did so without probable cause that Mr. Wells had stolen the Rifle Plate or received it knowing it to be stolen, among other conduct described herein.

212. Additionally, Fuentes' conduct on February 28, 2020, relating to the bench trial implies that Fuentes either failed to be candid with the judge hearing the trial against Mr. Wells on the two citations issued by Fuentes or he failed to secure Mr. Wells' appearance while Mr. Wells was in custody.

213. Additionally, Shepherd cooperated with the malicious prosecution by providing misleading information to the Commonwealth's Attorney's office relating to what documentation he possessed and receipts falsely implying that the Rifle Plate was known to have shipped to Mr. Wells' unit while he was present at that unit.

## **COUNT FIVE**
**VIOLATION OF Va. CODE § 19.2-59 AND VIRGINIA COMMON LAW**
**(against Fuentes, Lugasi, Soules, Kline, and Vanak for the events of February 9, 2020)**
**(against Wanek for the events of February 10, 2020, and thereafter)**
**(against Barnickle for the events of February 18, 2020)**

214. Plaintiff realleges and incorporates the foregoing paragraphs as if restated fully herein.

215. "[Virginia] Code § 19.2-59 prohibits warrantless searches of any place, thing, or person

   and provides that any officer performing such a search shall be 'liable to any person

   aggrieved thereby in both compensatory and punitive damages.' The statute creates a

   cause of action against law enforcement officers and other government agents."

   *Cromartie v. Billings*, 298 Va. 284, 296-97 (2020) (citing *Buonocore v. Chesapeake &*

   *Potomac Tel. Co.*, 254 Va. 469, 473 (1997)).

216. Mr. Wells was not under arrest on February 9, 2020.

217. Fuentes, Lugasi, Soules, Kline, and Vanak, on February 9, 2020, searched Mr. Wells, his

   Ford Mustang, and his personal property therein without any warrant or any valid

   exception to Va. Code § 19.2-59. *See Cromartie v. Billings*, 298 Va. 284, 298, 837

   S.E.2d 247, 254 (2020) ("The Supreme Court of the United States has held that an officer

   may not conduct a 'vehicle search incident to a recent occupant's arrest after the arrestee

   has been secured and cannot access the interior of the vehicle'").

218. "The evidence in this case established that while Cromartie was seated behind her

   vehicle, secured with handcuffs and leg shackles, and in the physical custody of the

   backup officer, Billings entered Cromartie's car, retrieved her purse from it, and

   proceeded to search the purse. Neither her vehicle nor her purse could have contained

   evidence of speeding." *Id.* at 255.

219. "Additionally, neither her vehicle nor her purse could have contained evidence

   related to obstruction of justice, the offense for which Billings obtained an arrest

warrant from a magistrate after the encounter. Gant is the requisite 'settled, indisputable law' that forbade Billings' search." *Cromartie v. Billings*, 298 Va. 284, 299, 837 S.E.2d 247, 255 (2020) (quoting *Burnham v. West*, 681 F. Supp. 1169, 1173 (E.D. Va. 1988) (referencing *Arizona v. Gant*, 556 U.S. 332, 344, 129 S. Ct. 1710, 1719 (2009)).

220. Fuentes, Lugasi, Soules, Kline, and Vanak searched Mr. Wells' vehicle while he was in handcuffs and seated on a nearby curb.  Mr. Wells was being investigated for driving without a license and for expired registration tags; neither his vehicle nor his property therein could have contained evidence of his expired tags and failure to produce his license.

221. On February 10, 2020, Mr. Wells' personal property was being held in the Arlington County Police Department and Wanek had ample opportunity to follow procedure and to apply for a warrant, if he had any probable cause to search Mr. Wells' property held as "Safekeeping."

222. Instead, Wanek, in violation of Va. Code § 19.2-59, searched Mr. Wells' property held in the ACPD without a warrant and without any valid legal basis or exception to the code or common law knowing there were no exigent circumstances or urgency.

223. On February 18, 2020, Barnickle sat in Mr. Wells' Pontiac and searched it knowing Plaintiff was in Wanek's custody, in handcuffs, inside the ACPD, knowing that the Tactical Team was surveilling the vehicle, knowing that she had no warrant or probable cause for such search and without any valid legal basis or exception to the code or common law.

224. Barnickle had ample opportunity to apply for a warrant according to proper procedure knowing that there were no exigent circumstances or urgency.

