IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

CURTIS LEVAR WELLS, JR.,

   Plaintiff,

v.                                Case No. 1:22-cv-00140-MSN-IDD

JAVIER FUENTES, SCOTT WANEK,
MICHAEL P. ARMSTRONG, ASHLEY
BARNICKLE, LAUREN LUGASI,
KIMBERLY SOULES, AUSTIN KLINE,
JOHN VANAK, KEITH SHEPHERD,
COUNTY OF ARLINGTON, ARLINGTON
COUNTY POLICE DEPARTMENT AND
JOHN AND JANE DOES 1-10,

   Defendants.

**BRIEF IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT
ON BEHALF OF DEFENDANTS FUENTES, LUGASI, SOULES, KLINE, AND VANAK**

On February 9, 2020, several Arlington County Police Department ("ACPD") officers[1]

responded to a call for assistance from Military Police Officer Michael P. Armstrong

("Armstrong"), who was assigned to Joint Base Meyer-Henderson Hall ("JBM-HH").

Armstrong had allegedly detained Plaintiff Curtis Levar Wells, Jr., who was in the driver's seat

of his improperly registered Ford Mustang in a parking spot adjacent to Arlington National

Cemetery. Knowing the Mustang could not be lawfully operated in Arlington County, the

officers prepared to tow it and conducted an inventory search. In addition to an AR-15 rifle and

a Glock handgun that had already been removed from the car, they found five fully loaded

magazines for the AR-15 (constituting 150 rounds of ammunition), U.S. Army patches, a

crowbar, two face masks, two vests with bullet proof armor, a smoke grenade, a Texas license

---

[1] Defendants Fuentes, Lugasi, Soules, Kline and Vanak will be referred to collectively as the
"ACPD Officers."

plate, two walkie talkies, and a handwritten list of weapons and equipment that Plaintiff had or needed to purchase.

Plaintiff now claims that his Second and Fourth Amendment rights were violated at every turn of this interaction with ACPD officers. But even if Armstrong lacked reasonable suspicion for the initial alleged detention of Wells, no ACPD officer was involved in or responsible for that decision. Moreover, each action of the ACPD officers—including citing Plaintiff for traffic offenses, towing his car, and placing his inherently dangerous property in safekeeping until Plaintiff could safely retrieve it—did not violate Plaintiff's clearly established constitutional rights. Plaintiff's claims to the contrary are inconsistent with both the law and the documents on which he purports to rely in the Second Amended Complaint. He does not state a claim against the ACPD Officers, they are entitled to qualified immunity, and all claims against them in the Second Amended Complaint should be dismissed with prejudice.

## ALLEGATIONS

### I.     February 9, 2020[2]

#### A.     Plaintiff was allegedly detained by Military Police Officer Armstrong.

Plaintiff alleges that on February 9, 2020 he was seated in a car parked[3] in a lot adjacent to Arlington National Cemetery. ECF No. 48 ¶¶ 1, 27 n.1, 35. According to Plaintiff,

---

[2] Plaintiff's allegations regarding the events of February 9, 2020 purport to rely on an audio recording, captured by Officer Soules, of portions of Plaintiff's interactions with police. *See e.g.*, ECF No. 48 ¶ 47 n.4. Because the audio recording directly contradicts many of Plaintiff's allegations, and because Plaintiff declined to attach it as an exhibit to his Amended Complaint, the Officer Defendants respectfully attach it as **Exhibit 1** here. *See Gasner v. County of Dinwiddie*, 162 F.R.D. 280, 282 (E.D. Va. 1995) (holding that a court may consider documents quoted, relied upon, or incorporated by reference in the complaint in ruling upon a motion to dismiss).

Armstrong, parked a police cruiser behind Plaintiff's vehicle, impeding Plaintiff's ability to leave. *Id.* ¶¶ 10, 35. Plaintiff asserts that by blocking his exit and approaching his vehicle, Armstrong "placed him in apprehension" that he was detained and not free to leave. *Id.* ¶ 39. Armstrong then called for assistance from ACPD.

### B. The ACPD Officers responded to a call for assistance.

ACPD Officer Javier Fuentes ("Officer Fuentes") responded to Armstrong's call for assistance pursuant to Virginia Code § 15.2-1728 and a Memorandum of Understanding between JBM-HH and the County Board of Arlington County, Virginia. *See* **Exhibit 3, Memorandum of Understanding**.[4] The Memorandum of Understanding provides that JBM-HH law enforcement may request support and assistance from ACPD "to mitigate situations or threats on the JBM-HH reservation." Ex. 3 ¶ 5a. ACPD officers may then "support, assist, and render aid to [JBM-HH] Police Officers in the performance of their duties." *Id.* ¶ 5b.

---

[3] Although Plaintiff alleges that he was legally parked at the time he encountered law enforcement officers, public court records belie that allegation. The Court may properly consider such public records here. *See Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004). Those records show that, as a result of the February 9, 2020 incident, Plaintiff was charged with and found guilty of a violation of Virginia Code § 46.2-612. This section prohibits the display of a vehicle registration, license plate, or decal that is **fictitious, cancelled, revoked, or assigned to another vehicle**, not merely an expired registration as Plaintiff asserts. ECF No. 48 ¶ 27; Va. Code § 46.2-612(B)(1). *See also Commonwealth v. Wells*, No. GT20007396-00 (Arlington Gen. Dist. Ct. Feb. 28, 2020) and **Exhibit 2**. Violation of this statute is a class two misdemeanor. Moreover, no vehicle that is not lawfully registered may be parked in any public place in Arlington County. ARLINGTON COUNTY, VA. CODE § 14.2-2(A)(2). Accordingly, Plaintiff's vehicle was not legally parked at the time he was contacted by law enforcement.

[4] In evaluating a motion to dismiss, the court may properly take judicial notice of matters of public record. *Hall*, 385 F.3d at 424 n.3 (noting it was proper during Rule 12(b)(6) review to consider "publicly available [statistics] on the official redistricting website of the Virginia Division of Legislative Services."). Arlington County has made the Memorandum of Understanding publicly accessible at https://public.powerdms.com/ARLVAPD /tree/documents/175.

Officer Fuentes approached Plaintiff and asked him to step out of his Mustang. ECF No. 48 ¶ 50. Officer Fuentes also asked Plaintiff if he were in possession of any firearms. *Id.* Plaintiff apparently acknowledged having guns in the Mustang. *Id.* ¶ 52. Officer Fuentes took possession of those weapons, an AR-15 and a Glock handgun, for the duration of the stop. *Id.* Plaintiff was placed in handcuffs while officers conducted their investigation. ECF *Id.* ¶ 49.

At the conclusion of Officer Fuentes's investigation, he cited Plaintiff for operating his vehicle while not in possession of his Virginia driver's license, in violation of Va. Code § 46.2-104.[5] Exhibit 2. In addition, Plaintiff's Mustang bore a fictitious, cancelled, revoked, or otherwise improper registration, in violation of Va. Code § 46.2-612. Exhibit 2. This statute prohibits displaying a revoked or fictitious vehicle registration, and its violation is a class two misdemeanor.

