## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

| | | |
|---|---|---|
| **CURTIS LEVAR WELLS, JR.,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No.**     **1:22-cv-00140-MSN-IDD** |
| | ) | **Next Event:  Motion Hearing** |
| **JAVIER FUENTES,** et al., | ) | **December 16, 2022** |
| Defendants | ) | |
| | ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## DEFENDANT COUNTY OF ARLINGTON'S MOTION TO DISMISS

COMES NOW Plaintiff, Curtis Wells, by and through counsel and for his Memorandum in Opposition to Defendant County of Arlington's Motion to Dismiss (Dkt. No. 68), and therefore, respectfully states as follows:

## INTRODUCTION

Innocent African American citizens being harassed, detained, and arrested, based upon the nebulous post-hoc claim of "suspicious behavior" is a plague threatening to destroy the Fourth Amendment.  This plague's impact was implicitly referenced in the successful campaign of Parisa Dehghani-Tafti, the Commonwealth's Attorney for Arlington County.[1]  Even though there are numerous factors that go into such data, and the police, in large part, do justice and provide a safer community for us all, the persistent irrationality evident at every step of the treatment of Mr. Wells demonstrates something other than good-faith policework was going on.

---

[1] "For instance, African-Americans make up less than 9% of Arlington County's population, but about 66% of the population in the Arlington County jail, despite evidence that populations commit crimes at similar rates. This disproportionate incarceration is unacceptable. Parisa is committed to determining the causes of the disparities, addressing them, and helping repair the damage done to communities as a result."  https://parisaforjustice.com/on-the-issues/. Last accessed on October 17, 2022.

Plaintiff urges the Court to deny each Motion to Dismiss presently before the Court. Mr. Wells' pleading in the Second Amended Complaint ("SAC") provides sufficient factual allegations of the manifold fact pattern; from the first encounter based on Defendant Armstrong's bare hunch, at most, to the facially irrational assertion by some Defendants that Mr. Wells had created a chemical potion that could make the human body bulletproof, to the outright lies regarding the valuation and source of the Rifle Plate, to the mysterious appearance of a bag with a powder substance in it that Mr. Wells had never seen, and, ultimately, to keeping Plaintiff locked up for almost seven months on a completely made up allegation that was at most, if a crime at all, a misdemeanor.

Defendants have proffered that there is no guarantee that only the guilty will be arrested – indeed, that is true. Plaintiff is one such innocent who has been arrested. However, in the American judicial system, when police fabricate evidence, perjure themselves, contradict each other, hide evidence from Commonwealth attorneys, and lie to magistrates, in violation of the Constitution and intentionally or recklessly cross bright lines, plaintiffs such as Mr. Wells should receive substantial monetary compensation to do justice and to speak to police and municipalities everywhere that these actions will not be tolerated.

Before turning to the factual circumstances before the Court, Mr. Wells and undersigned counsel believe it is powerful and important to echo Judge Motz's dissent in *Waterman*:

> Law enforcement officers face some of the most grueling, difficult, and dangerous work in our communities; they are called upon to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving. All of us are, and should be, grateful to those who accept these challenges on our behalf.
>
> However, we cannot let our gratitude and admiration erode the limits the Constitution imposes on the use of force by police officers - especially fatal force. The hazards of police work simply do not authorize officers to engage in the unbridled use of force.

2

*Waterman v. Batton*, 393 F.3d 471, 483 (4th Cir. 2005).  Mr. Wells has the highest regard for law enforcement officers, a fact that can be seen by the extent to which he trusted the Defendants in this matter.  While handcuffed and in a situation hazardous to his liberty, he was jovial, amiable, and cooperative – to a fault.  Plaintiff's positive demeanor, trust of the police, and joviality should not be used against him in this case.

Mr. Wells pursued criminal justice in college, in West Texas A & M, in Canyon, Texas in 2016-2017, prior to Mr. Wells joining the U.S. Army.  Then Mr. Wells joined the Army and was posted to the Presidential Honor Guard and stationed at Ft. Myer, Virginia.  Mr. Wells and his command mutually agreed to an early discharge under honorable circumstances due to the fact that Mr. Wells was having difficulty adjusting to his unit and command.

After exiting the military, Mr. Wells was actively assisting real estate transactions, training for a career in force protection, and working in A/V installation on military bases.  He was an avid hobbyist in airsofter and milsim (military simulation exercises).

Mr. Wells was young, naïve, and trusting of the police on February 9 through 18, 2020 – the Defendants then educated him that he should not trust the police, that they have no interest but to find guilt, no matter how strained, and there was no protection for the innocent once the Defendants caught the scent.

Plaintiff's Second Amended Complaint was filed on August 22, 2022, and sought compensation for civil rights violations under 42 U.S.C. 1983 for the conduct of five Arlington police officers on February 9, 2020, Fuentes, Lugasi, Soules, Kline, and Vanak, the conduct on the same day of one civilian employee of the Department of Defense, Armstrong, the conduct of a detective within Arlington County Police Department, Wanek, on February 10, 2020, and thereafter, the conduct of an additional Arlington County Police Officer, Barnickle, on February

3

18, 2020, and thereafter, and the conduct of a civilian detective with the Department of Defense, Shepherd, for his conduct starting on or about February 10, 2020, and thereafter.  Additionally, Plaintiff pleads damages caused by the County of Arlington under a *Monell* theory of recovery and against the United States under the Federal Tort Claims Act.

Plaintiff requests the Court to preserves his right to amend and substitute in presently unknown individuals for the John and Jane Does, as discovery may show to be proper.

## FACTUAL BACKGROUND[2]

On February 9, 2020, Mr. Wells was detained and cited for an expired temporary tag on his Ford Mustang and for driving without his Virginia license on his person.  Shortly before his encounter with police, Mr. Wells had to take an important phone call and, because his car was too loud to hold a conversation while driving, and it was an extremely important phone call, Plaintiff pulled into an easily accessible public parking lot near the store from which he purchased his smoothie.

**Mr. Wells disturbed no one, threatened no one, made no unusual gestures, no one contacted the police, no reports were made about Mr. Wells, and he was minding his business.  For no articulable reason, he was then detained by Armstrong**.

