```
VIRGINIA:
THE GENERAL DISTRICT COURT
OF THE COUNTY OF ARLINGTON

                  + + + + +

------------------------
                       :
IN THE MATTER OF:      :
                       :
COMMONWEALTH OF VIRGINIA : GC-20000810-00
                       :
    VS.                :
                       :
CURTIS LEVAR WELLS, JR.  :
                       :
    DEFENDANT.         :
------------------------

              Monday,
              March 16, 2020

              Arlington, Virginia




              The preliminary hearing commenced at

12:19 p.m.




BEFORE:


        THE HONORABLE DANIEL T. LOPEZ, JUDGE
```

PLAINTIFF'S
EXHIBIT

**5**

APPEARANCES:


      ON BEHALF OF THE COMMONWEALTH OF VIRGINIA:


           MELANIE WRIGHT, ESQ.

           Assistant Commonwealth's Attorney

           1425 N. Courthouse Road

           Suite 5200

           Arlington, VA  22201

           (703) 228-4410


      ON BEHALF OF DEFENDANT WELLS:


           ANDREW O. CLARKE, ESQ.

           Andrew Clarke Law, PLLC

           1712 Eye Street, NW

           Suite 915

           Washington, D.C. 20006

           202-780-9144

CONTENTS

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Lauren Lagasse | 6 | 11 | | |
| Kimberly Soles | 17 | 21/27 | 28 | |
| Keith E. Shepherd | 30 | 41 | 47 | |
| Scott Wanik | 50 | 82 | | |
| Devon Dotson | 105 | | | |

| EXHIBIT NO. | DESCRIPTION | IDEN | RECD |
|-------------|-------------|------|------|
| **Commonwealth's** | | | |
| 1 | Photograph of items found in Mr. Wells' vehicle | 10 | 11 |

1               P-R-O-C-E-E-D-I-N-G-S

2               THE COURT:  All right.  Mr. Wells,

3    have you had any trouble hearing what's going on

4    today in court?

5               THE DEFENDANT WELLS:  I have not, Your

6    Honor.

7               THE COURT:  All right.  All right,

8    sir, I'm just going to remind you that, if you

9    make outbursts or you say things that could be

10   used against you at some point, these aren't

11   ideal because you aren't sitting right next to

12   your attorney.  But let it be known, I want you

13   to know that this is not a trial; it's a

14   preliminary hearing.  Do you understand?

15              THE DEFENDANT WELLS:  I do understand,

16   Your Honor.

17              THE COURT:  So, there will be no

18   finding as to guilt or innocence.

19              If there's anything you want to say to

20   your attorney, sir, remember this room is full of

21   people.  So, please don't make any outbursts.

22   Okay?

1              THE DEFENDANT WELLS:  Completely

2     understand, Your Honor.

3              THE COURT:  All right.  All right.

4     Let me have the witnesses raise your right hands

5     to be sworn.

6              (WITNESSES SWORN.)

7              THE COURT:  All right.  The defense

8     counsel has asked for a rule on witnesses.  So,

9     one of you will remain; the others will wait

10    outside.  Please don't discuss your testimony

11    with anybody else, including your colleagues who

12    will be sitting out there with you.  All right?

13              MS. WRIGHT:  Corporal Lagasse is the

14    first.

15              THE COURT:  All right, Corporal.

16    WHEREUPON,

17      CORPORAL LAUREN LAGASSE

18    was called for examination by Counsel for the

19    Commonwealth and, having first been duly sworn,

20    assumed the witness stand, was examined and

21    testified as follows.

22              THE CLERK:  Have a seat here.  It's

1    especially important that you speak into the

2    microphone because we are doing this by video to

3    be able to hear, for the Defendant to hear.

4                    THE WITNESS:  Okay.

5                    THE CLERK:  Thank you.

6                    THE COURT:  So, before you begin, Mr.

7    Wells, if you can't hear, please let us know that

8    you can't hear.  Okay?

9                    THE DEFENDANT WELLS:  Noted, Your

10   Honor.

11                   THE COURT:  Very well.

12        DIRECT EXAMINATION

13                   BY MS. WRIGHT:

14        Q      Please state your name and occupation.

15        A      Corporal Lauren Lagasse, police

16   officer with the Arlington County Police

17   Department.

18        Q      And how long have you been an officer

19   with the Arlington County Police Department?

20        A      I've been employed since December

21   2015.

22        Q      And on February 9th of this year, were

1    you so employed in that capacity?

2         A    I was.

3         Q    And on that date, did you come into

4    contact with someone that you know to be Curtis

5    Wells?

6         A    I did.

7         Q    Do you see Mr. Wells in the courtroom

8    today anywhere?

9         A    I do.  I see him on the video monitor

10   behind the judge.

11        Q    Okay.  Thank you.

12             MS. WRIGHT:  If the Court would please

13   note the identification of the Defendant?

14             THE COURT:  She has identified Mr.

15   Wells.

16             MS. WRIGHT:  Thank you.

17             BY MS. WRIGHT:

18        Q    On February 9th of this year, did you

19   respond to a call involving the Defendant?

20        A    I did.

21        Q    And what was the nature of that call?

22        A    It was a suspicious vehicle located

1    outside of Fort Myer.  They had called for our

2    assistance.

3         Q     And where specifically did you

4    respond?

5         A     It was on approximately One Southgate

6    Road outside of the cemetery.

7         Q     Is that located here in Arlington

8    County?

9         A     It is.

10        Q     And when you responded, were there any

11   other officers already on the scene?

12        A     There were.

13        Q     And who was on the scene when you

14   responded?

15        A     Officer Fuentes (phonetic), Corporal

16   Wanik (phonetic), now Corporal Kim Soles

17   (phonetic), and Nicole Pearson (phonetic).

18        Q     And where was the Defendant positioned

19   when you arrived?

20        A     He was seated on, just along the gate

21   of the cemetery with Officer Soles, and he was

22   detained in handcuffs.

1        Q    And did there come a time when you

2    assisted with an inventory of the Defendant's

3    vehicle?

4        A    I did.

5        Q    And who else assisted with that

6    inventory, if you remember?

7        A    My Recruit Officer Klein (phonetic),

8    Corporal Wanik, Officer Pearson, and Officer

9    Fuentes did to some degree.

10        Q    Okay.  And what, if anything, was

11    located within the vehicle?

12        A    Well, there were numerous items

13    located.  Amongst those were a Glock 19, an AR 15

14    Diamondback.  There was a medium-sized rifle

15    plate.  There were two rubber knives, masks,

16    gloves, a crowbar, a drone, a smoke grenade,

17    amongst many other items.

18        Q    Okay.  And where was the Defendant

19    positioned while you all were conducting that

20    inventory?  Was he still seated on the ground?

21        A    He was seated along a raised curb

22    along the gate of the cemetery.

1       Q      And after conducting the interview,

2    did somebody speak with the Defendant about the

3    contents of the vehicle?

4       A      Yes.

5       Q      Who was that officer?

6       A      That was Corporal Soles.

7              MS. WRIGHT:  Your Honor, may I

8    approach the witness?

9              THE COURT:  Yes.

10             (WHEREUPON, THE DOCUMENT REFERRED TO

11   WAS MARKED AS COMMONWEALTH'S EXHIBIT NO. 1 FOR

12   IDENTIFICATION.)

13             BY MS. WRIGHT:

14      Q      I'm going to show you what's been pre-

15   marked as Composite No. 1.  Do you recognize

16   these items?

17      A      I do.  This was the rifle plate that

18   was located in his vehicle.

19      Q      And is that a fair and accurate

20   depiction of how the rifle plate looked on

21   February 9th when you found it inside the

22   vehicle?

```
 1              A      It is.

 2                     MS. WRIGHT:  Your Honor, I offer this

 3       into evidence as Commonwealth's Exhibit 1.

 4                     THE COURT:  Any objection?

 5                     MR. CLARKE:  No objection.

 6                     THE COURT:  It will be admitted.

 7                     MS. WRIGHT:  Thank you.

 8                     (WHEREUPON, THE DOCUMENT REFERRED TO,

 9       PREVIOUSLY MARKED AS COMMONWEALTH'S EXHIBIT NO. 1

10       FOR IDENTIFICATION, WAS RECEIVED IN EVIDENCE.)

11                     MS. WRIGHT:  I have no further

12       questions for this witness at this time.

13                     THE COURT:  Ma'am, could you pass

14       the --

15                     THE WITNESS:  I can.

16                     THE COURT:  Thank you very much.

17                     Cross-exam?

18              CROSS-EXAMINATION

19                     BY MR. CLARKE:

20              Q      Where was the rifle plate located?

21              A      I do not recall exactly.

22              Q      Well, you said that you helped in
```

1       assisting the recovery of these items?

2               A      I did.

3               Q      So, it's possible that these items

4       were found somewhere else then?

5               A      They were located in the vehicle, and

6       that's all I can tell you.

7               Q      But your testimony is that you aren't

8       aware in the vehicle if these were (inaudible).

9       Did you actually physically take these items out

10      of the vehicle?

11              A      I don't recall.  I don't believe that

12      I took that specific rifle plate out of the

13      vehicle.  So, I can't --

14              Q      Okay.  So, let's clarify this.  What

15      exactly were you doing when you saw the item that

16      you just under oath introduced into evidence as

17      Commonwealth 1?  You said that is the same plate,

18      correct?

19              A      That was the plate, yes.

20              Q      So, what were you doing when you saw

21      that plate?

22              A      I was amongst many officers.  There

1   was a lot of property.  So, we were organizing

2   it.  I had a recruit officer.  So, I'm a field

3   training officer.  So, at that point, I was

4   making sure that he was documenting everything

5   that -- I can't tell you exactly where in the

6   vehicle it was located, but it was located from

7   the vehicle, based on my -- the other officers on

8   scene.

9       Q    So, it is based on hearsay, not your

10  own personal knowledge of where this thing was?

11      A    I don't know where exactly.  It came

12  from the vehicle.

13           MR. CLARKE:  Your Honor, I'm going to

14  move to strike her testimony about whether or not

15  this was true and accurate.

16           THE COURT:  Overruled.  She said she

17  knows it came from the car, but she can't tell

18  you exactly where.  That's what she says.

19           BY MR. CLARKE:

20      Q    Did you draft a police report?

21      A    My recruit officer did.

22      Q    And who's your recruit officer?

1          A      Austin Klein.

2          Q      Did you have any other involvement in

3    this case after this initial arrest?

4          A      I did not.

5          Q      At the time did Mr. Wells seem erratic

6    to you when he was sitting on the side of the

7    road?

8          A      He was making various different

9    statements kind of all over the place.

10         Q      What statements was he making?

11         A      I'm not going to say specifically.  He

12   was speaking to another officer, but the things

13   which he was discussing were not one that a

14   normal person would just be talking about on a

15   regular basis.

16         Q      But you can't say what it was?

17         A      You're going to have to listen to the

18   recording from the interview.

19         Q      From the -- I'm talking about your

20   interaction with him on the side of the road.

21         A      My interaction was very minimal with

22   him.

1      Q      Okay.

2      A      But, according to another officer,

3  from what was discussed with him, his statements

4  that were made were -- it ranged.

5      Q      Okay.  But you didn't hear any of

6  these statements yourself?

7      A      I heard pieces of it.

8      Q      Right, and that's what I'm trying to

9  get to.

10      A      And I'm not, I'm not going to testify

11  to exactly what was said.

12      Q      Why not?

13      A      Because it's on the recording and I

14  can't recall exactly what was said.

15      Q      So, you can't recall what was said?

16  All right.

17      A      That's correct.

18      Q      And the firearm that was found, the

19  Glock 19, it was unloaded?

20      A      I did not recover the Glock from the

21  vehicle.  Another officer did.

22      Q      The AR 15 Diamondback, was that loaded

1    or unloaded?

2         A    That was recovered by another officer

3    from the vehicle.

4              MR. CLARKE:  No further questions,

5    Your Honor.

6              THE COURT:  Any redirect?

7              MS. WRIGHT:  No, Your Honor.

8              THE COURT:  She's subject to recall?

9    Or is she free to go?

10             MS. WRIGHT:  I'll leave her subject to

11   the recall.

12             THE WITNESS:  Okay.

13             THE COURT:  All right.  Corporal, just

14   wait outside.  Please don't discuss your

15   testimony with the other officers.

16             (WITNESS EXCUSED.)

17             THE COURT:  Next witness?

18             MS. WRIGHT:  Corporal Soles.

19             MR. CLARKE:  And I apologize, Your

20   Honor.  I'm always sitting down because --

21             THE COURT:  That's okay.  So, they can

22   hear you.  Mr. Clarke, just as I stated before,

1    because the Court may make another determination

2    on bond at the preliminary hearing, if you have

3    any questions that might go to bond, you should

4    ask them now, so we don't have to call everybody

5    back up.

6              MR. CLARKE: No, Your Honor.

7              THE COURT:  All right.  And I can

8    easily distinguish what's the charge from what

9    the issue is at bond.

10             All right, Corporal Soles, come up and

11   have a seat, please.

12             Thank you.

13   WHEREUPON,

14      CORPORAL KIMBERLY SOLES

15   was called for examination by Counsel for the

16   Commonwealth and, having first been duly sworn,

17   assumed the witness stand, was examined and

18   testified as follows.

19             THE WITNESS:  Thank you, Your Honor.

20       DIRECT EXAMINATION

21             BY MS. WRIGHT:

22        Q     Please state your name and occupation.

1          A      Corporal Kimberly Soles.  I am a

2     police officer with Arlington County Police

3     Department.

4          Q      And how long have you been employed

5     with the Arlington County Police Department?

6          A      Over three years.

7          Q      And on February 9th of this year, were

8     you still employed, on duty, and displaying your

9     badge of authority?

10         A      Yes.

11         Q      And on that date, did you come into

12    contact with someone that you know to be Curtis

13    Wells?

14         A      I did.

15         Q      And do you see Mr. Wells anywhere in

16    the courtroom today?

17         A      He is on the teleprompter up there.

18         Q      Thank you.

19         A      The TV.

20         Q      And on February 9th, did you respond

21    to a call involving the Defendant?

22         A      I did.

1      Q      Where did you respond?

2      A      Over at One Southgate, outside of the

3  base and the Arlington Cemetery.

4      Q      And is that located here in Arlington

5  County?

6      A      It is.

7      Q      And when you responded to the scene,

8  were other officers already on the scene?

9      A      They were.

10      Q      Who was on scene when you arrived?

11      A      There was Corporal Wanik and there was

12  Officer Fuentes.

13      Q      And where was the Defendant when you

14  arrived on scene?

15      A      He was in the driver seat and was

16  being -- he was getting out of the driver's seat

17  with Officer Fuentes.

18      Q      Okay.  And after you arrived on the

19  scene, did you Mirandize the Defendant?

20      A      I did.

21      Q      And how long after you arrived on the

22  scene did that happen?

1        A        It happened almost immediately.   He

2    was placed into handcuffs and, then, within

3    minutes after, I did.

4        Q        And did you speak with him before or

5    after the vehicle was inventoried?

6        A        I spoke with him while the vehicle was

7    being inventoried and after.

8        Q        Okay.   And what did he say to you?

9        A        He stated that everything laid out

10   made it look suspicious.   And I asked him why he

11   had all the belongings, and he said that he does

12   a lot of training because he wants to be a

13   contract -- contract training for other officers

14   and other people that are interested in training.

15       Q        Did he elaborate on what that meant at

16   all to you?

17       A        He was very vague in his answers to

18   me.

19              MR. CLARKE:   Objection as to vague,

20   Your Honor.   She just laid out the details, Your

21   Honor, and, then, she said that he was vague.

22              THE COURT:   I'll overrule.   You can

1    cross-examine her on that issue.  It's her

2    impression.

3              BY MS. WRIGHT:

4         Q    Did he make any other statements to

5    you?

6         A    We talked about a lot of different

7    things, some relevant, some not.  He talked about

8    being from Texas, where his family is, and talked

9    about how he was in the military, but got out

10   after three years, things of that nature.

11             MS. WRIGHT:  Your Honor, I have no

12   further questions for this witness at this time.

13             THE COURT:  Cross-examine?

14        CROSS-EXAMINATION

15             BY MR. CLARKE:

16        Q    When you arrived on the scene, Mr.

17   Wells did give you details about why the items

18   were in his vehicle, correct?

19        A    He said that he had the items because

20   he does a lot of training and that he is hoping

21   to be a contract trainer for other people through

22   his business.

1      Q     Okay.  And then, on direct, you said

2    that he was being vague, but that sounds like

3    he's giving you a lot of details about his

4    employment.  Wouldn't you say that?

5      A     Well, when I asked who he works for,

6    what exactly he does, that's when he wasn't

7    answering the questions.

8      Q     Did you ask any followup questions to

9    him?

10      A     I attempted to find out more about the

11    place of employment and where he works, if it's

12    an office, if he works from home.  And he still

13    said he mostly worked from home, but there is an

14    office.  So, it was kind of both and roundabout,

15    which is why I said he was vague.

16      Q     Okay.  And you said that you gave him

17    his advice on constitutional rights?

18      A     Yes.

19      Q     Okay.  And those rights are the rights

20    to remain silent?

21      A     That is one of them.  It's all stated

22    on a card that's issued to us from my agency that

1   I read directly from.

2       Q    So, if the Defendant is not silent,

3   then you would say that they were being patently

4   vague?

5       A    No, I did not say that.

6       Q    I'm sorry, if the Defendant is silent,

7   then you would say that they were being vague?

8       A    No.

9       Q    Okay.  But you would admit that he did

10  have the right to remain silent at that point?

11      A    I did tell him he had the right to

12  remain silent and he said he understood, yes.

13      Q    So, him not answering your questions,

14  that's not him being vague?  That's him

15  exercising his constitutional right to remain

16  silent?

17      A    But he wasn't being silent.

18      Q    I'm sorry, was he being vague or was

19  he just not -- was he not answering your

20  questions or was he being --

21      A    He was not answering the questions by

22  not giving an answer of, oh, I work for business

1   such-and-such.  He was being vague in that, oh, I

2   work for myself; oh -- things of that nature.

3   Nothing direct.

4         Q    So, did you ask followup questions?

5   Sorry, I didn't get your answer to that.

6         A    Again, we talked at length.

7         Q    Okay.  And Mr. Wells was taken into

8   custody on that day?

9         A    Yes.

10        Q    On February 9th?

11        A    Well, he was detained at that time

12   while they were doing the inventory of the

13   vehicle.

14        Q    Was he arrested on that day?

15        A    He was issued citations for parking

16   infractions, or the registration infraction I

17   believe, and then, he was released.

18        Q    He was released?

19        A    To my understanding, he left with the

20   tow truck driver.

21        Q    But you just said that he made all

22   these vague statements, but he was released on

1      citations that day?

2          A      Well, it's not illegal to make vague

3      statements.

4          Q      But he did have two firearms in the

5      vehicle?

6          A      You would have to talk with the

7      officers that were investigating that.

8          Q      But at the time you didn't see

9      anything that would warrant him being taken into

10     custody?

11         A      At that point he was detained.  He was

12     not under arrest.

13             MR. CLARKE:  No further questions.

14             THE COURT:  Any redirect?

15             MS. WRIGHT:  No redirect, Your Honor.

16             THE COURT:  All right.  I have a

17     question.

18             THE WITNESS:  Yes, sir.

19             THE COURT:  So, when you came into

20     contact with Mr. Wells, you said he was getting

21     out of his vehicle?

22             THE WITNESS:  Yes.

1              THE COURT:  So, where was his vehicle,

2    was it in relation to the Southgate?

3              THE WITNESS:  So, the Southgate is --

4    sorry, it's going to be situated around here.

5    There's a long line of parking that's like front-

6    end-in that's all facing the cemetery.  He was in

7    that parking, parking spot, facing the cemetery.

8    So, he would have been a little bit kind of east

9    of the Southgate entrance.

10             THE COURT:  And the Southgate entrance

11   is at the top of the hill with the road coming up

12   from 110 going past the Netherlands Carillon?  Is

13   that the Southgate?

14             THE WITNESS:  So, Southgate is --

15             THE COURT:  By Iwo Jima Memorial?

16             THE WITNESS:  No, it's the one that's

17   over by the Air Force Memorial.

18             THE COURT:  Oh, okay.  All right.  And

19   who else was around Mr. Wells at this point

20   besides law enforcement?

21             THE WITNESS:  I only saw law

22   enforcement around him.

 1                    THE COURT:  All right.  Was there

 2     emergency equipment activated?

 3                    THE WITNESS:  I don't recall.

 4                    THE COURT:  And was he in handcuffs

 5     when you were talking to him?

 6                    THE WITNESS:  He was being placed in

 7     handcuffs, and then, he was in handcuffs the

 8     entire time I talked to him.

 9                    THE COURT:  All right.  Any questions

10     based on mine?

11       FURTHER CROSS-EXAMINATION

12                    BY MR. CLARKE:

13          Q     Approximately how far away from the

14     actual gate was Mr. Wells?

15          A     I couldn't give --

16          Q     What's the (inaudible)?

17          A     I couldn't give you an estimated

18     number.  Several hundred feet; I'm not sure.

19          Q     Several hundred feet?

20          A     I would -- it would be my best guess.

21     I couldn't give you a true, accurate estimate.

22          Q     Was it fair to say that he wouldn't be

1    able to see the front gate from where his vehicle

2    was parked?

3         A     I wouldn't be able to say that, yes,

4    one way or another.

5         Q     You said you would or --

6         A     I would not be able to say that one

7    way or another.

8         Q     No?

9               MS. WRIGHT:  May I ask a few

10   questions?

11              THE COURT:  Yes, please.

12      REDIRECT EXAMINATION

13              BY MS. WRIGHT:

14        Q     Corporal Soles, do you know who

15   detained the Defendant?  Do you remember?

16        A     It would have been Officer Fuentes.

17        Q     Okay.  Do you know if he detained him

18   before or after he learned that there were

19   firearms in the vehicle?

20        A     He detained him after he learned there

21   were firearms in the vehicle.

22        Q     Okay.  And did the Defendant indicate

1      to Officer Fuentes that there were firearms in

2      the vehicle?

3             A     I was told by Officer Fuentes that --

4                    MR. CLARKE:  Objection, Your Honor.

5      It's hearsay.

6                    THE COURT:  Well, I mean, you're going

7      to ask me to reconsider bond.  In a bond motion

8      hearsay is allowed.  So --

9                    MR. CLARKE:  Oh, as long as it's

10     for --

11                   THE COURT:  Go ahead.

12                   BY MS. WRIGHT:

13            Q     Go ahead.  Go ahead.

14            A     I was told by Officer Fuentes that he

15     was informed there was a handgun in the center

16     console of the vehicle.

17            Q     And do you know if Officer Fuentes was

18     told there were any other firearms in his

19     vehicle?

20            A     At that point I didn't know.

21                   MS. WRIGHT:  I have no further

22     questions of this witness.

1              THE COURT:  All right.  Subject to

2    recall?

3              MS. WRIGHT:  Also subject to recall.

4              THE COURT:  All right.  Corporal

5    Soles, you're subject to recall.  Please wait

6    outside and don't discuss your testimony with

7    anybody else.

8              THE WITNESS:  Thank you, Your Honor.

9              (WITNESS EXCUSED.)

10             MS. WRIGHT:  Detective Shepherd.

11   WHEREUPON,

12    DETECTIVE KEITH E. SHEPHERD

13   was called for examination by Counsel for the

14   Commonwealth and, having first been duly sworn,

15   assumed the witness stand, was examined and

16   testified as follows.

