UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | |
|---|---|
| **CURTIS LEVAR WELLS, JR.,** ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> **JAVIER FUENTES,** et al., ) <br> Defendants ) <br> ) | Case No. 1:22-cv-00140-MSN-IDD <br> Next Event: Motion Hearing <br> December 16, 2022 |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT ACPD OFFICERS' MOTION TO DISMISS**

COMES NOW Plaintiff, Curtis Wells, by and through counsel and for his Memorandum in Opposition to Defendants Fuentes, Lugasi, Soules, Kline, and Vanak's ("ACPD Officers'") Motion to Dismiss (Dkt. No. 59), and therefore, respectfully states as follows:

In the interests of brevity and not repeating briefing commonly applicable, Plaintiff incorporates by this reference Plaintiff's Memorandum in Opposition to Defendant County of Arlington's Motion to Dismiss; incorporating, as if restated herein in its entirety, Plaintiff's Introduction, Factual Background, and Legal Standard stated therein.

**ARGUMENT**

**SECTION I – CONCERT OF ACTION.[1]**

"Persons who concurrently violate others' civil rights are jointly and severally liable for injuries that cannot be apportioned." *Northington v. Marin*, 102 F.3d 1564, 1569 (10th Cir. 1996). "1983 should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions. Since the common law recognized the

---

[1] Plaintiff responds, *seriatim*, to the ACPD Officers' Argument section.

1

causal link between the submission of a complaint and an ensuing arrest, we read § 1983 as recognizing the same causal link." *Malley v. Briggs*, 475 U.S. 335, 344 n.7, 106 S. Ct. 1092, 1098 (1986). Joint and several liability by concert of action is a method by which to demonstrate each tortfeasor is responsible for the natural results of their torts. The ACPD Officers argue in their brief that there can be no claim of concert of action and relies upon a series of cases correctly stating that civil rights allegations are personal in nature; however, that applies only in showing that they individually violated civil rights by their actions and the natural consequences of their actions; there can be no horizontal vicarious liability, and Plaintiff does not allege vicarious liability in the present context.

Defendants' case citations are misplaced; the *Arebaugh v. Dalton* opinion, for example, is construing whether to apply vicarious liability; it does not construe joint and several liability or concert of action of joint tortfeasors in a civil rights matter. 600 F. Supp. 1345, 1348 (E.D. Va. 1985). The *Wright v. Collins* opinion construes whether an inmate proceeding pro se had properly alleged a class action lawsuit and construed the application of *respondeat superior* liability; it does not consider joint and several liability or concert of action of joint tortfeasors in a civil rights matter causing an indivisible injury. 766 F.2d 841, 850 (4th Cir. 1985).

In the instant case, Plaintiff's SAC sufficiently alleges that each ACPD Officer on February 9, 2020, set into motion, through their individual conduct of unlawfully seizing Mr. Wells and his property, the reasonably foreseeable course of events that followed. Prejudging Mr. Wells to be a "fucking bullshitter"[2] and committed to arresting him, they took some, but not all, of his personal property in an effort to find *something* on which he could be arrested. SAC

---

[2] The Officer's comments can be heard on the recording attached as Exhibit 1 to ACDP Officers' Motion to Dismiss. 60-1 at 5:15 PM.

¶¶ 45-54, 63-79.  This course of conduct and natural result of each of their individual conduct as is well-pleaded in Plaintiff's SAC and is confirmed by Wanek's efforts *the very next day* to further investigate the items taken in the pretextual seizure with plenty of time to seek a warrant if he had probable cause.

The reasonable officer would know if they seized Mr. Wells' property and provided false or misleading notes and summations of their encounter with Mr. Wells on February 9, 2020, the natural result of such conduct and reports would be used in the malicious prosecution to follow.