48

**COUNT SIX**
*BIVENS* **CLAIM**
**Defendant Shepherd**

225.  Plaintiff realleges and incorporates the foregoing paragraphs as if restated fully herein.

226.  On February 9, 2020, and through the duration of the investigation and actions as described herein, Mr. Wells possessed the clearly established right under the Fourth Amendment to the United States Constitution to be free from unreasonable seizure.

227.  On February 9, 2020, and through the duration of the investigation and actions as described herein, Mr. Wells possessed the clearly established rights under the Fifth Amendment to the United States Constitution to be free from deprivation of his liberty without due process of law.

228.  The Supreme Court of the United States has held that a plaintiff may prosecute an action for money damages for injuries caused by federal officials for violations of Fourth Amendment rights.  *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 397 (1971).

229.  Under color of law, Defendant Shephard, as an employee of the Department of the Army working as a detective, deprived and infringed upon Mr. Wells' clearly established rights secured by the United States Constitution as described herein; the claims stated in Count Four are incorporated herein as if restated in full.

230.  Defendant Shephard acted in concert of action with the other Defendants or aided and abetted the unlawful conduct of the other Defendants, as described herein, to deprive Mr. Wells of his clearly established rights, or, in the alternative, and without waiving the foregoing, Defendant Shepherd's actions as described herein constituted a reckless or callous indifference to Mr. Walls' Fourth and Fifth Amendment rights.

231.  Defendant Shephard's conduct of relying on bare assumption and speculation in tracing

49

the pathway of the Rifle Plate to concoct the conclusion that Mr. Wells stole the Rifle Plate from the U.S. Government amounts to a violation of Mr. Wells' Fourth and Fifth Amendment rights.

232. A reasonable officer in Defendant Shepherd's circumstances for the duration of the events described herein, would know that operating based upon bare assumption and speculation, without any reasonable suspicion or articulable fact, would amount to violations of Mr. Wells' clearly established Fourth and Fifth amendment rights.

233. A reasonable officer in Shepherd's circumstances would have known that providing bare assumption and speculation to Wanek would more likely than not result in Mr. Wells' arrest and prosecution without a valid legal basis.

234. Because of Defendant Shepherd's conduct in concert of action and in aiding and abetting the other Defendants, as described herein, Mr. Wells suffered the numerous violations of his property rights and liberty rights, as described herein, and Defendant Shepherd's conduct caused or substantially contributed to, *inter alia*, Mr. Wells' injuries described herein, to include the harm of being falsely arrested, maliciously prosecuted, and held from February 18, 2020, to September 9, 2020.


**COUNT SEVEN**
***BIVENS* CLAIM**
**Defendant Armstrong**

235. Plaintiff realleges and incorporates the foregoing paragraphs as if restated fully herein.

236. On February 9, 2020, Mr. Wells possessed the clearly established rights under the Fourth Amendment to the United States Constitution to be free from unreasonable search and seizure.

237. On February 9, 2020, Mr. Wells possessed the clearly established rights under the

Fifth Amendment to the United States Constitution to be free from deprivation of his liberty without due process of law.

238. The Supreme Court of the United States has held that a plaintiff may prosecute an action for money damages for injuries caused by federal officials for violations of Fourth Amendment rights. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 397 (1971).

239. Under color of law, Defendant Armstrong, as a military police officer, deprived and infringed upon Mr. Wells' clearly established rights secured by the United States Constitution, or other federal law, by, at least, blocking Mr. Wells' vehicle so as to detain Mr. Wells, depriving him of liberty without due process, and to unreasonably search and seize Mr. Wells and his effects without valid legal basis or applicable exception.

240. The claims stated in Counts One, Two, Three, Four, and Five are incorporated herein as if restated in full.

241. Defendant Armstrong, as a military police officer, lacked any jurisdiction or authority to detain Mr. Wells on February 9, 2020, because Mr. Wells was not on federal property.

242. By his own admission, and as corroborated by Defendant Fuentes, Defendant Armstrong used his vehicle to block Mr. Wells' vehicle on February 9, 2020.

243. A reasonable officer in Defendant Armstrong's circumstances on February 9, 2020, would have known that blocking Mr. Wells' vehicle as he did was a violation of Mr. Wells' clearly established Fourth and Fifth amendment rights.

244. Defendant Armstrong acted in concert of action with the other Defendants, as described herein, to deprive Mr. Wells of his clearly established rights, or, in the alternative, and without waiving the foregoing, Defendant Armstrong's actions as

described herein constituted a reckless or callous indifference to Mr. Wells' Fourth and Fifth Amendment rights.