### C.    The Mustang had to be towed from the scene.

Because the Mustang bore a revoked or fictitious registration, it could not be lawfully driven or parked on the streets of the Commonwealth or Arlington County. ARLINGTON COUNTY, VA. CODE § 14.2-2(A)(2). Accordingly, the ACPD Officers had no option other than to tow the Mustang from the scene. The ACPD Officers repeatedly discussed these

---

[5] Plaintiff implies he should not have been charged with this offense because he was in possession of a Texas driver's license. ECF No. 48 ¶ 47 n.4. Plaintiff told the officers that he had a Virginia driver's license. Exhibit 1 at approximately 4:47:50. Virginia law—and that of most if not all states—prohibits possessing driver's licenses issued by more than one state. *See* Va. Code § 46.2-483 (enacting the Driver's License Compact, Article V § 3 of which requires an applicant for a Virginia license to surrender and license held in another state); Va. Code § 46.2-323 ("The Department, as a condition for the issuance of any driver's license… shall require the surrender of any driver's license … issued by another stated and held by the applicant."). Accordingly, Plaintiff's conclusory assertion that the Texas license he possessed on February 9, 2020 was valid is without basis in the law. In fact, Plaintiff's possession of a Texas license was an additional example of a potentially fraudulent or fictitious document in his possession at the time he was contacted by law enforcement. The Commonwealth had issued Plaintiff a Virginia driver's license, and it was not in his possession on February 9, 2020. He was appropriately charged with violating § 46.2-104.

circumstances with Plaintiff throughout the course of the stop. For example, Officer Kimberly Soules ("Officer Soules") asked Plaintiff if he had any friends in the area who could come to the scene to pick him up because officers had to tow his car. Exhibit 1 beginning at approximately 4:38:35 P.M. Ten minutes later, an unidentified male ACPD officer approached Plaintiff to tell him that his vehicle had to be towed. Exhibit 1 beginning at approximately 4:48:12. That officer asked Plaintiff, "Do you know what's happening?" *Id.* Plaintiff responded "Well, it's got to be towed, and I've got to figure out what's going on with the weapons." *Id.* Plaintiff then asked the officer, "Can I, like, buy you dinner? Is there anything I can do to not get towed?" *Id.* The officer responded, "No, man, unfortunately I have to tow it. It's beyond that at this point." *Id.* Fourteen minutes later, an officer approached Plaintiff again to explain that he had to give a sheet of paper to the tow driver. Exhibit 1 beginning at approximately 5:02:00. Officer Soules then explained that Plaintiff would receive a card with the address of where the Mustang was being towed. Exhibit 1 beginning at approximately 5:02:30.

Approximately thirteen minutes later, and about thirty-seven minutes after first being told that his car had to be towed and after the inventory search, discussed *infra*, had been completed, Plaintiff asked, "I'm thinking what if I could pay the tow and impound—just pay for it—and they wouldn't have to actually bring it there, and they could just tow it to my property and just pay the additional fee?" Exhibit 1 beginning at approximately 5:15:29. A male officer responded, "Because we called it [the tow], they have to take it to their lot. […] Now you can pay them and have them take you home afterward. You can go there and be like, 'Hey, do you mind just taking it to my house. I'll pay you for it.' That'd be between you guys." *Id.*

Plaintiff acknowledged to the officers that he understood the process they were following. Plaintiff stated, "This is the one time I've been in any sort of law enforcement

situation where it makes sense. It's clear. Why can't it always be this smooth? This is how it should be." Exhibit 1 beginning at approximately 4:50:15.

### D. The ACPD Officers complete an inventory search.

Because the Mustang had to be towed, the ACPD Officers completed an inventory search of the vehicle. In addition to the AR-15 rifle and Glock handgun, ACPD Officers located items including five fully loaded magazines for the AR-15 (constituting 150 rounds of ammunition), U.S. Army patches, a crowbar, two face masks, two vests with bullet proof armor, a smoke grenade, a Texas license plate, two walkie talkies, and a handwritten list of weapons and equipment that Plaintiff had or needed to purchase. See Detective Barnickle's Search Warrant, attached as **Exhibit 4** at 6-7.[6] Officers also recovered a medium Ceradyne, Inc. rifle plate with serial number 2923205 (the "rifle plate"), as well as a "handwritten list of chemical compounds that have potential to make the human body bulletproof or even invincible." *Id.* A full copy of this list, a small portion of which Plaintiff included in his Second Amended Complaint in Paragraph 99, is attached as **Exhibit 5.**

---

[6] "On a motion to dismiss, "a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint." *Dangerfield v. WAVY Broadcasting, LLC*, 228 F. Supp. 3d 696 (E.D. Va. 2017) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011)). "When a document is integral to and explicitly relied on in the complaint, and the opposing party does not challenge the authenticity, a court may consider a document outside the complaint when evaluating a motion to dismiss." *Id.* (quotation omitted). "Finally, when an external document that is incorporated into the complaint conflicts with Plaintiff's allegations, the external document controls." *Id.* In *Dangerfield*, the court considered a search warrant affidavit in evaluating a motion to dismiss because it was integral to the allegations in the Complaint and was a public record. The same analysis should apply here. Detective Barnickle's search warrant, including her Statement of Material Facts in support of her search warrant affidavit, is a public record filed in the Circuit Court of Arlington County. Without attaching it as an exhibit to his Complaint, Plaintiff purports to rely Detective Barnickle's Search Warrant. *See* ECF No. 48 ¶¶ 118-126. Accordingly, the Search Warrant is both a public record and is fairly incorporated into the Amended Complaint, and the Court may consider it in reviewing a motion to dismiss pursuant Federal Rule of Civil Procedure 12(b)(6).

Officers discussed some of the items located in the Mustang with Plaintiff on the scene of the traffic stop. An officer asked Plaintiff, "You can tell why we're freaked out, right?" Exhibit 1 beginning at approximately 4:59:03. Plaintiff responded that he "one hundred percent" understood. *Id.* An officer began to ask Plaintiff about a paper found in his car with "a bunch of scientific…" Exhibit 1 beginning at approximately 4:59:15. Plaintiff interrupted the officer by exclaiming, "Don't lose those! That's my stack for nootropics." *Id.* The officer then proceeded to ask about the paper referencing compounds to "make you bulletproof." *Id.* Plaintiff reacted incredulously, but then declared that he is an "education guy" who prefers that to other activities when he is bored. *Id.* The officer followed up by asking, "I'm bored, so let's make myself bulletproof?" *Id.* Plaintiff responded, "Fuck yeah." *Id.* Plaintiff then stated that he believed the officers were misreading the note, explaining that he had done a series of studies on "nootropics" and "ballistics." *Id.*

**E.     The ACPD Officers talked to Plaintiff about his firearms.**

Officer Soules told Plaintiff that, because officers could not simply leave all of his valuable property in the vehicle, Plaintiff could arrange for a friend to come pick up both him and his property, or officers would take it for safekeeping until Plaintiff could retrieve it at his convenience. *Id.* Plaintiff responded by inquiring if those were his only options and asking "I can't skip over that?" *Id.* at approximately 4:39:40. Officer Soules responded "I would prefer you not to…" *Id.* Plaintiff later specifically asked if he could take his Glock handgun. *Id.* at approximately 4:42:50. Although Officer Soules's response is inaudible, Plaintiff replied by asking to confirm that he could not carry the handgun on his person. *Id.*