At approximately 4:00 PM, Armstrong, a civilian military police officer, stopped his vehicle behind Mr. Wells' Mustang, exited his vehicle, approached Mr. Wells' driver-side

---

[2] Defendants, in their five memoranda supporting their respective motions, have included factual allegations that conflict with Plaintiff's SAC and the limited documents presently available. Plaintiff requests the Court to disregard Defendants' novel and conflicting allegations and resolve all factual disputes in Plaintiff's favor, at this stage.

window, and asked, "is this your car?"[3]  A classic trope that African Americans are accustomed

to hearing from white police officers, Mr. Wells, who was still on his phone call, responded to

Armstrong calmly and honestly.  Mr. Armstrong then requested to see Mr. Wells' license and

paperwork.  Mr. Wells attempted to explain that he did not have his license on him because he

had been on a run, and he began looking for it in his car.  Then, Armstrong walked to the back of

Mr. Wells' vehicle and notified Mr. Wells that his temporary registration tag was expired.  At the

end of this initial encounter, Armstrong ordered Mr. Wells to, "sit tight" and went back to his

vehicle.  Contrary to the Federal Defendants' Motion to Dismiss, Armstrong ***did not move his***

***vehicle*** – as confirmed by Fuentes' later testimony.  Mr. Wells was unable to drive away without

smashing into Armstrong's vehicle, and Mr. Wells was under the reasonable apprehension that

he was not free to leave.  Unbeknownst to Mr. Wells at the time, Armstrong then made a report

of a suspicious person to the Arlington County Police Department "ACPD" and within

approximately 10 minutes, Fuentes arrived on scene.

   ***Armstrong did not leave and did not move his vehicle*** – he remained on scene and

participated in the unlawful search and seizure of Mr. Wells' property from his vehicle – for

approximately 2 hours.  SAC ¶35-44.  In the audio recording, at approximately 4:43 and 4:45

PM mark, Armstrong can be heard participating in the baseless and unlawful search.[4]

Armstrong's assertion to this Court in the Federal Defendants' Brief, and to the Arlington

County Circuit Court on August 17, 2020, that his encounter with Plaintiff on February 9, 2020,

was brief "to make sure that [Mr. Wells] was alright" is false and contradicted by Fuentes.

Armstrong falsely stated to the Court that he immediately put his vehicle in reverse, ***then***

---

[3] It is hoped that Mr. Armstrong or his command have preserved any recording of the events of
February 9, 2020, however, at this time, Plaintiff is not in possession of any such recording.
[4] The recording is attached as Exhibit 1 to ACPD Officers' Memorandum.  Dkt. No. 60-1.

contacted the ACPD.  Mot. To Suppress Hrn'g. Tr. 20:10 – 21:17, August 17, 2020.  It will be

Plaintiff's testimony that such assertions in the United States' allegations in its Brief (Dkt. No.

57 pp. 1, 3, 12, 18, 19, 29) are false.  Fuentes testified that when he arrived on scene, Mr. Wells'

vehicle was blocked in by Armstrong's vehicle and Mr. Wells was unable to leave.  Mot. To

Suppress Hrn'g. Tr. 90:16 – 90:22, August 17, 2020.

Armstrong's conduct on February 9, 2020, was not a brief one-minute encounter, was not

a wellness check, and Armstrong made no contemporaneous action that indicated he believed

Mr. Wells was in a medical emergency, and he did nothing to indicate, objectively, that

Armstrong had any valid law enforcement or community caretaking intentions.  Armstrong

initiated this encounter based upon nothing but a hunch that a black man sitting in a nice vehicle

was doing something wrong, or, as Armstrong said "… you know when your kid does something

wrong and you just kind of get that feeling that something is off, you don't know quite what they

did yet?"  SAC ¶ 38 (quoting Mot. To Suppress Hrn'g. Tr. 43:3 – 46:12, August 17, 2020).[5]

During that initial detention, Defendant Armstrong, together with Defendants Fuentes,

Lugasi, Soules, Kline, and Vanak, from the Arlington County Police Department, searched Mr.

Wells' Mustang and seized much of his personal property therein, but not all of it.

Defendants assert or imply, falsely, that they took all personal property out of Mr. Wells'

vehicle pursuant to an inventory search, for safekeeping of valuable items, to ensure police

safety, or for the security of potentially harmful weapons.[6]  All such allegations are contested by

Plaintiff's well-pleaded allegations.  SAC ¶¶ 49, 53, 55, 63, 66, 69, 72-75, 77-79.  The officers

left in Mr. Wells' trunk dangerous items, such as a set of sharp tactical knives, and items of

---

[5] Attached as Exhibit 1 to the Federal Defendants' Memorandum.  Dkt. No. 57-1.
[6] Dkt. No. 60 at p. 2, 7, 8, 22 – 23, and 26.

substantial value.  A brief list of what was left by the ACPD officers in Mr. Wells' vehicle on February 9, 2020, includes: hearing protection headphones for the gun range, worth approximately $100.00, sharp metal throwing knives, a large quantity of books and papers, soft body armor (later seized on February 18, 2020), miscellaneous tools (such as a DeWalt cordless drill, 100-piece ratchet set, and similar tools), worth approximately $800.00, a pair of shoes worth approximately $150.00, a portable tire inflator, tactical bags, Ray-Ban Sunglasses, worth approximately $300.00, and two laptops worth approximately $1,000.00 in total.[7]

ACPD Officers further assert, falsely, "Plaintiff voluntarily chose to have his firearms placed in safekeeping."  Dkt. No. 60 at 26.  Defendants fail to demonstrate any indicia of consent or voluntariness of the search or seizure; as well-pleaded by Plaintiff, they were not consensual or voluntary.  SAC ¶ 55.

The personal property wrongfully seized had no evidentiary value to the citations issued by Fuentes.  SAC ¶¶ 48, 52, 58.  On February 9, 2020, the ACPD Officers acted in violation of departmental policy on Towing, Seizing, Impounding, Searching & Releasing Vehicles by, *inter alia*, failing to fill out the impound form according to Arlington County Police Department Directive Manual § 514.01.  SAC ¶ 70.