17             THE COURT:  All right, Detective, come

18   up and have a seat in the witness chair, please.

19             THE WITNESS:  Thank you, Your Honor.

20        DIRECT EXAMINATION

21             BY MS. WRIGHT:

22        Q    Please state your full name for the

1   Court.

2       A     Keith E. Shepherd.

3       Q     And, Mr. Shepherd, what do you do for

4   a living?

5       A     I am a detective assigned to the

6   Department of the Army at Joint Base Myer-

7   Henderson Hall.

8       Q     And how long have you been doing that?

9       A     I've been a detective since 2016.

10  I've been employed with the agency since 2009.

11      Q     And are you in the United States Army?

12  Like are you active --

13      A     Not in this capacity.

14      Q     Okay.  And can you explain to the

15  Court your duties and responsibilities as it

16  pertains to the United States Army?

17      A     My duties and responsibilities are

18  basically to investigate any and all instances

19  that might have a nexus to the Department of

20  Defense.  So, larcenies, assaults, threats

21  online, basically anything that would affect that

22  installation or possibly the Army a little bit

1    wider.

2         Q     And you indicated that you have

3    previously investigated larcenies, is that

4    correct?

5         A     I have.

6         Q     And what do you do in preparation to

7    investigating a larceny?

8         A     Depending on the larceny, but,

9    basically, gather facts, gather evidence, attempt

10   to link subjects, witnesses, victims, depending

11   on whether it's an individual or if it's a series

12   of larcenies.

13        Q     And when investigating a larceny, do

14   you also determine the value of the property that

15   is missing?

16        A     Yes, we do.

17             MS. WRIGHT:  Your Honor, may I

18   approach with Commonwealth 1?

19             THE COURT:  Yes.

20             BY MS. WRIGHT:

21        Q     Detective, I'm going to show you

22   what's already in evidence as Commonwealth's

1    Exhibit 1.  Do you know what this is?

2         A     This is an E-SAPI plate.

3         Q     And can you explain to the Court what

4    it is exactly?

5         A     So, this is a ceramic armor protective

6    insert utilized for a ballistic vest issued to

7    military troops and some law enforcement

8    agencies, designed to be paired in this instance

9    in an interceptor outer tactical vest.  So, if

10   one were to deploy to Afghanistan, you would have

11   a vest.  It would have a soft armor panel backing

12   it and, then, this hard armor plate placed in

13   front of it.  The purpose of this plate is to

14   stop rifle rounds.  So, armor-piercing, 5.56-

15   caliber, M4-style rifle rounds, AK rounds, and

16   rounds of that nature.

17        Q     Okay.  Are those high-caliber rounds

18   that you're listing off or --

19        A     You could call them high-caliber.

20   They're standard military-grade rifle rounds used

21   in combat.

22        Q     Okay.  Are plates like this purchased

1    by the United States Army?

2         A    Yes, they are.

3         Q    And do you know the Army purchasing

4    process?

5         A    Not exactly because I'm not a

6    Contracting Officer.  I have a very loose

7    understanding of it.

8         Q    Okay.  And when you were investigating

9    -- did you come to investigate an individual that

10   you know to be Curtis Wells?

11        A    Yes.

12        Q    And when you were investigating the

13   Curtis Wells case, was that a larceny case?

14        A    It was.

15        Q    Okay.  And as part of that

16   investigation, did you determine how the Army

17   purchased rifle plates like this?

18        A    I did.

19        Q    Okay.  And as a part of that

20   investigation, did you learn how this particular

21   rifle plate or rifle plates like this were

22   purchased by the Army?

1          A     Yes, I did.

2          Q     Okay.  And can you explain that to the

3     Court?

4          A     So --

5               MR. CLARKE:  Objection, Your Honor.

6     I believe that was a compound question.  She

7     said, larceny plates or larceny plates like this.

8     Mr. Wells currently is being charged with  stolen

9     property for this particular rifle plate, not for

10    any other rifle plate.  So, she can just specify

11    that she's talking about a purchase like this

12    rifle --

13              THE COURT:  All right.  Rephrase your

14    question.

15              MS. WRIGHT:  Okay.

16              BY MS. WRIGHT:

17         Q     Did you investigate how this

18    particular rifle plate was purchased by --

19         A     Yes, I did.

20         Q     Can you explain that to the Court?

21         A     So, the Army initiated a contract.  If

22    I may refer to my notes real quick?  The United

1    States Army sent out a contract request to

2    Ceradyne Industries for X amount of plates.

3          I reached out to Ceradyne Industries

4    with these photos of this plate, along with the

5    serial number.  They were able to tell me that it

6    was purchased under an Army contract.  They

7    provided me with a copy of the contract to prove

8    that this plate serial number came in Lot No. 10.

9    It was part of that lot ordered in on or around

10   March of 2011.

11         Based on the documents they sent me,

12   ordered under Army contract, paid for by the

13   Army, manufactured by Ceradyne Industries, and

14   then, Ceradyne Industries shipped these to a

15   military shipping and receiving point for the

16   United States Army, so that they could be

17   distributed throughout the force.

18         Q    Okay.  And do you know the purchase

19   price of this plate?

20         A    According to the Central Issuing

21   Facility supervisor at Fort Myer, this plate cost

22   $590.

1          Q      Okay.  And once the plates are

2     purchased, how does the Army come into possession

3     of the plates?  Do they eventually receive them

4     on base?

5          A      Yes.

6          Q      Okay.

7          A      Yes.

8          Q      And once they are received on base, do

9     you know if they are, then, distributed out to

10    active duty servicemen?

11         A      They are.

12         Q      Okay.  And do you know how that

13    process works, how they're distributed to --

14         A      So, all of the military-type equipment

15    goes to a Central Issuing Facility on any

16    installation.  That, it's basically a warehouse.

17         Q      Okay.

18         A      So, service members, when they're

19    newly assigned to the installation as part of

20    their in-processing are directed to go to the

21    Central Issuing Facility and, depending on what

22    their job is, they have a list of items that they

1      are required to receive from that Central Issuing

2      Facility and maintain for the duration of time

3      they are assigned to that installation.

4              There are some differences between an

5      initial issue and an installation-specific issue.

6      Some items service members are allowed to keep

7      for their entire contract.  Some items, such as

8      body armor and very specific tactical gear, are

9      drawn at the installation and, then, turned back

10     in, so they can be recycled, because each

11     installation has a different purpose.

12          Q     Okay.  And do you know where this

13     plate would fall under that?

14          A     This is a draw it at the installation

15     and turn in before you depart that installation

16     for any reason.

17          Q     Okay.  Is there ever a time, if you

18     know, when someone either retires or is

19     discharged from the Army, that they are ever able

20     to keep a plate like this?

21          A     There is not.

22              MS. WRIGHT:  I have no further

1    questions for this witness.

2              THE COURT:  Cross-examine?

3              MS. WRIGHT:  Oh --

4              THE COURT:  Go ahead.  If you have

5    more questions, please feel free to ask them.

6              MS. WRIGHT:  Thank you.  I just want

7    to ask one question.

8              BY MS. WRIGHT:

9        Q     Do you know where the Southgate

10   entrance is to Fort Myer?

11       A     Yes, ma'am.

12       Q     And do you know where that is in

13   relation to the cemetery?

14       A     Yes, ma'am.

15       Q     And if someone is parked right in

16   front of the cemetery, how far away is that to

17   the gate?

18       A     So, there are two gates on that side

19   of the installation, one which is permanently

20   closed, which is called Henderson Hall Annex

21   Gate, which abuts the cemetery wall itself.  And

22   then, there is the Henderson Hall Gate, as we

1   call it, which is up closer to the Marine Corps

2   Exchange.

3               If we're speaking about where the

4   vehicle in this case was parked in relation to

5   the Annex Gate, it's probably 50 feet.  If we're

6   talking about the gate that is open and manned

7   with security personnel, you're talking about 200

8   yards.

9        Q    Okay.  Would somebody parked in that

10  parking lot be able to see the gate --

11       A    No.

12       Q    -- from where they were parked?  No?

13       A    Not the one that's open and

14  operational.

15       Q    The one that's closed, would you be

16  able to see that?

17       A    Absolutely.

18       Q    And is there ever anybody manning that

19  gate, although it is closed?

20       A    At certain hours, based on our current

21  increase in security posture -- I can't give you

22  the schedule -- but there are patrols that do

1    keep an eye on that gate because it is considered

2    a vulnerability point.

3         Q    Okay.

4              MS. WRIGHT:  I have no further

5    questions of this witness at this time.

6              THE COURT:  Cross?

7              THE DEFENDANT WELLS:  Can I just ask

8    questions?

9              THE COURT:  Your attorney.

10             THE DEFENDANT WELLS:  Oh, okay.

11             THE COURT:  They turned off your

12   client's microphone, which is probably a good

13   idea.

14             Sir, your attorney is asking

15   questions.  You have an attorney here to

16   represent you.  That's his job.  So, he's

17   representing you.  So, it's not up to you to ask

18   the questions.  Mr. Clarke is doing that.

19        CROSS-EXAMINATION

20             BY MR. CLARKE:

21        Q    How long did you say that you're

22   working, that you were working for the Department

1    of the Army?

2           A       I have been an employee with the

3    Department of the Army police since February of

4    2009.

5           Q       And during direct testimony, you said

6    that there is never any instance where a rifle

7    plate that was issued to a service member would

8    be released back to that service member for --

9           A       Not lawfully, by policy.

10          Q       Say that again?

11          A       Not lawfully, according to policy.

12          Q       And this purchase, to wrap up what you

13   said, was purchased back in 2011?

14          A       The order was placed in 2011.

15          Q       And then, from 2011, it was, then --

16   sorry -- when it was received by the Army base,

17   it was then shipped to Fort Myer?  Is that what

18   your testimony is?

19          A       That's my understanding.

20          Q       That's your understanding of the

21   event?

22          A       Yes, sir.

1        Q     Okay.  So, you're not really sure?

2        A      So, the way these plates are done is

3    they go to a Central Issuing hub outside of the

4    installation.  So, they go to -- give me one

5    second -- it's a U.S. Army command at Aberdeen

6    Proving Group.  Once they enter that system, they

7    are no longer tracked by serial number.  So, I

8    can't tell you that it came to Fort Myer.  I can

9    tell you it is a serialized plate owned by the

10   United States Army.  But once it enters the

11   Army's supply system, the Army tracks it by size,

12   not by serial number.

13             THE CLERK:  The Court's indulgence,

14   Your Honor.

15             (PAUSE.)

16             BY MR. CLARKE:

17        Q     So, did you tell Detective Wanik,

18   around February 13th, 2020, that this particular

19   shipment of rifle plates were received by the

20   U.S. Army at Aberdeen Proving Ground and, then,

21   subsequently, transferred to the U.S. Army at

22   Fort Myer?

1       A       That was the belief.  So, they were

2   received by the United States Army at Aberdeen

3   Proving Ground and, then, believed to have been

4   shipped to Fort Myer.

5       Q       What are you basing that belief on?

6       A       Assumption.

7       Q       So, you're speculating?

8       A       Yes.

9       Q       You're conjecturing?

10      A       Sorry, not familiar with the word.

11      Q       Withdraw that last question.

12              And you talked about the rifle plate

13  itself and the grade of that rifle plate.  Those

14  rifle plates are also widely available to the

15  public as well?  It's nothing that's exclusive to

16  the Army?

17      A       I mean, this green style here is

18  fairly exclusive to the Army.

19      Q       So, fairly?  What do you mean by

20  fairly exclusive?

21      A       I mean, I'm not an expert on who else

22  Ceradyne sends their plate to.  In my years, I

1    have only ever seen this style of SAPI plate

2    issued to the Department of Defense.

3         Q    So, it's possible that this particular

4    rifle plate could have been sold publicly?

5         A    No, not based on the information that

6    I was provided by the manufacturer.

7         Q    So, are there other types of rifle

8    plates that are Army-issued that could be sold

9    publicly?

10        A    Not to my knowledge, but I'm not a

11    supply specialist.

12        Q    So, you just simply just don't know?

13        A    Not to that -- I can tell you that

14    this plate was bought and sold to the United

15    States Army.

16        Q    I'm talking about, I'm talking about,

17    I'm talking about plates that have that U.S.

18    symbol line.  Those plates, in general, those

19    plates could possibly be sold publicly or

20    surplussed by the Army?

21        A    Okay.  I can't -- so, I can tell you

22    that they're not surplussed by the Army.

1      Q      Okay.

2      A      As per the DLA disposition individual

3  that we spoke to at Fort Meade that handles

4  disposition of all D mail D type items, which

5  these plates are considered, the DoD policy

6  across the board is, once they reach the end of

7  their service life, they are to be physically

8  destroyed.  They are not, by policy, lawfully

9  allowed to be transferred to the civilian market.

10      Q      Okay.  You say by policy, but it does,

11  it does happen?

12      A      I mean, lots of things happen.  That

13  doesn't make them legal.

14              MR. CLARKE:  Just a moment, Your

15  Honor.

16              BY MR. CLARKE:

17      Q      And do you know whether or not this --

18  whether or not the value of the plate goes up and

19  down, depending on whether it's still useful to

20  the Army?

21      A      I -- all I can tell you is, when I

22  checked with the Central Issuing Facility, they

1    gave me a set price for this plate.  They did not

2    mention any depreciation because the item is

3    either serviceable and should be replaced or not

4    serviceable and it would be destroyed.

5         Q    And you're not sure whether or not

6    this fell on the former or latter?

7         A    I, because I've not inspected the

8    plate or had the plate inspected for

9    serviceability, I can't testify to that.

10        Q    Okay.  So, it's possible that this

11   plate could be out of service and considered no

12   longer useful to the Army at that point?

13        A    In its current condition, yes.  When

14   it was issued, no, it would have been fully

15   functional.

16             MR. CLARKE:  Nothing further, Your

17   Honor.

18             THE COURT:  Redirect?

19             MS. WRIGHT:  Yes, Your Honor.

20        REDIRECT EXAMINATION

21             BY MS. WRIGHT:

22        Q    Can you tell me what the service life

1    is on each plate?

2         A    Only by speculation.  But, basically,

3    the way it was explained to me, the plates are

4    serviceable so long as they are inspected and

5    found to be useful, unlike soft body armor that

6    the manufacturers have, I think, an average of

7    five years.  And again, that's just based on

8    personal experience, not expertise.

9         Q    And how does the Army determine

10   whether a plate is serviceable or not?

11        A    I don't know the actual scientific

12   method.  I know the end-user one that they tell

13   us is you put it on with the curved edge down and

14   you roll it to listen for any cracks, pops, or

15   snaps.  If you hear anything like that, you're

16   supposed to take it in.  Then, they will send it

17   off for proper evaluation and issue you another

18   plate.

19        Q    And would a non-serviceable plate ever

20   be issued to an active duty serviceman for their

21   use?

22        A    Not by policy.

```
 1        Q    Okay.  And Defendant's counsel briefly
 2   discussed depreciation.  Do these plates
 3   depreciate?
 4        A    Not to my knowledge.
 5        Q    Okay.
 6             MS. WRIGHT:  I have no further
 7   questions at this time.
 8             THE COURT:  Is he subject to recall?
 9             MS. WRIGHT:  Yes.
10             THE COURT:  All right, Detective,
11   please wait outside.
12             THE WITNESS:  Yes, sir.
13             THE COURT:  And you're subject to
14   recall.  Do not discuss your testimony with
15   anybody else.
16             (WITNESS EXCUSED.)
17             MS. WRIGHT:  Detective Wanik is the
18   last Commonwealth witness.
19             THE COURT:  All right.  Detective
20   Wanik.
21             All right, Detective, please come up
22   and have a seat in the witness chair.
```

1   WHEREUPON,

2        DETECTIVE SCOTT WANIK

3   was called for examination by Counsel for the

4   Commonwealth and, having first been duly sworn,

5   assumed the witness stand, was examined and

6   testified as follows.

7        DIRECT EXAMINATION

8             BY MS. WRIGHT:

9        Q    Please state your full name for the

10  Court.

11       A    Scott Wanik.

12       Q    Detective Wanik, what do you do for a

13  living?

14       A    I'm a detective with Arlington County

15  Police Department.

16       Q    And how long have you been employed

17  with the Arlington County Police Department?

18       A    Twenty-one years.

19       Q    And do you have a special assignment?

20       A    I work for the Criminal Investigations

21  Division, Homeland Security Section.

22       Q    Okay.  How long have you been doing

1    that?

2          A      Since April of last year.

3          Q      And on February 9th of this year, did

4    you learn about an incident pertaining to an

5    individual by the name of Curtis Wells?

6          A      I did.

7          Q      And on that date, did you begin to

8    investigate that individual?

9          A      I did.

10         Q      And after that investigation, on

11   February 18th, did you ultimately arrest the

12   Defendant?

13         A      I did.

14         Q      And do you see the Defendant anywhere

15   here in the courtroom today?

16         A      I do.  He's on the monitor.

17         Q      All right.

18                MR. CLARKE:  Let the record reflect

19   that the witness has not immediately identified

20   my client.  After several people in the courtroom

21   pointed to the monitor, that's when he did.

22                THE COURT:  Well, no, no, no.  No, no,

1    no.  Mr. Clarke, you do not decide what to

2    reflect.  You can ask him questions on that.

3              MR. CLARKE:  Okay.

4              THE COURT:  And he looked around and

5    he looked up at the monitor.  He didn't see a

6    monitor.  There's no monitor in front of this

7    witness, as he's testifying.  As he looks out, he

8    can see the Commonwealth in the back of the

9    courtroom.  The only monitor that he can see is

10   behind him.  So, it's not apparently visible to

11   him, but he did look at it and identify Mr.

12   Wells.  But you can certainly go into, ask him if

13   he can identify Mr. Wells.

14             MR. CLARKE:  Okay, Your Honor.

15             THE COURT:  But he did identify Mr.

16   Wells.

17             Go ahead.

18             MS. WRIGHT:  Thank you, Your Honor.

19             BY MS. WRIGHT:

20        Q    After taking the Defendant into

21   custody, did you interview him?

22        A    I did.

1        Q      And prior to doing that interview, did

2    you Mirandize the Defendant?

3        A      I did.

4        Q      And did he indicate that he understood

5    his rights?

6        A      He did.

7        Q      And did anyone else interview the

8    Defendant with you?

9        A      Yes.

10       Q      Who else was in the room?

11       A      George Ziragronis (phonetic) which --

12              MR. CLARKE:  I'm going to object.  I'm

13   going to object to this line of questioning, Your

14   Honor.  This bears no relevance to whether or not

15   he actually took that warrant out.  He took that

16   warrant out, I believe it was February.

17              THE COURT:  Well, I'm going to

18   overrule the objection.  She's just asking who

19   was present when she Mirandized; if he Mirandized

20   the Defendant, who was present during his

21   statement.  So, the objection is overruled.

22              Maybe there's another objection

1    coming, but you can answer that question.

2            BY MS. WRIGHT:

3        Q    Who else was in the room with you?

4        A    Task Force Officer George, I'm just

5    going to say "Z".

6        Q    I understand.

7        A    I don't want to butcher his last name.

8    But he was with me from the FBI Joint Terrorism

9    Task Force.

10       Q    Thank you.

11           THE COURT:  And I will just note, the

12   Court will take, has taken judicial notice,

13   there's a warrant of arrest that has Arresting

14   Officer Wanik's name on it.  And I believe he

15   testified that he did arrest Mr. Wells.

16           MR. CLARKE:  Correct, Your Honor.  But

17   what they're about to testify to is an event that

18   happened four days after the warrant itself.

19           THE COURT:  All right.  Well, we

20   haven't gotten there.  I have no idea what

21   they're going to ask.  So, let's just take it one

22   step at a time.

1            MS. WRIGHT:  Okay.

2            BY MS. WRIGHT:

3       Q     Was there ever a point in that

4   interview when you discussed with the Defendant a

5   rifle plate that was found in a vehicle on

6   February 7th --

7            MR. CLARKE:  Again, Your Honor, I'm

8   objecting to the fact that this interview

9   happened four days after --

10            THE COURT:  Well, I need some grounds.

11   What's the grounds for the objection?  Is it

12   relevance?

13            MR. CLARKE:  The objection is

14   relevance, relevancy, Your Honor.  It's been --

15            THE COURT:  Okay.  Hold on.  You don't

16   have to keep going.  I understand the relevancy.

17            How is it relevant?

18            MS. WRIGHT:  Your Honor, Detective

19   Wanik interviewed the Defendant and the Defendant

20   made statements regarding the rifle plate that

21   was found in his possession on February 7th,

22   which is the subject of the warrant.  This is a

1    Franks hearing.

2              THE COURT:  All right.

3              MS. WRIGHT:  So --

4              THE COURT:  Well, that is --

5              MR. CLARKE:  What the Commonwealth is

6    not telling the Court is the date that this

7    particular interview occurred.

8              THE COURT:  Well, so wait a minute.

9              MS. WRIGHT:  I did tell the --

10             THE COURT:  So, hold on.  Hold on.

11             So, what you're telling me, Mr.

12   Clarke, is if he, Detective Wanik, interviewed

13   Mr. Wells on a date other than the 9th of

14   February, that the interview, the statements that

15   he made wouldn't be relevant?

16             MR. CLARKE:  No, Your Honor.  What

17   we're --

18             THE COURT:  Okay.  Then, what's the --

19   tell me the relevance -- why it's not relevant.

20             MR. CLARKE:  Because, Your Honor,

21   we're here on a preliminary hearing  as to the

22   warrant that was sworn out on February 14th of

1    this year.  What they're getting ready to testify

2    to is an interview that happened subsequently

3    after he was arrested on February 18th.  So, for

4    preliminary hearing purposes, all we're trying to

5    figure out is whether or not Mr. Wells is the

6    person that committed a crime in order for them

7    to be able to --

8              THE COURT:  So far, you haven't told

9    me anything that I don't know.

10             MR. CLARKE:  Correct.

11             THE COURT:  So, Mr. Clarke, so if

12   somebody commits a murder today, and the warrant

13   is issued in a week, and the person's not

14   arrested for six months and makes a statement,

15   are you telling me that those statements that

16   that person made six months after the alleged

17   offense are not admissible?

18             MR. CLARKE:  No, Your Honor.

19             THE COURT:  Then, I don't understand

20   your argument at all.

21             MR. CLARKE:  My argument --

22             THE COURT:  So, make it concise and

1    short.  And know that I know what a preliminary

2    hearing is and I know what the elements of the

3    possession of stolen property are.

4              So, go ahead.

5              MR. CLARKE:  Your Honor, what the

6    Court should not consider is anything that

7    happens after the arrest.  Now, if we're in

8    Circuit Court, that's a different, that's a

9    different --

10             THE COURT:  Why?

11             MR. CLARKE:  Because we're trying to

12   figure out --

13             THE COURT:  No, no, I know what we're

14   trying to figure out.  But why shouldn't the

15   Court consider any of those events between the

16   9th of February and the 18th of February, 2020?

17             MR. CLARKE:  No, I am asking the Court

18   to consider that.  What I'm saying is that this

19   interview happened after that.