**SECTION II – ACPD OFFICERS' QUALIFIED IMMUNITY.**

The ACPD Officers seek dismissal of the 1983 civil rights claims, Count One and Count Two, based upon Qualified Immunity.  The ACPD Officer Defendants correctly cite to the Court the two-pronged approach of determining whether the facts make out a violation of a constitutional right and whether the right in question was clearly established at the time of the events.  However, Qualified Immunity does not protect officers who knowingly violate the law or are plainly incompetent. *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).  The ACPD Officers' actions were unreasonable mistakes, or worse, and thus Qualified Immunity does not protect them from suit or liability. *See Henry v. Purnell*, 652 F.3d 524, 534-35 (4th Cir. 2011).  The burden of establishing a qualified immunity defense is on the ACPD Officers. *Wingate v. Fulford*, 987 F.3d 299, 311 (4th Cir. 2021).

As detailed more fully below, the conduct of the ACPD officers on February 9, 2020, was either an intentional pretextual search of Mr. Wells' property to rummage through it to find potential contraband or evidence of a crime, or it was so grossly incompetent or an intentional

deprivation of the Fourth Amendment that Qualified Immunity will not protect them from suit or liability.

### SECTION III. A – FUENTES' RELIANCE UPON ARMSTRONG.

The ACPD Officers' detention of Plaintiff was a violation of the Fourth Amendment if they relied upon Armstrong, because, Armstrong had no reasonable suspicion or probable cause. *See Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 564–69 (1971) (recognizing that a necessary condition of the Fourth Amendment violation was that the arresting officer lacked probable cause).

Fuentes, in discussing his conduct as the first ACPD Officer on the scene, appears to defend his actions on February 9, 2020, in detaining Mr. Wells as a continuation of Armstrong's choice to detain Mr. Wells; this is a factual dispute between the two Defendants. Armstrong claims he made no action that can be construed as a traffic stop or detention. (Federal Defendants' Memorandum of Law, Dkt No. 57 at 3-4, 18-19). Such disagreement between Armstrong and Fuentes is a factual dispute that should be put to a jury. Did Armstrong effect a *Terry* stop? Did Armstrong inform Fuentes that he had reasonable suspicion for a *Terry* stop? Who is more believable on this topic, Mr. Wells' well-pleaded allegations together with Fuentes' testimony on August 17, 2020, or Armstrong's testimony that he reversed his vehicle ***then*** contacted the ACPD? At this stage, the SAC contains well-pleaded allegations that Armstrong placed Plaintiff in the reasonable apprehension that he was not permitted to leave, and Armstrong lacked any reasonable suspicion or probable cause to do so. SAC ¶¶ 35 – 39.

If a jury believes Armstrong's testimony that he did not conduct a stop and that Armstrong moved his vehicle away from Mr. Wells' vehicle and thereafter contacted the ACPD,

then Fuentes' justification fails in attempting to justify his seizure of Plaintiff as a continuation of Armstrong's alleged reasonable suspicion to seize Mr. Wells. At this stage, Fuentes should not be asking the Court to resolve this factual contest. *See Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). Furthermore, Fuentes attempts to argue that he cannot be held liable on this Fourth Amendment claim because he reasonably relied in good faith upon the report of Armstrong – again this creates a factual dispute for the Court to resolve on the instant Motion. Armstrong emphatically asserted that he provided no information to Fuentes and there was no stop in progress when Fuentes arrived. (Federal Defendants' Memorandum of Law, Dkt No. 57 at 3-4, 18-19).

Ultimately, the cases referenced by Fuentes relate to ongoing urgent issues such as struggles with an officer's foot wedged in a door and in that scenario, he radioed for help (*Guerrero v. Deane*),[3] officers assisting to execute an arrest warrant, (*Whiteley v. Warden*),[4] and when the first officer on the scene actually conducted an investigation and stated to the subsequent three officers that probable cause existed (*Ware v. James City Cty.*).[5] No such urgency or emergency exists in the instant case.

Fuentes is asking the Court to resolve factual disputes to find one version of the events existed when the briefing before the Court contradict each other. The Court should disregard Fuentes' request and assume the well-pleaded facts in the SAC are true.