245.    Because of Defendant Armstrong's conduct, as described herein, Mr. Wells suffered the numerous violations of his property rights and liberty rights, as described herein, and Defendant Armstrong caused or substantially contributed to, *inter alia*, Mr. Wells' injuries described herein, to include the harm of being falsely arrested, maliciously prosecuted, and held from February 18, 2020, to September 9, 2020.

### COUNT EIGHT
### *MONELL* CLAIM
### COUNTY OF ARLINGTON

246.    Plaintiff realleges and incorporates the foregoing paragraphs as if restated fully herein.

247.    A municipality may be liable for the unconstitutional conduct of its law enforcement officers for its formal policies, informal customs arising to law or policy, and if it fails to train its officers.  *Monell v. Department of Soc. Svcs.*, 436 U.S. 658 (1978).

248.    Municipal liability may arise for a policy or custom under *Monell* in four ways:

> (1) through an express policy, such as a written ordinance or regulation;
> (2) through the decisions of a person with final policymaking authority;
> (3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens'; or (4) through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

249.    Arlington County's widespread infringement upon Second Amendment rights has been evidenced by the historical practice of harassing law-abiding gun owners and, ultimately, is evidenced by the passing of an ordinance unlawfully prohibiting the keeping and bearing of arms in arbitrary and capricious ways.  ARLINGTON COUNTY, VA. CODE § 13-

11, *et seq.*[21]

250. Arlington County officers have shown a longstanding bias against arresting armed persons of color as observed by the Chief of Police, M. Jay Farr on July 1, 2020, that, despite only 10% of the County's population being black, 50.7% of the arrestees in 2019 were black and 60.4% of the weapon-related arrestees were black. M. Jay Farr & Nate Foster, 2019 ACPD ARRESTS AND TRAFFIC CITATION DEMOGRAPHIC ELEMENTS, 2-6, 2020.

251. Defendants Fuentes, Wanek, Barnickle, Lugasi, Soules, Kline, and Vanak were, at the relevant times described herein, employees or agents of the County of Arlington and the Arlington County Police Department and acted pursuant to the policies, practices, informal customs, or acted without sufficient training or supervision by their employers or managers, and the foregoing resulted in the unconstitutional acts herein described that resulted in or substantially contributed to the harms, injuries, and damages suffered by Mr. Wells as described herein.

252. The County of Arlington and its policies, practices, informal customs, and failure to train or supervise its officers in the constitutional rights of American citizens resulted in the harms and injuries Mr. Wells suffered, as described herein.

253. Specifically, the policy, practice, and customs evidenced by the manners in which Wanek and Barnickle sought and obtained the warrants described herein directly and proximately caused Mr. Wells to suffer the harms and injuries described herein.

---

[21] By way of example, the Arlington County ordinance codified the longstanding practice of harassing, detaining, and arresting lawful gunowners, particularly persons of color, who lawfully possess or open carry firearms in Arlington County; the ordinance explicitly makes illegal the mere possession of a firearm by an otherwise lawful gun owner who coincidentally drives on a public road near a permitted event. ARLINGTON COUNTY, VA. CODE § 13-14(1)(iv).

254. Furthermore, the lack or insufficiency of oversight, auditing, or other review of the policy, practice, or customary conduct of Wanek and Barnickle in their warrant application processes resulted in the numerous constitutional violations described herein.

255. The lack or insufficiency of a review of the ACPD's seizing and holding Mr. Wells' person from February 18, 2020, to September 9, 2020, on, at most, a misdemeanor charge, resulted in the harms described herein.

256. The lack of supervision over the process of the officers searching Mr. Wells' car and seizing his property on February 9, 2020, not incident to an impoundment.

257. The custom or practice in the ACPD that resulted in Barnickle having access to Mr. Wells' vehicle on February 18, 2020, prior to any photographs being taken, documenting the contents of the vehicle, resulted in, in part, Mr. Wells' harms described herein.

258. The custom, practice, or training of officers in how to properly evaluate items suspected to be stolen resulted in Wanek falsely stating the value of the Rifle Plate, as described herein.

## COUNT NINE
### FEDERAL TORT CLAIMS ACT
### UNITED STATES OF AMERICA

259. Plaintiff realleges and incorporates the foregoing paragraphs as if restated fully herein.

260. The Federal Tort Claims Act ("FTCA") permits suits against the United States as if they were claims against a private person under Virginia law. *See* 28 U.S.C. § 1346(b)(1).

261. Congress has explicitly waived sovereign immunity for claims against the United States for the conduct of its employees. 28 U.S.C. § 2674.