The ACPD Officers discussed with Plaintiff how they would handle his property— including his firearms—in light of the necessity of towing his vehicle. An officer told Plaintiff,

"You can take all your stuff. We're going to make sure—whatever you don't need and you don't want to, like, take, we'll throw it back in the car so it can go with the car. Whatever you want to take, which will probably be the weapons and whatever else will go with you. Do you have somebody who can pick you up from here?" Exhibit 1 beginning at approximately 4:48:30. Plaintiff responded that he "would even be for leaving everything in the trunk." Exhibit 1 beginning at approximately 4:48:50. An unidentified officer responded "I don't know if we can leave the weapons in there, though." *Id.* Officer Soules followed up by stating "Anytime we tow a car, if there's anything—I mean if you had like, the Hope Diamond in there, we couldn't just throw it in the trunk and let them tow it. We'd have to put it in property for safekeeping." *Id.* The unidentified officer then explained, "Yeah, we can take it to our property, exactly like she said, for safekeeping. We give you a paper receipt, and then whenever you're ready you just go pick it up. Take an ID and that paper receipt. But we'd prefer if somebody picked you up and you can just take whatever you need and be done with it." *Id.*

Plaintiff was unsuccessful in contacting anyone to give him a ride. Exhibit 1 beginning at approximately 5:20:10. Accordingly, Plaintiff told the officers he did not want them to have to stay out with him any longer than necessary and that he would "figure it out." *Id.* The officers then provided Plaintiff a copy of the property retrieval form for his property that would be held in safekeeping. *Id. See also* ECF No. 48-3. Plaintiff signed that form. *Id.*

### F. Plaintiff was convicted of the traffic offenses.

The two traffic offenses with which Officer Fuentes charged Plaintiff went to trial on February 28, 2020 in the General District Court of Arlington County. Exhibit 2. Plaintiff received notice of this court date and time during his February 9, 2020 encounter with the ACPD Officers. *Id.* Although the court's orders are ambiguous, Plaintiff alleges that he was not

physically present in court on that day. ECF No. 48 ¶ 60. Instead, Plaintiff claims that "the Commonwealth did not produce Mr. Wells to defend against the citations." *Id*. Plaintiff alleges, without reference to any supporting facts, that Officer Fuentes "knew" Plaintiff was in custody on the date of his trial and was "obligated" to inform the general district court judge of that fact. *Id.* ¶ 60. Plaintiff acknowledges that he was represented by counsel prior to February 28, 2020. *Id.* ¶ 57. Plaintiff did not appeal his convictions. *See Commonwealth v. Wells*, No. GT20007396-00 (Arlington Gen. Dist. Ct. Feb. 28, 2020).

## II.     Detective Wanek's Investigation

Plaintiff alleges that on February 10, 2020, Detective Scott Wanek ("Detective Wanek") opened some of the property that had been placed in ACPD safekeeping. ECF No. 48 ¶ 80. Among the items opened was soft body armor. *Id.* Plaintiff claims that Detective Wanek stated in his notes from that day that he assumed that Plaintiff stole the rifle plate from the United States government. *Id.* ¶ 81. Plaintiff further alleges that Wanek's notes show that he was aware that the rifle plate was removed from service in 2016. *Id.* ¶ 82.

Detective Wanek's notes dated February 10, 2020 do not so reflect. *See* **Exhibit 6**, Detective Wanek's Notes Dated February 10, 2020. Instead, they show that Detective Wanek learned from "Fort Meyer that [Plaintiff] had been involuntarily separated from U.S. Army service on or about May 3, 2019." Exhibit 6 at 1. They further show that Detective Keith Shepherd of the JBM-HH Police Department ("Shepherd") informed Detective Wanek that the rifle plate had been delivered to the U.S. Army in 2011 and subsequently transferred to JBM-HH. *Id.* at 2. Detective Shepherd further stated that out-processing military personnel cannot retain rifle plates upon separation from service, that rifle plates are destroyed when they become unserviceable, and that each plate is valued at $590.00. In addition, Detective Wanek learned

that JBM-HH law enforcement did a search for stolen property reports and found that rifle plates had been stolen from Plaintiff's unit shortly before his separation from the military. *Id.* at 2-3. According to Plaintiff, Shepherd confirmed having given this information to Detective Wanek in subsequent testimony. ECF No. 48 ¶ 88.

Detective Wanek's notes further reflect his interviews with Plaintiff's former squad mates. *Id.* at 2. These witnesses described Plaintiff as a compulsive liar, thief, and poor soldier. *Id.* The notes do not reflect Detective Wanek's receipt of any information that the value of the rifle plate was less than $500 prior to his petitioning for a warrant for Plaintiff's arrest on February 14, 2020. Ex. 6.

In addition to Plaintiff's assertions regarding Detective Wanek's knowledge of the origin and value of the rifle plate, Plaintiff claims that the rifle plate "was obviously unserviceable and in extremely bad condition," such that Detective Wanek should have understood the plate to have no value. ECF No. 48 ¶ 104. In support of this contention, Plaintiff includes portions of a series of photos taken by officers on February 9, 2020 when the rifle plate was placed in safekeeping. ECF No. 48 ¶¶ 108-09. Full versions of these photos are attached as **Exhibit 7**.

Plaintiff maintains that Detective Wanek withheld his alleged knowledge of the origin, value, and condition of the rifle plate from the magistrate on February 14, 2020 and subsequently from the Commonwealth's Attorney. ECF No. 48 ¶¶ 113-114.

On February 18, 2020, Plaintiff met with and was interviewed by Detective Wanek and a federal agent. ECF No. 48 ¶ 115. During the course of that interview, Wells admitted in a written statement that he kept the rifle plate despite knowing that it did not belong to him "because [he] didn't want to put in the time and energy to return it." **Exhibit 8, Written**

**Statement of Plaintiff**.[7]  Plaintiff asserts that he only made these statements in response to Detective Wanek's statement that the "truth will set you free."  ECF No. 48 ¶¶ 139-42.  Detective Wanek's notes reflect that, prior to his interviewing Plaintiff, he observed Plaintiff by video rehearsing his story about the rifle plate, before he had even been told that he was suspected of stealing the rifle plate.  Ex. 6 at 4.

After receiving this statement from Plaintiff, Detective Wanek served him with the outstanding arrest warrant for receipt of stolen property, in violation of Va. Code § 18.2-108.  ECF No. 48 ¶ 146.