Finally, on February 9, 2020, Mr. Wells was not arrested but was told by one of the officers that it was not required that his Mustang be towed to the police impound lot and then he was released.  SAC ¶ 67.  That is, the officers knew they were not following any departmental policy to search and seize Mr. Wells' property incident to an arrest, vehicle exception, inventory or impoundment search, and without consent or any other possible exception to the Fourth Amendment requirements.  Mr. Wells' property that was taken during the pretextual search on

---

[7] An officer is heard at the 5:28 PM mark stating, "don't forget your laptop."

7

February 9, 2020, was ostensibly held as "Safekeeping" – but it appears obvious that his property was taken to rummage through it to find a reason, no matter how strained, to arrest Mr. Wells and to search further.

Based upon the foregoing, Mr. Wells was incarcerated from February 18, 2020, to September 9, 2020, a time period when COVID-19 was gripping the world – and Mr. Wells was incarcerated, terrified, isolated, and put in peril for no good reason.

During that incarceration, the Commonwealth did not produce Mr. Wells to attend the hearing on February 28, 2020. Mr. Wells had no notice or ability to defend the citations, and it appears some officer, possibly Fuentes, appeared and there was some confusion because the Judge checked and crossed out the sections that read, "THE ACCUSED WAS THIS DAY: TRIED IN ABSENCE" and "PRESENT." SAC ¶ 59 – 61. Fuentes, or another ACPD officer, was obligated to inform the Judge of Mr. Wells' incarceration or, at the least, notify Mr. Wells' counsel. SAC ¶ 62. Mr. Wells was unaware that he was tried in absentia until much later.

## LEGAL STANDARD

### A.  Standard for Fed. R. Civ. P. 12(b)(1) and (6).

The narrow issues before the Court on Defendants' motions are whether the SAC's allegations, if accepted as true, plausibly establish the claimed violations and that the Court has subject-matter jurisdiction. "When considering a motion to dismiss pursuant to Rule 12(b)(1), the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff. Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Raila v. United States*, 355 F.3d 118, 119 (2d Cir. 2004).

8

Similarly, a complaint satisfies Federal Rule of Civil Procedure 8 and achieves facial plausibility sufficient to survive a 12(b)(6) motion when the facts alleged in the complaint, taken as true, including reasonable inferences therefrom, give the defendant fair notice of what the claims are and the grounds upon which the claims rest. *See Bell Atlantic Corp v. Twombly*, 550 US. 544, 570 (2007). The complaint need not contain detailed factual allegations; it is the plaintiff's obligation to provide the grounds of his claimed entitlement beyond mere labels and conclusions, but the allegations must be enough to raise a right to relief above the speculative level. *See id*.

> A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses. Our inquiry, then, is limited to whether the allegations constitute a short and plain statement of the claim showing that the pleader is entitled to relief. [A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. We must assume that the allegations of the complaint are true and construe them in the light most favorable to the plaintiff.

*Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citations omitted). To survive a motion to dismiss, a plaintiff must merely nudge his claims across the line from conceivable to plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009).

**B.  42 U.S.C. § 1983.**

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983.

**C.  Fourth Amendment.**

> The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances.  And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?  Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction.  And simple good faith on the part of the arresting officer is not enough.  If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be secure in their persons, houses, papers, and effects, only in the discretion of the police.

*Terry v. Ohio*, 392 U.S. 1, 20-22 (1968) (cleaned up).  "The Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances."  *Graham v. Connor*, 490 U.S. 386, 399 (1989).

A person is considered seized for the purposes of the Fourth Amendment "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S. Ct. 1975, 1979 (1988).  "Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed."  *Delaware v. Prouse*, 440 U.S. 648, 662-63 (1979) (holding that when police stopped an individual to check his license and registration and searched the car, thereafter finding substantial quantities of marijuana, the search violated the Fourth Amendment).

"The Fourth Amendment permits an officer to initiate a brief investigative traffic stop when he has a particularized and objective basis for suspecting the particular person stopped of criminal activity."  *Nazario v. Gutierrez*, Civil Action No. 2:21CV169 (RCY), 2022 U.S. Dist. LEXIS 142044, at *15-16 (E.D. Va. Aug. 9, 2022) (quoting *Kansas v.*

*Glover*, 140 S. Ct. 1183, 1187 (2020); *see also United States v. Cortez*, 449 U.S. 411,

417-18 (1981).

In the *Nazario* case, the Court found that officers had probable cause for the stop,

however, Judge Young held, "[t]o satisfy the reasonableness requirements for an

investigative detention, a traffic stop must be legitimate at its inception, and the officers'

actions during the stop must be reasonably related in scope to the basis for the stop."

*Nazario* at *15 (E.D. Va. Aug 9, 2022) (quoting *United States v. Hill*, 852 F.3d 377, 381

(4th Cir. 2017)).  "A stop that is justified at its inception may still be unconstitutional if

its manner of execution unreasonably infringes interests protected by the Constitution."

*Nazario* at *16 (E.D. Va. Aug 9, 2022) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407

(2005).


### C (1).  Inventory Search Exception.

The inventory search exception applies, exclusively, to vehicles impounded and in police

custody for the purpose of protecting the contents of the car, protecting the police from things

like explosives stored in a vehicle parked in the police impound lot, and to protect the police

against claims that the police stole or damaged the contents – such searches of impounded

vehicles must be conducted after impounding and in accordance with standard departmental

procedures.  *See South Dakota v. Opperman*, 428 U.S. 364, 369, 383 (1976).  As a default,

searches without consent or a warrant are unreasonable and therefore violative of the Fourth

Amendment, even when there exists unquestionable probable cause.  *See id*. at 381.

> When vehicles are impounded, local police departments generally follow a
> routine practice of securing and inventorying the automobiles' contents.  These
> procedures developed in response to three distinct needs: the protection of the
> owner's property while it remains in police custody the protection of the police

> against claims or disputes over lost or stolen property, and the protection of the
> police from potential danger.  The practice has been viewed as essential to
> respond to incidents of theft or vandalism.  In addition, police frequently attempt
> to determine whether a vehicle has been stolen and thereafter abandoned.