20             THE COURT:  So what?  I don't

21   understand.  I mean, your argument that -- I mean

22   with all due respect -- your argument doesn't

1    hold any water.  Based on what you're telling me,

2    that's my response.  It's, so what?  Legally --

3    legally, it's a matter of law -- what rule of

4    evidence is going to keep that out and why isn't

5    it relevant when he's discussing -- specifically,

6    the question was about this alleged plate that

7    was found in his vehicle, allegedly.  So, I don't

8    understand the basis of -- I mean, I'm sorry if

9    I'm thick-headed, but I don't get it.

10                   So, go ahead and try again, please.

11                   MR. CLARKE:  Your Honor, the basis is

12   that we're here on a preliminary hearing.

13                   THE COURT:  I get it.  Show probable

14   cause that was felony was committed --

15                   MR. CLARKE:  Exactly.

16                   THE COURT:  -- and this gentleman

17   committed the offense.

18                   MR. CLARKE:  Exactly.  Thank you, Your

19   Honor.

20                   THE COURT:  The evidence that I have

21   thus far is that he was there in front of this

22   gate.  I don't know why he was initially stopped,

1    but he was.  There was testimony that he said he

2    had a gun or a gun was found in the middle of the

3    console.  They started to question him about

4    that.  They searched the vehicle.  They found

5    that plate that's in evidence.

6              MR. CLARKE:  Correct.

7              THE COURT:  A gentleman has come in

8    and testified that his investigation revealed

9    that the plate, medium Ceradyne plate with the

10    serial number on the warrant was sold to the Army

11    on a certain date.  His understanding is that, if

12    this plate is given to you when you're in the

13    Army, then you have to give it back; that he

14    doesn't know of any circumstances that you are

15    supposed to be able to keep the plate.

16              Now the question is from the

17    Commonwealth Attorney, did this detective

18    question the Defendant regarding the plate?  Why

19    is that not relevant?

20              MR. CLARKE:  So, one, Your Honor, this

21    happened on Tuesday, February 18th.  We're here

22    just looking at the arrest warrant, right?  Your

1      Honor is trying to consider, Your Honor is trying

2      to consider -- what we're trying to do, and I'm

3      trying to break this down as simply as possible,

4      Your Honor, but what we're trying to do is we're

5      trying to ascertain on this warrant --

6                THE COURT:  Well -- go ahead.  I'm

7      trying to ascertain, right?

8                MR. CLARKE:  Yes.

9                THE COURT:  Go ahead.

10               MR. CLARKE:  On this warrant arrest --

11               THE COURT:  Right.

12               MR. CLARKE:  -- right? --

13               THE COURT:  Yes.  February 9th, 2020,

14     that he was in possession of this plate, and the

15     plate was stolen.  And he knew it was stolen.

16               MR. CLARKE:  Right.

17               THE COURT:  Okay.

18               MR. CLARKE:  But the facts and

19     circumstances surrounding that particular

20     warrant, right?

21               THE COURT:  Why do you keep getting

22     hung up on the warrant?  Yes, we're here on the

1  warrant.  I get it.

2           MR. CLARKE:  All right.  That's

3  correct.

4           THE COURT:  That's the only thing we

5  could be here on.

6           MR. CLARKE:  But Your Honor is trying

7  to consider things that happened after the fact

8  that the detective already made the decision to

9  arrest him.

10           THE COURT:  I haven't heard that yet.

11           MR. CLARKE:  But he was already, he

12  was already arrested at the time that this

13  interview was provided.

14           THE COURT:  Your own motion says he

15  wasn't under arrest yet; that they kind of

16  tricked him into coming in and talking about it.

17           MR. CLARKE:  That's --

18           THE COURT:  And then, before he left,

19  they arrested him.

20           MR. CLARKE:  That is what they did,

21  yes, but that's not what, that's not what

22  happened.  So, when he, when he's --

1               THE COURT:  Overruled.  Oh, no, I'm

2     not going to spend another 20 -- with all due

3     respect, I don't have -- your motion does not

4     have any merit to it.  I don't see the merit at

5     all.

6               MR. CLARKE:  I was reflecting this

7     agreement --

8               THE COURT:  I understand that, and

9     that's --

10              MR. CLARKE:  And I'm going to raise

11    the same objection as it becomes clear to Your

12    Honor that he was already --

13              THE COURT:  All right.  Go ahead.

14    Next question.

15              BY MS. WRIGHT:

16        Q    Did there come a point in the

17    interview when the Defendant discussed the rifle

18    plate that was located in his car on February

19    9th?

20        A    Yes.

21        Q    Okay.  And initially, how did the

22    Defendant indicate to you he came in possession

1       of that rifle plate?

2            A      He initially told me that he had

3       purchased it from a white male who he thought was

4       a Marine at an airsoft convention or an airsoft

5       event somewhere nearby.

6                       THE COURT:  All right.  And what date

7       was the interview?  Was there more than one

8       interview?

9                       THE WITNESS:  There's one interview.

10                      THE COURT:  And what date was that?

11                      THE WITNESS:  The same date as the

12      arrest.

13                      MS. WRIGHT:  February 18th.

14                      THE COURT:  February 18th?

15                      MS. WRIGHT:  Yes.

16                      THE COURT:  Okay.

17                      BY MS. WRIGHT:

18           Q      And during your interview, did the

19      Defendant also explain his time of service in the

20      United States Army?

21           A      Yes.

22           Q      And did he explain that he was no

1        longer in the Army?

2              A     Yes.

3              Q     And explain to the Court how he

4        indicated his time of service ended.

5              A     He told me that he was discharged.

6        There were a series of disciplinary issues that

7        led to his discharge under -- it was honorable

8        under general conditions, or something to that

9        effect.

10             Q     And did he also explain during this

11       interview this outprocessing with the Army?

12             A     Yes, he did.

13             Q     And how did he explain that happened?

14             A     He said that, when he was outprocessed

15       through the CIF, the Central Issue Facility, that

16       he turned in all his issued equipment and was

17       given a clean bill where he didn't owe anything

18       for any missing property.

19             Q     And did he explain that he was

20       required to turn in all of his Army-issued

21       equipment?

22             A     He indicated to me that he was aware

1      of that.  We talked about that --

2              Q      Okay.

3              A      -- several times during the interview.

4              Q      And what specifically was he aware of?

5              A      That you can't keep military-issued

6      armor and weapons, as two examples, but you can't

7      keep military-issued equipment after you

8      discharge; you have to turn that stuff back in.

9              Q      Okay.  And did he indicate that he

10     turned in all of the equipment that was issued to

11     him personally?

12             A      Yes.  Yes, he did.

13             Q      Okay.  And did he explain to you how

14     his barracks were ultimately packed when he was

15     discharged from the Army?

16                    THE COURT:  How what was ultimately

17     packed?

18                    MS. WRIGHT:  His barracks where he

19     lived.

20                    THE COURT:  Barracks?  Okay.  Uh-hum.

21                    THE WITNESS:  He said that during his

22     outprocessing he was trying to get things signed;

1    he was running from office to office getting a

2    piece of paper, you know, paperwork signed.  And

3    while he was doing that, his squad members were

4    removing his personal property from his room and

5    putting it onto some type of moving vehicle.

6            BY MS. WRIGHT:

7        Q    And after he explained the

8    outprocessing to you, did he, then, change his

9    story in relation to how he came into possession

10   of this rifle plate?

11       A    Yes.

12       Q    And what was the second version of

13   events that he explained to you?

14       A    After we went around and around a

15   couple of times, he confessed to having taken

16   that plate from someone on Fort Myer.  He said

17   that it did belong to Fort Myer.  He recognized

18   that it was a serialized piece of issued

19   equipment from Fort Myer, and he indicated that

20   he took it from someone in the barracks.  Yeah.

21       Q    And did he ultimately indicate that he

22   knew whether or not he was supposed to be in

1   possession of that item?

2       A    Yes, he knew that he was not supposed

3   to be in possession of that.

4            MS. WRIGHT:  Your Honor, that's all I

5   have for the preliminary hearing, but I would ask

6   additional questions for the bond aspect --

7            THE COURT:  Go ahead.

8            MS. WRIGHT:  -- when Your Honor wants

9   to take that up.

10           THE COURT:  You want to be heard on

11  that issue, correct?

12           MR. CLARKE:  Correct.

13           THE COURT:  Okay.  Go ahead.

14           MS. WRIGHT:  All right.

15           BY MS. WRIGHT:

16       Q    And while you were speaking with the

17  Defendant, did he also explain to you how he

18  would attack Fort Myer, if given the opportunity?

19       A    Yes.

20       Q    And how did he lead up to those

21  questions?  How did that come out like that?

22       A    It was sort of on his own.

1        Q     Okay.

2        A     Yeah.

3        Q     What, if anything, did he explain to

4    you?

5        A     I have it transcribed in my notes.  I

6    mean, I can read it to you or I can summarize it.

7            THE COURT:  So, just Mr. Clarke filed

8    a bond motion that we took up earlier.  But, Mr.

9    Clarke, you have a section that's reportedly from

10   the transcript that's kind of set apart single-

11   spaced?

12           MR. CLARKE:  Yes, yes.

13           THE COURT:  Do you have any objection

14   to the Defendant -- I mean, sorry -- to Detective

15   Wanik looking at that?

16           MR. CLARKE:  Correct.  It's taken from

17   his notes.  So, that --

18           THE COURT:  And do you have -- it

19   might be easier for him to look at that.  I've

20   re-read this as we've been sitting here.  Any

21   objection to him looking at that?

22           MR. CLARKE:  No, thank you, Your

1    Honor.

2              THE COURT:  Do you want to take a look

3    at this?

4              THE WITNESS:  Yes.

5              THE COURT:  It's from the --

6              THE WITNESS:  Yes, Your Honor.

7              THE COURT:  -- motion filed by defense

8    counsel.  If you want to just look at the area

9    that's -- well, you can see where it's indented.

10   I'll just direct your attention to the indented

11   portion.

12             (PAUSE.)

13             THE WITNESS:  This looks like it's

14   taken right from my notes, Your Honor.

15             THE COURT:  Okay.  All right.  So, is

16   there any more that you would need to review

17   before you can answer the Commonwealth's

18   question?

19             THE WITNESS:  No, Your Honor.

20             THE COURT:  Okay.  Go ahead and ask

21   your question.

22             BY MS. WRIGHT:

1      Q     Can you please explain to the Court

2  what the Defendant told you how he would attack

3  the base?

4      A     He told me that, I mean, he told me

5  that he would, if he were to -- he didn't say

6  that he would, but he said if he were to, he

7  would -- and he outlined the location that he

8  would make entry on the base because it would be

9  closer to where the hypothetical targets might

10  be, the equipment that he would carry, the way he

11  would conceal it, what he would wear, the

12  armament he would choose, the particular, you

13  know, face covering that he would choose, what

14  boots he would wear, the route he would take, and

15  talking about, generally, how a person to be

16  successful would engage that target.

17      Q     And did he also -- did you also

18  mention to him the list of additional tactical

19  equipment that was found in his vehicle?

20      A     I did.

21      Q     And explain to the Court what that

22  list was.

1       A    That list, you know, was a list of

2   things needed yet to buy for -- the quotation on

3   there was "for an op".  And it was a list of

4   additional weapons and equipment and materials

5   needed to carry out an op.

6       Q    And what did Defendant say about that

7   list?

8       A    He said that that was something that

9   he wanted to -- that list was to be fulfilled

10  because he was concerned for his own safety, that

11  someone might, you know, try to burglarize his

12  house wearing body armor.  He might be in a place

13  where there is a shooting, and then, he could

14  just, you know, have that equipment ready to use

15  for that purpose.

16      Q    And did he also indicate to you what

17  his potential jobs in the future were going to be

18  or what he wanted his job to be in the future?

19      A    He said that he wanted to be a

20  contractor, a security contractor.  I asked him

21  to specify what exactly he meant by that.  And to

22  contract to the government to provide security

1    for dignitaries overseas on military bases, and

2    so on and so forth.

3        Q    And did he indicate to you that he had

4    training for that?

5        A    He, yes, he said that he was

6    continuing to train himself for that.  He

7    attended -- he talked about a Sheepdog Response

8    school that he intended to attend taught by Tim

9    Kennedy, who's a former Green Beret.

10            And in his notes that were recovered

11   from the vehicle, there was sort of a training

12   schedule that he wrote that pretty much took the

13   day from 0600 all the way 'til, you know, after

14   the sun went down, what he was going to do every

15   20-30 minutes out of the day to train for these

16   types of, these types of things.

17       Q    Okay.  And did he also talk to you

18   about airsofting?

19       A    Yes.

20       Q    And did he indicate to you that it was

21   a hobby of his?

22       A    He did.

1      Q     And explain to the Court what he
2   explained to you about that thought.
3      A     That the equipment and materials and
4   the training that he is attempting to procure and
5   get for himself, that they are for airsoft.
6   That's his hobby.  It's sort of a play, a play
7   war game type of thing where BBs come out of the
8   gun and you run around in a field.
9      Q     And did he mention a particular field
10   that he does airsoft on?
11      A     He did, but I don't recall the name of
12   it right now.
13      Q     Okay.  And is that also the same field
14   where he first indicated that he purchased --
15      A     Yes.
16      Q     -- the plate from?
17      A     Yes.
18            MS. WRIGHT:  I have no further
19   questions, Your Honor.
20            THE COURT:  Before you cross-examine,
21   let me just -- I want to be able to understand
22   something that's going to go to your argument.

1          So, are you the lead detective in this

2     matter?

3               THE WITNESS:  I am.

4               THE COURT:  So, after the 9th of

5     February, what sort of investigation did you

6     conduct in this matter?

7               THE WITNESS:  Your Honor --

8               THE COURT:  You don't have to go into

9     the details, but did you talk to the other people

10     involved and what did you do in that matter?

11               THE WITNESS:  On the 10th, I checked

12     the serial -- on the 10th, I reviewed all the

13     case materials.  It was the day after I received

14     this, I received this case.  I reviewed all the

15     case materials and I went down to Property to

16     take a look at the items that were taken from the

17     vehicle.

18          At that time, I saw two items that

19     were suspicious.  One was the serialized plate

20     with the U.S. Army stamping on it, and the other

21     one was a Glock pistol that had a "U.S." at the

22     end of the serial number, which indicated at

1    least at one point it had been a U.S. Government

2    item.  So, that gun, I ordered a trace on that

3    from the ATF to see, find out who the true owner

4    should be.  And then, I contacted Detective Keith

5    Shepherd over at Fort Myer to ask him about the

6    plate and see if he could figure out some kind of

7    paper trail for that to prove that it was, in

8    fact, the Army's or not, so we knew whether or

9    not a crime had occurred.

10            After that point, the next day, after

11   reviewing all the case materials, there was

12   enough information in the report about Mr. Wells,

13   his behavior on the day of the stop, the items

14   that were in his car, his responses to some of

15   the officers' questions that he was asked on the

16   street the day he was stopped on February the

17   9th, the fact that he had armor-piercing

18   ammunition loaded into 30-round magazines.  There

19   were five fully-loaded magazines for the rifle.

20   The rifle was loaded in the trunk.

21            He had body armor.  He had masks.  He

22   had gloves with hard knuckles on them.  He had

1    BDUs like military uniforms.  He had a variety of

2    different patches, and he was in possession of an

3    access card that at one point allowed him access

4    into Fort Myer.

5              This and the fact that he had been

6    adversely separated from the military, and his

7    chain of command that separated him was still

8    working on Fort Myer, and his proximity to Fort

9    Myer, sitting outside the gate, with evasive

10   questions, or answers to the officers who talked

11   to him that day about why exactly he was there.

12             So, all of that led me to file a

13   report that goes to the federal government and

14   other jurisdictions, just to make them aware.  So

15   that, if he's doing this in other places, I won't

16   know about it since I'm just in Arlington.  If I

17   send that out, then if he's doing this in other

18   places and he's on anybody else's radar, we can

19   sort of get together on that and figure out what

20   we're going to do.

21             THE COURT:  But, in relation to this,

22   to the rifle plate --

1            THE WITNESS:  Yes?

2            THE COURT:  -- and you followed up

3    with Detective Shepherd.

4            THE WITNESS:  Uh-hum.

5            THE COURT:  And based on the

6    information you collected, did you take, did you

7    go to a magistrate?

8            THE WITNESS:  I did.

9            THE COURT:  And where was that

10   magistrate?

11           THE WITNESS:  Arlington County.

12           THE COURT:  And did the magistrate

13   place you under oath?

14           THE WITNESS:  Yes.

15           THE COURT:  And did you, then, tell

16   the magistrate what your investigation revealed?

17           THE WITNESS:  Yes, Your Honor.

18           THE COURT:  And then, the magistrate

19   then issued this warrant?

20           THE WITNESS:  Yes, Your Honor.

21           THE COURT:  That's the warrant dated

22   the 14th of February?

1            THE WITNESS:  Yes, Your Honor.

2            THE COURT:  And when you questioned

3    Mr. Wells -- well, part of the purposes -- I'm

4    sure you had many reasons for questioning him

5    based on what you've told me, but one of them was

6    either to confirm or deny the information that

7    you had received regarding the possession of that

8    rifle plate?

9            THE WITNESS:  Yes, Your Honor.

10           THE COURT:  And then, he made some

11   statements to you --

12           THE WITNESS:  He did, Your Honor.

13           THE COURT:  -- regarding the

14   statements that Commonwealth Attorney brought up?

15           THE WITNESS:  Yes, Your Honor.

16           THE COURT:  So, Mr. Robinson

17   (phonetic), knowing -- Mr. Clarke, knowing that,

18   I think your objection is that this officer had

19   made a determination that was an extrajudicial

20   determination that the arrest warrant should

21   issue.  And that he went and got the warrant.

22   Some days later, he was able to execute the

1    warrant on a ruse to get Mr. Wells to come and

2    talk to him.  Therefore, everything that

3    happened, everything that was stated to the

4    officer should not be considered as to whether

5    this is a valid warrant.  Is that your argument?

6            MR. CLARKE:  That is Your Honor.

7            THE COURT:  Okay.  All right.  Again,

8    the Court is not persuaded by that argument

9    because I am in a different position now.  It

10   sometimes happens that the officer or detective,

11   the investigating team, does their investigation

12   and, then, they come into court and they have

13   other information they want the court to consider

14   that happened after they've executed the warrant

15   to support their hypothesis, their reasoning to

16   believe that a crime was considered.  And this

17   Court is still not convinced, based on even that

18   evidence that comes in, that the Commonwealth

19   wants to come in, that there still isn't enough

20   for probable cause.

21           However, this Court has to make a

22   determination based on all of the evidence, not

1    only what was the investigation that was

2    revealed, but, then, when the Defendant was then

3    brought in and makes statements about what he

4    allegedly was thinking or doing regarding this

5    plate, because those statements are relevant to

6    that time period when he was allegedly in

7    possession of this, of this rifle plate.

8              So, I understand your argument.

9    However, I don't believe that -- I mean the

10   Court's not of the opinion that it's improper for

11   the Court making a judicial determination now

12   regarding what the officer did leading up to the

13   warrant, and then, talking to Mr. Wells.  Because

14   in other matters you could easily conceive that,

15   after a warrant was issued, the investigation

16   continues and that other things might have

17   happened.

18             For instance, they might put a wiretap

19   where they're listening and they're confirming,

20   hey, everything I thought was right, or

21   everything I thought was wrong.  Or they put a

22   surveillance on somebody and they're going to

1      wait for them to do a certain thing before they

2      serve the warrant because they have information

3      that this person might be going, for instance, to

4      go meet with an undercover or an unwitting in a

5      drug case who's going to sell him cocaine.  And

6      that extra piece of evidence helps their case,

7      say, in a conspiracy or in a -- yes, in a

8      conspiracy charge.

9               So, I'm going to overrule your

10     objection.  I do continue to believe that what

11     was said by, allegedly said by Mr. Wells during

12     this interview is relevant for today's probable

13     cause hearing.

14              So, I wanted to get that part out of

15     the way, so we didn't have to have a long

16     question.  But feel free, again, to ask him

17     whatever questions you deem as necessary for your

18     case.  Okay?

19              MR. CLARKE:  Thank you.  Thank you,

20     Your Honor.

21         CROSS-EXAMINATION

22              BY MR. CLARKE:

1          Q      Detective Wanik, I'm going to start on

2     February 10th of your investigation.

3          A      Uh-hum.

4          Q      And you wrote in your notes that you

5     suspected that the pistol might have been stolen?

6          A      Correct.

7          Q      And why is that?

8          A      Based on my experience, the U.S.

9     serial number on the back of the -- addition on

10    the back of the serial indicated it was a U.S.

11    Government-issued weapon, and --

12         Q      So --

13         A      Yeah?

14         Q      So, based on the fact that it says

15    "U.S." on it?

16         A      Yeah.

17         Q      Okay.  And the same for the plate,

18    correct, based on the fact that it says "U.S." on

19    it?

20         A      Says "U.S." and it's serialized, yeah.

21         Q      Okay.

22         A      Also, I served on Fort Myer.  I served

1    eight years in the Army and I served on Fort Myer

2    for three of those years.  And I'm aware of the

3    fact that, you know, those things tend not to

4    leave the Army.

5         Q    "Tend not to leave"?

6         A    They don't.  They don't leave the

7    Army.

8         Q    But the firearm, later on in your

9    investigation --

10        A    Uh-hum.

11        Q    -- you realized that it was --

12        A    It took a while because the first

13   trace that I did on the firearm came back the

14   last ownership was U.S. Customs Service on Fort

15   Benning back in 1998.  So, the trace that I

16   initially got a couple of days after I made the

17   request was that the gun was issued from Glock in

18   Smyrna, Georgia, to Fort Benning, and then, it

19   ended there.  So, there was no further

20   transactions after that.  That also led to me

21   being very suspicious about that, since Mr. Wells

22   had been stationed at Fort Benning, as all

1      infantry soldiers are, for at least 15 weeks.

2              So, I followed up with that --

3      Q      I'm sorry.

4      A      Yeah.

5      Q      Just to be clear, you are aware that

6      Mr. Wells was born in 1998, correct?

7      A      Oh, I knew that, but that's when the

8      gun got there.

9      Q      Oh.

10     A      Yeah.

11     Q      Okay.  And also, for the rifle plate,

12     you were aware that that was issued to the Army

13     in 2011?

14     A      I became aware of that, yes, through

15     the receipts.

16     Q      So, it was purchased by the Army --

17     A      Yeah.

18     Q      -- in 2011?

19     A      Yes.

20     Q      And that there was just no, there was

21     just no -- once it reached the base, not Fort

22     Myer, but once it reached the base, they don't

1    track it anymore?

2         A    That's my understanding.

3         Q    So, at that point, you still just

4    didn't know how this particular plate came into

5    the possession of Mr. Wells, correct?  At that

6    point --

7         A    At that point in time, I was not sure

8    how Mr. Wells had gotten the plate, but there was

9    -- after there was some suspicion, based on the

10   information that I received from Detective

11   Shepherd, because there was this open case on

12   Fort Myer back in March of 2019.

13        Q    Well, I'm just, well, I'm just, you

14   know --

15        A    Yeah.

16        Q    -- just focusing on at that point.

17        A    Okay.

18             THE COURT:  Well, I mean, you asked

19   him the question.  So, I think you have to let

20   him answer it.

21             BY MR. CLARKE:

22        Q    But I believe that that comes --

1      didn't that come later on, that other date?

2          A      I don't understand the question.  Are

3      you asking me why I thought the plate was stolen?

4          Q      I'm asking you specifically about it

5      being tracked from 2011 and, then, what happened

6      to it after that.