In the instant case, Armstrong was not executing a warrant, was not in a fight or struggle with Mr. Wells, and Mr. Wells was not resisting or evading. Armstrong also claimed, under

---

[3] *Guerrero v. Deane*, 750 F. Supp. 2d 631, 652 (E.D. Va. 2010).
[4] *Whiteley v. Warden*, 401 U.S. 560, 568, 91 S. Ct. 1031, 1037 (1971).
[5] *Ware v. James City Cty.*, 652 F. Supp. 2d 693, 703 (E.D. Va. 2009).

oath, that he made no report to Fuentes and wanted Fuentes to make his own determination of the facts.  Mot. To Suppress Hrn'g. Tr. 51:14 – 53:4, August 17, 2020.

Fuentes' had no good-faith basis to rely on Armstrong and is obligated by the Fourth Amendment's clear import to conduct his own reasonable suspicion calculation prior to effecting a *Terry* stop, removing Mr. Wells from his vehicle, and searching his vehicle.  Fuentes had no reasonable action other than to issue citations for an expired temporary tag and failure to show a driver's license and he should have sent Mr. Wells on his way.

**SECTION III. B – AN INVENTORY SEARCH OR PRETEXTUAL RUMMAGING.**

The ACPD Officers argue to the Court that they reasonably believed they were conducting an inventory search of the Mustang.  The allegations in the SAC, and the documentation presently available, do not bear out the Inventory Search Exception in this case.  By default, all searches without a warrant or consent are unreasonable.  *See South Dakota v. Opperman*, 428 U.S. 364, 369, 381 (1976).  There was no consent for the searches and seizures on February 9, 2020.  SAC ¶¶ 49, 55, and 57.

The police, then, bear a necessarily difficult challenge of proving that they had some good-faith exception to the mandates of the Fourth Amendment.  The ACPD Officers assert they were conducting an inventory search of the Mustang; however, such exception requires an actual inventory of all items in the vehicle, which was not done, and it must be done according to departmental policies, which was not done, after the vehicle was in police custody and impound lot, which was not done and the officers stated on February 9, 2020, their contemporaneous knowledge that the Mustang was not being towed to the impound lot.

To guard against claims of theft, vandalism, or negligence by the police, they should have, as required, inventoried and taken for safekeeping ***all items*** in the vehicle. They neither took all valuable items nor all dangerous items on February 9, 2020. The ACPD officers then removed Mr. Wells' handcuffs and sent him on his way to ride with the tow-truck driver to his apartment with some valuable and dangerous items put back in Mr. Wells' trunk.

One officer is heard on the recording confirming the foregoing, in contradiction to the ACPD Officers' arguments and allegations, that at least some of his property is being put back into his trunk. Dkt. No. 60-1 at 5:26 PM. Furthermore, as they were departing, one officer is even heard reminding Mr. Wells not to forget his laptop. Dkt. No. 60-1 at 5:28 PM. These facts specifically undermine the Defendants' argument that the Inventory Search Exception applies – the officers' actual conduct demonstrated they did not conduct an inventory of the vehicle for the purposes of impounding it. Mr. Wells, for example, could have claimed such laptop and items in the trunk were stolen by the police because they did not conduct an inventory, one of the primary three purposes of the procedural nature of the inventory search exception.

It is also conspicuous that, despite clear reference to it in Plaintiff's SAC, the ACPD Officers did not attach any evidence of the relevant departmental policies applicable at the time. This issue, then, is ripe for discovery and Plaintiff must be given the opportunity to discover and put on expert witness testimony of such policies and whether they were followed. To the best of Plaintiff's present knowledge, one of the primary requirements of the ACPD policy is that the proper impound form be completed, as was done on February 20, 2020, for the Pontiac seized by Barnickle on February 18, 2020. No such form was completed on February 9, 2020, for Plaintiff's Mustang. Expert witness testimony from Plaintiff's expert is anticipated to be that the reasonable officer would rely on the regular training he receives to know what an impound

means, to know what an inventory of a vehicle means, what the standard policies and procedures are, and that personal property may not be taken as a mere ruse to attempt to discover inculpatory evidence or non-obvious contraband.