262. "Typically, an agent is jointly and severally liable with a principal for torts committed in the scope of the agent's employment." *Berman v. Grossman*, No. 1:09-cv-211, 2009 U.S. Dist. LEXIS 110252, at *16 (E.D. Va. Nov. 24, 2009) (citing *Miller v. Quarles*, 242 Va. 343, 347-48 (1991) and *McLaughlin v. Siegel*, 166 Va. 374, 376-77 (1936)).

263. "Under Virginia law, a court can also hold an employer liable for an employee's intentional tort if it finds sufficient grounds upon which to do so." *Berman* at *16 (citing *Giant v. Enger*, 257 Va. 513 (1999)).

264. The United States is liable to Mr. Wells under the doctrines of *respondeat superior* and vicarious liability for the wrongful conduct of Shepherd and Armstrong while they were acting as agents and employees of the United States and operating within the scope of their employment therefor, as described herein.

265. During the time periods relevant to Mr. Wells' claims, Shepherd and Armstrong were employees of the United States within the meaning of the FTCA and were acting within the scope of such employment. *See* 28 U.S.C. 2671, *et seq.*

266. On February 8, 2022, Mr. Wells submitted his claims to the appropriate agencies of the United States for the damages Shepherd and Armstrong caused, as described herein.

267. The United States has not responded within six months and, therefore, the lack of response is deemed a final denial of the claim and thus the District Court has jurisdiction over Plaintiff's claims against the United States pursuant to 28 U.S.C. § 2675.

268. Shepherd and Armstrong's conduct, described herein, constituted negligent, willful, reckless, or intentional torts proximately and directly causing injury to Mr. Wells

resulting in harm in excess of $6,134,000.00 as well-pleaded on the Form 95 submitted on February 8, 2022, to Fort Myer, the Department of Defense, and the Department of the Army by mail, facsimile, and by email.

**WHEREFORE**, the premises considered, Plaintiff Curtis Wells prays this Honorable Court enter judgment in favor of Plaintiff Curtis Wells and against Defendants Javier Fuentes, Scott Wanek, Michael P. Armstrong, Ashley Barnickle, Lauren Lugasi, Kimberly Soules, Austin Kline, John Vanak, Keith Shepherd, County of Arlington, and John and Jane Does 1-10, and the United States of America, jointly and severally, as follows:

    a. $6,500,000.00 in compensatory damages, or such greater amount as found by the jury at trial;

    b. Costs related to bringing this action pursuant to 42 U.S.C. § 1988 *et seq*;

    c. Attorney's fees and litigation costs pursuant to 42 U.S.C. § 1988 *et seq*;

    d. All other and additional remedies, damages, or harms as allowable by law and determined by a jury to be just in light of the circumstances; and,

    e. Such other and additional relief as the Court may deem reasonable and just; plus,

    f. $350,000.00 in punitive damages pursuant to Va. Code § 19.2-59 and common law punitive damages against Javier Fuentes;

    g. $350,000.00 in punitive damages pursuant to Va. Code § 19.2-59 and common law punitive damages against Scott Wanek;

    h. $350,000.00 in punitive damages pursuant to Va. Code § 19.2-59 and common law punitive damages against Michael P. Armstrong;

    i. $350,000.00 in punitive damages pursuant to Va. Code § 19.2-59 and common law punitive damages against Ashley Barnickle;

j.    $350,000.00 in punitive damages pursuant to Va. Code § 19.2-59 and common

law punitive damages against Lauren Lugasi;

k.    $350,000.00 in punitive damages pursuant to Va. Code § 19.2-59 and common

law punitive damages against Kimberly Soules;

l.    $350,000.00 in punitive damages pursuant to Va. Code § 19.2-59 and common

law punitive damages against Austin Kline;

m.    $350,000.00 in punitive damages pursuant to Va. Code § 19.2-59 and common

law punitive damages against John Vanak; and

n.    $350,000.00 in punitive damages pursuant to Va. Code § 19.2-59 and common

law punitive damages against Keith Shepherd.

**TRIAL BY JURY IS DEMANDED ON ALL ISSUES SO TRIABLE.**

**PLAINTIFF REQUESTS A BIFURCATED BENCH TRIAL FOR ALL CLAIMS AGAINST THE UNITED STATES.**

**Dated August 10, 2022.**

Respectfully submitted,

Curtis Wells,

By:_____/s/_____
Counsel

Matthew A. Crist, VSB No. 85922
mcrist@MACPLLC.net
Matthew A. Crist, PLLC
10432 Balls Ford Rd., Suite 300
Manassas, VA 20109
(571) 551-6859
***Counsel for Plaintiff***