On March 16, 2020, the General District Court conducted a preliminary hearing.  *See Commonwealth v. Wells*, No. GC20000810-00 (Arlington Gen. Dist. Ct. 2020).  The General District Court found that probable cause existed to certify the charge to the grand jury.  *Id.*  The grand jury issued a true bill on March 30, 2020.  *Commonwealth v. Wells*, No. CR20000235-00 (Arlington Cir. Ct. Sept. 29, 2020).  With regard to the evidence presented at the preliminary hearing, Plaintiff claims that Detective Wanek stated that Plaintiff "recognized that [the Rifle Plate] was a serialized piece of issued equipment from Fort Myer, and he indicated that he took it from someone in the barracks."  ECF No. 48 ¶ 138.

On August 17, 2020, the Circuit Court of Arlington County granted Plaintiff's motion to suppress the evidence obtained from the Mustang.  **Exhibit 9**.  The court found that the Commonwealth had not presented sufficient evidence to show that the procedures surrounding the inventory search met the standards outlined in *Cantwell v. Commonwealth*, 65 Va. App. 53, 60, 774 S.E.2d 469 (2015).  *Id.*  The court specifically disclaimed any determination as to the

---

[7] Plaintiff purports to attach this statement to the Second Amended Complaint as ECF No. 48-5, but appears to have inadvertently attached the incorrect document.

lawfulness of Armstrong's encounter with Plaintiff, or whether the decision to impound the Mustang was lawful. *Id.*

## III. Detective Barnickle's Search of the Pontiac

On February 18, 2020, Plaintiff arrived at the ACPD property storage area driving a Pontiac. ECF No. 48 ¶ 115. He claims to have parked in "the courthouse parking lot." *Id.* According to Plaintiff, Detective Barnickle seized the Pontiac at 1:17 P.M. upon receiving the keys from Detective Wanek. ECF No. 48 ¶¶ 116, 118. A tow truck arrived to tow the Pontiac to ACPD's impound lot at 1:50 P.M. ECF No. 48 ¶ 133. Detective Barnickle subsequently obtained a search warrant for the Pontiac, which issued at 4:39 P.M.[8] *See* Search Warrant, attached as **Exhibit 4** at 1.

Plaintiff asserts that "there is a contradiction" between the narrative of the Tactical Team that observed the Pontiac and Detective Barnickle's Investigative Supplement. ECF No. 48 ¶ 133. Detective Barnickle, however, stated that the tactical team observed the Pontiac until she arrived to take possession of it at 1:17 P.M. **Exhibit 10, Detective Barnickle's Investigative Supplement** at 2.

Plaintiff further claims that Detective Barnickle must have searched his vehicle prior to obtaining the search warrant because Paragraph 13 of the Statement of Material Facts attached to her search warrant affidavit stated that the Pontiac "contained evidence to include a personal communication device." ECF No. 48 ¶ 119; *see also* **Exhibit 4** at 9. According to Plaintiff, because this single sentence of the Statement of Material Facts used the past tense, the only logical conclusion is that Detective Barnickle had already searched the Pontiac at the time she

---

[8] Plaintiff incorrectly alleges that the search warrant issued at 4:50 P.M. ECF No. 48 ¶ 116.

applied for the search warrant. ECF No. 48 ¶ 121. Plaintiff bases this assumption on Detective Barnickle's statement that she retrieved Plaintiff's cell phone "from the center console." *Id.*

In her investigative supplement, Detective Barnickle explained that she, in fact, retrieved Plaintiff's cell phone from the center console at 4:50 P.M. after obtaining the search warrant for the Pontiac. Exhibit 10 at 1. Plaintiff also appears to assume, without justification, that no part of the center console of the Pontiac was visible without physically entering the vehicle. ECF No. 48 ¶ 121.

Moreover, Detective Barnickle explained the basis for her belief that the Pontiac would contain evidence, including a cell phone, in the remainder her of Statement of Material Facts. She identified the items found inside the Ford Mustang during the inventory search, as well as other information obtained during the investigation prior to February 18, 2020. Exhibit 4 ¶¶ 1-2. Detective Barnickle identified specific information Detective Wanek had received from the JBM-HH Police Department as follows:

> Your Affiant learned that Joint Base Myer-Henderson Hall Police Department Investigations Branch did a search for cases of stolen property with a focus on Medium Ceradyne, Inc. rifle plates and discovered a Larceny of Government and Personal Property Case #00421-2019-MPC041 reported on March 29, 2019. This case occurred in Echo Company, 4/3 Infantry Regiment shortly before Wells [*sic*] departure from the U.S. Army. A review of the Case found several pairs of Medium Ceradyne, Inc. rifle plates were stolen along with a large amount of U.S. Government and personal tactical equipment, the total value over $5,000.00. Because of this recent incident, Wells has been identified as a "Person of Interest" in the 2019 Larceny case due to his possession of a similar plate and the proximity of his departure from the Military.

**Exhibit 4 ¶ 9.**

In addition, Detective Barnickle noted that, based on "her training and experience … suspects attempting to buy and sell stolen property tend to use personal communication devices,

such as personal computers and smartphones, to coordinate the sales." **Exhibit 4** at ¶ 12. Detective Barnickle noted that Plaintiff arrived at ACPD on February 18, 2020 driving the Pontiac, "which contained evidence to include a personal communication device." *Id.* ¶ 13. Detective Barnickle went on in her affidavit to explain that, because people often travel with their phones, "[i]t is, therefore, reasonable to believe that computers, tablets, wireless telephones, and other electronic storage media may be present" in the 2008 Pontiac. **Exhibit 4** ¶ 15.

Detective Barnickle later assisted in the execution of the search warrant on the Pontiac. Among the items recovered was a bag containing controlled substances. ECF No. 48 ¶ 128. Plaintiff alleges that Detective Barnickle, "or another officer, had the motive, means, and opportunity to plant the bag of drugs in the map pocket of the vehicle prior to the photographs being taken the day after the vehicle was impounded." ECF No. 48 ¶ 130.

Plaintiff received three additional charges related to drug possession following the execution of the search warrant on the Pontiac. *Commonwealth v. Wells*, No. GC2000250, 52, 53 (Arlington Gen. Dist. Ct. July 24, 2020). Those charges were certified to the grand jury on July 24, 2020, which issued a true bill on July 27, 2020. *Id.*; *Commonwealth v. Wells*, No. CR20000418, 419, 444 (Arlington Cir. Ct. Apr. 1, 2021). The Commonwealth's Attorney subsequently moved to *nolle prosequi* the charges on April 1, 2021. *Id.*

## CLAIMS AND PROCEDURAL POSTURE

Plaintiff filed the original Complaint, ECF No. 1, in this matter on February 8, 2022. All Defendants moved to dismiss that Complaint on June 14, 2022. ECF Nos. 22, 32. Rather than respond to those motions, Plaintiff filed an Amended Complaint July 5, 2022. ECF No. 38. Plaintiff subsequently sought leave to file a Second Amended Complaint, which was filed on August 22, 2022. ECF No. 48.