*Id*. at 369 (1976).  The *Opperman* guidance has been routinely followed in the Fourth Circuit,

even as recently as 2017, "[i]mpoundment constitutes a reasonable course of action when the

owner of a vehicle abandons it, or law enforcement cannot identify the owner."  *United States v.*

*Bullette*, 854 F.3d 261, 265 (4th Cir. 2017).  The *Opperman* lineage of cases relating to inventory

searches all relate to impounded or abandoned vehicles.  *See, e.g.*, *South Dakota v. Opperman*,

428 U.S. 364, 369 (1976) and *States v. Bullette*, 854 F.3d 261, 265 (4th Cir. 2017).

> Inventory searches constitute a well-established exception to the warrant
> requirement of the fourth amendment.  For an inventory search to be valid, the
> vehicle searched should first be in the valid custody of the law enforcement
> officers conducting the inventory.  If the vehicle is in lawful custody, the police
> may inventory the vehicle, if such inventories are routine and conducted pursuant
> to standard police procedures, so long as the purpose of the inventory is to secure
> the car or its contents and not to gather incriminating evidence against the owner.

*United States v. Brown*, 787 F.2d 929, 931-32 (4th Cir. 1986) (citations omitted) (citing *Illinois*

*v. Lafayette*, 462 U.S. 640, 643 (1983), and *South Dakota v. Opperman*, 428 U.S. 364, 374

(1976)).

For the police to impound a vehicle, it must be taken into custody or taken as evidence

for a criminal prosecution.  *See* Impound, Black's Law Dictionary (10th Ed. 2014).

**C (2).  Search Incident to Arrest.**

> The Supreme Court has outlined a two-part rule under which an automobile
> search incident to a recent occupant's arrest is constitutional (1) if the arrestee is
> within reaching distance of the vehicle during the search, or (2) if the police have
> reason to believe that the vehicle contains evidence relevant to the crime of arrest.

*Nazario* at *41-42 (E.D. Va. Aug. 9, 2022).

**C (3).  Automobile Exception.**

"Another possible avenue to justify this search would be the automobile exception to the warrant requirement.  Under this exception, officers may search a vehicle without a warrant if the vehicle is readily mobile and probable cause exists to believe it contains contraband or evidence of criminal activity."  *Id*.

### C (4).  Plain View Exception.

As previously discussed, it is disputed whether the firearm was actually in plain view. Under the plain view doctrine, 'law enforcement officers may seize an object without a warrant if '(1) the officer was lawfully in a place from which the object could be viewed; (2) the officer had a lawful right of access to the seized items; and (3) the incriminating character of the items was immediately apparent.'

*Nazario v. Gutierrez*, *43 (E.D. Va. Aug. 9, 2022) (quoting *United States v. Gardner*, 554 Fed. App'x 165, 167 (4th Cir. 2014)).

### D.  Second Amendment.

Similar to the Fourth Amendment's framing in securing "the right of the people" as an individual right to be secure in one's person and property, the Second Amendment secures "the right of the people to keep and bear arms," as an individual right.  U.S. Const. amend II.  "There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms."  *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008).  "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms."  *Id*. at 582.

[T]he Fourteenth Amendment's ratifiers understood that it would stop gun seizures. Before the Civil War, black people had been denied citizenship and, with it, the right to keep and carry arms.  *Dred Scott v. Sandford*, 60 U.S. 393, 417 (1857).  Though *Dred Scott* fell with the Confederacy, Southerners kept seizing the freedmen's guns.  In Mississippi, white militias seized every gun and pistol found in the hands of the (so called) freedmen, insisting that state law did not recognize their right to arms.  So too in South Carolina, where a former federal official reported similar seizures to Congress.  As one senator put it, 'the greatest outrages are perpetrated by armed men who go up and down the country

> searching houses, disarming people, committing outrages of every kind and
> description.'
>
> In response, the federal government took pains to explain to freedmen 'that no
> military or civil officer ha[d] the right or authority to disarm' them.  Against this
> backdrop, Congress passed the Freedmen's Bureau Act of 1866 and the Civil
> Rights Act of 1871 to protect all citizens' constitutional rights, including the right
> to arms.  The Fourteenth Amendment was designed to secure that right as well.

*Frein v. Pa. State Police*, 47 F.4th 247 (3d Cir. 2022) (cleaned up).  The right of each individual

to keep and bear arms, pistols and rifles, has been clearly established since the ratification of the

Second Amendment and its vindication was renewed with the ratification of the Fourteenth

Amendment.  *See id*.

### E.  False Imprisonment.

False imprisonment is "the direct restraint by one person of the physical liberty of another

without adequate legal justification." *Jordan v. Shands*, 255 Va. 492, 497 (1998).

> If a person is under a reasonable apprehension that force will be used unless he
> willingly submits, and he does submit to the extent that he is denied freedom of
> action, this, in legal contemplation, constitutes false imprisonment. Importantly, it
> is not necessary to show malice, ill will or the slightest wrongful intention, and the
> defendant's good faith will not defeat a false imprisonment claim.

*Amisi v. Riverside Reg'l Jail Auth.*, 469 F. Supp. 3d 545, 577 (E.D. Va. 2020) (citations omitted).

*Accord Jordan v. Shands*, 255 Va. 492, 497 (1998).  "However, in no case may a person prevail

on a claim of false imprisonment if [his] arrest was lawful."  *Dill v. Kroger Limited Partnership

I*, 300 Va. 99, 114 (2021).

### F.  Malicious Prosecution.

"In an action for malicious prosecution, the plaintiff must prove four elements: that the

prosecution was (1) malicious; (2) instituted by or with the cooperation of the defendant; (3)

without probable cause; and (4) terminated in a manner not unfavorable to the plaintiff." *Lewis

v. Kei*, 281 Va. 715, 722, 708 S.E.2d 884 (2011).  "An action for malicious prosecution most

14

often is based upon an underlying criminal proceeding maliciously instigated without probable cause." *Daniczek v. Spencer*, 156 F. Supp. 3d 739, 754 (E.D. Va. 2016).

"The test for probable cause is whether the facts and circumstances known, or made known, to the [initiator of the criminal proceedings] are sufficient to justify a prudent and reasonable man in the belief that an accused is guilty of the crime charged." *Daniczek v. Spencer*, 156 F. Supp. 3d 739, 755 (E.D. Va. 2016).