7          A      The purchase orders took some -- the

8      purchase orders and the shipping receipts took

9      some time to get.  It was, it was a couple of

10     days.

11         Q      Okay.

12         A      I don't, I don't recall exactly which

13     day, but, I mean, we -- there was suspicion, I

14     think reasonable suspicion, that the plates were

15     stolen.  And it wasn't until we received the

16     purchase order from Ceradyne to the Army, and

17     then, we showed the shipping transfer receipts --

18     I was shown the shipping transfer receipts that

19     showed that that plate went from Ceradyne to

20     Aberdeen Proving Ground in Maryland, and then, to

21     Fort Myer.

22         Q      And --

```
 1          A      And then, once they get to Fort

 2     Myer --

 3                  (Simultaneous speaking)

 4          A      Yeah.

 5          Q      You found out from Detective

 6     Shepherd --

 7          A      Correct.

 8          Q      -- that it went from Aberdeen Proving

 9     Grounds to Fort Myer?

10          A      That's my recollection of the receipts

11     that I read, yes.

12          Q      And was this told to you by Detective

13     Shepherd or did you actually see the receipts?

14          A      I saw the receipts.  He emailed me

15     copies of the receipts.

16          Q      And you provided that to the

17     Commonwealth?

18          A      It's in evidence.  It's in evidence.

19          Q      And I'm going to draw your attention

20     to February 14th.  On February 14th, Mr. Wells

21     contacted you?

22          A      He did.
```

1          Q      And he contacted you and he asked

2    about the status of the return of the property?

3          A      He did.

4          Q      And at this point you had already

5    confirmed that the two firearms that were found

6    were legally purchased?

7          A      No, just the one, the rifle.  We

8    suspected it.  We were still waiting for the

9    traces to come back.  They take about two weeks.

10         Q      I'm sorry, you're talking about on

11   February 14th?

12         A      On February 14th, I knew that there

13   was a trace that came back for the rifle, and it

14   appeared to be a lawful purchase from a gun show

15   in Chantilly.

16         Q      Okay.  That was my question, was

17   whether or not you confirmed that with a

18   firearm --

19         A      I mean, you're using the word

20   "confirm".  It takes time to confirm.  I got a

21   trace that said that that's probably what

22   happened.  So, sometimes, like in the case of the

1      Glock pistol, you have to ask for follow-on

2      traces.  So, they have to go further.

3              Like, for example, with the Glock,

4      when they told me that the last time that that

5      gun had changed hands was in 1998 from Glock to

6      Fort Benning, I didn't just stop there.  I kept

7      asking for more traces because that sounded

8      suspicious, and it would have led me, you know,

9      in a different path.

10              So, I kept asking for -- so, they take

11      a little bit of time to come in.  So, on the

12      14th, there was limited information about the two

13      rifles.  But, from what I recall, the rifle, or

14      rather the two firearms, from what I recall, the

15      rifle looked more legit than the Glock.

16          Q    Okay.  So, have you confirmed at any

17      time that the handgun that was found with U.S.

18      plates was legally purchased?

19          A    It appears that way, yes.

20          Q    So, you don't believe that receipt

21      that you saw or how -- you said --

22          A    Based on the initial trace, it wasn't

1    until -- so, that firearm, after Fort Benning,

2    was transferred to another, it was transferred

3    out to another federal agency for, if my memory

4    serves, it was a museum somewhere.  And from

5    there, it got in the hands of a private dealer, a

6    private individual, who I believe Wells purchased

7    that firearm from the private individual online.

8    And I believe they were in Maryland.

9              And then, in order for a Virginia

10   resident to obtain ownership of that gun, it's

11   got to be transferred to a federal firearms

12   licensee in Virginia.  The licensee was a gun

13   store in Vienna, which went out of business in

14   2015.  The fact that it went out of business in

15   2015, you know, that forced me to contact the ATF

16   and look at microfiche files for the firearms

17   transaction record.  That takes a little bit more

18   time.

19             So, after we -- I did, I was able to

20   recover the firearms transaction record for that

21   transaction between Wells and the Vienna gun

22   store, and that looked legit to me.

1          Q      Okay.

2          A      But that was a couple of, that was a

3     couple of weeks it took to do that.

4          Q      Okay.

5          A      Yeah.

6          Q      And going back to February 12th, you

7     had a conversation with Mr. Wells' former

8     roommate?

9          A      I did.

10         Q      And that's Devon Jason Dotson?

11         A      Yes.

12         Q      Okay.  And he told you -- and I'm

13    sorry, was this the same, was this the same

14    Dotson that you later on spoke to Mr. Wells

15    about?

16         A      Yes.  Yes, it is.

17         Q      Okay.  And Mr. Wells told you what

18    about Mr. Dotson and his problem?

19         A      I asked Mr. Wells if it was Dotson's

20    plate.  And Mr. Wells says -- he kind of walked

21    his way through it.  He said:  No.  Well, it

22    might be.  Yeah, it probably is.  Yeah, it

1    probably is.  He said -- I'm paraphrasing, but he

2    said something like that.

3              So, I said, would you be willing to

4    write an apology letter?  And he agreed to do

5    that, and he wrote the apology letter to Dotson.

6         Q    And have you subsequently spoken to

7    Mr. Dotson?

8         A    I didn't solicit anything from Mr.

9    Dotson, but I overheard him speaking about his

10   gear.  My understanding, when I talked with him

11   on the, I believe it was the 12th, when I spoke

12   to him on the 12th, my understanding is that he

13   was that he had lost his plate carrier.  And

14   speaking to him -- listening to him speak out

15   there, he said that he is only missing parts of

16   his plate carrier, not the plate.

17        Q    So, this plate was not Mr. Dotson's?

18        A    According to what Mr. Dotson said out

19   in the ready area today, no.

20        Q    So, then, the explanation that Mr.

21   Wells gave you about writing this apology

22   letter --

1        A      Right.

2        Q      -- that wasn't correct?

3        A      There's two -- so, and then, we

4    recently learned that there's two Dotsons in the

5    platoon.  And I know that this, you know, one is

6    D-O-D.  We had D-O-T-S-O-N out there, and there's

7    D-O-D-S-O-N.  So, I don't know what was in Mr.

8    Wells' mind when he wrote an apology letter to

9    Dotson.

10       Q      You asked him to write the apology?

11       A      I did.  I did, but I don't know what

12   was in his mind, right?

13       Q      Okay.

14       A      So, when he writes that to -- and I

15   just learned that today, that there's another

16   Dotson.  And I haven't fleshed that out yet.

17       Q      Okay.  So, it's possible that Mr.

18   Wells was telling you the truth initially with

19   his first explanation of how he received that

20   plate?

21       A      That's not possible, not in my mind.

22       Q      But you just still to this day don't

1        know how he came in possession of that plate?

2              A      Well, I know that that plate belongs

3        to the Army and I know it was sent to Fort Myer.

4        I know that Mr. Wells was assigned to Fort Myer

5        and present.  I know he had access to those, and

6        I know that when he was stopped on February 9th

7        by the other officers, I know he was in

8        possession of it, and that's what I know.

9              Q      So, you said you know that he had

10       access to them.  What do you mean?  Did he work

11       in the equipment room while he was there?

12             A      So, there -- yeah, well, all the, all

13       the soldiers have their gear and they are in

14       their rooms, and he was roommates with Dotson.

15       So, I know he had, he had access to those.

16             Q      So, you've already dispelled the fact

17       that he, that --

18             A      I haven't dispelled anything.  I'm

19       just telling you what Dotson has told me on two

20       different occasions.

21             Q      Okay.

22                    THE COURT:  Mr. Clarke, you need to

```
 1      keep moving on --

 2                  MR. CLARKE:  Yes, I am going to, Your

 3      Honor.

 4                  THE COURT:  -- because I do have a

 5      2:00 docket.

 6                  MR. CLARKE:  I understand, Your Honor.

 7                  THE COURT:  And you know I'm not going

 8      to make any guilt or innocence decisions today.

 9                  MR. CLARKE:  I understand, Your Honor.

10      Thank you.

11                  BY MR. CLARKE:

12          Q      And I wanted to take you to February

13      18th.

14          A      Mm-hmm.

15          Q      You told Mr. Wells for him to come

16      down to receive his firearms?

17          A      I did.

18          Q      Okay.  You didn't tell him at that

19      point that he was going to be arrested when he

20      arrived?

21          A      No, I did not.

22          Q      So, you did not tell him the truth on
```

1      that day?

2              A     Well, I -- yeah, I guess that's fair.

3              Q     Okay.  And then, when he came down to

4      -- when he came down, he was immediately

5      arrested, correct?

6              A     He was, yeah.

7              Q     Okay.  And he was told that he was

8      arrested for stolen property?

9              A     Yes.

10             Q     And that was it?

11             A     Yes.

12             Q     And the interview that you -- that he

13     gave to you was initially about this stolen

14     property, correct?

15             A     Correct.

16             Q     And at any point did Mr. Wells -- did

17     you or anyone else tell Mr. Wells that he was

18     under suspicion of possibly wanting to attack

19     Fort Myer?  I'm sorry, at this, at the beginning

20     of this interview?

21             A     No.

22             Q     Okay.  And at what point -- oh, I'm

1    sorry.

2              MR. CLARKE:  And I'm just going to go

3    to the --- (Inaudible.)

4              THE COURT:  Sure.

5              BY MR. CLARKE:

6         Q    And you guys -- then, at some point

7    you broke it to him that you feel as though he

8    was going to attack Fort Myer?

9         A    I don't -- we didn't bring it up.  I

10   mean, that was, that was the other odd thing

11   about it, is he brought up the fact that he

12   could, that he -- he could see how this could all

13   be misconstrued like he's some -- you know, he's

14   feeling like he's some kind of terrorist, I think

15   is what his words were.  And then, we offered him

16   an opportunity to just talk about it, you know.

17        Q    So, you never said to him that you

18   thought that he was going to -- you never asked

19   him about the items in his car and whether or not

20   he thought he was going to attack --

21        A    I did.  I asked him about those, yeah.

22        Q    Okay.  And I'm sorry, because you said

1    that you never brought it up.  So --

2         A    At the point in the interview that he

3    offered his explanation of how one might attack

4    Fort Myer, no one had -- we hadn't solicited

5    that.

6         Q    Not about the attack, but --

7         A    Right.

8         Q    -- you did, then, alert him that you

9    think he's under suspicion for a possible attack

10   on Fort Myer at that --

11        A    During the interview, you know, we had

12   a long talk.  And we talked about how -- and he

13   acknowledged, and we -- we discussed at points in

14   the interview how this could look like it's

15   something else.  So, part of the interview is to

16   ascertain whether or not, you know, there's more

17   to that.

18        Q    Okay.  So, you misspoke when you said

19   that he just brought it up on his --

20        A    No, I didn't misspoke.  At that point

21   in the interview, I don't think we had gotten to

22   it yet.  I think he --

1          Q      Oh.

2          A      -- he just offered it.

3          Q      And so --

4          A      That was kind of the opener for it,

5      and we kind of discussed it after that.

6          Q      Okay.  And when he gave this

7      explanation, he says he's very -- he's very

8      clear, he makes it very clear that this is not

9      something that he ever has thought about?

10         A      He did say that.

11         Q      Several times?

12         A      Well -- right, right.  Right, he said

13     that, but, like I was stationed there for three

14     years.  I never once thought about attacking the

15     base.  I never once even hypothesized how one

16     might attack the base.  So --

17         Q      Have you ever been accused of --

18                THE COURT:  Hey, gentlemen, with all

19     due respect to Detective Wanik, he's not on --

20     whatever he might have thought is not relevant to

21     me now, right?

22                MR. CLARKE:  Okay.

1           THE COURT:  What he -- because he

2    never thought about it doesn't mean anything to

3    Mr. Wells.  Okay?

4           THE WITNESS:  Sure.

5           MR. CLARKE:  Okay.

6           THE COURT:  So, let's just stick to

7    what Mr. Wells might have said or not said as far

8    as the bond motion.  I have what -- Detective

9    Wanik says that this is accurate, what you

10   quoted.

11          MR. CLARKE:  Correct.

12          THE COURT:  And I've read it a few

13   times as we've been sitting here.  So, if you

14   have more questions about -- it sounds like a

15   three-hour interview.

16          MR. CLARKE:  It's three and a half

17   hours, Your Honor.

18          THE COURT:  Three and a half hours.

19          MR. CLARKE:  But I'm just trying to

20   get more of a full view of what the room looked

21   like --

22          THE COURT:  Okay.

1              MR. CLARKE:  -- at that point in time.

2              THE COURT:  So, with all due respect,

3    Detective, let's just focus on your conversation

4    with Mr. --

5              THE WITNESS:  Yes, Your Honor.

6              THE COURT:  -- with Mr. Wells and how

7    the conversation progressed.  Go ahead.

8              BY MR. CLARKE:

9         Q    And at this time, Mr. Wells didn't

10   seem evasive to you about answering the questions

11   about a possible --

12        A    He was very forthcoming, yeah.

13        Q    And he was almost kind of like matter

14   of fact?  He even, as he got to the end and he

15   says, you know, now you know -- because now you

16   know how I would have done it, and if I were to

17   do it, how moronic and stupid that something like

18   that would be; it would be a suicide action?

19        A    Right.

20        Q    And you subsequently had searched his

21   house, his two vehicles that he has, his

22   motorcycles that he owns?

```
 1          A     We didn't -- we didn't search the
 2    motorcycles.
 3          Q     Okay.  But you saw that he owns
 4    motorcycles?
 5          A     Yes.
 6          Q     What kind of motorcycles?
 7          A     I don't recall.
 8          Q     Ducatis?
 9          A     Yeah, Ducatis, sure.
10          Q     They're expensive motorcycles.
11          A     Okay.
12          Q     And then, he has these items as well.
13                So, at that point you didn't bring any
14    additional charges against him?
15          A     At that point, no.
16          Q     And has your investigation concluded?
17          A     I would say, I mean, as far as this
18    charge, this is -- I am concluded.
19                MR. CLARKE:  Nothing further, Your
20    Honor.
21                THE COURT:  Any redirect?
22                MS. WRIGHT:  No, Your Honor.
```

```
 1              THE COURT:  Is he free to go or
 2    subject to recall?
 3              MS. WRIGHT:  He is free to go.  That
 4    is Commonwealth's evidence.
 5              THE COURT:  That is Commonwealth's
 6    evidence.  All right.
 7              Detective, you can remain in the
 8    courtroom, if you wish.
 9              THE WITNESS:  Thank you, Your Honor.
10              THE COURT:  And if you want to ask
11    your colleagues if they want to come in, you may.
12              And please, before you leave, if I may
13    just ask you, could you pass me the exhibits?
14              THE WITNESS:  Yes, Your Honor.
15              THE COURT:  Thank you so much.
16              (WITNESS EXCUSED.)
17              THE COURT:  All right.  Does the
18    defense have any evidence or witnesses you want
19    to call?
20              MR. CLARKE:  Just one, Your Honor.
21    Devon Jason Dotson.
22              THE COURT:  All right.  Is there a Mr.
```

1    Dotson here?

2              I know I have a 2:00.  We don't have

3    any protective orders, but we still have some

4    arraignments, but that's all right.

5              THE CLERK:  Your Honor, as for the

6    witness, he has not yet been sworn for testimony.

7              THE COURT:  Okay.

8              THE CLERK:  Step inside the bar.

9    Raise your right hand to be sworn for testimony.

10             (WITNESS SWORN.)

11   WHEREUPON,

12             DEVON DOTSON

13   was called for examination by Counsel for the

14   Defendant and, having first been duly sworn, was

15   examined and testified as follows:

16             THE COURT:  All right.  Hello, Mr.

17   Dotson.

18             Right here, sir.  There's a chair.

19             THE CLERK:  By the window.  Come all

20   the way around to your left, to the open area on

21   your left.  There's a chair here.  Have a seat.

22   Speak into the microphone while you testify, so

1        all parties can hear.

2                    THE WITNESS:  All right.

3                    THE CLERK:  Thank you.

4                    THE COURT:  All right.  Mr. Dotson,

5        before you testify, I want you to know you have

6        certain rights.  And one of the rights that you

7        have is the right not to incriminate yourself.

8        So, there's been testimony, and there's been an

9        allegation that there was a rifle plate with a

10       certain serial number and that the investigation

11       concluded certain people to believe that it was

12       removed without permission from the possession of

13       the U.S. Army and it was in the possession of a

14       private individual.  There's been some testimony

15       that maybe that's yours or maybe it's somebody

16       else's, or I'm not sure.

17                    But you have a right, sir -- I just

18       want to make sure that this gentleman knows he

19       has a right not to incriminate himself.

20                    So, if there are questions that are

21       asked to you, sir, that you would find yourself

22       admitting to be in possession of federal property

1    without permission, that's a state offense, but

2    it could also be a federal offense.  There have

3    been cases in the Eastern District on this

4    particular issue with these particular rifle

5    plates over the years.

6              So, before -- if you have any

7    questions, sir, before you answer, and you think

8    you might incriminate yourself -- I don't see any

9    attorneys here that I could appoint.  Usually, it

10   will be the Public Defender and you could talk

11   with that person before answering the question.

12             Or if you have or are going to assert

13   your Fifth Amendment privilege, sir, you need to

14   do that before you start answering.  Because once

15   you start answering, you might have waived your

16   Fifth Amendment privilege, and we have law

17   enforcement officers here who might take your

18   admission -- might take certain things you say as

19   admission that you committed a crime, and you

20   could expose yourself to criminal liability.  Do

21   you understand all that?

22             THE WITNESS:  Yes, sir.

```
 1                    THE COURT:  All right.  And knowing
 2          that, sir, are you still willing to testify
 3          today?
 4                    THE WITNESS:  I'd like to exercise my
 5          Fifth Amendment.
 6                    THE COURT:  All right.  Let me see if
 7          we have some questions here, and if you want to
 8          assert your Fifth Amendment, we'll get to that.
 9                    But, right now, what he's saying is he
10          wishes to assert his Fifth Amendment privilege,
11          his right not to incriminate himself.
12                    That's what I heard you say.  Is that
13          correct, sir?
14                    THE WITNESS:  Yes, Your Honor.
15                    THE COURT:  All right.  So, that being
16          the case, anything other than his name -- he
17          doesn't have a lawyer here and that's what
18          concerns me.  If there was a public defender
19          here, I'd appoint him and he could go talk to
20          him, and we could be sure.  But he's a layperson.
21                    Do you have any legal training, sir?
22                    THE WITNESS:  No, sir.
```

1          THE COURT:  And you and I know, and

2     the Commonwealth knows, if he gets too far down

3     the road, somebody's going to get up and tell him

4     he's waived his Fifth Amendment privilege, but

5     he's asserting it now.  So, if he's asserting it

6     now, are there any questions that you think you

7     can ask him where he is not going to be either

8     opening himself up to perjury or obstruction of

9     justice?  Think broadly here, because that's what

10     his lawyer would tell him, as you know.

11          MR. CLARKE:  May we approach without

12     the witness?

13          THE COURT:  Yes, sir.  Why don't you,

14     sir, just have a seat in the back there, maybe

15     with -- just so you can't hear.  And I'll hear

16     from --

17          (OFF MIC BENCH CONFERENCE.)

18          (END OF BENCH CONFERENCE.)

19          THE COURT:  Mr. Dotson, why don't you

20     come forward again, sir?

21          THE CLERK:  Do you want him all the

22     way to the stand, Your Honor?

1              THE COURT:  Yes.

2              Why don't you come and have a seat,

3     sir?

4              And we'll just do this this way.  So,

5     I have you here and you're under my --

6     (Inaudible.)

7              Mr. Dotson, you've asserted your Fifth

8     Amendment privilege to remain silent and not

9     incriminate yourself.  And in this matter, the

10    issues that you -- I'm sorry -- the issues that

11    you could incriminate yourself on could range

12    from perjury, obstruction of justice, false

13    police -- filing a false police report, to

14    possession of stolen federal property.  I'm not

15    saying that that's what happened.  I'm just

16    saying that's a potential exposure to criminal

17    liability.

18              You've told the Court you were going

19    to assert your privilege, sir.  And there's

20    nobody here granting you immunity.  So, sir, I'm

21    going to, out of an abundance of caution today,

22    I'm not going to allow Mr. Clarke to question you

1    because you don't have a chance to talk to an

2    attorney.

3              And there may be a certain question he

4    could have asked that you would not waive, but

5    this case law says, once you start to talk, you

6    can't then say, now I assert my privilege.  And

7    because you haven't spoken to an attorney, we're

8    going to strictly abide by that today.  But that

9    doesn't mean at trial, if you're called as a

10   witness, it will go this way.

11             But everybody knows that you could be

12   involved.  So, everybody knows that you would

13   have the right to an attorney.  So, I hope that

14   the parties, knowing that, if Mr. Clarke is going

15   to subpoena you, which he has an absolute right

16   to do, that the Commonwealth and Mr. Clarke make

17   the judge aware that there could be some exposure

18   to you, and he'll talk to you about a lawyer, and

19   even appoint one, if necessary, so that you will

20   know what your rights are.

21             THE WITNESS:  Yes, Your Honor.

22             THE COURT:  All right?  So, thank you

1    for being here today, sir.  You're excused.  But

2    please keep what I said in mind.

3              THE WITNESS:  Yes, Your Honor.  Thank

4    you.

5              (WITNESS EXCUSED.)

6              THE COURT:  Any other besides this

7    gentleman?

8              MR. CLARKE:  No, sir.

9              THE COURT:  All right.  Argument?

10   Does the Commonwealth reserve?

11             MS. WRIGHT:  Yes.

12             THE COURT:  All right.  Why don't you

13   argue the case first.  Then, I'll hear you on

14   your bond.

15             MR. CLARKE:  Thank you, Your Honor.

16             We are here for one count of

17   possession of stolen property.  We heard evidence

18   from officers that you'll see that this rifle

19   plate that says U.S. on it being either taken

20   from the vehicle or around the vehicle that Mr.

21   Wells was driving on February 9th.  We also heard

22   testimony that they let him go on that day, even

1        with what else was found in the vehicle.

2                    Then, we heard testimony from

3        Detective Shepherd, where he says, all I was able

4        to do was track the plate to an Army base in --

5        it was in Aberdeen, and that was it.  And I

6        questioned him several times about whether or not

7        he was able to trace it over to Fort Myer.  And

8        he said, no, I was just speculating that it had

9        gone to Fort Myer.

10                    But, then, you heard Detective Wanik

11       come up and say, completely contradict the

12       testimony of Detective Shepherd and say that he

13       with his eyeballs saw the receipts from Detective

14       Shepherd.  And that should be a huge red flag for

15       the Court, because we have two law enforcement

16       officials who are contradicting each other on

17       very important testimony about what actually

18       happened with these plates, or with this plate

19       that was found in possession.

20                    So, then, that's a question of the

21       value here.  We heard Detective Shepherd say,

22       yes, in 2011 this particular plate was purchased

 1    by a military department for $590.  And the

 2    Commonwealth asked them a question, well, you

 3    know, do these things have an expiration date?

 4    And he said maybe about five years.  And he also

 5    testified that if something is unserviceable,

 6    it's just going to be considered -- basically,

 7    it's trash to the military at that point.  So,

 8    whether or not it's actually even worth $590

 9    eight or nine years later to the military I think

10    is a strong question.  I think that's the biggest

11    question here, right, is the value amount?  Can

12    they meet that $500 threshold enough for the

13    Court to certify up to the Circuit Court?  And I

14    just don't think that they are able to do that.