The Fourth Circuit and the Supreme Court cases regarding Inventory Searches all require the vehicle must first be in police custody, thus creating the primary tripartite purpose for the inventory exception. *See, inter alia, United States v. Brown*, 787 F.2d 929, 931-32 (4th Cir. 1986). The three valid purposes that give rise to the inventory search exception come from (1) the need to protect the car owner's property within the vehicle while in the police impound lot, (2) to protect against claims of theft or damage against the police by the owner, and (3) to protect police from potential danger, such as bombs in the car. *See South Dakota v. Opperman*, 428 U.S. 364, 369 (1976).

In this case, on February 9, 2020, the ACPD officers did not secure or take into safekeeping all of Mr. Wells' property in his Mustang and did not do a written inventory of what was taken by police, thus negating the first purpose, did not do a written impound form indicating what was inventoried, thus negating the second purpose of protecting the officers from claims they stole or damaged the property, and because it was not towed to the impound lot and not taken into police custody, and they knew they were not going to impound the Mustang, there was no need to inventory the vehicle to ensure there were no bombs in it while in the impound lot, thus negating the third purpose.

Defendants' memorandum contains only a partial quote from Plaintiff's SAC on this topic. (Dkt. No. 60 at 22). Defendants provide a misleadingly partial quote that the ACPD Officers "knew that the Mustang was not going to be towed…" *Id*. The full quote of Plaintiff's SAC that the Defendants should have provided is:

8

> The ACPD officers on the scene on February 9, 2020, particularly Fuentes and
> Soules, knew that the Mustang was not going to be towed to the impound lot and
> that they were not conducting an inventory or safety search of the vehicle and that
> they did not have a warrant to conduct any search of Mr. Wells' vehicle or
> probable cause to otherwise justify a search or seizure, and despite that
> knowledge, Mr. Wells' property was searched and seized by them anyway.

SAC ¶ 73. The relevance of this paragraph, and the reason the Defendants misleadingly quoted only part of the paragraph, is because the ACPD Officers knew the Mustang was not going to be towed to the impound lot, had not yet taken custody of it, and did not follow procedure. Thus, their conduct on February 9, 2020, was, by default, a violation of the Fourth Amendment and Va. Code § 19.2-59, and the Inventory Search exception does not apply.

While not binding precedent on this Court, Judge Chuang of the United States District Court for the District of Maryland examined a case with facts similar to the instant case and found the actions of those police officers flagrantly violated the Fourth Amendment in numerous ways. *United States v. Johnson*, No. TDC-16-0135, 2017 U.S. Dist. LEXIS 78035, at *45 (D. Md. May 22, 2017).

To preempt a potential argument shift, should the Defendants attempt to shift and argue the Search Incident to Arrest, Automobile Exception, or Plain View exceptions apply, the Court should reject those arguments, also. The Search Incident to Arrest exception is not satisfied by the circumstances before the Court because Mr. Wells was not within reaching distance of the vehicle during the search and the ACPD Officers had no reason to believe evidence of the lack of license or expired temporary tag could be found within the vehicle. *See Arizona v. Gant*, 556 U.S. 332, 335 (2009) and *Cromartie v. Billings*, 298 Va. 284, 298 (2020).

The Automobile Exception does not apply because the ACPD Officers were in control of the situation, had Mr. Wells in handcuffs, and there was no probable cause to believe the vehicle contained contraband or evidence of criminal activity. *See United States v. Graham*, 686 F.