The Second Amended Complaint advances claims against twelve defendants in nine counts. In Count 1, Plaintiff asserts that Officer Fuentes, Officer Soules, Officer Kline, Officer Lugasi, Armstrong, Officer Vanak, Detective Wanek, and Detective Barnickle violated his rights under the Fourth Amendment to the United States Constitution. Count 2 purports to state a claim against Officer Fuentes, Detective Wanek, Officer Soules and Arlington County for violation of the Second and Fourteenth Amendments to the United States Constitution. Count 3 advances a claim for False Imprisonment under Virginia common law against Armstrong, Officer Fuentes, Officer Soules, Officer Kline, Officer Vanak, Officer Lugasi, and Detective Wanek. Count 4 alleges a claim of malicious prosecution under Virginia common law against Detective Wanek, Officer Fuentes, Officer Lugasi, Officer Soules, and Shepherd. Count 5 is a Virginia statutory claim under Va. Code § 19.2-59 purportedly against Officer Fuentes, Officer Lugasi, Officer Soules, Officer Kline, Officer Vanak, Detective Wanek, and Detective Barnickle.

The remaining four counts are not addressed to any ACPD officer.

## LEGAL STANDARD

The purpose of a motion to dismiss is "to test the legal sufficiency of the Complaint." *Randall v. U.S.,* 30 F.3d 518, 523 (4th Cir. 1994). "To survive a motion to dismiss, a Complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is "plausible" when the plaintiff pleads facts sufficient to allow the court to draw the reasonable inference that the defendant is liable for the alleged misconduct. *Twombly,* 550 U.S. at 556. A court should grant a motion to dismiss, however, where the allegations are nothing more than legal conclusions, or where they permit a court to infer no more than a possibility of misconduct. See *Iqbal,* 556 U.S. at 678–79. Thus, where a

Complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*. at 678.

The Court need not accept legal conclusions that are presented as factual allegations, *id*. at 555, or "unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). "[L]abels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a Complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557); see also, *Tobey v. Jones*, 706 F.3d 379, 387–88 (4th Cir. 2013).

## ARGUMENT

### I.     Plaintiff cannot rely on a theory of "concert of action."

Much like the original Complaint, the Second Amended Complaint repeatedly invokes a theory of "concert of action" in an apparent attempt to hold each Defendant responsible for the decisions and actions of each other Defendant in this action. *See, e.g.*, ECF No. 48 ¶¶ 169, 170, 181. Plaintiff's invocation of this theory is inconsistent with the Fourth Circuit's instruction that a plaintiff affirmatively show "that the official charged acted personally in the deprivation of the plaintiff's rights." *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985).

"Liability under § 1983 has always been personal in nature." *Arebaugh v. Dalton*, 600 F. Supp. 1345, 1348 (E.D. Va. 1985). "Each defendant is entitled to have his case considered individually." *Id.* (citing *Rizzo v. Goode*, 423 U.S. 362, 371-72 (1976)). "[A] plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009); see also, *Parker v. Keen*, 7:16-CV-00568, 2017 WL 1234077 (W.D. Va. April 4,

2017); *Trulock v. Freeh*, 275 F.3d. 391, 402 (4th Cir. 2001) ("[L]iability is personal, based upon each defendant's own constitutional violations."); *Octave v. Wade*, No. 3:16-CV-00338-JAG, 2017 WL 465467, at *3 (E.D. Va. Feb. 3, 2017) ("[T]he culpability of one government official does not infect his or her colleagues by osmosis.").

This point is particularly salient as to Officers Vanak, Kline, and Lugasi, who are merely alleged to have assisted in the inventory search of the Mustang. These officers did not cite Plaintiff for any violations. They did not subsequently obtain any warrants for Plaintiff's arrest. They did not take possession of Plaintiff's firearms and they did not institute any process against him. Plaintiff merely seeks to hold them responsible for the actions of other officers. This theory of liability is insufficient to state a claim against them.

Accordingly, to the extent Plaintiff relies on this theory—by which an officer could be held responsible for the unspecified actions of her colleagues—as to any of the ACPD Defendants, the Second Amended Complaint does not state a claim.

## II.  Standard for Qualified Immunity

Qualified immunity[9] provides immunity from suit rather than a mere defense to liability. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Thus, it should be resolved at the earliest possible stage of litigation. *Anderson v. Creighton*, 483 U.S. 635, 646, n.6 (1987) (emphasis added). Indeed, qualified immunity "is effectively lost if a case is erroneously permitted to go to trial." *White v. Pauly*, 137 S. Ct. 548, 551–52 (2017). The safe harbor of qualified immunity ensures that public employees will not be liable for bad guesses in gray areas, but only for transgressing bright lines. *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

---

[9] Because the analysis applicable to each of Plaintiff's claims includes assessments of both whether Plaintiff's allegations describe a violation of the constitution, and whether that alleged violation was clearly established at the time it occurred, the ACPD Officers outline the standard for qualified immunity here, on which they will rely through their Brief.

The Supreme Court has outlined a two-pronged test governing qualified immunity. The first prong considers whether the facts, viewed in the light most favorable to the plaintiff, make out a violation of a constitutional right. If they do, the second prong considers whether the constitutional right in question was "clearly established" at the time of the defendants' alleged violation. *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009). The Court has discretion to determine which prong to address first. *Hunsberger v. Wood*, 570 F.3d 546, 552 (4th Cir. 2009). A clearly established right is not discussed in a generalized fashion, but instead must be defined at a high level of particularity. *Wilson v. Kittoe*, 337 F.3d 392, 403 (4th Cir. 2003). The Supreme Court has reiterated that "clearly established law must be 'particularized' to the facts of the case . . . [o]therwise, plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *White*, 137 S. Ct. 548, 552 (2017) (emphasis added).

The Supreme Court has stated that,

> [A] court must ask whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted. If so, then the defendant officer must have been either incompetent or else a knowing violator of the law, and thus not entitled to qualified immunity. If not, however—i.e., if a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability.

*Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017). "[I]n other words, the legal question must be 'beyond debate.'" *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 725 (E.D. Va. 2015) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)).

**III.    The ACPD Officers did not violate Plaintiff's Fourth Amendment rights as alleged in Count I.**

    **A.    Officer Fuentes did not violate the Fourth Amendment in responding to assist Officer Armstrong.**

Count I of the Second Amended Complaint first appears to contend that ACPD officers—Officer Fuentes in particular—seized Plaintiff in the absence of reasonable suspicion that he had committed a crime.  It is not clearly established, however, that Officer Fuentes violated the Fourth Amendment to the United States Constitution by relying on Officer Armstrong's decision—made prior to Officer Fuentes's arrival—that good cause existed to detain Plaintiff.  In fact, courts have consistently held that police officers "in one jurisdiction are [ ] entitled to rely on the determination of another jurisdiction that there is reasonable suspicion to stop a person." *United States v. Avagyan*, 164 F. Supp. 3d 864, 884 (E.D. Va. 2016).

"[E]ffective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation of the transmitted information.'"  *United States v. Hensley*, 469 U.S. 221, 231 (1985) (internal quotation omitted).  Where officers respond to a call for assistance from another officer or jurisdiction, "'they [are] not required to conduct an independent investigation of the facts to come to their own determination regarding whether probable cause existed.  Such a requirement would be unworkable in the environments in which the police operate.'"  *Guerrero v. Deane*, 750 F. Supp. 2d 631, 652 (E.D. Va. 2010) (quoting *Ware v. James City County*, 652 F. Supp. 2d 693, 703 (E.D. Va. 2009)).  *Accord Whiteley v. Warden*, 401 U.S. 560, 568 (1971) ("Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to

assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause.").