"It is true that a magistrate's issuance of a warrant is pertinent evidence of probable cause. However, a magistrate's imprimatur does not conclusively establish that probable cause exists. The magistrate's blessing is relevant but not dispositive to lack of probable cause." *Daniczek v. Spencer*, 156 F. Supp. 3d 739, 755 (E.D. Va. 2016) (citing *Bennett v. R&L Carriers Shared Servs., LLC*, 744 F. Supp. 2d 494, 518 (E.D. Va. 2010)). "Virginia cases 'in no way suggest[] that a government official's belief in the guilt of the accused establishes, as a matter of law, that probable cause existed as would preclude a malicious prosecution claim.'" *Daniczek v. Spencer*, 156 F. Supp. 3d 739, 755 (E.D. Va. 2016) (quoting *Bennett* 744 F. Supp. 2d at 519-22). For example, "[i]f an officer knows that the facts on which he bases his probable cause determination are false, then probable cause does not exist." *Daniczek v. Spencer*, 156 F. Supp. 3d 739, 755 (E.D. Va. 2016) (citing *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)).

"In Virginia, 'malice' means 'any controlling motive other than a good faith desire to further the ends of justice, enforce obedience to the criminal laws, suppress crime, or see that the guilty are punished." *Daniczek v. Spencer*, 156 F. Supp. 3d 739, 756 (E.D. Va. 2016) (quoting *Hudson v. Lanier*, 255 Va. 330, 332, 497 S.E.2d 471, 473 (1998)).

**G. Va. Code § 19.2-59.**

"[Virginia] Code § 19.2-59 prohibits warrantless searches of any place, thing, or person and provides that any officer performing such a search shall be 'liable to

15

any person aggrieved thereby in both compensatory and punitive damages.' The statute creates a cause of action against law enforcement officers and other government agents."

*Cromartie v. Billings*, 298 Va. 284, 296-97 (2020) (citing *Buonocore v. Chesapeake & Potomac Tel. Co.*, 254 Va. 469, 473 (1997)).

### H. *Bivens* Claims.

The holding in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, is well-known in permitting actions against federal law enforcement agents for their individual conduct in violation of the Fourth Amendment in a search and seizure context while purporting to enforce the criminal law.  403 U.S. 388 (1971).  The Supreme Court "has permitted *Bivens* actions for money damages against federal officers for violations of the Fourth Amendment, [and] the Due Process Clause of the Fifth Amendment."  *Dunbar Corp. v. Lindsey*, 905 F.2d 754, 760 (4th Cir. 1990).

"To state a prima facie *Bivens* claim, the plaintiff must establish that: (1) the defendant violated a federal constitutional right of the plaintiff, (2) the right was clearly established, (3) the defendant was a federal actor by virtue of acting under color of federal law, and (4) the defendant was personally involved in the alleged violation[.]"  *Berman v. Crook*, 293 F. Supp. 3d 48, 54-55 (D.D.C. 2018) (citations omitted).

"[The Supreme Court] recognized in *Bivens* an implied damages action to compensate persons injured by federal officers who violated the Fourth Amendment's prohibition against unreasonable searches and seizures."  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1848 (2017).  Courts continue to observe that *Bivens* is still good law.  In refusing to extend Bivens to a new context, the District Court for the District of Columbia confirmed that *Bivens* remains settled in the

search-and-seizure context. *LKQ Corp. v. United States*, No. 18-cv-1562 (DLF), 2019 U.S. Dist. LEXIS 122343, at *2 (D.D.C. July 23, 2019).

## I. Qualified Immunity.

> A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of [a] right [are] sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.

*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson* v. *Creighton*, 483 U.S. 635, 640 (1987)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

"The doctrine of qualified immunity 'balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Nazario v. Gutierrez*, Civil Action No. 2:21CV169 (RCY), 2022 U.S. Dist. LEXIS 142044, at *8-9 (E.D. Va. Aug. 9, 2022) (citing *Wingate*, 987 F.3d at 311; *Meyers v. Baltimore County*, 713 F.3d 723, 731 (4th Cir. 2013)). "The burden of establishing a qualified immunity defense is on the official asserting qualified immunity." *Nazario* at *9 (E.D. Va. Aug 9, 2022).

In reviewing a case for the application of qualified immunity, "[t]he relevant question is fact-specific *but* objective, asking whether the law clearly established that an officer's conduct was unlawful in the particular circumstances he or she confronted. [The defendant-officer's]

17

subjective intent and his professed justifications for his use of force are irrelevant to that

inquiry." *Brown v. Elliott*, 876 F.3d 637, 644-45 (4th Cir. 2017) (emphasis in the original).

> [A] defendant cannot be said to have violated a clearly established right unless the
> right's contours were sufficiently definite that any reasonable official in the
> defendant's shoes would have understood that he was violating it. In other words,
> while a case directly on point is not required, existing precedent must have placed
> the . . . constitutional question beyond debate. The dispositive question is whether
> the violative nature of *particular* conduct is clearly established.

*Maney v. Garrison*, 681 F. App'x 210, 215 (4th Cir. 2017) (quoting *Plumhoff v. Rickard*, 572

U.S. 765 (2014), *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011), and *Mullenix v. Luna*, 577 U.S. 7

(2015)). "Although officers are only human and even well-intentioned officers may make

unreasonable mistakes on occasion, the doctrine of qualified immunity does not serve to protect

them on those occasions." *Henry v. Purnell*, 652 F.3d 524, 534-35 (4th Cir. 2011).

### J. *Monell* Claims.

Municipal liability may arise for a policy or custom under *Monell* in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2)
> through the decisions of a person with final policymaking authority; (3) through
> an omission, such as a failure to properly train officers, that 'manifest[s]
> deliberate indifference to the rights of citizens'; or (4) through a practice that is so
> 'persistent and widespread' as to constitute a 'custom or usage with the force of
> law.'

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

> [W]hile it is true that Plaintiff will need to show more than just a single or isolated
> incident to ultimately *prevail* in his claim or to survive a motion for *summary*
> *judgment*, this Court is only evaluating if Plaintiff has asserted enough to prevail
> on a motion to *dismiss*. Under *Iqbal*, this means Plaintiff's complaint must only
> contain enough facts that, accepted as true, allows this Court to draw the
> 'reasonable inference' that there have been a sufficient number of particular
> instances of unconstitutional conduct by Defendant Cabell County's officials.
> Additionally, this Court must draw all reasonable factual inferences in Plaintiff's
> favor.