15              Again, you have two detectives that

16    are conflicting in their testimony.  None of them

17    really knows how much this plate would actually

18    cost today.  And the value being in question is

19    something that the Court should strongly consider

20    and not certify in this case.

21              The next thing is the knowledge of

22    possession of the stolen property.  We heard

1    Detective Wanik say that there were at least two

2    different explanations given by Mr. Wells.  The

3    first one, which I would say is the truth, right,

4    because it's the first explanation that's given,

5    is that he got it from someone else, that he

6    legally purchased it, which says that he doesn't

7    have the knowledge that it's stolen.

8            Then, he gets into when Detective

9    Wanik says that they're going around in circles

10   several times.  Then, he says, oh, well, you

11   know, when I was in the military base, I may have

12   taken it from Dotson.  And then, you heard

13   Detective Wanik say that he overheard Dotson tell

14   someone that that wasn't his, that his rifle

15   plate was not taken.

16           So, with all that, Your Honor,

17   speculation was used a lot today, the word,

18   speculation.  Speculation, and conjecture wasn't

19   used, but I would assert, Your Honor, that's all

20   this case is, is speculation and conjecture.

21   They have no idea what happened to this plate

22   after 2011.  And they don't know whether or not

1    Mr. Wells said while he was in Fort Myer, they

2    don't know whether or not he bought it from

3    someone online, or purchased it some other way.

4    All they know is that he was in possession of

5    this, but they haven't been able to prove

6    anything about him knowing that this particular

7    plate was stolen, Your Honor.

8              Thank you.

9              THE COURT:  Okay.  Commonwealth?

10             MS. WRIGHT:  Your Honor, all we know

11   is that Defendant was outside of the gate, and

12   when police talked to him, he was in possession

13   of this rifle plate.  Detective Shepherd

14   testified that the Army purchases these rifle

15   plates, and that once the Army purchases the

16   rifle plates, they ultimately make their way to

17   Fort Myer.  He testified that this particular

18   plate made its way to Fort Myer, where it was

19   then distributed out.

20             He testified that no one retains

21   possession of these rifle plates once they are

22   discharged or retired from the United States

1  Army.  And he indicated that the Army has checks

2  and balances in place for distribution of the

3  plates, as well as retaining the plates.  When I

4  asked him about the service life of the plates,

5  he indicated that they're either serviceable or

6  they're not.  He indicated that they don't

7  depreciate.  And that's the evidence that we have

8  before us today.

9           He indicated that the Army values them

10  at $590 and the Army, then, decides whether they

11  can be distributed out to their servicemen.  He

12  indicated that a non-serviceable plate would not

13  be issued out.  So, the fact that a plate is

14  issued means that it is serviceable.  And he

15  indicated that they don't depreciate.  He said

16  they're worth $590.  And that is the evidence

17  that we have before the Court at this time in

18  regards to the value.

19           In regards to knowledge, the Defendant

20  testified that he knew that he was not supposed

21  to be in possession of that plate.  He indicated

22  that he thought it was his roommate's plate, but

1    he wasn't quite sure where it came from.  But,

2    ultimately, he indicated that he knew that, when

3    he was discharged from the Army, he was supposed

4    to return all of his Army-issued equipment and

5    that he was not to be in possession of any Army-

6    issued equipment, including the rifle plate that

7    was found in his possession in February of this

8    year.

9         THE COURT:  Well, there's no doubt

10   that the plate was found in his possession.  The

11   Court is also convinced that this -- that the

12   investigation of Detective Shepherd regarding the

13   serial number was that this plate was bought by

14   the United States Army.  The testimony was that

15   these plates are issued and that they are

16   supposed to be given back.

17        The statement of the Defendant was

18   that, when he was processed out, he gave

19   everything back that he was supposed to give

20   back, that he had some signing to do, but when he

21   was at CIF, he turned in all his equipment.  He

22   didn't owe anything to the military.  He turned

1    everything in.

2              The testimony was by the two

3    detectives -- I do remember what Mr. Clarke was

4    saying, is that the plate originated in Aberdeen

5    and, from there, it went out.  And Detective

6    Wanik said that he saw receipts or information

7    that it made its way into Fort Myer.

8              Again, being a probable cause hearing,

9    and looking at the statements of the Defendant,

10   he made a number of statements.  But the Court,

11   looking at probable cause, can look at his other

12   statements as being self-serving, and when they

13   weren't being accepted, he said, yeah, right, I

14   took the plate from Fort Myer, and I know I

15   shouldn't have it in my possession.

16             So, based on that, we have knowledge,

17   intent, knowing the nature of the item that he

18   has in his possession, that he shouldn't have in

19   his possession, that he knew it didn't belong to

20   him, the Court is satisfied that there's probable

21   cause for this charge, and I will certify it to

22   the Grand Jury.

1          And on the value issue, he testified

2    it was $590.  There's no testimony that when Mr.

3    Wells took it into possession it was not usable.

4    And then, the Court can infer that he had it in

5    his possession because it was usable.  Or else,

6    why would he have it with all of his other gear,

7    if it was a piece of junk?

8          And being usable, the testimony was

9    that it did not depreciate.  It's either usable,

10   or it's broken and not usable.  There's recent

11   case law that talks about the items and value of

12   items and it could be the resale value, it could

13   be the replacement value.  And that would be an

14   issue at trial as to what it was.  But, right

15   now, the only evidence I have is it's worth $590,

16   which Mr. Clarke is right, it's not much over

17   500, but it's sufficient enough for the statute.

18          So, I do find probable cause to

19   certify this case to the Grand Jury.  I order it

20   certified for the next term.  And I'll hear you

21   on your bond issue now that we have had a

22   hearing.

1          And again, I would just explain to you

2     I didn't know this was on for prelim.  We would

3     have had the officer here and he could cross-

4     examine on this statement that he made.  And I

5     would get a chance to hear more about the facts

6     and circumstances.

7          So, go ahead, Mr. Clark.

8          MR. CLARKE:  Your Honor, I know that

9     Your Honor went through at length the bond motion

10    and I made arguments earlier.  So, I'm not going

11    to rehash those.  But I do want to just lock in

12    some key points that we're talking about --

13         THE COURT:  Sure.

14         MR. CLARKE:  -- relevant to risk

15    assessment.

16         And you heard the testimony from the

17    officers about how far away from the base that he

18    was.  Some of them couldn't tell me whether or

19    not he could see the --

20         THE COURT:  Well, I tell you, once

21    they oriented me, I know now which side they were

22    going to, because of my mother's military

1    experience.  She goes over there all the time.

2    So now, I know that and have that.  The entrance

3    by Henderson Hall and, then, there's one further

4    down that's blocked off now, I know exactly what

5    you're talking about.

6              MR. CLARKE:  Okay.

7              THE COURT:  So, yes.

8              MR. CLARKE:  Yes.  And I believe the

9    testimony was that he was just gesturing towards

10   the cemetery and he was on the phone.  I mean,

11   this is not someone that's --

12             THE COURT:  Well, what's not in your

13   bond motion -- and which I didn't know

14   previously, I just heard -- was there was a

15   number of magazines that were loaded with armor-

16   piercing rounds.  I think I heard three, 33 clips

17   that could hold 30 rounds, I think Detective

18   Wanik testified.

19             MS. WRIGHT:  Five.

20             THE COURT:  Five?

21             MS. WRIGHT:  Five.

22             MR. CLARKE:  That sounds like a

1    Virginia Legislature issue.  They haven't charged

2    him with anything having to do with these --

3              THE COURT:  Well, I know, but now

4    we're talking about danger to the community and a

5    risk of flight.  And I haven't heard -- I don't

6    see -- it hasn't been on the record about the

7    risk of flight, but the danger to the community

8    is, I think the Commonwealth will correct me if

9    I'm wrong, but I believe that that's probably

10   what they're more concerned about and what the

11   Court should be concerned about.

12             MR. CLARKE:  So, I think having

13   firearms in the trunk of the vehicle, firearms

14   that are now in the possession of Arlington

15   County, and they're properly stored in accordance

16   to the Virginia Code.  I think the Court should

17   weigh that heavily.

18             I mean, this is not a situation where

19   he's riding with this rifle on the passenger

20   seat, and even the handgun that he has is

21   unloaded.  It's properly stored.  He's going

22   above and beyond to try to comply with the law

1    here, in trying to store and transport these,

2    these firearms.

3                    So, the fact of the matter is that

4    just by possessing these firearms shouldn't make

5    him a danger to the community, when Virginia

6    allows people to do this.  It's not something

7    that's disallowed in Virginia.  I understand

8    there's a lot of politics around maybe gun

9    control, but Mr. Wells is following the law as it

10   is today.

11                   And the only thing that he may have

12   been breaking the law in doing that day was he

13   had dead tags, which is why they, why they were

14   able to get him out of the vehicle in the first

15   place.  I mean, he's even upfront with the

16   officers when he tells them, yes, there are

17   firearms in the vehicle.  There's nothing amiss

18   about his ownership of firearms.

19                   And remember, this is someone that

20   just got out of the military.  So, the culture

21   and his mindset is a little bit different around

22   firearms, versus an everyday citizen.  I would

1    like the Court to take that into consideration.

2              In addition, I do have a letter from

3    his business partner, Mr. Justin Matterson

4    (phonetic), who's actually in the courtroom

5    today.

6              THE COURT:  Has the Commonwealth seen

7    it?

8              MS. WRIGHT:  No.

9              MR. CLARKE:  So, he has a job, Your

10   Honor.  He is employed.  Like you heard in the

11   testimony, he has two vehicles, two Ducatis.  One

12   of his vehicles is a Mustang, the other one is

13   Pontiac G6.  This is definitely not someone that

14   doesn't have anything going for him.

15             In addition, during the interview, he

16   told them about the business deal that he has

17   pending, that he was very close on closing -- on

18   closing deals.  And again, his business partner

19   is here to be able to speak to that, if the Court

20   would want.

21             But, again, we're talking about

22   someone who is trying to make a way for himself

1    outside of being in the military.  And he told

2    the officers that he just got, he just got

3    finished with his run in D.C.  He was coming back

4    to get a CV, he pulls over to make this phone

5    call, another overabundance of trying to follow

6    the law, and that's when they come and say, oh,

7    you know, you look suspicious because you're

8    pointing towards the cemetery.  So, this is

9    definitely not someone that is a danger to the

10   community.

11          And Mr. Wells does have something that

12   he would like the Court to briefly listen to, if

13   the Court would allow it.  I would have rather

14   him be here, but considering the circumstances,

15   I'm fine with him being able to do that.

16          THE COURT:  Well, Mr. Wells, if you

17   start speaking today, then I am going to -- you

18   have a lawyer.  The lawyer's making your

19   argument.  You're not under oath.  I would then

20   have to have the Commonwealth be able to cross-

21   examine you, which, you know, we're past the

22   admission of the evidence stage.

1         So, your counsel is here making the

2    argument.  He's competent counsel.  He knows what

3    he's doing.  He knows what the facts are.  He

4    knows what he needs to argue.

5         I don't know what you're going to add

6    that's going to help your case, because anything

7    that you say, sir, could be used against you

8    later.  Because, you know, you just can't make

9    free statements.  This isn't sentencing where you

10   can allocute.  This is a bond motion.

11        And if you're going to offer

12   testimony, I'll put you under oath and let the

13   Commonwealth cross-examine you.  Then, you're

14   talking about possibly waiving Fifth Amendment

15   privilege.  I don't know if that's the wisest

16   course of action.

17        You sure you want to do this?

18        THE DEFENDANT WELLS:  Your Honor, I

19   hope this doesn't count as for me talking, but if

20   my counsel recommends and I were to speak, I

21   would have no issue speaking, Your Honor.

22        MR. CLARKE:  Well, I am not going to

1    recommend that you speak anything else -- say

2    anything else, Mr. Wells.

3              THE COURT:  All right.  I'll hear from

4    the Commonwealth.

5              MS. WRIGHT:  Your Honor, when

6    Defendant was stopped on that day, he had several

7    items in his car that were concerning to the

8    Commonwealth.  He had a black Glock that was in

9    the vehicle at the center console, and he also

10   had the AR-15.  He had five fully-loaded 30-round

11   magazines.  He had a drone, a laptop, a crowbar,

12   a hammer, knives, padded knuckles, two face

13   masks, two vests with bulletproof armor.  He had

14   the rifle plate.  He had a grenade.  He had

15   walkie-talkies.  He had a list of dark web

16   websites.  And he also had a handwritten list of

17   equipment that he still needed to purchase for an

18   op, as well as stack of papers we believe to be a

19   manifesto.

20             When he was later interviewed, he gave

21   an account of how he would attack a base, and

22   that is concerning to the Commonwealth.

1        I know Defendant's counsel likes to

2   argue that he's a Gen Z'er and they just like to

3   make these statements, but it's concerning to the

4   Commonwealth that, regardless of why he would

5   make the statements, he made a very chilling

6   account step by step on what he would wear, how

7   he would do it, what he would do -- an account,

8   it was a 10-minute-long account to the detective

9   on how he would attack this base.  So, the

10  Commonwealth does believe that he is a risk to

11  the community.

12        Additionally, the letter that was

13  passed up to the Court from Justin Matterson, I

14  just want to let the Court know that he's on

15  supervised probation in the Circuit Court here in

16  Arlington County for a malicious wounding charge

17  that (inaudible) I believe last year.

18        So, I think this is a chilling

19  account.  I think this is something that the

20  Court should take very seriously.  I think he

21  obviously has the means to do this.  He has

22  firearms.  He is in possession of several items

1     that he could take the next step to conduct this.

2                     And so, the Commonwealth is asking

3     that he remain held without bond.

4                     THE COURT:  Was this grenade found to

5     be an operable grenade?

6                     MS. WRIGHT:  I think they disposed of

7     it.  Yes.

8                     PARTICIPANT:  It was a smoke grenade,

9     Your Honor.  It was a smoke (inaudible).

10                    THE COURT:  Is that considered an

11    incendiary device that needs to be registered by

12    the ATF?

13                    PARTICIPANT:  We don't think so, Your

14    Honor.

15                    THE COURT:  All right.  Is anybody

16    from the ATF here?

17                    (NO RESPONSE.)

18                    No?  All right.

19                    MR. CLARKE:  And again, Your Honor,

20    they are in possession of all these items, and

21    the Court can impose conditions that would keep

22    the community safe.

1          THE COURT:  All right.  Well, I think

2     I know what I'm --

3          THE DEFENDANT WELLS:  I want to speak.

4          THE COURT:  Mr. Wells, your attorney

5     is arguing and he's doing a -- I think, in the

6     Court's -- he's doing a good job trying to get

7     you out.

8          But what he's overlooking, sir, is the

9     totality of this circumstance.  It's not as if

10    you were on the highway and you were pulled over

11    and you had these items in the car.  You were

12    right next to the base that you have been

13    separated from, with weapons capability, the

14    knowledge, the knowhow, an ops list, and perhaps

15    the motivation to seek some vengeance.

16         As you said in your statement, let's

17    say even if I had a vendetta against them,

18    nowhere in my heart in any way, shape, or form

19    would I ever do anything to an innocent person.

20         All right.  So, you're talking about,

21    I wouldn't hurt an innocent person, but you're

22    not talking about these people who you might have

1    had a vendetta against.

2            But what's moving to the Court is you

3    say -- you're talking about having to wear pants

4    and boots, and then, you say, I'm not trying to

5    go into this too much because I'm once again

6    weighing again that I wouldn't do it, but that's

7    the way I would have wanted to do it, and that's

8    what I really want to weigh heavily on.

9            And when I read that sentence, sir,

10   what I am seeing is somebody who's weighing his

11   options, to use your word, considering how to do

12   it.  Against it, for it, how would I do it?   I

13   don't want to hurt innocent people, which, in

14   your language, civilians, but those that you

15   might have a vendetta against, reading this, I

16   would believe that you would say that those are

17   not innocent people.

18           Sir, the Court has to consider the

19   danger to the community in these types of cases

20   and how people separated from the military, or

21   separated from law enforcement, or even separated

22   from their jobs, get it in their mind that

1    they're so upset and angry, they have to take

2    action, which involves people being killed.

3         That did not happen, but, certainly,

4    sir, you talked about you studied the tactics and

5    training.  You have a smoke grenade for cover.

6    You have body armor, the military knowhow, and

7    the means to carry this out.

8         And, sir, I do find that there are no

9    terms or conditions that I can set that would

10   guarantee the safety of the community, that I

11   would feel comfortable releasing you on, and be

12   able to think that you might not change your

13   mind, because you are weighing --

14        THE DEFENDANT WELLS:  Your Honor, let

15   me explain --

16        THE COURT:  -- heavily.

17        So, sir, I've made my decision.  I'm

18   not going to change it.  So, if you wish to

19   speak, it's not going to change my mind.

20        Now that this has been decided, and

21   you are going up to the Circuit Court, Mr. Clarke

22   I'm sure will file another bond motion.  You'll

1    have another judge listen to it and continue to

2    seek your release.

3              But, today, sir, I will certify the

4    case and you will continue to be held without

5    bond until your appearance in the Circuit Court.

6              THE DEFENDANT WELLS:  All right.  May

7    I speak?

8              THE COURT:  Sir, I've already made up

9    my mind.

10             THE DEFENDANT WELLS:  I want to speak.

11             THE COURT:  So, I don't -- you're not

12   going to gain --

13             THE DEFENDANT WELLS:  I understand.

14             THE COURT:  -- anything by speaking.

15   So, I would advise against it.

16             Mr. Clarke, do you want your client to

17   speak?

18             MR. CLARKE:  No, Mr. Wells, we can

19   speak afterwards.

20             THE COURT:  All right.  Please turn

21   off the microphone.

22             MR. CLARKE:  Thank you, Your Honor.

1          THE COURT:  All right.  Thank you.

2          And so, I'll just leave this.  I

3    didn't reconsider -- just so we don't have any

4    issues with whatever might go on upstairs when

5    this case makes its way up there, but on the bond

6    hearing because it is I do have the ability, and

7    I agree with you 100 percent, to make another

8    determination regarding changed circumstances, et

9    cetera.  Okay?  So, I'll leave that in place.

10          And good luck to you, Mr. Clarke, in

11    this case.

12          MR. CLARKE:  Thank you, Your Honor.

13          THE COURT:  All right.  All right.

14    So, that's it for the preliminary hearings.

15          (WHEREUPON, THE PROCEEDINGS IN THE

16    ABOVE-ENTITLED MATTER WERE CONCLUDED.)

17

18

19

20

21

22

**A**

**Aberdeen** 43:5,20 44:2
  87:20 88:8 113:5
  119:4
**abide** 111:8
**ability** 135:6
**able** 6:3 28:1,3,6 36:5
  38:19 40:10,16 57:7
  60:15 74:21 79:22
  91:19 113:3,7 114:14
  116:5 124:14 125:19
  126:15,20 133:12
**ABOVE-ENTITLED**
  135:16
**absolute** 111:15
**Absolutely** 40:17
**abundance** 110:21
**abuts** 39:21
**accepted** 119:13
**access** 77:3,3 95:5,10
  95:15
**account** 128:21 129:6,7
  129:8,19
**accurate** 10:19 13:15
  27:21 101:9
**accused** 100:17
**acknowledged** 99:13
**action** 102:18 127:16
  133:2
**activated** 27:2
**active** 31:12 37:10
  48:20
**actual** 27:14 48:11
**add** 127:5
**addition** 83:9 125:2,15
**additional** 68:6 71:18
  72:4 103:14
**Additionally** 129:12
**admissible** 57:17
**admission** 107:18,19
  126:22
**admit** 23:9
**admitted** 11:6
**admitting** 106:22
**adversely** 77:6
**advice** 22:17
**advise** 134:15
**affect** 31:21
**Afghanistan** 33:10
**agencies** 33:8
**agency** 22:22 31:10
  91:3
**agree** 135:7
**agreed** 93:4
**agreement** 63:7
**ahead** 29:11,13,13 39:4
  52:17 58:4 59:10 61:6
  61:9 63:13 68:7,13

70:20 102:7 121:7
**Air** 26:17
**airsoft** 64:4,4 74:5,10
**airsofting** 73:18
**AK** 33:15
**alert** 99:8
**allegation** 106:9
**alleged** 57:16 59:6
**allegedly** 59:7 81:4,6
  82:11
**allocute** 127:10
**allow** 110:22 126:13
**allowed** 29:8 38:6 46:9
  77:3
**allows** 124:6
**Amendment** 107:13,16
  108:5,8,10 109:4
  110:8 127:14
**amiss** 124:17
**ammunition** 76:18
**amount** 36:2 114:11
**Andrew** 2:15,16
**angry** 133:1
**Annex** 39:20 40:5
**answer** 23:22 24:5 54:1
  70:17 86:20 107:7
**answering** 22:7 23:13
  23:19,21 102:10
  107:11,14,15
**answers** 20:17 77:10
**anybody** 5:11 30:7
  40:18 49:15 77:18
  130:15
**anymore** 86:1
**apart** 69:10
**apologize** 16:19
**apology** 93:4,5,21 94:8
  94:10
**apparently** 52:10
**appearance** 134:5
**APPEARANCES** 2:1
**appeared** 89:14
**appears** 90:19
**appoint** 107:9 108:19
  111:19
**approach** 10:8 32:18
  109:11
**approximately** 8:5
  27:13
**April** 51:2
**AR** 9:13 15:22
**AR-15** 128:10
**area** 70:8 93:19 105:20
**argue** 112:13 127:4
  129:2
**arguing** 131:5
**argument** 57:20,21
  58:21,22 74:22 80:5,8

81:8 112:9 126:19
  127:2
**arguments** 121:10
**Arlington** 1:2,12 2:9
  6:16,19 8:7 18:2,5
  19:3,4 50:14,17 77:16
  78:11 123:14 129:16
**armament** 71:12
**armor** 33:5,11,12 38:8
  48:5 66:6 72:12 76:21
  128:13 133:6
**armor-** 122:15
**armor-piercing** 33:14
  76:17
**Army** 31:6,11,16,22
  34:1,3,16,22 35:21
  36:1,6,12,13,16 37:2
  38:19 42:1,3,16 43:5
  43:10,11,20,21 44:2
  44:16,18 45:15,20,22
  46:20 47:12 48:9
  60:10,13 64:20 65:1
  65:11 66:15 75:20
  84:1,4,7 85:12,16
  87:16 95:3 106:13
  113:4 116:14,15
  117:1,1,9,10 118:3,14
**Army's** 43:11 76:8
**Army-** 118:5
**Army-issued** 45:8
  65:20 118:4
**arraignments** 105:4
**arrest** 14:3 25:12 51:11
  54:13,15 58:7 60:22
  61:10 62:9,15 64:12
  79:20
**arrested** 24:14 57:3,14
  62:12,19 96:19 97:5,8
**Arresting** 54:13
**arrived** 8:19 19:10,14
  19:18,21 21:16 96:20
**ascertain** 61:5,7 99:16
**asked** 5:8 20:10 22:5
  72:20 76:15 86:18
  89:1 92:19 94:10
  98:18,21 106:21
  111:4 114:2 117:4
**asking** 41:14 53:18
  58:17 87:3,4 90:7,10
  130:2
**aspect** 68:6
**assaults** 31:20
**assert** 107:12 108:8,10
  110:19 111:6 115:19
**asserted** 110:7
**asserting** 109:5,5
**assessment** 121:15
**assigned** 31:5 37:19