9

App'x 166, 173 (4th Cir. 2017). And finally, the Plain View Doctrine does not apply because the various items the ACPD Officers rummaged through were in Plaintiff's trunk, not in plain view, no officer had a lawful right to access them, and there was no incriminating character of the items immediately apparent. *See Nazario* at \*43 (E.D. Va. Aug. 9, 2022). Notably, the Rifle Plate was fully enclosed inside of an outer, soft armor carrier, which was inside Plaintiff's trunk.

Applying South Carolina towing and inventory procedures, the Defendants primarily rely upon *United States v. Fort*; it is substantially distinguishable. 313 F. App'x 665, 667 (4th Cir. 2009). Furthermore, the *Fort* opinion resolves factual disputes which, at the present moment is inappropriate for the Defendants to request the Court to do. The case in *Fort* is an appeal after the criminal defendant pleaded guilty to possessing unlawful firearms and, thereafter, he moved the Court to suppress the evidence against him.

Furthermore, the factual difference between **when the inventory was unreasonable** is distinguishable between the instant case and the *Fort* matter. In the instant matter, it was unreasonable for the ACPD Officers to rummage through Plaintiff's property at the beginning; irrespective of whether the vehicle was going to be towed. The only actions necessitated by the facts available to the ACPD Officers on February 9, 2020, were that Mr. Wells ought to have been cited for the license and tag violations and Fuentes should have sent him on his way with the tow-truck driver. In *Fort*, the Court found that, in part, the vehicle contained facially obvious contraband, a grenade launcher and machine gun, in the officers' plain view – it was not relevant whether Fort's wife arrived. *See United States v. Fort*, 313 F. App'x 665, 668 (4th Cir. 2009). Mr. Wells had no contraband in plain view and had no contraband *at all* in his vehicle and he was not arrested.

Another defect in applying the *Fort* opinion to the instant case is that the Court in *Fort* appears to be applying the criteria of a combination of the Automobile Exception and the Plain View Exception rather than the Inventory Search Exception. In sum, Defendants' reliance upon the *Fort* opinion is misplaced and should be disregarded.

It does not pass Fourth Amendment muster to claim, as the ACDP Defendants imply, that each time an individual gets a traffic ticket requiring towing to his home, that the entire contents of his car can be seized as evidence. If that is the state of the Fourth Amendment, it is dead letter.

### SECTION III. C – CONSENT AND SAFEKEEPING.

The ACPD Officers impermissibly rely upon two unpublished opinions as precedent in this case. *United States v. Fort*, 313 F. App'x 665, 668 (4th Cir. 2009) and *United States v. Williams*, Nos. 96-4222, 96-7523, 106 F.3d 394 (4th Cir. 1997). Such reliance should be disregarded by the Court.

The ACPD Officers falsely state that Plaintiff "allowed" ACPD to place his property and firearms in "safekeeping." Plaintiff did not consent or allow the police to do anything on February 9, 2020. SAC ¶¶ 42, 49, 52, 54, 55, and 65. Plaintiff was in handcuffs and requested the ACPD Officers allow him to keep his property. SAC ¶¶ 55, 56, 184, and 193.

The ACPD Defendants list the lawfully owned property that Mr. Wells possessed on February 9, 2020: a pistol, a rifle, 150 rounds of ammunition, a smoke grenade, body armor, knives, and masks. This list is an effort to show the dangerous or hazardous nature of the items in Mr. Wells' possession. (Dkt No. 60 at 22-23). Not one of those items is hazardous in the

sense used in the *Fort* opinion.[6] They were all lawful items, lawfully owned, and not contraband. The smoke grenade and one of the masks, for example, are basically toys used in games of airsoft. The smoke grenade, for example, is sold commercially for $7.99 to airsofters and paintballers. Not one of those items is "inherently hazardous" and the vehicle was not impounded as those terms are used in the two unpublished opinions cited by Defendants and used by them as impermissible authority.