Accordingly, although an initial decision to make an investigatory stop may have lacked the necessary reasonable suspicion, officers who responded to a call for assistance during the course of a stop already in progress are innocent of that unconstitutional conduct. *See Hensley*, 469 U.S. at 232 (observing that officers who rely in good faith on information received from another officer in making a stop "may have a good-faith defense to any civil suit.").

In this case, Officer Fuentes responded to a call from Armstrong for assistance with a stop that was already in progress. The law imposed no clearly established imperative on Officer Fuentes to cross-examine Armstrong regarding the circumstances that led to his alleged decision to detain Plaintiff. Even had Officer Fuentes been so obliged, he could readily ascertain that Plaintiff's vehicle had no lawful registration and was, therefore, not lawfully on the roads of Arlington County. *See* Exhibit 2; ARLINGTON COUNTY, VA. CODE § 14.2-2(A)(2). Moreover, the Memorandum of Understanding between Arlington County and JBM-HH requires ACPD to respond to calls for assistance from JBM-HH law enforcement to mitigate situations or potential threats to the JBM-HH reservation. Exhibit 3 ¶ 5a.

Officer Fuentes, therefore, reasonably relied on the validity of Armstrong's call for assistance and alleged decision to detain Plaintiff prior to Officer Fuentes's arrival. Officer Fuentes did not violate Plaintiff's clearly established Fourth Amendment rights in joining Armstrong's encounter with Plaintiff, and he is entitled to qualified immunity from this claim.

**B.    The ACPD Officers reasonably believed they were conducting an inventory search of the Mustang.**

Citing the Virginia Supreme Court's decision in *Cromartie v. Billings*, 298 Va. 284, 837 S.E.2d 247 (2020) and the decision of the Supreme Court of the United States in *Arizona v.*

*Gant*, 556 U.S. 332 (2009), Plaintiff alleges that ACPD officers violated the Fourth Amendment by searching the Mustang incident to his "arrest" for traffic-related offenses in the absence of probable cause. But, contrary to Plaintiff's numerous conclusory allegations and as shown by the audio recording attached as Exhibit 1, the Mustang was searched not incident to arrest but rather pursuant to an inventory search preceding a valid tow necessitated by Plaintiff's failure to produce a proper registration for the vehicle.

An inventory search qualifies as a well-defined exception to the warrant requirement of the Fourth Amendment, as the exception serves to "guard against claims of theft, vandalism, or negligence" by police, as well as to "avert any danger to police or others that may have been posed by the property." *Colorado v. Bertine*, 479 U.S. 367, 373 (1987). If an inventory search is conducted according to departmental policies and not as a ruse for an impermissible search, the search does not violate the Fourth Amendment. *See Florida v. Wells*, 495 U.S. 1, 3-5 (1990).

In this case, because the Mustang could not be lawfully operated or parked on the streets of Arlington County, the officers' only option was to tow the vehicle. Plaintiff contends that the inventory search violated the Fourth Amendment because the Mustang was ultimately towed to his residence. ECF No. 48 ¶ 67. But the Fourth Circuit has explained that it is not the ultimate destination of the inventoried vehicle, but rather the officer's reasonable understanding of that destination, that governs the validity of an inventory search. In *United States v. Fort*, 313 Fed. Appx. 665 (4th Cir. 2009), the Fourth Circuit concluded that an inventory search was valid despite the driver's wife appearing on scene and taking possession of the vehicle prior to the tow truck's arrival. The Fourth Circuit emphasized that the decision to tow the vehicle and, therefore, subject it to an inventory search, was made before the plaintiff's wife arrived and spoke to the officers. *Id.* at 667. The court further emphasized the dangerous nature of the

items—including an AR-15 machine gun—that were removed from the vehicle in concluding that the decision to conduct an inventory was reasonable. *Id.* at 668.

Plaintiff repeatedly contends that the ACPD Officers "knew that the Mustang was not going to be towed…" ECF No. 48 ¶ 73. The recording on which Plaintiff purports to rely, however, does not support this contention. Over the course of well over half an hour, officers repeatedly explained to Plaintiff that his vehicle had to be towed. Exhibit 1 at 4:38:35 P.M.; 4:48:12 P.M.; and 5:02:00 P.M. Plaintiff even offered to buy an officer dinner to avoid the tow, which the officer declined. Exhibit 1 at 4:48:12. Finally, after the inventory search was already complete, Plaintiff asked the officers if he could pay the tow truck to deliver the Mustang directly to his residence rather than the impound lot. Exhibit 1 at 5:15:29. The officers again responded negatively, explaining that because they had called the tow, the Mustang had to be taken to the contractor's impound lot, but Plaintiff could make whatever arrangements with the tow company he wished after that time. *Id.*

Accordingly, none of the ACPD Defendants knew at the time of the inventory search that the vehicle would ultimately be towed to Plaintiff's residence. In fact, contrary to Plaintiff's allegations, the recording on which Plaintiff purports to rely establishes that they continued to believe that standard inventory procedures would be followed. In light of the Fourth Circuit's decision in *Fort*, it was not clearly established that they violated Plaintiff's Fourth Amendment rights in doing so. Thus, they are entitled to qualified immunity.

### C. Plaintiff's property was properly placed in safekeeping.

Plaintiff asserts that certain items of property, discovered during the inventory search of his vehicle, were placed in safekeeping at ACPD as a "mere pretext." ECF No. 48 ¶ 170. As outlined above, the officers reasonably believed they were conducting an inventory search as

required by ACPD policy such that any valuable or hazardous property had to be placed in safekeeping. Moreover, among the items found in the car were a Glock handgun, AR-15 rifle, 150 rounds of ammunition, a smoke grenade, body armor, knives, and masks. "One of the key purposes served by an inventory search is to provide officers with precise knowledge of the property in order to avert any danger to police or others that may have been posed by the property." *Fort*, 313 Fed. Appx. at 668 (internal quotation omitted). Accordingly, if officers locate "inherently hazardous … items" in a vehicle, they are justified in carrying out a complete inventory search and placing those items in safekeeping. *Id. Accord United States v. Williams*, Nos. 96-4222, 96-7523, 106 F.3d 394 (Table) (4th Cir. 1997) (unpublished) ("Valid inventory searches also protect the impounding authority from dangerous items and from false claims for loss.").

Moreover, the video on which Plaintiff purports to rely to support his allegations demonstrates that Plaintiff, in fact, consented to the placement of his property in safekeeping. The officers gave Plaintiff options for handling his property given the necessity of towing his vehicle. Plaintiff could leave with his property—including his firearms—if he obtained a ride from the scene, or he could choose to allow ACPD to place the property in safekeeping until Plaintiff could safely come retrieve it as his convenience. Officers told Plaintiff, "we'd prefer if somebody picked you up and you can just take whatever you need and be done with it." Exhibit 1 at 4:48:50. Plaintiff ultimately told the officers that he did not want them to stay out with him any longer than necessary and he would "figure it out." *Id.* at 4:50:20. Plaintiff then signed the property safekeeping form. ECF No. 48-3.