*Nichols v. Cty. Comm'n*, No. 3:18-0266, 2018 U.S. Dist. LEXIS 142409, at *13-14 (S.D. W. Va.

Aug. 22, 2018).

> The way in which a municipal police force is trained, including the design and implementation of training programs and the follow-up supervision of trainees, is necessarily a matter of 'policy' within the meaning of *Monell*. To the extent a particular training policy is fairly attributable to a municipality, it is 'official municipal policy.' To the extent such an official municipal policy has deficiencies resulting from municipal fault that then cause specific constitutional violations by deficiently trained police officers, the municipality is liable under 42 U.S.C. § 1983.

*Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987).

"Without having been directly authorized, or tacitly encouraged, or inadequately trained

in specific ways by responsible municipal policymakers, police officers, like other public

employees, may fall into patterns of unconstitutional conduct in their encounters with suspects,

arrestees, persons in custody and others involved in law enforcement situations." *Id*. at 1390.


## K.  Federal Tort Claims Act.

> [T]he district courts … shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages … for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C.S. § 1346(b)(1).

> The United States is generally immune from claims for money damages in civil suits, but the FTCA waives that immunity in certain circumstances, rendering the United States liable in tort in accordance with the law of the place where the act or omission occurred in the same manner as a private individual.

28 U.S.C. § 1346(b)(1); 28 U.S.C. § 2674.

**L.  Joint and Several Liability.**

"Tort defendants, including those sued in Bivens actions, are responsible for the 'natural consequences' of their actions."  *Higazy v. Templeton*, 505 F.3d 161, 175 (2d Cir. 2007). "Multiple tortfeasors who concurrently cause an indivisible injury are jointly and severally liable; each can be held liable for the entire injury. It is not essential that all persons who concurrently caused the harm be joined as defendants."  *Northington v. Marin*, 102 F.3d 1564, 1569 (10th Cir. 1996).  Persons who concurrently violate others' civil rights are jointly and severally liable for injuries that cannot be apportioned." *Id*. (citing *Weeks v. Chaboudy*, 984 F.2d 185, 188-89 (6th Cir. 1993); *Finch v. City of Vernon*, 877 F.2d 1497 (11th Cir. 1989); *Hinshaw v. Doffer*, 785 F.2d 1260, 1269 (5th Cir. 1986); *Watts v. Laurent*, 774 F.2d 168, 179 (7th Cir. 1985), *cert. denied* 475 U.S. 1085, 89 L. Ed. 2d 722, 106 S. Ct. 1466 (1986).

"1983 should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.  Since the common law recognized the causal link between the submission of a complaint and an ensuing arrest, we read § 1983 as recognizing the same causal link."  *Malley v. Briggs*, 475 U.S. 335, 344 n.7, 106 S. Ct. 1092, 1098 (1986).

## ARGUMENT[8]

**SECTION I. – 1983 STANDARD AGAINST THE COUNTY.**

The County of Arlington (hereinafter "County") correctly identified the core basis of a *Monell* claim, however, the *Spell* opinion by the Fourth Circuit provides for a fuller examination of municipal liability for police misconduct.  *Spell v. McDaniel*, 824 F.2d 1380 (4th Cir. 1987). In *Spell*, an arrestee, Henry Spell, was arrested after he was driving under the influence of

---

[8] Responding to the County's arguments *seriatim*.

20

alcohol and other drugs. *Id*. He was processed, tested, and arrested; while in the custody of the

officers, Mr. Spell was brutally attacked by an officer who struck Mr. Spell in the groin, causing

one of his testicles to rupture, and the coordinate pain and suffering. *Id*. In what the County may

argue is a "single instance" of bad conduct, the trial Court permitted the *Monell* claim to go to a

jury, the jury found the officer and the City of Fayetteville liable under the theory of *Monell*

liability, and the Fourth Circuit affirmed.[9] *See id*.

> On one hand, there is concern that actual municipal culpability in these matters
> should not be masked and final responsibility avoided by overly rigid
> interpretations and applications of the concepts of policy or custom, policymaking
> authority, and causation. *See, e.g., Tuttle*, 471 U.S. at 833 n.8 (Brennan, J.,
> concurring) (rejecting "metaphysical distinction between policies that are
> themselves unconstitutional and those that cause constitutional violations"). On
> the other hand, there is concern that a back-door vicarious liability principle
> should not be developed by overly tolerant interpretations and applications of
> those same key concepts. *See, e.g., id.* at 821 (plurality opinion) (overly tolerant
> concepts of policy and causation would impose municipal liability simply because
> the municipality hired one bad apple).

*Spell v. McDaniel*, 824 F.2d 1380, 1388 (4th Cir. 1987) (citations in original).

In the instant case, the persistence of the constitutional violations, the patent hyper-

irrationality of the County's officers with decades of experience in Arlington's police force

believing irrational things, for example, that Mr. Wells was in possession of "a handwritten list

of chemical compounds that have potential to make the human body bulletproof or even

invincible;" the use of such facially irrational assertions in multiple warrant affidavits by County

officers, and the manifold facts that followed, as well-pleaded in the SAC, do not show merely a

"single instance" of constitutional violations or a single "bad apple." The County is liable for

Mr. Wells' injuries because the routine or habitual unreasonable nature of the conduct of the

---

[9] The judgments against the officer and the City were affirmed on the merits; however, the
Fourth Circuit vacated the Court's award of a multiplier on the plaintiff's attorney's fee award.

ACPD officers on and after February 9, 2020, evince a pattern of unconstitutional conduct and irrationality that facially is not a one-off instance.

From the lack of an impound being conducted, but the officers claiming they reasonably believed they were impounding Mr. Wells' Mustang, to the lack of an impound and inventory form being completed, the failure to inventory and seize all valuable and dangerous items in Mr. Wells' vehicle, while claiming to be conducting an inventory, to the lack of knowing what an impound actually is, to falsely reporting the contents of Mr. Wells' vehicle, the ACPD Officers' conduct on February 9, 2020, demonstrates a pattern of conduct by, at least, five of the County's officers.