38:3 95:4
**assignment** 50:19
**assistance** 8:2
**Assistant** 2:6
**assisted** 9:2,5
**assisting** 12:1
**assumed** 5:20 17:17
  30:15 50:5
**Assumption** 44:6
**ATF** 76:3 91:15 130:12
  130:16
**attack** 68:18 71:2 97:18
  98:8,20 99:3,6,9
  100:16 128:21 129:9
**attacking** 100:14
**attempt** 32:9
**attempted** 22:10
**attempting** 74:4
**attend** 73:8
**attended** 73:7
**attention** 70:10 88:19
**attorney** 2:6 4:12,20
  41:9,14,15 60:17
  79:14 111:2,7,13
  131:4
**attorneys** 107:9
**Austin** 14:1
**authority** 18:9
**available** 44:14
**average** 48:6
**aware** 12:8 65:22 66:4
  77:14 84:2 85:5,12,14
  111:17

**B**

**back** 17:5 38:9 42:8,13
  52:8 60:13 66:8 83:9
  83:10 84:13,15 86:12
  89:9,13 92:6 109:14
  118:16,19,20 126:3
**backing** 33:11
**badge** 18:9
**balances** 117:2
**ballistic** 33:6
**bar** 105:8
**barracks** 66:14,18,20
  67:20
**base** 19:3 31:6 37:4,8
  42:16 71:3,8 85:21,22
  100:15,16 113:4
  115:11 121:17 128:21
  129:9 131:12
**based** 13:7,9 27:10
  36:11 40:20 45:5 48:7
  59:1 78:5 79:5 80:17
  80:22 83:8,14,18 86:9
  90:22 119:16
**bases** 73:1

basically 31:18,21 32:9
  37:16 48:2 114:6
basing 44:5
basis 14:15 59:8,11
BBs 74:7
BDUs 77:1
bears 53:14
beginning 97:19
BEHALF 2:3,13
behavior 76:13
belief 44:1,5
believe 12:11 24:17
  35:6 53:16 54:14
  80:16 81:9 82:10
  86:22 90:20 91:6,8
  93:11 106:11 122:8
  123:9 128:18 129:10
  129:17 132:16
believed 44:3
belong 67:17 119:19
belongings 20:11
belongs 95:2
BENCH 109:17,18
Benning 84:15,18,22
  90:6 91:1
Beret 73:9
best 27:20
beyond 123:22
biggest 114:10
bill 65:17
bit 26:8 31:22 90:11
  91:17 124:21
black 128:8
blocked 122:4
board 46:6
body 38:8 48:5 72:12
  76:21 133:6
bond 17:2,3,9 29:7,7
  68:6 69:8 101:8
  112:14 120:21 121:9
  122:13 127:10 130:3
  133:22 134:5 135:5
boots 71:14 132:4
born 85:6
bought 45:14 116:2
  118:13
break 61:3
breaking 124:12
briefly 49:1 126:12
bring 98:9 103:13
broadly 109:9
broke 98:7
broken 120:10
brought 79:14 81:3
  98:11 99:1,19
bulletproof 128:13
burglarize 72:11
business 21:22 23:22

91:13,14 125:3,16,18
butcher 54:7
buy 72:2

**C**
caliber 33:15
call 7:19,21 17:4 18:21
  33:19 40:1 104:19
  126:5
called 5:18 8:1 17:15
  30:13 39:20 50:3
  105:13 111:9
capability 131:13
capacity 7:1 31:13
car 13:17 63:18 76:14
  98:19 128:7 131:11
card 22:22 77:3
Carillon 26:12
carrier 93:13,16
carry 71:10 72:5 133:7
case 14:3 34:13,13 40:4
  75:13,14,15 76:11
  82:5,6,18 86:11 89:22
  108:16 111:5 112:13
  114:20 115:20 120:11
  120:19 127:6 134:4
  135:5,11
cases 107:3 132:19
cause 59:14 80:20
  82:13 119:8,11,21
  120:18
caution 110:21
cemetery 8:6,21 9:22
  19:3 26:6,7 39:13,16
  39:21 122:10 126:8
center 29:15 128:9
Central 36:20 37:15,21
  38:1 43:3 46:22 65:15
Ceradyne 36:2,3,13,14
  44:22 60:9 87:16,19
ceramic 33:5
certain 40:20 60:11
  82:1 106:6,10,11
  107:18 111:3
certainly 52:12 133:3
certified 120:20
certify 114:13,20
  119:21 120:19 134:3
cetera 135:9
chain 77:7
chair 30:18 49:22
  105:18,21
chance 111:1 121:5
change 67:8 133:12,18
  133:19
changed 90:5 135:8
Chantilly 89:15
charge 17:8 82:8

103:18 119:21 129:16
charged 35:8 123:1
charges 103:14
checked 46:22 75:11
checks 117:1
chilling 129:5,18
choose 71:12,13
CIF 65:15 118:21
circles 115:9
Circuit 58:8 114:13
  129:15 133:21 134:5
circumstance 131:9
circumstances 60:14
  61:19 121:6 126:14
  135:8
citations 24:15 25:1
citizen 124:22
civilian 46:9
civilians 132:14
clarify 12:14
Clark 121:7
clean 65:17
clear 63:11 85:5 100:8
  100:8
CLERK 5:22 6:5 43:13
  105:5,8,19 106:3
  109:21
client 51:20 134:16
client's 41:12
clips 122:16
close 125:17
closed 39:20 40:15,19
closer 40:1 71:9
closing 125:17,18
cocaine 82:5
Code 123:16
colleagues 5:11 104:11
collected 78:6
combat 33:21
come 7:3 9:1 17:10
  18:11 30:17 34:9 37:2
  49:21 60:7 63:16
  68:21 74:7 80:1,12,19
  87:1 89:9 90:11 96:15
  104:11 105:19 109:20
  110:2 113:11 126:6
comes 80:18 86:22
comfortable 133:11
coming 26:11 54:1
  62:16 126:3
command 43:5 77:7
commenced 1:16
commits 57:12
committed 57:6 59:14
  59:17 107:19
Commonwealth 1:6 2:3
  5:19 12:17 17:16
  30:14 32:18 49:18

50:4 52:8 56:5 60:17
  79:14 80:18 88:17
  109:2 111:16 112:10
  114:2 116:9 123:8
  125:6 126:20 127:13
  128:4,8,22 129:4,10
  130:2
Commonwealth's 2:6
  3:17 10:11 11:3,9
  32:22 70:17 104:4,5
community 123:4,7
  124:5 126:10 129:1
  130:22 132:19 133:10
competent 127:2
completely 5:1 113:11
comply 123:22
Composite 10:15
compound 35:6
conceal 71:11
conceive 81:14
concerned 72:10
  123:10,11
concerning 128:7,22
  129:3
concerns 108:18
concise 57:22
concluded 103:16,18
  106:11 135:16
condition 47:13
conditions 65:8 130:21
  133:9
conduct 75:6 130:1
conducting 9:19 10:1
CONFERENCE 109:17
  109:18
confessed 67:15
confirm 79:6 89:20,20
confirmed 89:5,17
  90:16
confirming 81:19
conflicting 114:16
conjecture 115:18,20
conjecturing 44:9
consider 58:6,15,18
  61:1,2 62:7 80:13
  114:19 132:18
consideration 125:1
considered 41:1 46:5
  47:11 80:4,16 114:6
  130:10
considering 126:14
  132:11
console 29:16 60:3
  128:9
conspiracy 82:7,8
constitutional 22:17
  23:15
contact 7:4 18:12 25:20

91:15
**contacted** 76:4 88:21
89:1
**contents** 3:4 10:3
**continue** 82:10 134:1,4
**continues** 81:16
**continuing** 73:6
**contract** 20:13,13 21:21
35:21 36:1,6,7,12
38:7 72:22
**Contracting** 34:6
**contractor** 72:20,20
**contradict** 113:11
**contradicting** 113:16
**control** 124:9
**convention** 64:4
**conversation** 92:7
102:3,7
**convinced** 80:17
118:11
**copies** 88:15
**copy** 36:7
**Corporal** 5:13,15,17
6:15 8:15,16 9:8 10:6
16:13,18 17:10,14
18:1 19:11 28:14 30:4
**Corps** 40:1
**correct** 12:18 15:17
21:18 32:4 54:16
57:10 60:6 62:3 68:11
68:12 69:16 83:6,18
85:6 86:5 88:7 94:2
97:5,14,15 101:11
108:13 123:8
**cost** 36:21 114:18
**counsel** 5:8,18 17:15
30:13 49:1 50:3 70:8
105:13 127:1,2,20
129:1
**count** 112:16 127:19
**County** 1:2 6:16,19 8:8
18:2,5 19:5 50:14,17
78:11 123:15 129:16
**couple** 67:15 84:16
87:9 92:2,3
**course** 127:16
**Court's** 43:13 81:10
131:6
**Courthouse** 2:7
**courtroom** 7:7 18:16
51:15,20 52:9 104:8
125:4
**cover** 133:5
**covering** 71:13
**cracks** 48:14
**crime** 57:6 76:9 80:16
107:19
**criminal** 50:20 107:20

110:16
**Cross** 3:6 41:6
**cross-** 121:3 126:20
**Cross-exam** 11:17
**CROSS-EXAMINATI-**
11:18 21:14 27:11
41:19 82:21
**cross-examine** 21:1,13
39:2 74:20 127:13
**crowbar** 9:16 128:11
**culture** 124:20
**curb** 9:21
**current** 40:20 47:13
**currently** 35:8
**Curtis** 1:8 7:4 18:12
34:10,13 51:5
**curved** 48:13
**custody** 24:8 25:10
52:21
**Customs** 84:14
**CV** 126:4

_____

**D**

**D** 46:4,4
**D-O-D** 94:6
**D-O-D-S-O-N** 94:7
**D-O-T-S-O-N** 94:6
**D.C** 2:19 126:3
**danger** 123:4,7 124:5
126:9 132:19
**DANIEL** 1:22
**dark** 128:15
**date** 7:3 18:11 51:7
56:6,13 60:11 64:6,10
64:11 87:1 114:3
**dated** 78:21
**day** 24:8,14 25:1 73:13
73:15 75:13 76:10,13
76:16 77:11 87:13
94:22 97:1 112:22
124:12 128:6
**days** 54:18 55:9 79:22
84:16 87:10
**dead** 124:13
**deal** 125:16
**dealer** 91:5
**deals** 125:18
**December** 6:20
**decide** 52:1
**decided** 133:20
**decides** 117:10
**decision** 62:8 133:17
**decisions** 96:8
**deem** 82:17
**Defendant** 1:9 2:13 4:5
4:15 5:1 6:3,9 7:13,19
8:18 9:18 10:2 18:21
19:13,19 23:2,6 28:15

28:22 41:7,10 51:12
51:14 52:20 53:2,8,20
55:4,19,19 60:18
63:17,22 64:19 68:17
69:14 71:2 72:6 81:2
105:14 116:11 117:19
118:17 119:9 127:18
128:6 131:3 133:14
134:6,10,13
**Defendant's** 9:2 49:1
129:1
**defender** 107:10 108:18
**defense** 5:7 31:20 45:2
70:7 104:18
**definitely** 125:13 126:9
**degree** 9:9
**deny** 79:6
**depart** 38:15
**department** 6:17,19
18:3,5 31:6,19 41:22
42:3 45:2 50:15,17
114:1
**depending** 32:8,10
37:21 46:19
**depiction** 10:20
**deploy** 33:10
**depreciate** 49:3 117:7
117:15 120:9
**depreciation** 47:2 49:2
**DESCRIPTION** 3:15
**designed** 33:8
**destroyed** 46:8 47:4
**details** 20:20 21:17
22:3 75:9
**detained** 8:22 24:11
25:11 28:15,17,20
**detective** 30:10,12,17
31:5,9 32:21 43:17
49:10,17,19,21 50:2
50:12,14 55:18 56:12
60:17 62:8 69:14 75:1
76:4 78:3 80:10 83:1
86:10 88:5,12 100:19
101:8 102:3 104:7
113:3,10,12,13,21
115:1,8,13 116:13
118:12 119:5 122:17
129:8
**detectives** 114:15
119:3
**determination** 17:1
79:19,20 80:22 81:11
135:8
**determine** 32:14 34:16
48:9
**device** 130:11
**Devon** 3:12 92:10
104:21 105:12

**Diamondback** 9:14
15:22
**differences** 38:4
**different** 14:8 21:6
38:11 58:8,9 77:2
80:9 90:9 95:20 115:2
124:21
**dignitaries** 73:1
**direct** 3:6 6:12 17:20
22:1 24:3 30:20 42:5
50:7 70:10
**directed** 37:20
**directly** 23:1
**disallowed** 124:7
**discharge** 65:7 66:8
**discharged** 38:19 65:5
66:15 116:22 118:3
**disciplinary** 65:6
**discuss** 5:10 16:14
30:6 49:14
**discussed** 15:3 49:2
55:4 63:17 99:13
100:5
**discussing** 14:13 59:5
**dispelled** 95:16,18
**displaying** 18:8
**disposed** 130:6
**disposition** 46:2,4
**distinguish** 17:8
**distributed** 36:17 37:9
37:13 116:19 117:11
**distribution** 117:2
**District** 1:1 107:3
**Division** 50:21
**DLA** 46:2
**docket** 96:5
**DOCUMENT** 10:10 11:8
**documenting** 13:4
**documents** 36:11
**DoD** 46:5
**doing** 6:2 12:15,20
24:12 31:8 41:18
50:22 53:1 67:3 77:15
77:17 81:4 124:12
127:3 131:5,6
**Dotson** 3:12 92:10,14
92:18 93:5,7,9,18
94:9,16 95:14,19
104:21 105:1,12,17
106:4 109:19 110:7
115:12,13
**Dotson's** 92:19 93:17
**Dotsons** 94:4
**doubt** 118:9
**draft** 13:20
**draw** 38:14 88:19
**drawn** 38:9
**driver** 19:15 24:20

driver's 19:16
driving 112:21
drone 9:16 128:11
drug 82:5
Ducatis 103:8,9 125:11
due 58:22 63:2 100:19
  102:2
duly 5:19 17:16 30:14
  50:4 105:14
duration 38:2
duties 31:15,17
duty 18:8 37:10 48:20

**E**

E 3:10 30:12 31:2
E-SAPI 33:2
earlier 69:8 121:10
easier 69:19
easily 17:8 81:14
east 26:8
Eastern 107:3
edge 48:13
effect 65:9
eight 84:1 114:9
either 38:18 47:3 79:6
  109:7 112:19 117:5
  120:9
elaborate 20:15
elements 58:2
else's 77:18 106:16
emailed 88:14
emergency 27:2
employed 6:20 7:1 18:4
  18:8 31:10 50:16
  125:10
employee 42:2
employment 22:4,11
end-in 26:6
end-user 48:12
ended 65:4 84:19
enforcement 26:20,22
  33:7 107:17 113:15
  132:21
engage 71:16
enter 43:6
enters 43:10
entire 27:8 38:7
entrance 26:9,10 39:10
  122:2
entry 71:8
equipment 27:2 37:14
  65:16,21 66:7,10
  67:19 71:10,19 72:4
  72:14 74:3 95:11
  118:4,6,21 128:17
erratic 14:5
especially 6:1
ESQ 2:5,15

estimate 27:21
estimated 27:17
et 135:8
evaluation 48:17
evasive 77:9 102:10
event 42:21 54:17 64:5
events 58:15 67:13
eventually 37:3
everybody 17:4 111:11
  111:12
everyday 124:22
evidence 11:3,10 12:16
  32:9,22 59:4,20 60:5
  80:18,22 82:6 88:18
  88:18 104:4,6,18
  112:17 117:7,16
  120:15 126:22
exactly 11:21 12:15
  13:5,11,18 15:11,14
  22:6 33:4 34:5 59:15
  59:18 72:21 77:11
  87:12 122:4
examination 5:18 6:12
  17:15,20 28:12 30:13
  30:20 47:20 50:3,7
  105:13
examine 121:4 126:21
examined 5:20 17:17
  30:15 50:5 105:15
example 90:3
examples 66:6
Exchange 40:2
exclusive 44:15,18,20
excused 16:16 30:9
  49:16 104:16 112:1,5
execute 79:22
executed 80:14
exercise 108:4
exercising 23:15
Exhibit 3:15 10:11 11:3
  11:9 33:1
exhibits 104:13
expensive 103:10
experience 48:8 83:8
  122:1
expert 44:21
expertise 48:8
expiration 114:3
explain 31:14 33:3 35:2
  35:20 64:19,22 65:3
  65:10,13,19 66:13
  68:17 69:3 71:1,21
  74:1 121:1 133:15
explained 48:3 67:7,13
  74:2
explanation 93:20
  94:19 99:3 100:7
  115:4

explanations 115:2
expose 107:20
exposure 110:16
  111:17
extra 82:6
extrajudicial 79:19
eye 2:17 41:1
eyeballs 113:13

**F**

face 71:13 128:12
Facility 36:21 37:15,21
  38:2 46:22 65:15
facing 26:6,7
fact 55:8 62:7 76:8,17
  77:5 83:14,18 84:3
  91:14 95:16 98:11
  102:14 117:13 124:3
facts 32:9 61:18 121:5
  127:3
fair 10:19 27:22 97:2
fairly 44:18,19,20
fall 38:13
false 110:12,13
familiar 44:10
family 21:8
far 27:13 39:16 57:8
  59:21 101:7 103:17
  109:2 121:17
FBI 54:8
February 6:22 7:18
  10:21 18:7,20 24:10
  42:3 43:18 51:3,11
  53:16 55:6,21 56:14
  56:22 57:3 58:16,16
  60:21 61:13 63:18
  64:13,14 75:5 76:16
  78:22 83:2 88:20,20
  89:11,12 92:6 95:6
  96:12 112:21 118:7
federal 77:13 91:3,11
  106:22 107:2 110:14
feel 39:5 82:16 98:7
  133:11
feeling 98:14
feet 27:18,19 40:5
fell 47:6
felony 59:14
field 13:2 74:8,9,13
Fifth 107:13,16 108:5,8
  108:10 109:4 110:7
  127:14
figure 57:5 58:12,14
  76:6 77:19
file 77:12 133:22
filed 69:7 70:7
files 91:16
filing 110:13

find 22:10 76:3 106:21
  120:18 133:8
finding 4:18
fine 126:15
finished 126:3
firearm 15:18 84:8,13
  89:18 91:1,7
firearms 25:4 28:19,21
  29:1,18 89:5 90:14
  91:11,16,20 96:16
  123:13,13 124:2,4,17
  124:18,22 129:22
first 5:14,19 17:16
  30:14 50:4 74:14
  84:12 94:19 105:14
  112:13 115:3,4
  124:14
five 48:7 76:19 114:4
  122:19,20,21 128:10
flag 113:14
fleshed 94:16
flight 123:5,7
focus 102:3
focusing 86:16
follow 126:5
follow-on 91:1
followed 78:2 85:2
following 124:9
follows 5:21 17:18
  30:16 50:6 105:15
followup 22:8 24:4
force 26:17 36:17 54:4
  54:9
forced 91:15
form 131:18
former 47:6 73:9 92:7
Fort 8:1 36:21 39:10
  42:17 43:8,22 44:4
  46:3 67:16,17,19
  68:18 76:5 77:4,8,8
  83:22 84:1,14,18,22
  85:21 86:12 87:21
  88:1,9 90:6 91:1 95:3
  95:4 97:19 98:8 99:4
  99:10 113:7,9 116:1
  116:17,18 119:7,14
forth 73:2
forthcoming 102:12
forward 109:20
found 3:19 10:21 12:4
  15:18 48:5 55:5,21
  59:7 60:2,4 71:19
  88:5 89:5 90:17 113:1
  113:19 118:7,10
  130:4
four 54:18 55:9
Franks 56:1
free 16:9 39:5 82:16

104:1,3 127:9
**front** 28:1 33:13 39:16
  52:6 59:21
**front-** 26:5
**Fuentes** 8:15 9:9 19:12
  19:17 28:16 29:1,3,14
  29:17
**fulfilled** 72:9
**full** 4:20 30:22 50:9
  101:20
**fully** 47:14
**fully-loaded** 76:19
  128:10
**functional** 47:15
**further** 11:11 16:4
  21:12 25:13 27:11
  29:21 38:22 41:4
  47:16 49:6 74:18
  84:19 90:2 103:19
  122:3
**future** 72:17,18

**G**

**G6** 125:13
**gain** 134:12
**game** 74:7
**gate** 8:20 9:22 27:14
  28:1 39:17,21,22 40:5
  40:6,10,19 41:1 59:22
  77:9 116:11
**gates** 39:18
**gather** 32:9,9
**GC-20000810-00** 1:6
**gear** 38:8 93:10 95:13
  120:6
**Gen** 129:2
**general** 1:1 45:18 65:8
**generally** 71:15
**gentleman** 59:16 60:7
  106:18 112:7
**gentlemen** 100:18
**George** 53:11 54:4
**Georgia** 84:18
**gesturing** 122:9
**getting** 19:16 25:20
  57:1 61:21 67:1
**give** 21:17 27:15,17,21
  40:21 43:4 60:13
  118:19
**given** 60:12 65:17
  68:18 115:2,4 118:16
**giving** 22:3 23:22
**Glock** 9:13 15:19,20
  75:21 84:17 90:1,3,5
  90:15 128:8
**gloves** 9:16 76:22
**gotten** 54:20 86:8 99:21
**government** 72:22 76:1

77:13
**Government-issued**
  83:11
**grade** 44:13
**Grand** 119:22 120:19
**granting** 110:20
**green** 44:17 73:9
**grenade** 9:16 128:14
  130:4,5,8 133:5
**ground** 9:20 43:20 44:3
  87:20
**grounds** 55:10,11 88:9
**Group** 43:6
**guarantee** 133:10
**guess** 27:20 97:2
**guilt** 4:18 96:8
**gun** 60:2,2 74:8 76:2
  84:17 85:8 89:14 90:5
  91:10,12,21 124:8

**H**

**half** 101:16,18
**Hall** 31:7 39:20,22
  122:3
**hammer** 128:12
**hand** 105:9
**handcuffs** 8:22 20:2
  27:4,7,7
**handgun** 29:15 90:17
  123:20
**handles** 46:3
**hands** 5:4 90:5 91:5
**handwritten** 128:16
**happen** 19:22 46:11,12
  133:3
**happened** 20:1 54:18
  55:9 57:2 58:19 60:21
  62:7,22 65:13 80:3,14
  81:17 87:5 89:22
  110:15 113:18 115:21
**happens** 58:7 80:10
**hard** 33:12 76:22
**he'll** 111:18
**hear** 6:3,3,7,8 15:5
  16:22 48:15 106:1
  109:15,15 112:13
  120:20 121:5 128:3
**heard** 15:7 62:10 68:10
  108:12 112:17,21
  113:2,10,21 114:22
  115:12 121:16 122:14
  122:16 123:5 125:10
**hearing** 1:16 4:3,14
  17:2 56:1,21 57:4
  58:2 59:12 68:5 82:13
  119:8 120:22 135:6
**hearings** 135:14
**hearsay** 13:9 29:5,8