The ACPD Defendants falsely assert, and fail to provide any support for such assertion, that Plaintiff consented to the placement of his property in safekeeping. Plaintiff's easy-going demeanor and temperament, lack of resisting arrest, and cordially not wanting to take up the officers' time should not be conflated with consent. Furthermore, Plaintiff's signature on the safekeeping form demonstrated, only, that he received the form. There is no attestation of consent to searches or seizures. Dkt. No. 48-3.

### SECTION III. D – VIOLATION OF Va. CODE § 19.2-59.

The Defendants claim, *ipse dixit*, that Count Five of the SAC should fail for the same reasons as they already argued. The Court should reject such attempt because, while the injury is an indivisible injury, the Commonwealth of Virginia has a separate and distinct policy reason for making its own prohibition of the ACPD Defendants' conduct on February 9, 2020, and Plaintiff is permitted to plead alternative forms of recovery.

The ACPD Defendants have not provided any argument why their searches and seizures without a warrant satisfy any exception to the Fourth Amendment or Va. Code § 19.2-59.

---

[6] *Fort* discusses a short-barreled shotgun, a machine gun, and a grenade launcher which were unregistered and in plain view. *United States v. Fort*, 313 F. App'x 665, 666 (4th Cir. 2009). Mr. Wells had nothing remotely close to such contraband.

Furthermore, in applying that code section on a substantially similar fact pattern, the Virginia Supreme Court vindicated the prohibitions of such searches and seizures by reversing a motion to strike and directing the circuit court to hold a hearing on the assessment of damages, only. *Cromartie v. Billings*, 298 Va. 284, 309 (2020).

### SECTION IV[7] – THE SECOND AMENDMENT.

The ACPD Officers' argue that Count II should be dismissed because Fuentes and Soules did not violate the Second or Fourteenth Amendment when the officers prohibited Mr. Wells from keeping and bearing his arms on February 9, 2020, and thereafter as they were held by the ACPD. Their primary argument is that it was not clearly established that Mr. Wells had an individual right to keep and bear arms "while on the public streets of Arlington County" in February 2020.

### SECTION IV. A – NO PROTECTIVE SWEEP.

Fuentes did not conduct a protective sweep of Plaintiff's Mustang on February 9, 2020. Plaintiff is not claiming he conducted such a sweep nor that such a sweep would be a violation of the Second Amendment. The vast bulk of this section is irrelevant to Plaintiff's SAC and should be disregarded.

Plaintiff's well-pleaded allegations state that Fuentes had no reasonable suspicion to believe the firearms were evidence in any crime, no belief they were evidence of the license and expired temporary tag citations issued to Mr. Wells, and had no belief they were contraband or stolen. SAC ¶¶ 52, 53, 54, and 55. Count II is not alleging a temporary seizure to protect the

---

[7] The Defendants' memo reverts to Roman Numeral II in this section. Dkt. No. 60 at 24.

officers; the well-pleaded allegations are clear: The ACPD Officers explicitly prohibited Mr. Wells from keeping his lawfully purchased and owned firearms on February 9, 2020, prevented Mr. Wells from keeping and bearing them, prohibited him from open carrying them, and prohibited him from placing them into his lockable trunk so the vehicle and property could be towed back to his home. SAC ¶ 56. Mr. Wells' right to open carry his unloaded pistol and rifle in his hands as he walked away has not been challenged by any Defendant and no Defendant has provided a single citation to any case that empowered the officers to prohibit Mr. Wells from open carrying his firearms nor to seize his firearms on February 9, 2020.

Thereafter, the firearms were unlawfully seized and held by the ACPD until April 16, 2021. SAC ¶¶ 53, 184, 189, and 194.

**SECTION IV. B – PLAINTIFF DID NOT CONSENT OR PERMIT THE SEIZURES.**

Providing no support whatsoever, Defendants falsely claim Plaintiff voluntarily chose to have his firearms placed in safekeeping. Defendants assert that while Mr. Wells was locked in handcuffs, surrounded by five or more officers, and behaving in a cordial and cooperative way, that somehow he permitted his firearms to be placed in safekeeping. Notably, Defendants do not refer the Court to any part of the February 9, 2020, recording or any document or case to support such a claim. That which is asserted without support can be disregarded without effort.