No ACPD officer, therefore, violated Plaintiff's clearly establish constitutional rights by the placement of his property in ACPD's safekeeping.

**D.** **For the same reasons, Plaintiff has not stated a claim against the ACPD Officers in Count V.**

In Count V of the Second Amended Complaint, Plaintiff purports to state a claim under Va. Code § 19.2-59, which provides that "[n]o officer of the law or any other person shall search any place, thing or person, except by virtue of and under a warrant issued by a proper officer." This code section "has consistently 'been held to provide the same protections as the Fourth Amendment.'" *Nazario v. Gutierrez*, No. 2:21-cv-169, 2022 WL 3213538 (E.D. Va. Aug. 9, 2022) (quoting *Amato v. City of Richmond*, 875 F. Supp. 1124, 1143 (E.D. Va. 1994). *See also Carter v. Commonwealth*, 209 Va. 317, 320, 163 S.E.2d 589, 592 (1968).

Accordingly, Plaintiff's claim in Count V against the ACPD Officers fails for the reasons outlined above as to Count I. It should be dismiss pursuant to Rule 12(b)(6).

**II.** **Officers Fuentes and Soules did not violate Plaintiff's rights under the Second and Fourteenth Amendments as alleged in Count II.**

In Count II, Plaintiff asserts that Officers Fuentes and Soules violated his Second and Fourteenth Amendment rights to possess firearms. As Plaintiff's reliance on a 2022 decision of the Supreme Court of the United States, as well as decisions of the Seventh and Eighth Circuits, highlights, Plaintiff's right to possess specific firearms while on the public streets of Arlington County was not clearly established in February 2020.

First, to the extent Plaintiff seeks to rely on either the Fourteenth Amendment's due process standard, or the Fifth Amendment's Takings Clause, he does not state a claim for relief. "[T]he Supreme Court has made clear, allegations of false arrest, malicious prosecution, and unlawful seizure are all governed not by the procedural and due process components of the Fourteenth Amendment, but by the Fourth Amendment…" *Emesowum v. Arlington County*, No. 1:20-cv-113, 2020 WL 3050377 (E.D. Va. June 5, 2020) (citing *Graham v. Connor*, 490 U.S.

386, 388 (1989)).  Similarly, "[i]t is well-settled that the Fifth Amendment Takings Clause is not implicated when the government exercises its police power."  *Id.* (citing *Mugler v. Kansas*, 123 U.S. 623 (1887)).  To the extent Count II presents any claim for relief, therefore, it arises solely under the Second Amendment.

### A. Officer Fuentes did not violate the Second Amendment by conducting a protective sweep of Plaintiff's Mustang.

As to Officer Fuentes, Plaintiff objects to the officer's taking possession of his firearms during the course of the traffic stop on February 9, 2020.  The Supreme Court has approved of an officer's decision to conduct a protective sweep of a vehicle for weapons during the course of a traffic stop.  *Michigan v. Long*, 463 U.S. 1032 (1983).  In *Long*, the Supreme Court observed, "Our past cases indicate then that protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger, that roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect."  *Long*, 463 U.S. at 1049.  The Supreme Court continued:

> Just as a *Terry* suspect on the street may, despite being under the brief control of a police officer, reach into his clothing and retrieve a weapon, so might a *Terry* suspect in Long's position break away from police control and retrieve a weapon from his automobile.  In addition, if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside.  Or [ ] the suspect may be permitted to reenter the vehicle before the *Terry* investigation is over, and again, may have access to weapons.  In any event, we stress that a *Terry* investigation, such as the one that occurred here, involves a police investigation at close range, when the officer remains particularly vulnerable in part *because* a full custodial arrest has not been effected, and the officer must make a quick decision as to how to protect himself and others from possible danger.  In such circumstances, we have not required that officers adopt alternate means to ensure their safety in order to avoid the intrusion involved in a *Terry* encounter.

*Id*. at 1051-52 (quotations and citations omitted) (emphasis in original).

Accordingly, Officer Fuentes's inquiry about and protective sweep for firearms did not violate Plaintiff's Constitutional rights under the Second, Fourth, or Fourteenth Amendments. Officer Fuentes's temporary seizure of those firearms—including an AR-15 that had five fully loaded 30-round magazines, **Exhibit 4** ¶ 2—was a reasonable and temporary intrusion on Plaintiff's possessory interests in light of the officers' need "to protect themselves and other prospective victims of violence…" *Long*, 463 U.S. at 1047.

**B.      Plaintiff permitted his firearms to be placed in safekeeping, and the officers where not unreasonable in doing so.**

As explained in § 3.C., *supra*, Plaintiff voluntarily chose to have his firearms placed in safekeeping.   Moreover, as the Fourth Circuit observed in *Fort*, police officers are not unreasonable when they conclude that inherently hazardous items identified during an inventory search should be placed in safekeeping.  *Fort*, 313 Fed. Appx. at 668 (holding that it was proper for officers to place an assault rifle, grenade launcher, loaded magazines, and police tactical gear in safekeeping "to avert any danger to police or others that may have been posed by the property.")

Officer Fuentes and Detective Soules, therefore, reasonably believed that they were not violating any clearly established right of Plaintiff in suggesting that his firearms and other property should be placed in safekeeping.

**C.      The placement of Plaintiff's firearms in safekeeping did not clearly violate the Second Amendment.**

Moreover, even had Officers Fuentes and Soules's actions amounted to a governmental seizure of Plaintiff's firearms, in February 2020 the Supreme Court had not yet held that the Second Amendment to the United States Constitution guaranteed a private right to possess firearms on public streets.  Plaintiff points to *District of Columbia v. Heller*, 554 U.S. 570 (2008)

to support his claim.  The holding in *Heller*, however, was limited to the private right to possess a handgun in an individual's home.  *Heller*, 554 U.S. at 635.  Plaintiff similarly points to *New York State Rifle & Pistol Association, Inc., v. Bruen*, 142 S. Ct. 2111 (2022), which had not—of course—been decided in February 2020.  In fact, at the time this incident occurred, controlling precedent in the Fourth Circuit held that the Second Amendment did not protect an individual's right to possess any specific type of firearm.  *See Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017), *abrogated by Bruen*, 142 S. Ct. 2111 (2022), (concluding that the Second Amendment did not protect an individual's possession of an AR-15 rifle).

The Fourth Circuit does not appear to have addressed the Second Amendment implications of a seizure of firearms by the police during a stop or arrest.  The Seventh Circuit's approach in *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 571 (7th Cir. 2014) is instructive. The court observed that "Whether and to what extent the Second Amendment protects an individual's right to possess a particular gun (and limits the power of the police to seize it absent probable cause to believe it was involved in a crime) is an issue that is just beginning to receive judicial attention." *Id.* at 571.  The court further noted that the seizure of a particular firearm is more properly considered as a question of due process, rather than the Second Amendment.  *Id.* at 571-572.  "[T]he seizure of a particular firearm did not otherwise interfere with this Second Amendment interests... The defendants did not prohibit [the subject] from retaining or acquiring other firearms." *Id.* (discussing *Walters v. Wolf*, 660 F.3d 307, 317-18 (8th Cir. 2011)).  An argument that the Second Amendment prohibits the seizure of a particular firearm "implicates not only the individual's right to possess a firearm, but the ability of the police to take appropriate action when they are confronted with a firearm that *may or may not* be lawfully

possessed, and which, irrespective of the owner's right to possess the firearm, may pose a danger to the owner or others." *Id.* at 572.