The pattern continued with Wanek's conduct on February 10, 2020, and thereafter, to demonstrate that Wanek was either woefully undertrained, unsupervised, or was similarly demonstrating the existence of official policy by such a pattern of unconstitutional conduct or a deliberate indifference to the rights of citizens.  For example, Wanek's misleading use of the current replacement cost of new rifle plates similar to the Rifle Plate in question, $590.00, instead of the market value at the time of the alleged larceny of the Rifle Plate that was purchased by the United States for $471.38 in 2009, demonstrates inadequate training or, in the alternative, discovery may show that Wanek defends his conduct by stating he acted in accordance with official municipal policy to value property in larceny cases and, as such, Mr. Wells' constitutional injuries were then caused by Wanek following such official policy, a separate valid reason to find *Monell* liability.  Plaintiff cannot know which is the case at the present time.

Finally, Barnickle's conduct on February 18, 2020, of searching and seizing Mr. Wells' Pontiac and his property therein before applying for a warrant, search and seizure of certain

property from his Pontiac before photographs were taken, and the fact that the impound and

inventory form was not completed until two days after it was searched and seized without a

warrant, and without any Fourth Amendment exception, indicates an absence of training and

supervision or continued demonstration of the pattern of unconstitutional conduct shown by her

colleagues.

### SECTION II. (A) – SECOND AMENDMENT INJURY.

A civil rights injury under 42 U.S.C. § 1983 exists when a person is deprived of any right

secured by the Constitution.  As the County's code demonstrates, implicitly, the County dislikes

gun owners and the Second Amendment.  The conduct of five of the County's officers on

February 9, 2020, demonstrated an instance of such dislike of gun owners and the Second

Amendment.  Mr. Wells was ordered by, at least, Fuentes and Soules on February 9, 2020, not to

keep and bear his arms, not to open carry, and his guns were confiscated without any possible

Fourth Amendment exception or any lawful law enforcement purpose.  However, instead of Mr.

Wells' firearms promptly being returned to him, hopefully with a solemn apology by the County,

Mr. Wells' firearms were held until April 16, 2021, and Mr. Wells was maliciously prosecuted.

As clearly articulated in the Heller decision, "[t]here seems to us no doubt, on the basis of

both text and history, that the Second Amendment conferred an individual right to keep and bear

arms." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008).  "[T]he Second Amendment

extends, prima facie, to all instruments that constitute bearable arms."  *Id*. at 582.  A deprivation

of an individual extension of such a right, for example, Mr. Wells' pistol and rifle on February 9,

2020, is a deprivation of Mr. Wells' Second Amendment rights within the meaning of 42 U.S.C.

§ 1983 just the same as if Fuentes, et al., had prohibited Mr. Wells from attending church

because they did not like his religion and believe it should be banned.  The conduct of the County officers amounted to a violation of the Second Amendment *and* the Fourth Amendment.

The County relies on the *Andrews* case from the Northern District of Ohio.  *Andrews v. Flaiz*, No. 1:14 CV 623, 2014 U.S. Dist. LEXIS 139664, at *25 (N.D. Ohio Sep. 30, 2014).  In *Andrews*, it was reported to the police that a man had a firearm pointed at his head and was going to commit suicide.  *Id*.  The police responded and took lawful action to attempt to stop such a tragedy.  *Id*.

In the instant case, Mr. Wells' well-pleaded allegations provide that there was no lawful law enforcement search and the County's officers on February 9, 2020, had no warrant, no reasonable suspicion, and no probable cause, and their search did not meet any Fourth Amendment exception.  Furthermore, there was no lawful law enforcement action to order Mr. Wells not to keep and bear his arms, open carry, or keep them in his locked trunk as his Mustang was towed to his apartment.  Mr. Wells' right to open carry his unloaded pistol and rifle in his hands as he walked away has not been challenged by any Defendant and no Defendant has provided a single citation to any case that empowered the officers to prohibit Mr. Wells from open carrying his firearms nor to seize his firearms on February 9, 2020.  The County similarly fails.

**SECTION II. (B) – SECOND AMENDMENT INJURY – POLICY OR CUSTOM.**

The County argues that the SAC does not have enough evidence to carry Mr. Wells' burden.  However, at this stage, Mr. Wells has provided well-pleaded allegations that the above-demonstrated pattern by the County's officers, by itself, is a consistent pattern demonstrating patent irrationality with one logical inference being that it was because Mr. Wells, in part, was a

24

gun owner.  Further evidence of the County's irrational anti-gun informal policy and custom

comes from the actual unconstitutional code passed by and still in force by the County.

Arlington County Code § 13.  Plaintiff does not refer to such code to demonstrate that it was

used to inflict an injury, however, it is evidence of the County's policy or custom to harass gun

owners unlawfully.  For example, Arlington County Code § 13-14, in part, unconstitutionally

prohibits gun possession, "(iv) in any public street, road, alley, or sidewalk or public right-of-

way, or any other place of whatever nature that is open to the public and is being used by, or is

adjacent to, a County-permitted event or an event that would otherwise require a County permit,

is prohibited, subject to the notice requirements of (5)." Arlington County Code § 13-14(1)(iv).

Thus, an otherwise law-abiding citizen with a lawful firearm, otherwise lawfully driving on a

public street through Arlington who happens by an event permitted by the County that has a 10-

point font notice hanging on a tree by the road is violating the County Code.  Such prohibition is

facially unconstitutional and demonstrates the County's patent policy or custom of violating the

rights of gun owners.

   The County argues that the report of the County's arrest and traffic data demographics for

2019 published by the Arlington County Police Department showing that black gun owners were

arrested at a disproportionately higher rate than their representation in the general population

provides no support for Mr. Wells' contention that he, as a black gun owner, was targeted as an

individual example of such pattern within Arlington County.  The County's arguments

misrepresent the purpose for the inclusion of such data.  The SAC contained allegations that the

search and seizure on February 9, 2020, the subsequent irrational treatment of Mr. Wells and his

property, the false warrant affidavits, the improper searches and seizures, are individual

extensions of the pattern laid out by the July 1, 2020, report published by Arlington County

Police Department.  It is Plaintiff's contention the evidence will bear out patterns analogous to *Spell v. McDaniel*, matter.  824 F.2d 1380 (4th Cir. 1987).  However, at this stage, Mr. Wells' SAC must contain only sufficient pleadings, taken as true, to nudge his claims of a pattern of racial and gun-ownership status unconstitutional conduct from conceivable to plausible.