**heart** 131:18
**heavily** 123:17 132:8
  133:16
**held** 130:3 134:4
**Hello** 105:16
**help** 127:6
**helped** 11:22
**helps** 82:6
**Henderson** 31:7 39:20
  39:22 122:3
**hey** 81:20 100:18
**high-caliber** 33:17,19
**highway** 131:10
**hill** 26:11
**hobby** 73:21 74:6
**hold** 55:15 56:10,10
  59:1 122:17
**home** 22:12,13
**Homeland** 50:21
**Honor** 4:6,16 5:2 6:10
  10:7 11:2 13:13 16:5
  16:7,20 17:6,19 20:20
  20:21 21:11 25:15
  29:4 30:8,19 32:17
  35:5 43:14 46:15
  47:17,19 52:14,18
  53:14 54:16 55:7,14
  55:18 56:16,20 57:18
  58:5 59:11,19 60:20
  61:1,1,4 62:6 63:12
  68:4,8 70:1,6,14,19
  74:19 75:7 78:17,20
  79:1,9,12,15 80:6
  82:20 96:3,6,9 101:17
  102:5 103:20,22
  104:9,14,20 105:5
  108:14 109:22 111:21
  112:3,15 115:16,19
  116:7,10 121:8,9
  125:10 127:18,21
  128:5 130:9,14,19
  133:14 134:22 135:12
**honorable** 1:22 65:7
**hope** 111:13 127:19
**hoping** 21:20
**hours** 40:20 101:17,18
**house** 72:12 102:21
**hub** 43:3
**huge** 113:14
**hundred** 27:18,19
**hung** 61:22
**hurt** 131:21 132:13
**hypothesis** 80:15
**hypothesized** 100:15
**hypothetical** 71:9

**I**

**idea** 41:13 54:20 115:21

**ideal** 4:11
**IDEN** 3:15
**identification** 7:13
  10:12 11:11
**identified** 7:14 51:19
**identify** 52:11,13,15
**illegal** 25:2
**immediately** 20:1 51:19
  97:4
**immunity** 110:20
**important** 6:1 113:17
**impose** 130:21
**impression** 21:2
**improper** 81:10
**in-processing** 37:20
**incendiary** 130:11
**incident** 51:4
**including** 5:11 118:6
**increase** 40:1
**incriminate** 106:7,19
  107:8 108:11 110:9
  110:11
**indented** 70:9,10
**indicate** 28:22 53:4
  63:22 66:9 67:21
  72:16 73:3,20
**indicated** 32:2 65:4,22
  67:19 74:14 75:22
  83:10 117:1,5,6,9,12
  117:15,21 118:2
**individual** 32:11 34:9
  46:2 51:5,8 91:6,7
  106:14
**indulgence** 43:13
**Industries** 36:2,3,13,14
**infantry** 85:1
**infer** 120:4
**information** 45:5 76:12
  78:6 79:6 80:13 82:2
  86:10 90:12 119:6
**informed** 29:15
**infraction** 24:16
**infractions** 24:16
**initial** 14:3 38:5 90:22
**initially** 59:22 63:21
  64:2 84:16 94:18
  97:13
**initiated** 35:21
**innocence** 4:18 96:8
**innocent** 131:19,21
  132:13,17
**insert** 33:6
**inside** 10:21 105:8
**inspected** 47:7,8 48:4
**installation** 31:22 37:16
  37:19 38:3,9,11,14,15
  39:19 43:4
**installation-specific**

38:5
**instance** 33:8 42:6
81:18 82:3
**instances** 31:18
**intended** 73:8
**intent** 119:17
**interaction** 14:20,21
**interceptor** 33:9
**interested** 20:14
**interview** 10:1 14:18
52:21 53:1,7 55:4,8
56:7,14 57:2 58:19
62:13 63:17 64:7,8,9
64:18 65:11 66:3
82:12 97:12,20 99:2
99:11,14,15,21
101:15 125:15
**interviewed** 55:19
56:12 128:20
**introduced** 12:16
**inventoried** 20:5,7
**inventory** 9:2,6,20
24:12
**investigate** 31:18 34:9
35:17 51:8
**investigated** 32:3
**investigating** 25:7 32:7
32:13 34:8,12 80:11
**investigation** 34:16,20
51:10 60:8 75:5 78:16
80:11 81:1,15 83:2
84:9 103:16 106:10
118:12
**Investigations** 50:20
**involved** 75:10 111:12
**involvement** 14:2
**involves** 133:2
**involving** 7:19 18:21
**issue** 17:9 21:1 38:5,5
48:17 65:15 68:11
79:21 107:4 120:1,14
120:21 123:1 127:21
**issued** 22:22 24:15
33:6 42:7 45:2 47:14
48:20 57:13 65:16
66:10 67:18 78:19
81:15 84:17 85:12
117:13,14 118:6,15
**issues** 65:6 110:10,10
135:4
**Issuing** 36:20 37:15,21
38:1 43:3 46:22
**item** 12:15 47:2 68:1
76:2 119:17
**items** 3:19 9:12,17
10:16 12:1,3,9 21:17
21:19 37:22 38:6,7
46:4 75:16,18 76:13

98:19 103:12 120:11
120:12 128:7 129:22
130:20 131:11
**Iwo** 26:15

_____

**J**

**Jason** 92:10 104:21
**Jima** 26:15
**job** 37:22 41:16 72:18
125:9 131:6
**jobs** 72:17 132:22
**Joint** 31:6 54:8
**JR** 1:8
**judge** 1:22 7:10 111:17
134:1
**judicial** 54:12 81:11
**junk** 120:7
**jurisdictions** 77:14
**Jury** 119:22 120:19
**justice** 109:9 110:12
**Justin** 125:3 129:13

_____

**K**

**keep** 38:6,20 41:1 55:16
59:4 60:15 61:21 66:5
66:7 96:1 112:2
130:21
**Keith** 3:10 30:12 31:2
76:4
**Kennedy** 73:9
**kept** 90:6,10
**key** 121:12
**killed** 133:2
**Kim** 8:16
**Kimberly** 3:9 17:14
18:1
**Klein** 9:7 14:1
**knew** 61:15 67:22 68:2
76:8 85:7 89:12
117:20 118:2 119:19
**knives** 9:15 128:12
**knowhow** 131:14 133:6
**knowing** 79:17,17
108:1 111:14 116:6
119:17
**knowledge** 13:10 45:10
49:4 114:21 115:7
117:19 119:16 131:14
**known** 4:12
**knows** 13:17 106:18
109:2 111:11,12
114:17 127:2,3,4
**knuckles** 76:22 128:12

_____

**L**

**Lagasse** 3:8 5:13,17
6:15
**laid** 20:9,20

**language** 132:14
**laptop** 128:11
**larcenies** 31:20 32:3,12
**larceny** 32:7,8,13 34:13
35:7,7
**Lauren** 3:8 5:17 6:15
**law** 2:16 26:20,21 33:7
59:3 107:16 111:5
113:15 120:11 123:22
124:9,12 126:6
132:21
**lawful** 89:14
**lawfully** 42:9,11 46:8
**lawyer** 108:17 109:10
111:18 126:18
**lawyer's** 126:18
**layperson** 108:20
**lead** 68:20 75:1
**leading** 81:12
**learn** 34:20 51:4
**learned** 28:18,20 94:4
94:15
**leave** 16:10 84:4,5,6
104:12 135:2,9
**led** 65:7 77:12 84:20
90:8
**left** 24:19 62:18 105:20
105:21
**legal** 46:13 108:21
**legally** 59:2,3 89:6
90:18 115:6
**Legislature** 123:1
**legit** 90:15 91:22
**length** 24:6 121:9
**let's** 12:14 54:21 101:6
102:3 131:16
**letter** 93:4,5,22 94:8
125:2 129:12
**LEVAR** 1:8
**liability** 107:20 110:17
**licensee** 91:12,12
**life** 46:7 47:22 117:4
**likes** 129:1
**limited** 90:12
**line** 26:5 45:18 53:13
**link** 32:10
**list** 37:22 71:18,22 72:1
72:1,3,7,9 128:15,16
131:14
**listen** 14:17 48:14
126:12 134:1
**listening** 81:19 93:14
**listing** 33:18
**little** 26:8 31:22 90:11
91:17 124:21
**lived** 66:19
**living** 31:4 50:13
**loaded** 15:22 76:18,20

122:15
**located** 7:22 8:7 9:11
9:13 10:18 11:20 12:5
13:6,6 19:4 63:18
**location** 71:7
**lock** 121:11
**long** 6:18 18:4 19:21
26:5 29:9 31:8 41:21
48:4 50:16,22 82:15
99:12
**longer** 43:7 47:12 65:1
**look** 20:10 52:11 69:19
70:2,8 75:16 91:16
99:14 119:11 126:7
**looked** 10:20 52:4,5
90:15 91:22 101:20
**looking** 60:22 69:15,21
119:9,11
**looks** 52:7 70:13
**loose** 34:6
**LOPEZ** 1:22
**lost** 93:13
**lot** 13:1 20:12 21:6,20
22:3 36:8,9 40:10
115:17 124:8
**lots** 46:12
**luck** 135:10

_____

**M**

**M4-style** 33:15
**ma'am** 11:13 39:11,14
**magazines** 76:18,19
122:15 128:11
**magistrate** 78:7,10,12
78:16,18
**mail** 46:4
**maintain** 38:2
**making** 13:4 14:8,10
81:11 126:18 127:1
**male** 64:3
**malicious** 129:16
**manifesto** 128:19
**manned** 40:6
**manning** 40:18
**manufactured** 36:13
**manufacturer** 45:6
**manufacturers** 48:6
**March** 1:11 36:10 86:12
**Marine** 40:1 64:4
**marked** 10:11,15 11:9
**market** 46:9
**Maryland** 87:20 91:8
**masks** 9:15 76:21
128:13
**materials** 72:4 74:3
75:13,15 76:11
**matter** 1:5 59:3 75:2,6
75:10 102:13 110:9

matters 81:14
Matterson 125:3 129:13
Meade 46:3
mean 29:6 44:17,19,21
  46:12 58:21,21 59:8
  69:6,14 71:4 81:9
  86:18 87:13 89:19
  95:10 98:10 101:2
  103:17 111:9 122:10
  123:18 124:15
means 117:14 129:21
  133:7
meant 20:15 72:21
medium 60:9
medium-sized 9:14
meet 82:4 114:12
MELANIE 2:5
member 42:7,8
members 37:18 38:6
  67:3
Memorial 26:15,17
memory 91:3
mention 47:2 71:18
  74:9
merit 63:4,4
method 48:12
MIC 109:17
microfiche 91:16
microphone 6:2 41:12
  105:22 134:21
middle 60:2
military 21:9 33:7 36:15
  73:1 77:1,6 114:1,7,9
  115:11 118:22 121:22
  124:20 126:1 132:20
  133:6
military-grade 33:20
military-issued 66:5,7
military-type 37:14
mind 94:8,12,21 112:2
  132:22 133:13,19
  134:9
mindset 124:21
mine 27:10
minimal 14:21
minute 56:8
minutes 20:3 73:15
Mirandize 19:19 53:2
Mirandized 53:19,19
misconstrued 98:13
missing 32:15 65:18
  93:15
misspoke 99:18,20
moment 46:14
Monday 1:10
monitor 7:9 51:16,21
  52:5,6,6,9
months 57:14,16

moronic 102:17
mother's 121:22
motion 29:7 62:14 63:3
  69:8 70:7 101:8 121:9
  122:13 127:10 133:22
motivation 131:15
motorcycles 102:22
  103:2,4,6,10
move 13:14
moving 67:5 96:1 132:2
murder 57:12
museum 91:4
Mustang 125:12
Myer 8:1 36:21 39:10
  42:17 43:8,22 44:4
  67:16,17,19 68:18
  76:5 77:4,8,9 83:22
  84:1 85:22 86:12
  87:21 88:2,9 95:3,4
  97:19 98:8 99:4,10
  113:7,9 116:1,17,18
  119:7,14
Myer- 31:6

N

N 2:7
name 6:14 17:22 30:22
  50:9 51:5 54:7,14
  74:11 108:16
nature 7:21 21:10 24:2
  33:16 119:17
nearby 64:5
necessary 82:17
  111:19
need 55:10 70:16 95:22
  107:13
needed 72:2,5 128:17
needs 127:4 130:11
Netherlands 26:12
never 42:6 98:17,18
  99:1 100:14,15 101:2
newly 37:19
nexus 31:19
Nicole 8:17
nine 114:9
non-serviceable 48:19
  117:12
normal 14:14
note 7:13 54:11
Noted 6:9
notes 35:22 69:5,17
  70:14 73:10 83:4
notice 54:12
number 27:18 36:5,8
  43:7,12 60:10 75:22
  83:9 106:10 118:13
  119:10 122:15
numerous 9:12

NW 2:17

O

O 2:15
oath 12:16 78:13
  126:19 127:12
object 53:12,13
objecting 55:8
objection 11:4,5 20:19
  29:4 35:5 53:18,21,22
  55:11,13 63:11 69:13
  69:21 79:18 82:10
obstruction 109:8
  110:12
obtain 91:10
obviously 129:21
occasions 95:20
occupation 6:14 17:22
occurred 56:7 76:9
odd 98:10
offense 57:17 59:17
  107:1,2
offer 11:2 127:11
offered 98:15 99:3
  100:2
office 22:12,14 67:1,1
officer 6:16,18 8:15,21
  9:7,8,8 10:5 13:2,3,21
  13:22 14:12 15:2,21
  16:2 18:2 19:12,17
  34:6 54:4,14 79:18
  80:4,10 81:12 121:3
officers 8:11 12:22 13:7
  16:15 19:8 20:13 25:7
  77:10 95:7 107:17
  112:18 121:17 124:16
  126:2
officers' 76:15
officials 113:16
once 37:1,8 43:6,10
  46:6 85:21,22 88:1
  100:14,15 107:14
  111:5 116:15,21
  121:20 132:5
online 31:21 91:7 116:3
op 72:3,5 128:18
open 40:6,13 86:11
  105:20
opener 100:4
opening 109:8
operable 130:5
operational 40:14
opinion 81:10
opportunity 68:18
  98:16
ops 131:14
options 132:11

order 42:14 57:6 87:16
  91:9 120:19
ordered 36:9,12 76:2
orders 87:7,8 105:3
organizing 13:1
oriented 121:21
originated 119:4
outbursts 4:9,21
outer 33:9
outlined 71:7
outprocessed 65:14
outprocessing 65:11
  66:22 67:8
outside 5:10 8:1,6
  16:14 19:2 30:6 43:3
  49:11 77:9 116:11
  126:1
overabundance 126:5
overheard 93:9 115:13
overlooking 131:8
overrule 20:22 53:18
  82:9
overruled 13:16 53:21
  63:1
overseas 73:1
owe 65:17 118:22
owned 43:9
owner 76:3
ownership 84:14 91:10
  124:18
owns 102:22 103:3

P

P-R-O-C-E-E-D-I-N-G-S
  4:1
p.m 1:17
packed 66:14,17
padded 128:12
paid 36:12
paired 33:8
panel 33:11
pants 132:3
paper 67:2 76:7
papers 128:18
paperwork 67:2
paraphrasing 93:1
parked 28:2 39:15 40:4
  40:9,12
parking 24:15 26:5,7,7
  40:10
part 34:15,19 36:9
  37:19 79:3 82:14
  99:15
PARTICIPANT 130:8,13
particular 34:20 35:9
  35:18 43:18 45:3 56:7
  61:19 71:12 74:9 86:4
  107:4,4 113:22 116:6

116:17
**parties** 106:1 111:14
**partner** 125:3,18
**parts** 93:15
**pass** 11:13 104:13
**passed** 129:13
**passenger** 123:19
**patches** 77:2
**patently** 23:3
**path** 90:9
**patrols** 40:22
**PAUSE** 43:15 70:12
**Pearson** 8:17 9:8
**pending** 125:17
**people** 4:21 20:14
21:21 51:20 75:9
106:11 124:6 131:22
132:13,17,20 133:2
**percent** 135:7
**period** 81:6
**perjury** 109:8 110:12
**permanently** 39:19
**permission** 106:12
107:1
**person** 14:14 57:6,16
71:15 82:3 107:11
131:19,21
**person's** 57:13
**personal** 13:10 48:8
67:4
**personally** 66:11
**personnel** 40:7
**persuaded** 80:8
**pertaining** 51:4
**pertains** 31:16
**phone** 122:10 126:4
**phonetic** 8:15,16,17,17
9:7 53:11 79:17 125:4
**Photograph** 3:19
**photos** 36:4
**physically** 12:9 46:7
**piece** 67:2,18 82:6
120:7
**pieces** 15:7
**piercing** 122:16
**pistol** 75:21 83:5 90:1
**place** 14:9 22:11 72:12
78:13 117:2 124:15
135:9
**placed** 20:2 27:6 33:12
42:14
**places** 77:15,18
**plate** 9:15 10:17,20
11:20 12:12,17,19,21
33:2,12,13 34:21 35:9
35:10,18 36:4,8,19,21
38:13,20 42:7 43:9
44:12,13,22 45:1,4,14

46:18 47:1,8,8,11
48:1,10,18,19 55:5,20
59:6 60:5,9,9,12,15
60:18 61:14,15 63:18
64:1 67:10,16 74:16
75:19 76:6 77:22 79:8
81:5,7 83:17 85:11
86:4,8 87:3,19 92:20
93:13,16,16,17 94:20
95:1,2 106:9 112:19
113:4,18,22 114:17
115:15,21 116:7,13
116:18 117:12,13,21
117:22 118:6,10,13
119:4,14 128:14
**plates** 33:22 34:17,21
35:7,7 36:2 37:1,3
43:2,19 44:14 45:8,17
45:18,19 46:5 48:3
49:2 87:14 90:18
107:5 113:18 116:15
116:16,21 117:3,3,4
118:15
**platoon** 94:5
**play** 74:6,6
**please** 4:21 5:10 6:7,14
7:12 16:14 17:11,22
28:11 30:5,18,22 39:5
49:11,21 50:9 59:10
71:1 104:12 112:2
134:20
**PLLC** 2:16
**point** 4:10 13:3 23:10
25:11 26:19 29:20
36:15 41:2 47:12 55:3
63:16 76:1,10 77:3
86:3,6,7,16 89:4
96:19 97:16,22 98:6
99:2,20 102:1 103:13
103:15 114:7
**pointed** 51:21
**pointing** 126:8
**points** 99:13 121:12
**police** 6:15,16,19 13:20
18:2,2,5 42:3 50:15
50:17 110:13,13
116:12
**policy** 42:9,11 46:5,8
46:10 48:22
**politics** 124:8
**Pontiac** 125:13
**pops** 48:14
**portion** 70:11
**position** 80:9
**positioned** 8:18 9:19
**possessing** 124:4
**possession** 37:2 55:21
58:3 61:14 63:22 67:9

68:1,3 77:2 79:7 81:7
86:5 95:1,8 106:12,13
106:22 110:14 112:17
113:19 114:22 116:4
116:12,21 117:21
118:5,7,10 119:15,18
119:19 120:3,5
123:14 129:22 130:20
**possible** 12:3 45:3
47:10 61:3 94:17,21
99:9 102:11
**possibly** 31:22 45:19
97:18 127:14
**posture** 40:21
**potential** 72:17 110:16
**pre-** 10:14
**prelim** 121:2
**preliminary** 1:16 4:14
17:2 56:21 57:4 58:1
59:12 68:5 135:14
**preparation** 32:6
**present** 53:19,20 95:5
**pretty** 73:12
**previously** 11:9 32:3
122:14
**price** 36:19 47:1
**prior** 53:1
**private** 91:5,6,7 106:14
**privilege** 107:13,16
108:10 109:4 110:8
110:19 111:6 127:15
**probable** 59:13 80:20
82:12 119:8,11,20
120:18
**probably** 40:5 41:12
89:21 92:22 93:1
123:9
**probation** 129:15
**problem** 92:18
**PROCEEDINGS** 135:15
**process** 34:4 37:13
**processed** 118:18
**procure** 74:4
**progressed** 102:7
**proper** 48:17
**properly** 123:15,21
**property** 13:1 32:14
35:9 58:3 65:18 67:4
75:15 89:2 97:8,14
106:22 110:14 112:17
114:22
**protective** 33:5 105:3
**prove** 36:7 76:7 116:5
**provide** 72:22
**provided** 36:7 45:6
62:13 88:16
**Proving** 43:6,20 44:3
87:20 88:8

**proximity** 77:8
**public** 44:15 107:10
108:18
**publicly** 45:4,9,19
**pulled** 131:10
**pulls** 126:4
**purchase** 35:11 36:18
42:12 87:7,8,16 89:14
128:17
**purchased** 33:22 34:17
34:22 35:18 36:6 37:2
42:13 64:3 74:14
85:16 89:6 90:18 91:6
113:22 115:6 116:3
**purchases** 116:14,15
**purchasing** 34:3
**purpose** 33:13 38:11
72:15
**purposes** 57:4 79:3
**put** 48:13 81:18,21
127:12
**putting** 67:5

**Q**

**question** 25:17 35:6,14
39:7 44:11 54:1 59:6
60:3,16,18 63:14
70:18,21 82:16 86:19
87:2 89:16 107:11
110:22 111:3 113:20
114:2,10,11,18
**questioned** 79:2 113:6
**questioning** 53:13 79:4
**questions** 11:12 16:4
17:3 21:12 22:7,8
23:13,20,21 24:4
25:13 27:9 28:10
29:22 39:1,5 41:5,8
41:15,18 49:7 52:2
68:6,21 74:19 76:15
77:10 82:17 101:14
102:10 106:20 107:7
108:7 109:6
**quick** 35:22
**quite** 118:1
**quotation** 72:2
**quoted** 101:10

**R**

**radar** 77:18
**raise** 5:4 63:10 105:9
**raised** 9:21
**range** 110:11
**ranged** 15:4
**re-read** 69:20
**reach** 46:6
**reached** 36:3 85:21,22
**read** 23:1 69:6 88:11

101:12 132:9
**reading** 132:15
**ready** 57:1 72:14 93:19
**real** 35:22
**realized** 84:11
**reason** 38:16
**reasonable** 87:14
**reasoning** 80:15
**reasons** 79:4
**recall** 11:21 12:11
  15:14,15 16:8,11 27:3
  30:2,3,5 49:8,14
  74:11 87:12 90:13,14
  103:7 104:2
**RECD** 3:15
**receipt** 90:20
**receipts** 85:15 87:8,17
  87:18 88:10,13,14,15
  113:13 119:6
**receive** 37:3 38:1 96:16
**received** 11:10 37:8
  42:16 43:19 44:2
  75:13,14 79:7 86:10
  87:15 94:19
**receiving** 36:15
**recognize** 10:15
**recognized** 67:17
**recollection** 88:10
**recommend** 128:1
**recommends** 127:20
**reconsider** 29:7 135:3
**record** 51:18 91:17,20
  123:6
**recording** 14:18 15:13
**recover** 15:20 91:20
**recovered** 16:2 73:10
**recovery** 12:1
**RECROSS** 3:6
**recruit** 9:7 13:2,21,22
**recycled** 38:10
**red** 113:14
**redirect** 3:6 16:6 25:14
  25:15 28:12 47:18,20
  103:21
**refer** 35:22
**REFERRED** 10:10 11:8
**reflect** 51:18 52:2
**reflecting** 63:6
**regarding** 55:20 60:18
  79:7,13 81:4,12
  118:12 135:8
**regardless** 129:4
**regards** 117:18,19
**registered** 130:11
**registration** 24:16
**regular** 14:15
**rehash** 121:11
**relation** 26:2 39:13 40:4