Plaintiff explicitly tried to have the ACPD Officers give him his property and let him go on his way on February 9, 2020, on at least three occasions.[8]

4:39 PM: "I can't just like … get an Uber with that?"

---

[8] Timestamp references are made to the timestamps on the video attached to the Defendants' Motion at Exhibit 1. Dkt. No. 60-1.

14

4:48 PM: "Can I, like, buy you dinner? Is there anything I can do to not get towed?"

4:48:50 PM: "I would be for leaving everything in the trunk."

Nothing said by Plaintiff evinces consent. Instead, it demonstrated he was cooperative and cordial – such conduct should not be interpreted against Mr. Wells' interests.

When speaking alone, the officers resolve to take everything at 5:15 PM. While there was a discussion amongst themselves about whether they can give Mr. Wells an opportunity to have a friend with a trunk come by to transport Mr. Wells and his property, the conversation concluded with clear intent to seize his property in their police vehicles, "[h]e's a fucking bullshitter, he doesn't have anyone to come get him."[9] Dkt. No. 60-1 at 5:15 PM. The ACPD Officers had already made up their minds assuming throughout the video, and the rest of the investigation, that Mr. Wells was lying about everything, ignoring the context of practically everything he said, and concluding the most irrational conclusions at each step.

Furthermore, the very little that can be seen in the video portion of the recording shows the officers had already began moving Mr. Wells' property to their own police vehicles despite paying lip service to an instruction they received from a superior to give Plaintiff an opportunity to have a friend come to help him move his property.[10]

**SECTION IV. C – PROHIBITING MR. WELLS FROM KEEPING AND BEARING HIS ARMS VIOLATED THE SECOND AMENDMENT.**

Fuentes and Soules argue that there was no clearly established private right to keep and bear arms and cite to the *Heller* decision. The *Heller* decision clearly articulated an individual right to keep and bear arms in, at least, 2008. *District of Columbia v. Heller*, 554 U.S. 570, 595

---

[9] Believed to be Lugasi.
[10] The loading of Mr. Wells' property into a police vehicle can be seen as early as 4:35 PM.

(2008). The *Bruen* and *Frein* decisions both provide a framework to demonstrate the fact that *Heller* did, in fact, stand for the individual right to keep and bear arms; whether on a street or in the home. *New York State Rifle & Pistol Association, Inc., v. Bruen*, 142 S. Ct. 2111 (2022); *Frein v. Pa. State Police*, 47 F.4th 247 (3d Cir. 2022). While both *Bruen* and *Frein* are 2022 decisions, their analysis is included to demonstrate that the right of the individual to keep and bear arms, in a car, on his person, or in his home, was clearly articulated since the ratification of the Second Amendment and apply to both pistols and rifles.

The reliance by the Defendants on the Seventh and Eighth Circuit opinions are misplaced. The *Sutterfield* matter involved a woman who was mentally ill and was involuntarily committed; the police had cause to believe she would likely harm herself or others and on that basis the officers took her firearms. *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 547 (7th Cir. 2014). The *Walters* opinion does not stand for the proposition that the Defendants claim.

> We do not foreclose the possibility that some plaintiff could show that a state actor violated the Second Amendment by depriving an individual of a specific firearm that he or she otherwise lawfully possessed for self-defense. However, on this record, Walters has failed to make such a showing.

*Walters v. Wolf*, 660 F.3d 307, 318 (8th Cir. 2011). Furthermore, the facts of *Walters* are exceptionally different. In *Walters*, the plaintiff was a fugitive from justice with outstanding warrants when he was pulled over for the lack of a front license plate. *Id* at 309. During that traffic stop, the officer discovered that he was a fugitive from justice, the plaintiff was arrested, and his firearm was lawfully seized. *Id*.