Accordingly, Plaintiff's allegations regarding the seizure of the two firearms from the Mustang does not articulate a clearly established violation of the Second Amendment. For this reason, Officers Fuentes and Soules are entitled to qualified immunity. Plaintiff's claim against them for a violation of the Second Amendment should be dismissed with prejudice.

### III. Plaintiff does not state a claim against the ACPD Officers for false imprisonment.

In Count 3, Plaintiff charges all the ACPD Officers with false imprisonment under Virginia law. "To prevail in an action for false imprisonment, a plaintiff must prove that [his] liberty was restrained, either by words or acts that [he] would fear to disregard, and that there was no sufficient legal excuse to justify the restraint." *Dill v. Kroger Limited Partnership I*, 300 Va. 99, 114, 860 S.E. 2d 372, 380 (2021). "However, in no case may a person prevail on a claim of false imprisonment if [his] arrest was lawful." *Id.* at 114, 381.

Here, Plaintiff does not contend that any of the ACPD officers initiated his allegedly improper detention. On the contrary, the ACPD officers arrived after Armstrong had detained Plaintiff, a decision on which the ACPD officers reasonably relied. *See supra* § III.A. To the extent Plaintiff contends the ACPD officers continued his detention to investigate his violation of Va. Code §§ 46.2-104 and 612, that investigation was unquestionably lawful. Plaintiff does not deny that he could not produce a proper registration for the Mustang, nor does he contend he had his Virginia driver's license in his possession, and Plaintiff was ultimately convicted of those charges in the General District Court of Arlington County. Moreover, Plaintiff was only detained for the time necessary to fully investigate those charges and to process his vehicle, which could not be lawfully driven away from the scene. Detaining Plaintiff at the scene for this

brief period of time was, therefore, legally justified and cannot constitution false imprisonment under Virginia law.

Finally, to the extent Plaintiff contends that he should not have been physically restrained while the ACPD Officers completed their investigation on February 9, 2020, the Fourth Circuit has rejected that argument. *See Unus v. Kane*, 565 F.3d 103 (4th Cir. 2009) (approving of federal agents' keeping individuals handcuffed for four hours during the execution of a search warrant because of officer safety concerns). Here, the ACPD Officer quickly became aware that Plaintiff was heavily armed, with both firearms and knives and, therefore, their decision to detain Plaintiff in handcuffs during the course of a lawful investigation did not amount to false imprisonment. Count III, therefore, therefore, should be dismissed as to the ACPD Officers.

## IV. Plaintiff does not state a claim against Officers Fuentes, Lugasi and Soules for malicious prosecution.

In Count IV, Plaintiff charges Officers Fuentes, Lugasi and Soules with malicious prosecution under Virginia law. "In an action for malicious prosecution, the plaintiff must prove four elements: that the prosecution was (1) malicious; (2) instituted by or with the cooperation of the defendant; (3) without probable cause; and (4) terminated in a manner not unfavorable to the plaintiff." *Lewis v. Kai*, 281 Va. 715, 722, 708 S.E.2d 884, 889 (2011).

Plaintiff appears to be seeking to hold Officers Fuentes, Lugasi and Soules responsible for Detective Wanek's decision to obtain an arrest warrant for Plaintiff on February 14, 2020. Without commenting on the lawfulness of that decision, these three officers did not institute that prosecution against Plaintiff. Although Plaintiff makes the conclusory allegation that Officers Fuentes, Soules and Lugasi "each cooperated in or directly or constructively instituted the prosecution against [Plaintiff], ECF No. 48 ¶ 210, he alleges no facts in support of these assertion. Plaintiff asserts that Officers Fuentes, Soules and Lugasi "provided false statements to

the prosecution," without identifying a single statement any of these officers made to the Commonwealth's Attorney, must less a statement that was false. Plaintiff, therefore, fails to meet the first three elements of a claim for malicious prosecution under Virginia law as to these three officers.

In addition, to the extent Plaintiff relies on his convictions for violating Va. Code §§ 46.2-104 and 612, for which he was cited by Officer Fuentes, Plaintiff cannot proceed on that claim because he cannot show that those prosecutions were malicious, without probable cause, or that they terminated in his favor.

Count IV, therefore, does not state a claim against Officers Fuentes, Soules, or Lugasi. It should be dismissed against these Defendants with prejudice.

**CONCLUSION**

For the reasons outlined above, as well as the reasons stated in Detective Wanek and Detective Barnickle's Briefs in Support of their respective Motions to Dismiss the Second Amended Complaint does not state a claim against the ACPD Officers. The Second Amended Complaint should be dismissed as to the ACPD Officers with prejudice.

> **JAVIER FUENTES, LAUREN LUGASI, KIMBERLY SOULES, AUSTIN KLINE AND JOHN VANAK**
>
> By Counsel

/s/ Leslie A. Winneberger
David P. Corrigan (VSB No. 26341)
Leslie A. Winneberger (VSB No. 45040)
Blaire H. O'Brien (VSB No. 83961)
Counsel for Javier Fuentes, Lauren Lugasi,
Kimberly Soules, Austin Kline and John Vanak
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia  23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
lwinneberger@hccw.com
bobrien@hccw.com

## C E R T I F I C A T E

I hereby certify that on the 6th day of October, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Matthew A. Crist, Esq.(VSB No. 85922)
Matthew A. Crist, PLLC
10432 Balls Ford Road
Suite 300
Manassas, VA 20109
571-551-6859 - Phone
mcrist@MACPLLC.net

Ryan C. Samuel, Esq. (VSB No. 84400)
Arlington County
One Courthouse Plaza
2100 Clarendon Blvd, Suite 403
Arlington, VA 22201
703-228-3100 - Phone
703-228-7106 - Fax
rsamuel@arlingtonva.us

Jessica D. Aber, Esq.
United States Attorney's Office for
the Eastern District of Virginia
600 East Main Street, Suite 1800
Richmond, VA 23219
804-819-5465 – Phone
jessica.d.aber@usdoj.gov

Yuri S. Fuchs, Esq.
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
703-299-3872 – Phone
703-299-3983 – Fax
yuri.fuchs@usdoj.gov

/s/ Leslie A. Winneberger
David P. Corrigan (VSB No. 26341)
Leslie A. Winneberger (VSB No. 45040)
Blaire H. O'Brien (VSB No. 83961)
Counsel for Javier Fuentes, Lauren Lugasi,
Kimberly Soules, Austin Kline and John Vanak
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia  23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
lwinneberger@hccw.com
bobrien@hccw.com