### SECTION III. (A) – FOURTH AMENDMENT VIOLATIONS.

The County's argument that Mr. Wells failed to state a Fourth Amendment claim under *Monell* against the County should be rejected.  Similar to the *Spell* case, the SAC at this stage has placed before the Defendants a brief statement of the routine hyper-irrationality of the conduct of the ACPD officers on February 9, 2020, and Wanek and Barnickle thereafter.  The County references, only, Paragraph 251 of the SAC and fails to deal with the detailed description of the conduct of the ACPD officers on February 9, 2020, and thereafter.  Notably, the well-pleaded allegations that Fuentes and Soules, among the other officers, had no power or authority to prohibit Mr. Wells from open carrying his firearms.  SAC ¶ 56.  The ACPD Officers were untrained, unsupervised, or were following a pattern of practice that was persistent and widespread that resulted in their not knowing what an impound was, among other violations, including, without limiting,

- Searching and seizing items without evidentiary value to the citations being issued, ¶ 48;

- Seizing and holding firearms with no legal basis, ¶¶ 53-55;

- By either lying or failing to assist the judge, and failing to produce Mr. Wells, who was in custody, on February 28, 2020, related to the citations issued by Fuentes, ¶¶ 60-62;

- By the conduct of Lugasi, Soules, Kline, and Vanak, in conducting the search and seizure with no basis and without any specific or articulable facts.  ¶ 65;

- By opening closed containers, and searching and seizing Mr. Wells' property without consent, and that could have no evidentiary value to the citations.  ¶ 66;

- By not having the proper impound forms or not filling out and circulating such form, ¶ 70;

- By not knowing that to inventory a vehicle, the police must take it into custody, impound it, and fill out the appropriate form.  ¶¶ 71-75.

Such pattern promptly continued with Wanek and Barnickle's conduct, thereafter, substantially following the same pattern demonstrating deliberate indifference to the rights of citizens or persistent and widespread practice.  SAC ¶ 80-147.  Finally, at present, Plaintiff is unable to articulate certain facts related to the conversations that Soules and other officers had with an unnamed supervisor who was consulted.[10]  Furthermore, at the end of the encounter on February 9, 2020, another officer appeared on scene and Plaintiff believes it was a supervisor.  Such facts will necessarily need discovery, however, if it is the case that a sergeant or supervisor made certain decisions on February 9, 2020, relating to the search and seizure of Mr. Wells' property, then it would be an independent basis on which *Monell* liability may be found.  *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

The County argues that the fact that the officers did not follow policy implies that the County should not be held liable under *Monell*.  The failure of the officers to follow policy by failing to fill out the proper impound form is only one of the multitude of facts alleged in the SAC and it implies the County failed to properly train and supervise them and manifesting a

---

[10] At approximately 5:07 PM on Soules' recording of February 9, 2020, one officer, believed to be Soules, discussed with another officer, believed to be Vanak and Lugasi, their communications with a supervisor regarding the events on February 9, 2020; such communications are not presently available to Plaintiff and require discovery and may significantly implicate *Monell* liability.

deliberate indifference to the rights of its citizens.  The County cannot use as a defense the failure of its officers to follow policy.

In sum, the numerous examples of the ACPD Officers demonstrating through their conduct, and sometimes implying by their own words, that they regularly harass, search, and seize, gun owners' property in the County is sufficiently alleged in Plaintiff's SAC that allows the Court to draw the reasonable inference that there are a sufficient number of particular instances of unconstitutional conduct.  *See Nichols v. Cty. Comm'n*, No. 3:18-0266, 2018 U.S. Dist. LEXIS 142409, at *13-14 (S.D. W. Va. Aug. 22, 2018).


**SECTION III. B – NO FIFTH AMENDMENT CLAIM; FUENTES' ACTIONS ON FEBRUARY 28, 2020, VIOLATED THE FOURTEENTH AMENDMENT.**

Plaintiff has made no independent Fifth Amendment claim against the County and makes no substantive due process claim.

Fuentes' conduct, or the conduct of whatever officer appeared on February 28, 2020, however, grossly violated Mr. Wells' Fourteenth Amendment rights to due process.  SAC ¶¶ 60-62, 212.  The County does not dispute the conduct on February 28, 2020, violated the Fourteenth Amendment.  On February 28, 2020, Mr. Wells was in the County's custody and its officers were obligated to produce Mr. Wells for such Court appearance.  Furthermore, the documents attached as Exhibits 1 and 2 to Plaintiff's SAC indicate either a failure to be candid with the presiding judge or outright deception.  Ultimately, such conduct amplified the same indivisible injury properly pleaded by Plaintiff's SAC.  The conduct on February 28, 2020, demonstrates further failure to train the County's officers or failure to supervise.

### SECTION IV – NO § 19.2-59 OR TORT CLAIMS AGAINST THE COUNTY.

Plaintiff has made no such claims against the County.  Plaintiff's claims against the County comprise, "the unconstitutional conduct of its law enforcement officers for its formal policies, informal customs arising to law or policy, and if it fails to train its officers."  SAC ¶ 247.  The incorporation of the factual allegations in prior paragraphs is common and the County's apparent objection to it is confusing.  Plaintiff's SAC clearly states its claims against the County.

**WHEREFORE**, the premises considered, Plaintiff Mr. Wells respectfully requests the Court DENY the County of Arlington's Motion to Dismiss with prejudice, and for such other or additional relief as the Court may deem reasonable and just.

**Dated November 6, 2022.**

Respectfully submitted,

Curtis Wells,

By:_____/s/_____
Counsel

Matthew A. Crist, VSB No. 85922
mcrist@MACPLLC.net
Matthew A. Crist, PLLC
10432 Balls Ford Rd., Suite 300
Manassas, VA 20109
(571) 551-6859
***Counsel for Plaintiff***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on this day, November 6, 2022, that the foregoing paper was filed and served with the Clerk of Court via the Court's CM/ECF system, which will send notice of such filing to all registered users.

_____/s/_____
Matthew A. Crist
***Counsel for Plaintiff***