67:9 77:21
**release** 134:2
**released** 24:17,18,22
  42:8
**releasing** 133:11
**relevance** 53:14 55:12
  55:14 56:19
**relevancy** 55:14,16
**relevant** 21:7 55:17
  56:15,19 59:5 60:19
  81:5 82:12 100:20
  121:14
**remain** 5:9 22:20 23:10
  23:12,15 104:7 110:8
  130:3
**remember** 4:20 9:6
  28:15 119:3 124:19
**remind** 4:8
**removed** 106:12
**removing** 67:4
**Rephrase** 35:13
**replaced** 47:3
**replacement** 120:13
**report** 13:20 76:12
  77:13 110:13
**reportedly** 69:9
**represent** 41:16
**representing** 41:17
**request** 36:1 84:17
**required** 38:1 65:20
**resale** 120:12
**reserve** 112:10
**resident** 91:10
**respect** 58:22 63:3
  100:19 102:2
**respond** 7:19 8:4 18:20
  19:1
**responded** 8:10,14
  19:7
**response** 59:2 73:7
  130:17
**responses** 76:14
**responsibilities** 31:15
  31:17
**retaining** 117:3
**retains** 116:20
**retired** 116:22
**retires** 38:18
**return** 89:2 118:4
**revealed** 60:8 78:16
  81:2
**review** 70:16
**reviewed** 75:12,14
**reviewing** 76:11
**riding** 123:19
**rifle** 9:14 10:17,20
  11:20 12:12 33:14,15
  33:20 34:17,21,21

35:9,10,12,18 42:6
  43:19 44:12,13,14
  45:4,7 55:5,20 63:17
  64:1 67:10 76:19,20
  77:22 79:8 81:7 85:11
  89:7,13 90:13,15
  106:9 107:4 112:18
  115:14 116:13,14,16
  116:21 118:6 123:19
  128:14
**rifles** 90:13
**rights** 22:17,19,19 53:5
  106:6,6 111:20
**risk** 121:14 123:5,7
  129:10
**road** 2:7 8:6 14:7,20
  26:11 109:3
**Robinson** 79:16
**roll** 48:14
**room** 4:20 53:10 54:3
  67:4 95:11 101:20
**roommate** 92:8
**roommate's** 117:22
**roommates** 95:14
**rooms** 95:14
**roundabout** 22:14
**rounds** 33:14,15,15,16
  33:17,20 122:16,17
**route** 71:14
**rubber** 9:15
**rule** 5:8 59:3
**run** 74:8 126:3
**running** 67:1
**ruse** 80:1

---

**S**

**safe** 130:22
**safety** 72:10 133:10
**SAPI** 45:1
**satisfied** 119:20
**saw** 12:15,20 26:21
  75:18 88:14 90:21
  103:3 113:13 119:6
**saying** 58:18 108:9
  110:15,16 119:4
**says** 13:18 62:14 83:14
  83:18,20 92:20 100:7
  101:9 102:15 111:5
  112:19 113:3 115:6,9
  115:10
**scene** 8:11,13 13:8 19:7
  19:8,10,14,19,22
  21:16
**schedule** 40:22 73:12
**school** 73:8
**scientific** 48:11
**Scott** 3:11 50:2,11
**search** 103:1

**searched** 60:4 102:20
**seat** 5:22 17:11 19:15
  19:16 30:18 49:22
  105:21 109:14 110:2
  123:20
**seated** 8:20 9:20,21
**second** 43:5 67:12
**section** 50:21 69:9
**security** 40:7,21 50:21
  72:20,22
**seeing** 132:10
**seek** 131:15 134:2
**seen** 45:1 125:6
**self-serving** 119:12
**sell** 82:5
**send** 48:16 77:17
**sends** 44:22
**sent** 36:1,11 95:3
**sentence** 132:9
**sentencing** 127:9
**separated** 77:6,7
  131:13 132:20,21,21
**serial** 36:5,8 43:7,12
  60:10 75:12,22 83:9
  83:10 106:10 118:13
**serialized** 43:9 67:18
  75:19 83:20
**series** 32:11 65:6
**seriously** 129:20
**serve** 82:2
**served** 83:22,22 84:1
**serves** 91:4
**service** 37:18 38:6 42:7
  42:8 46:7 47:11,22
  64:19 65:4 84:14
  117:4
**serviceability** 47:9
**serviceable** 47:3,4 48:4
  48:10 117:5,14
**serviceman** 48:20
**servicemen** 37:10
  117:11
**set** 47:1 69:10 133:9
**shape** 131:18
**Sheepdog** 73:7
**Shepherd** 3:10 30:10
  30:12 31:2,3 76:5
  78:3 86:11 88:6,13
  113:3,12,14,21
  116:13 118:12
**shipment** 43:19
**shipped** 36:14 42:17
  44:4
**shipping** 36:15 87:8,17
  87:18
**shooting** 72:13
**short** 58:1
**show** 10:14 32:21 59:13

89:14
**showed** 87:17,19
**shown** 87:18
**side** 14:6,20 39:18
  121:21
**signed** 66:22 67:2
**signing** 118:20
**silent** 22:20 23:2,6,10
  23:12,16,17 110:8
**simply** 45:12 61:3
**Simultaneous** 88:3
**single-** 69:10
**sir** 4:8,20 25:18 41:14
  42:22 49:12 105:18
  106:17,21 107:7,13
  107:22 108:2,13,21
  108:22 109:13,14,20
  110:3,19,20 112:1,8
  127:7 131:8 132:9,18
  133:4,8,17 134:3,8
**sitting** 4:11 5:12 14:6
  16:20 69:20 77:9
  101:13
**situated** 26:4
**situation** 123:18
**six** 57:14,16
**size** 43:11
**smoke** 9:16 130:8,9
  133:5
**Smyrna** 84:18
**snaps** 48:15
**soft** 33:11 48:5
**sold** 45:4,8,14,19 60:10
**soldiers** 85:1 95:13
**Soles** 3:9 8:16,21 10:6
  16:18 17:10,14 18:1
  28:14 30:5
**solicit** 93:8
**solicited** 99:4
**somebody** 10:2 40:9
  57:12 81:22 106:15
  132:10
**somebody's** 109:3
**sorry** 23:6,18 24:5 26:4
  42:16 44:10 59:8
  69:14 85:3 89:10
  92:13 97:19 98:1,22
  110:10
**sort** 68:22 73:11 74:6
  75:5 77:19
**sounded** 90:7
**sounds** 22:2 101:14
  122:22
**Southgate** 8:5 19:2
  26:2,3,9,10,13,14
  39:9
**spaced** 69:11
**speak** 6:1 10:2 20:4

93:14 105:22 125:19
  127:20 128:1 131:3
  133:19 134:7,10,17
  134:19
**speaking** 14:12 40:3
  68:16 88:3 93:9,14
  126:17 127:21 134:14
**special** 50:19
**specialist** 45:11
**specific** 12:12 38:8
**specifically** 8:3 14:11
  59:5 66:4 87:4
**specify** 35:10 72:21
**speculating** 44:7 113:8
**speculation** 48:2
  115:17,18,18,20
**spend** 63:2
**spoke** 20:6 46:3 92:14
  93:11
**spoken** 93:6 111:7
**spot** 26:7
**squad** 67:3
**stack** 128:18
**stage** 126:22
**stamping** 75:20
**stand** 5:20 17:17 30:15
  50:5 109:22
**standard** 33:20
**start** 83:1 107:14,15
  111:5 126:17
**started** 60:3
**state** 6:14 17:22 30:22
  50:9 107:1
**stated** 16:22 20:9 22:21
  80:3
**statement** 53:21 57:14
  118:17 121:4 131:16
**statements** 14:9,10
  15:3,6 21:4 24:22
  25:3 55:20 56:14
  57:15 79:11,14 81:3,5
  119:9,10,12 127:9
  129:3,5
**States** 31:11,16 34:1
  36:1,16 43:10 44:2
  45:15 64:20 116:22
  118:14
**stationed** 84:22 100:13
**status** 89:2
**statute** 120:17
**step** 54:22 105:8 129:6
  129:6 130:1
**stick** 101:6
**stolen** 35:8 58:3 61:15
  61:15 83:5 87:3,15
  97:8,13 110:14
  112:17 114:22 115:7
  116:7

**stop** 33:14 76:13 90:6
**stopped** 59:22 76:16
  95:6 128:6
**store** 91:13,22 124:1
**stored** 123:15,21
**story** 67:9
**street** 2:17 76:16
**strictly** 111:8
**strike** 13:14
**strong** 114:10
**strongly** 114:19
**studied** 133:4
**stuff** 66:8
**stupid** 102:17
**style** 44:17 45:1
**subject** 16:8,10 30:1,3
  30:5 49:8,13 55:22
  104:2
**subjects** 32:10
**subpoena** 111:15
**subsequently** 43:21
  57:2 93:6 102:20
**successful** 71:16
**such-and-such** 24:1
**sufficient** 120:17
**suicide** 102:18
**Suite** 2:8,18
**summarize** 69:6
**sun** 73:14
**supervised** 129:15
**supervisor** 36:21
**supply** 43:11 45:11
**support** 80:15
**supposed** 48:16 60:15
  67:22 68:2 117:20
  118:3,16,19
**surplussed** 45:20,22
**surrounding** 61:19
**surveillance** 81:22
**suspected** 83:5 89:8
**suspicion** 86:9 87:13
  87:14 97:18 99:9
**suspicious** 7:22 20:10
  75:19 84:21 90:8
  126:7
**sworn** 5:5,6,19 17:16
  30:14 50:4 56:22
  105:6,9,10,14
**symbol** 45:18
**system** 43:6,11

---

**T**

**T** 1:22
**tactical** 33:9 38:8 71:18
**tactics** 133:4
**tags** 124:13
**taken** 24:7 25:9 54:12
  67:15 69:16 70:14

75:16 112:19 115:12
  115:15
**takes** 89:20 91:17
**talk** 25:6 73:17 75:9
  80:2 98:16 99:12
  107:10 108:19 111:1
  111:5,18
**talked** 21:6,7,8 24:6
  27:8 44:12 66:1 73:7
  77:10 93:10 99:12
  116:12 133:4
**talking** 14:14,19 27:5
  35:11 40:6,7 45:16,16
  45:17 62:16 71:15
  81:13 89:10 121:12
  122:5 123:4 125:21
  127:14,19 131:20,22
  132:3
**talks** 120:11
**target** 71:16
**targets** 71:9
**Task** 54:4,9
**taught** 73:8
**team** 80:11
**teleprompter** 18:17
**tell** 12:6 13:5,17 23:11
  36:5 43:8,9,17 45:13
  45:21 46:21 47:22
  48:12 56:9,19 78:15
  96:18,22 97:17 109:3
  109:10 115:13 121:18
  121:20
**telling** 56:6,11 57:15
  59:1 94:18 95:19
**tells** 124:16
**tend** 84:3,5
**term** 120:20
**terms** 133:9
**Terrorism** 54:8
**terrorist** 98:14
**testified** 5:21 17:18
  30:16 50:6 54:15 60:8
  105:15 114:5 116:14
  116:17,20 117:20
  120:1 122:18
**testify** 15:10 47:9 54:17
  57:1 105:22 106:5
  108:2
**testifying** 52:7
**testimony** 5:10 12:7
  13:14 16:15 30:6 42:5
  42:18 49:14 60:1
  105:6,9 106:8,14
  112:22 113:2,12,17
  114:16 118:14 119:2
  120:2,8 121:16 122:9
  125:11 127:12
**Texas** 21:8

**thank** 6:5 7:11,16 11:7
  11:16 17:12,19 18:18
  30:8,19 39:6 52:18
  54:10 59:18 69:22
  82:19,19 96:10 104:9
  104:15 106:3 111:22
  112:3,15 116:8
  134:22 135:1,12
**thick-headed** 59:9
**things** 4:9 14:12 21:7
  21:10 24:2 46:12 62:7
  66:22 72:2 73:16
  81:16 84:3 107:18
  114:3
**thought** 64:3 74:2
  81:20,21 87:3 98:18
  98:20 100:9,14,20
  101:2 117:22
**threats** 31:20
**three** 18:6 21:10 84:2
  100:13 101:16,18
  122:16
**three-hour** 101:15
**threshold** 114:12
**Tim** 73:8
**times** 66:3 67:15
  100:11 101:13 113:6
  115:10
**today** 4:4 7:8 18:16
  51:15 57:12 93:19
  94:15 96:8 108:3
  110:21 111:8 112:1
  114:18 115:17 117:8
  124:10 125:5 126:17
  134:3
**today's** 82:12
**told** 29:3,14,18 57:8
  64:2 65:5 71:2,4,4
  79:5 88:12 90:4 92:12
  92:17 95:19 96:15
  97:7 110:18 125:16
  126:1
**top** 26:11
**totality** 131:9
**tow** 24:20
**trace** 76:2 84:13,15
  89:13,21 90:22 113:7
**traces** 89:9 90:2,7
**track** 86:1 113:4
**tracked** 43:7 87:5
**tracks** 43:11
**trail** 76:7
**train** 73:6,15
**trainer** 21:21
**training** 13:3 20:12,13
  20:14 21:20 73:4,11
  74:4 108:21 133:5
**transaction** 91:17,20

91:21
**transactions** 84:20
**transcribed** 69:5
**transcript** 69:10
**transfer** 87:17,18
**transferred** 43:21 46:9
  91:2,2,11
**transport** 124:1
**trash** 114:7
**trial** 4:13 111:9 120:14
**tricked** 62:16
**troops** 33:7
**trouble** 4:3
**truck** 24:20
**true** 13:15 27:21 76:3
**trunk** 76:20 123:13
**truth** 94:18 96:22 115:3
**try** 59:10 72:11 123:22
**trying** 15:8 57:4 58:11
  58:14 61:1,1,2,3,4,5,7
  62:6 66:22 101:19
  124:1 125:22 126:5
  131:6 132:4
**Tuesday** 60:21
**turn** 38:15 65:20 66:8
  134:20
**turned** 38:9 41:11 65:16
  66:10 118:21,22
**TV** 18:19
**Twenty-one** 50:18
**two** 9:15 25:4 39:18
  66:6 75:18 89:5,9
  90:12,14 94:3,4 95:19
  102:21 113:15 114:15
  115:1 119:2 125:11
  125:11 128:12,13
**type** 46:4 67:5 74:7
**types** 45:7 73:16,16
  132:19

**U**

**U.S** 43:5,20,21 45:17
  75:20,21 76:1 83:8,10
  83:15,18,20 84:14
  90:17 106:13 112:19
**Uh-hum** 66:20 78:4
  83:3 84:10
**ultimately** 51:11 66:14
  66:16 67:21 116:16
  118:2
**undercover** 82:4
**understand** 4:14,15 5:2
  54:6 55:16 57:19
  58:21 59:8 63:8 74:21
  81:8 87:2 96:6,9
  107:21 124:7 134:13
**understanding** 24:19
  34:7 42:19,20 60:11

86:2 93:10,12
**understood** 23:12 53:4
**uniforms** 77:1
**United** 31:11,16 34:1
  35:22 36:16 43:10
  44:2 45:14 64:20
  116:22 118:14
**unloaded** 15:19 16:1
  123:21
**unserviceable** 114:5
**unwitting** 82:4
**upfront** 124:15
**upset** 133:1
**upstairs** 135:4
**usable** 120:3,5,8,9,10
**use** 48:21 72:14 132:11
**useful** 46:19 47:12 48:5
**Usually** 107:9
**utilized** 33:6

**V**

**VA** 2:9
**vague** 20:17,19,21 22:2
  22:15 23:4,7,14,18
  24:1,22 25:2
**valid** 80:5
**value** 32:14 46:18
  113:21 114:11,18
  117:18 120:1,11,12
  120:13
**values** 117:9
**variety** 77:1
**various** 14:8
**vehicle** 3:20 7:22 9:3,11
  10:3,18,22 12:5,8,10
  12:13 13:6,7,12 15:21
  16:3 20:5,6 21:18
  24:13 25:5,21 26:1
  28:1,19,21 29:2,16,19
  40:4 55:5 59:7 60:4
  67:5 71:19 73:11
  75:17 112:20,20
  113:1 123:13 124:14
  124:17 128:9
**vehicles** 102:21 125:11
  125:12
**vendetta** 131:17 132:1
  132:15
**vengeance** 131:15
**version** 67:12
**versus** 124:22
**vest** 33:6,9,11
**vests** 128:13
**victims** 32:10
**video** 6:2 7:9
**Vienna** 91:13,21
**view** 101:20
**Virginia** 1:1,6,12 2:3

91:9,12 123:1,16
  124:5,7
**visible** 52:10
**VS** 1:7
**vulnerability** 41:2

**W**

**wait** 5:9 16:14 30:5
  49:11 56:8 82:1
**waiting** 89:8
**waive** 111:4
**waived** 107:15 109:4
**waiving** 127:14
**walked** 92:20
**walkie-talkies** 128:15
**wall** 39:21
**Wanik** 3:11 8:16 9:8
  19:11 43:17 49:17,20
  50:2,11,12 55:19
  56:12 69:15 83:1
  100:19 101:9 113:10
  115:1,9,13 119:6
  122:18
**Wanik's** 54:14
**wanted** 72:9,18,19
  82:14 96:12 132:7
**wanting** 97:18
**wants** 20:12 68:8 80:19
**war** 74:7
**warehouse** 37:16
**warrant** 25:9 53:15,16
  54:13,18 55:22 56:22
  57:12 60:10,22 61:5
  61:10,20,22 62:1
  78:19,21 79:20,21
  80:1,5,14 81:13,15
  82:2
**Washington** 2:19
**wasn't** 22:6 23:17 62:15
  87:15 90:22 94:2
  115:14,18 118:1
**water** 59:1
**way** 28:4,7 43:2 48:3
  71:10 73:13 82:15
  90:19 92:21 105:20
  109:22 110:4 111:10
  116:3,16,18 119:7
  125:22 131:18 132:7
  135:5
**weapon** 83:11
**weapons** 66:6 72:4
  131:13
**wear** 71:11,14 129:6
  132:3
**wearing** 72:12
**web** 128:15
**websites** 128:16
**week** 57:13

weeks 85:1 89:9 92:3
weigh 123:17 132:8
weighing 132:6,10
   133:13
Wells 1:8 2:13 4:2,5,15
   5:1 6:7,9 7:5,7,15
   14:5 18:13,15 21:17
   24:7 25:20 26:19
   27:14 34:10,13 35:8
   41:7,10 51:5 52:12,13
   52:16 54:15 56:13
   57:5 76:12 79:3 80:1
   81:13 82:11 84:21
   85:6 86:5,8 88:20
   91:6,21 92:14,17,19
   92:20 93:21 94:18
   95:4 96:15 97:16,17
   101:3,7 102:6,9
   112:21 115:2 116:1
   120:3 124:9 126:11
   126:16 127:18 128:2
   131:3,4 133:14 134:6
   134:10,13,18
Wells' 3:20 92:7 94:8
went 67:14 73:14 75:15
   79:21 87:19 88:8
   91:13,14 119:5 121:9
weren't 119:13
white 64:3
widely 44:14
wider 32:1
willing 93:3 108:2
window 105:19
wiretap 81:18
wisest 127:15
wish 104:8 133:18
wishes 108:10
Withdraw 44:11
witness 3:6 5:20 6:4
   10:8 11:12,15 16:12
   16:16,17 17:17,19
   21:12 25:18,22 26:3
   26:14,16,21 27:3,6
   29:22 30:8,9,15,18,19
   39:1 41:5 49:12,16,18
   49:22 50:5 51:19 52:7
   64:9,11 66:21 70:4,6
   70:13,19 75:3,7,11
   78:1,4,8,11,14,17,20
   79:1,9,12,15 101:4
   102:5 104:9,14,16
   105:6,10 106:2
   107:22 108:4,14,22
   109:12 111:10,21
   112:3,5
witnesses 5:4,6,8 32:10
   104:18
word 44:10 89:19

115:17 132:11
words 98:15
work 23:22 24:2 50:20
   95:10
worked 22:13
working 41:22,22 77:8
works 22:5,11,12 37:13
worth 114:8 117:16
   120:15
wouldn't 22:4 27:22
   28:3 56:15 131:21
   132:6
wounding 129:16
wrap 42:12
WRIGHT 2:5 5:13 6:13
   7:12,16,17 10:7,13
   11:2,7,11 16:7,10,18
   17:21 21:3,11 25:15
   28:9,13 29:12,21 30:3
   30:10,21 32:17,20
   35:15,16 38:22 39:3,6
   39:8 41:4 47:19,21
   49:6,9,17 50:8 52:18
   52:19 54:2 55:1,2,18
   56:3,9 63:15 64:13,15
   64:17 66:18 67:6 68:4
   68:8,14,15 70:22
   74:18 103:22 104:3
   112:11 116:10 122:19
   122:21 125:8 128:5
   130:6
write 93:4 94:10
writes 94:14
writing 93:21
wrong 81:21 123:9
wrote 73:12 83:4 93:5
   94:8

X

X 36:2

Y

yards 40:8
year 6:22 7:18 18:7
   51:2,3 57:1 118:8
   129:17
years 18:6 21:10 44:22
   48:7 50:18 84:1,2
   100:14 107:5 114:4,9

Z

Z 54:5
Z'er 129:2
Ziragronis 53:11

0

0600 73:13

1

10 3:19 36:8
10-minute-long 129:8
100 135:7
105 3:12
10th 75:11,12 83:2
11 3:8,19
110 26:12
12:19 1:17
12th 92:6 93:11,12
13th 43:18
1425 2:7
14th 56:22 78:22 88:20
   88:20 89:11,12 90:12
15 9:13 15:22 85:1
16 1:11
17 3:9
1712 2:17
18th 51:11 57:3 58:16
   60:21 64:13,14 96:13
19 9:13 15:19
1998 84:15 85:6 90:5

2

2:00 96:5 105:2
20 63:2
20-30 73:15
200 40:7
20006 2:19
2009 31:10 42:4
2011 36:10 42:13,14,15
   85:13,18 87:5 113:22
   115:22
2015 6:21 91:14,15
2016 31:9
2019 86:12
202-780-9144 2:20
2020 1:11 43:18 58:16
   61:13
21/27 3:9
22201 2:9
228-4410 2:10
28 3:9

3

30 3:10 122:17
30-round 76:18 128:10
33 122:16

4

41 3:10
47 3:10

5

5.56- 33:14
50 3:11 40:5
500 114:12 120:17

5200 2:8
590 36:22 114:1,8
   117:10,16 120:2,15

6

6 3:8

7

703 2:10
7th 55:6,21

8

82 3:11

9

915 2:18
9th 6:22 7:18 10:21
   18:7,20 24:10 51:3
   56:13 58:16 61:13
   63:19 75:4 76:17 95:6
   112:21

C E R T I F I C A T E

This is to certify that the foregoing transcript

In the matter of: Virginia v Curtis Wells

Before: The Honorable Daniel T. Lopez, Judge

Date: 03-16-20

Place: Arlington, VA

was duly recorded and accurately transcribed under
my direction; further, that said transcript is a
true and accurate record of the proceedings.

------------------------
Court Reporter

**NEAL R. GROSS**

COURT REPORTERS AND TRANSCRIBERS

1323 RHODE ISLAND AVE., N.W.

(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com