The instant case is substantially different. Mr. Wells has made clear allegations that there was no cause for the officers to take his firearms on February 9, 2020, and the ACPD Officers have failed to provide any exception to the Fourth Amendment or Second Amendment that justifies their seizure or their infringement on his clearly established right to keep and bear his

arms by ordering him not to open carry, as he was lawfully permitted to do; Mr. Wells not fighting or resisting arrest is not an indication of consent.

### SECTION V – FALSE IMPRISONMENT.

Plaintiff's SAC contains well-pleaded allegations against the ACPD Officers that on February 9, 2020, they either took over the false imprisonment initiated by Armstrong or initiated their own false imprisonment as their initially justifiable stop on suspicion of the license or tag citations went overlong and became a false imprisonment. Such facts are well pleaded to support either finding by the trier of fact, however, it seems the ACPD Officers request the Court to find their conduct constituted a continuation of Armstrong's False Imprisonment.

The ACPD Officers allege their detention of Plaintiff can be justified as a continuation of Armstrong's detention; they request the Court to resolve a factual dispute between the ACPD Officers and Armstrong's allegations. Such resolution of a factual dispute between the various Defendants is inappropriate on the instant motions. Furthermore, Plaintiff does contend the detention on February 9, 2020, was inappropriate or could be initially appropriate to issue the citations, but then was overlong and thus converted into a false imprisonment. *See Nazario* at *16 (E.D. Va. Aug 9, 2022) ("A stop that is justified at its inception may still be unconstitutional if its manner of execution unreasonably infringes interests protected by the Constitution.")

Furthermore, the ACPD Officers appear to rest upon and justify their detention of Mr. Wells based upon Armstrong's False Imprisonment of Plaintiff. In that instance, the ACPD Officers are admitting that Armstrong's False Imprisonment of Mr. Wells was continued by them. It is unreasonable to claim that the issuance of citations for the expired tag and license infraction should take approximately two hours and require five police officers.

17

### SECTION VI – MALICIOUS PROSECUTION.

Plaintiff's SAC contains sufficient pleading to allege that the natural results of the ACPD Officers' conduct was the prosecution of Plaintiff without probable cause, and thus malicious, instituted by or with the cooperation of each individual ACPD Officer, without probable cause, and each such prosecution was terminated in Mr. Wells' favor. SAC ¶¶ 48-52, 59-62, 64-65, 210-212. The ACPD Officers materially cooperated and participated in every aspect of the Malicious Prosecution, from the initial seizure of Mr. Wells' property to the reports filled out providing either substantially misleading notes or simple false statements, such as reading of Plaintiff's notes regarding Bulletproof Choline Force products and asserting that Plaintiff had a list of chemicals that could make his body bulletproof. SAC ¶¶ 169-171, 210-211. The reasonable officer would know that the natural results of their conduct of providing such false or misleading reports would lead to Mr. Wells being subjected to Malicious Prosecution. Finally, the officers cooperated with each stage of the prosecution thereafter and cannot, now, evade liability by claiming they did not take part in it.

**WHEREFORE**, Plaintiff Curtis Wells respectfully requests the Court DENY ACPD Officers' Motion to Dismiss (Dkt. No. 59), filed on behalf of Defendants Fuentes, Lugasi, Soules, Kline, and Vanak, with prejudice, and for such other or additional relief as the Court may deem reasonable and just.

**Dated November 6, 2022.**

          Respectfully submitted,

          Curtis Wells,

          By:_____/s/_____
          Counsel

          Matthew A. Crist, VSB No. 85922

mcrist@MACPLLC.net
Matthew A. Crist, PLLC
10432 Balls Ford Rd., Suite 300
Manassas, VA 20109
(571) 551-6859
***Counsel for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify on this day, November 6, 2022, that the foregoing paper was filed and served with the Clerk of Court via the Court's CM/ECF system, which will send notice of such filing to all registered users.

_____/s/_____
Matthew A. Crist
*Counsel for Plaintiff*