UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

CURTIS WELLS,
*Plaintiff*,

v.

Case No. 1:22-cv-00140 (MSN/IDD)

JAVIER FUENTES, *et al.*,
*Defendants*.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendants' five separate dismissal motions. *See* Dkt. No. 56 (Motion to Dismiss for Lack of Jurisdiction and Failure to State a Claim on behalf of Michael Armstrong, Keith Shepherd, and the United States); Dkt. No. 59 (Motion to Dismiss for Failure to State a Claim on behalf of Javier Fuentes, Austin Kline, Lauren Lugasi, Kimberly Soules, and John Vanak); Dkt. No. 61 (Motion to Dismiss for Failure to State a Claim on behalf of Ashley Barnickle); Dkt. No. 63 (Motion to Dismiss for Failure to State a Claim on behalf of Scott Wanek); Dkt. No. 68 (Motion to Dismiss for Failure to State a Claim on Behalf of Arlington County). Upon consideration of the accompanying memoranda and the parties' briefing, the Court will grant the motions, and the case will be dismissed.

## I.   BACKGROUND

### A.  Plaintiff's Allegations

In his Second Amended Complaint, Plaintiff alleges that, on February 9, 2020, he was sitting in his parked Ford Mustang in a lot near the Arlington National Cemetery when Michael Armstrong, a civilian law enforcement officer employed by the Department of the Army, approached him. Dkt. No. 48 ¶ 35 ("Compl."). As explained at a suppression hearing in Plaintiff's

1

criminal case, Officer Armstrong testified that he approached Plaintiff's vehicle because, due to Plaintiff's demeanor, he sensed that "something was wrong," and wanted to make sure that Plaintiff was not suffering from a medical emergency or having vehicular problems. Compl. ¶ 38, n.3. Plaintiff claims that, at that time, he did not feel like he was free to leave because Officer Armstrong parked his cruiser in a way that impeded Plaintiff's ability to drive away. Compl. ¶¶ 35, 39.

During that "welfare check," Officer Armstrong noticed that Plaintiff's temporary license plate was expired. Compl. ¶ 38, n.3. Then, he requested assistance from the Arlington County Police Department ("ACPD"). Compl. ¶ 40. At least five ACPD officers were dispatched: Fuentes, Lugasi, Soules, Kline, and Vanak (together, "ACPD Officers"). Compl. ¶ 41. When they arrived, ACPD Officer Javier Fuentes ordered Plaintiff to step out of the vehicle and asked if there were any firearms inside. Compl. ¶ 50. After responding that there were, Plaintiff was placed in handcuffs, and the guns found in Plaintiff's car (a Glock handgun and an AR-15 rifle) were taken into the officers' possession for the duration of the stop. Compl. ¶ 49. At the conclusion of their investigation, the officers cited Plaintiff for operating his vehicle without a valid license and for bearing an improper registration in violation of Virginia law. Compl. ¶ 58.

Because the vehicle was not properly registered, it could not lawfully be driven (or parked) on local roads. As such, the vehicle needed to be towed. The officers informed Plaintiff that his car needed to be towed and explained why. *See* Dkt. No. 65-1 at 4:48:12 P.M.[1] Plaintiff expressed his understanding: "Well, it's got to be towed, and I've got to figure out what's going on with the

---

[1] Throughout his Complaint, Plaintiff relies on portions of the audio recording of his interaction with the ACPD Officers on February 9, 2020. *See, e.g.*, Dkt. No. 48 ¶ 47 n.4. And—both because of those references and because the parties agree that the recording may be considered "for any purpose," *see* Dkt. No. 75 at 1—the Court will consider the contents of that recording. *Cf. Dangerfield v. WAVY Broadcasting, LLC*, 228 F. Supp. 3d 696, 702 n.3 (E.D. Va. 2017) ("On a motion to dismiss, a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint.") (internal quotation omitted)).

weapons." *Id.* Plaintiff then asked if the vehicle had to be towed to the impound lot (rather than to his home). *See id.* at 5:15:29 P.M. The officers explained that "[b]ecause [they] called [the tow], they have to take it to their lot." *Id.* And because the vehicle was to be towed into police custody, the officers conducted an inventory search pursuant to department policy. In addition to the Glock handgun and AR-15 rifle, ACPD Officers uncovered five fully loaded AR-15 magazines (150 rounds of ammunition), U.S. Army patches, a crowbar, two face masks, two vests with bullet proof armor, a smoke grenade, a Texas license plate, two-way radios, and a handwritten list of other weapons and equipment that Plaintiff possessed or needed to purchase. Dkt. No. 60-4 at 6-7 (search warrant affidavit).[2] Officers also uncovered a Ceradyne, Inc. rifle plate and a "handwritten list of chemical compounds that have potential to make the human body bulletproof or even invincible." *Id.*

The ACPD Officers then talked to Plaintiff about how they would handle his property in light of the necessity of towing his vehicle. Specifically, Officer Soules told Plaintiff that, because officers could not simply leave all his valuable property in the vehicle, Plaintiff could arrange for a friend to come pick up both him and his property. *See* Dkt. No. 65-1 at 4:48:30 P.M. Plaintiff responded that he would agree to leaving everything in his trunk to be towed away. *See id.* at 4:48:50 P.M. The officers again cautioned that they could not leave valuable items (like firearms) in the trunk. *Id.* Instead, the officers offered a third option: "[W]e can take it to our property, exactly like she said, for safekeeping. We give you a paper receipt, and then whenever you're ready, you just go pick it up." *Id.* Ultimately, Plaintiff was unable to secure a ride home, and rather

---

[2] In *Dangerfield*, this Court considered a search warrant affidavit in evaluating a motion to dismiss because it was integral to the allegations in the Complaint and was a public record. *Dangerfield*, 228 F. Supp. 3d at 702 n.3. The Court applies the same analysis here.

than have the officers continue to wait, he agreed to the third option. And after signing the Property Retrieval form, *see* Dkt. No. 48-3, Plaintiff allowed the officers to take the items for safekeeping.

The vehicle was then towed. However, instead of being taken to the police impound lot, the vehicle was taken to Plaintiff's home. Compl. ¶ 67. Plaintiff alleges that the officers "knew that the Mustang was not going to be towed to the impound lot" all along and that their statements to the contrary were a ruse to justify the search of his vehicle. Compl. ¶ 73.

Plaintiff also alleges that on February 10, 2020, the day after the roadside encounter, Arlington County Detective Scott Wanek removed some of his property from safekeeping and searched it. Compl. ¶ 80. Specifically, Plaintiff alleges that Detective Wanek opened the soft body armor sleeve to reveal the Ceradyne, Inc. rifle plate. *Id.* Then, based on the plate's serial number, Detective Wanek reached out to Keith Shepherd, "a detective working for the Department of the Army," to determine whether it was possible that Plaintiff, a former serviceman stationed at Fort Myer, had stolen the plate from the United States government upon his separation from the military. Compl. ¶ 16, 138-39. Detective Wanek also reviewed the reports of the ACPD Officers who were at the scene, including the representations that they found "a handwritten list of chemical compounds that have potential to make the human body bulletproof." *See* Dkt. No. 60-4 at 6-7; *cf.* Compl. ¶ 98 (challenging the description of that list). The Complaint further alleges that, at the conclusion of his investigation and "based upon bare assumption and speculation," Detective Wanek "made false statements to the magistrate judge to seek and receive an arrest warrant." Compl. ¶¶ 87-88. According to Plaintiff, Detective Wanek's actions were improper, either because he purposely lied under oath or because he intentionally misled the magistrate judge by failing to disclose that the conclusions in the warrant application were speculative. Compl. ¶¶ 90-91. The warrant was issued on February 14, 2020.

4

On February 18, Plaintiff met with Detective Wanek believing that the detective intended to return Plaintiff's property that had been held for safekeeping. Compl. ¶ 115. On that day, Plaintiff was driving a 2008 Pontiac, which he parked near the police station. Compl. ¶ 117. And, at some point during Plaintiff's conversation with the detective, Plaintiff was arrested pursuant to the February 14 warrant. Compl. ¶ 119. After the arrest, Detective Wanek confiscated the keys to the Pontiac and gave them to ACPD Officer Ashley Barnickle, who then requested a warrant to search the vehicle. *Id.* The magistrate judge issued a warrant later that day. However, according to Plaintiff, Officer Barnickle "sat in" and "searched" the vehicle before it was moved to the police impound lot and before she applied for a search warrant. *Id.* Plaintiff makes this allegation based on the words used in the application. In Plaintiff's view, Officer Barnickle's use of the affirmative, past-tense language (that the car "contained" a cell phone) proves the officer's conduct occurred before the warrant had been issued. Compl. ¶ 120. Among other things, a bag of drugs was discovered in the Pontiac. Compl. ¶ 128. Plaintiff alleges that he "had never seen nor possessed" the drugs and that "[Officer] Barnickle, or another officer, had the motive, means, and opportunity to plant the bag." Compl. ¶ 130.

### B. Procedural History

On February 28, 2022, Plaintiff initiated this suit, alleging constitutional claims against the Federal Defendants (Armstrong, Shepherd, and the United States),  Arlington County, the ACPD Officers (Fuentes, Lugasi, Soules, Kline, and Vanak), Officer Barnickle, and Detective Wanek. Dkt. No. 1. The Complaint was later amended twice. *See* Dkt. No. 38 (First Amended Complaint); Dkt. No. 48 (Second Amended Complaint). The Court will only consider the allegations contained in the most recent iteration (Dkt. No. 48), which contains nine claims against the various officers and governmental entities.

*Count I* seeks relief under 42 U.S.C. § 1983 against the ACPD Officers' (including Detective Wanek and Officer Barnickle) alleging Fourth Amendment violations that occurred during the roadside encounter. Compl. ¶¶ 164-179. *Count II*, also brought under § 1983, alleges that Arlington County and some ACPD Officers (including Detective Wanek) violated Plaintiff's Second and Fourteenth Amendment rights by seizing his firearms. Compl. ¶¶ 180-195. *Count III* is a common law claim for False Imprisonment brought against Officer Armstrong and the ACPD Officers (including Detective Wanek). Compl. ¶¶ 196-201. *Count IV* is a common law claim for Malicious Prosecution brought against Detective Shepherd and some ACPD Officers (including Detective Wanek). Compl. ¶¶ 202-213. *Count V* alleges that the ACPD Officers (including Detective Wanek and Officer Barnickle) violated Virginia's prohibition against warrantless searches. Compl. ¶¶ 214-224. *Count VI* is a *Bivens* action against Detective Shepherd. Compl. ¶¶ 225-234. *Count VII* is a *Bivens* action against Officer Armstrong. Compl. ¶¶ 235-245. *Count VIII* is a *Monell* claim against Arlington County. Compl. ¶¶ 246-268. And finally, *Count IX* is a claim against the United States brought under the Federal Tort Claims Act ("FTCA"). Compl. ¶¶ 259-268.

In October 2022, Defendants filed five separate dismissal motions, asserting various immunities and other defenses. *See* Dkt. Nos. 56, 59, 61, 63, 68. In November 2022, Plaintiff filed separate responses opposing each of the dismissal motions. *See* Dkt. Nos. 77-81. Later that month, Defendants filed their replies. *See* Dkt. No. 82-86.

## II.   DISCUSSIONS

### A. Federal Defendants (Armstrong, Shepherd, United States)

The Court will start by addressing Plaintiff's claims against the Federal Defendants. As to Officer Armstrong and Detective Shepherd, Plaintiff makes two separate *Bivens* claims—alleging

that Officer Armstrong violated his Fourth and Fifth Amendment rights during the initial encounter (Count VII) and that Detective Shepherd violated his Fourth Amendment rights during his participation in the investigation of Plaintiff's possible crimes (Count VI). As to the United States, Plaintiff alleges two FTCA claims—alleging that the federal government is liable for the torts of False Imprisonment (Count III) and Malicious Prosecution (Count IV).[3] Plaintiff also claims that the United States is liable for Shepherd and Armstrong's conduct under the doctrine of *respondeat superior* (Count IX).

The Federal Defendants moved to dismiss the claims, arguing: (1) that the claims against Officer Armstrong and Detective Shepherd would impermissibly extend *Bivens* liability to new contexts; (2) that, even if relief was available under *Bivens*, the claims against the individual officers would be barred by the doctrine of qualified immunity; (3) that the United States cannot be held vicariously liable for the acts of the individual officers; and (4) that, despite the FTCA, the

---

[3] In his Second Amended Complaint (Dkt. No. 48), Plaintiff  alleged these tort claims against the individual federal officers. The Federal Defendants moved to substitute the United States for those individual officers. *See* Dkt. No. 55 (Notice of Substitution). Plaintiff challenges that substitution through a Motion to Strike Substitution. *See* Dkt. Nos. 71 (Motion), 72-73 (Original and Supplemental Memoranda in Support). In response, the Federal Defendants argue that because the individual officers were acting within the scope of their federal duties, the only proper defendant for the FTCA claims was the United States itself, citing the Federal Employees Liability Reform and Tort Compensation Act of 1988, 28 U.S.C. § 2679 ("Westfall Act"). *See* Dkt. No. 76.

The Westfall Act provides that, once the United States Attorney has certified that the defendant-employee was acting within the scope of his or her federal employment at the time of the incident in question, "any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant." 28 U.S.C. § 2679(d)(1). If the plaintiff challenges the scope of certification, the United States Attorney's certification "serves as prima facie evidence and shifts the burden to the plaintiff to prove, by a preponderance of the evidence, that the defendant federal employee was acting outside the scope of his employment." *Gutierrez de Martinez v. DEA*, 111 F.3d 1148, 1153 (4th Cir. 1997). To do so, plaintiffs must present more than "conclusory allegations and speculation"—they must provide "specific evidence." *Id.* at 1155. And when they do not, the government's certification is "conclusive." *Id.*

Here, Plaintiff provides no evidence that Detective Shepherd and Officer Armstrong were acting outside of the scope of their employment. Accordingly, Plaintiff's Motion to Strike will be denied, and the Court will analyze Counts III and IV with the other claim against the United States.

claims against the United States itself are barred by sovereign immunity. Dkt. No. 57. The Court agrees, and the claims will be dismissed.

### 1. Officer Armstrong and Detective Shepherd

Plaintiff's claims against Officer Armstrong and Detective Shepherd will be dismissed.

### a. Is a *Bivens* Remedy Available?

Yes and no. While a *Bivens* remedy is not available for most of Plaintiff's claims against the individual federal officers, there is one exception. The Court then will address the individual claims in turn. To start, however,  the Court provides a brief background of the *Bivens* remedy and its limits.

In *Bivens*, the Supreme Court was faced with the question of whether a plaintiff was entitled to seek damages in a civil action after federal officers conducted a warrantless search of his home, arrested him for alleged narcotics violations, and later subjected him to a visual strip search. *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 389 (1971). Answering that question in the affirmative,  the Court (for the first time) recognized an implied right of action in which "victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court." *See Carlson v. Green*, 446 U.S. 14, 14 (1980) (discussing *Bivens*, 403 U.S. 388). However, with two exceptions,[4] the availability of a *Bivens* remedy has been limited to cases that do not involve extending such liability to "any new context or new category of defendants." *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017).

To determine whether a case would amount to such an extension, the Supreme Court has developed a two-step inquiry. *Id.* at 139-40. First, courts must ask whether a given case presents a

---

[4] Those other two cases are: *Davis v. Passman*, 442 U.S. 228 (1979) (extending remedy to a case brought under the Fifth Amendment) and *Carlson v. Green*, 446 U.S. 14 (1980) (extending remedy to a case brought under the Eighth Amendment).

"new *Bivens* context." If the context is *not* new—*i.e.*, if the case is not "different in [any] meaningful way" from the three cases in which the Court has recognized a *Bivens* remedy— then a *Bivens* remedy continues to be available. *Id.* But if the context is new, then courts must proceed to the second step by evaluating whether there are "special factors counseling hesitation in the absence of affirmative action by Congress." *Id.* at 140 (cleaned up). If such "special factors" do exist, a *Bivens* action is not available. *Id.*

> i.   **Plaintiff's Fifth Amendment Claims**

Plaintiff's Fifth Amendment claims arise in new contexts. Plaintiff's due-process claims differ significantly from the Fifth Amendment claim recognized in *Davis v. Passman*. There, the plaintiff sought damages after allegedly experiencing gender discrimination by a congressperson. *Davis*, 442 U.S. 228, 244 (1979) . Here, Plaintiff seeks to hold the federal officers liable for "numerous violations of his property rights and liberty rights." Compl. ¶¶ 234 (Shepherd), 245 (Armstrong). The Fourth Circuit has recently held that ignoring similar deviations from the facts of *Davis* would require an expansion of *Bivens* liability. *See Doe v. Meron*, 929 F.3d 153, 169 (4th Cir. 2019) (declining to impose liability).

Furthermore, special factors counsel against extending *Bivens* liability to that new context. When determining whether special factors that counsel hesitation in expanding *Bivens* are present, courts must consider "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Tun-Cos v. Perritte*, 922 F.3d 514, 523 (4th Cir. 2019) (quoting *Abbasi*, 582 U.S. at 136). "If a factor exists that cause[s] a court to hesitate before answering that question in the affirmative," then a *Bivens* remedy is unavailable. *Id.* "In sum, if there are sound reasons to think Congress *might doubt* the efficacy or necessity of a damages remedy as part of the system for

enforcing the law and correcting a wrong, then courts *must refrain* from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III." *Abbasi*, 582 U.S. at 137 (emphasis added).

The fact that Detective Shepherd and Officer Armstrong are military personnel is particularly important. The Fourth Circuit has noted that—in more than fifty years—the Supreme Court has "never" extended *Bivens* liability to "the military context." *See Cioca v. Rumsfeld*, 720F.3d 505, 510 (4th Cir. 2013). First, in *Chappell v. Wallace*, the Supreme Court recognized "[t]he special status of the military" under the Constitution, "the unique disciplinary structure of the military establishment and Congress' activity in the field" as special factors that precluded the extension of *Bivens* to an employment discrimination claim brought by military service members against their superiors. 462 U.S. 296, 303-04 (1983). Then, in *United States v. Stanley*, the Court extended that rationale to civilian claims made against military personnel. *See* 483 U.S. 669 (1987). Reaffirming *Chappell* and discounting that case's concession that the Court had "never held" "that military personnel are barred from all redress in civilian courts for constitutional wrongs suffered in the course of military service," the Court unambiguously concluded that "no *Bivens* remedy is available for injuries that arise out of or are in the course of activity incident to service." *Id.* at 683-84. The Fourth Circuit has heeded that guidance. *See Cioca*, 720 F.3d at 517 ("[N]o case has permitted a *Bivens* action for money damages in the military setting."); *Lebron v. Rumsfeld*, 670 F.3d 540, 550 (4th Cir. 2012) (rejecting *Bivens* claim against military officers related to plaintiff's detention). And so has this District. *See, e.g.*, *Heap v. Carter*, 112 F. Supp. 3d 402, 430 (E.D. Va. 2015) (rejecting *Bivens* claim related to plaintiff's application for military employment).

This Court will follow suit. The fact that Plaintiff's claims may "not involve sensitive issues of national security or the administration of a uniquely defense-orientated institution," does not undercut the "DoD context" of Plaintiff's claims against military personnel. *See Doe v. United States*, 381 F. Supp. 3d 573, 618 (M.D.N.C. 2019). And that context (in and of itself) is a special factor counseling hesitation—especially considering the instruction of *Stanley*, *Chappell*, and the Fourth Circuit's applications of those cases.

### ii.   Plaintiff's Fourth Amendment Claim Against Detective Shepherd

Plaintiff's Fourth Amendment claim against Detective Shepherd is foreclosed by circuit precedent. In *Annappareddy*, the Fourth Circuit declined to extend *Bivens* liability to a similar claim alleging that a federal investigator submitted a false affidavit to obtain a warrant. *Annappareddy v. Pascale*, 996 F.3d 120, 135 (4th Cir. 2021). The court held that no *Bivens* liability was available because the alleged misdeeds there were "different from those in *Bivens*." *Id.* at 136. According to the Fourth Circuit, "speaking to witnesses, drafting reports, and sharing information with prosecutors and other investigators are information-gathering and case-building activities that represent a different part of police work than the apprehension, detention, and physical searches at issue in *Bivens*." *Id.* (cleaned up). And those differences were especially important because proving such claims requires a different type of showing: "one that would pose a greater risk of intruding on the investigatory and prosecutorial functions of the executive branch" than did the claims in *Bivens*. *Id.* Because Plaintiff's Fourth Amendment claim against Detective Shepherd mirrors those at issue in *Annappareddy*, it must suffer the same fate.

And as explained above, the special factor of Detective Shepherd's role as a detective for the Department of the Army counsels against extending *Bivens* liability to a new Fourth Amendment context in this case.

11

### iii.     Plaintiff's Fourth Amendment Claim Against Officer Armstrong

There is, however, a remedy for Plaintiff's Fourth Amendment claim against Officer Armstrong. After the briefing for the Federal Defendants' Motion to Dismiss was submitted, the Fourth Circuit decided *Hicks v. Ferreyra*, 64 F.4th 156 (4th Cir. 2023) ("*Hicks II*"), which makes a *Bivens* remedy available for claims (like Plaintiff's) which allege that, under the Fourth Amendment, an officer unreasonably seized their vehicle. In that case, two officers employed by the United States Park Police ("USPP") unreasonably seized a person parked on the shoulder of the Baltimore-Washington Parkway. 64 F.4th at 162-63. At trial, a jury found that the officers violated the plaintiff's Fourth Amendment rights and awarded money damages. *Id.* at 164. On appeal, the officers argued that the district court erred by concluding that they could be held liable under *Bivens* as the roadside-nature of the encounter rendered it a "new context" under Supreme Court precedent. *Id.* at 164-65. The Fourth Circuit disagreed. *Id.* at 169. In so doing, the appellate court held that—because both the arrest in *Bivens* and the stop in *Hicks II* were subject to the same "objective reasonableness" standard—the case was "not an extension of *Bivens* so much as a replay of the same principles of constitutional criminal law prohibiting the unjustified, warrantless seizure of a person." *Id.* at 167 (internal quotation omitted). And because the officers in *Hicks II* "confronted nothing more than established principles of Fourth Amendment law with extensive judicial guidance," the Court held that the plaintiff's claims fell into an existing *Bivens* context. *Id.* at 168.

As noted above, *Hicks II* resolves the issue before the Court today. Like the plaintiffs in *Hicks II* and *Bivens* itself, Plaintiff filed suit "to hold accountable only line-level investigative officers, not high-ranking officials." *Id.* at 167. Like  *Hicks II* and *Bivens*, Plaintiff's claims are "based on the officers' discrete actions and did not implicate large-scale policy decisions or other

general directives or statutes." *Id.* Like *Hicks II*, Plaintiff is suing federal law-enforcement personnel[5] whose actions were taken in "execution of principles of criminal law well-informed by decades of judicial guidance regarding the Fourth Amendment prohibition on the warrantless seizure of citizens without reasonable, articulable suspicion or probable cause." *Id.* And as the appellate court has noted, "courts, including [the Fourth Circuit], have applied *Bivens* to Fourth Amendment claims arising from police traffic stops like this one." *Hicks v. Ferreyra*, 965 F.3d at 311-23 (4th Cir. 2022) (collecting cases) ("*Hicks I*") (cleaned up).

Accordingly, as in the *Hicks* cases, the Court finds that Plaintiff's claims do not represent an extension of the doctrine and are therefore cognizable under *Bivens*. *See Hicks II*, 64 F.4th at 169 (ending its inquiry before addressing any "special factors" after finding that the case did not arise in a new context) (citing *Tun-Cos v. Perrotte*, 922 F.3d 514, 522-23 (4th Cir. 2019)).

**b.   Did Plaintiff Sufficiently Plead a Constitutional Violation?**

No. Notwithstanding the availability of a *Bivens* remedy, Plaintiff's claims against Officer Armstrong do not overcome the assertion of qualified immunity. Officers may assert the defense of qualified immunity only when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). *Saucier v. Katz* sets out the two-step process for determining when the

---

[5] The Court acknowledges that, while both cases involve "federal law-enforcement officers," the officers in *Hicks II* served with the USPP while Officer Armstrong is employed by the Department of the Army. And as the Fourth Circuit has announced in a similar case, Plaintiff's claims against Officer Armstrong would (at least, arguably) extend *Bivens* liability to a new *group* of defendants—military personnel. *See Doe v. Meron*, 929 F.3d 153,169 (4th Cir. 2019) (finding that a plaintiff's claims present a new context when defendants were "employees of the Department of Defense, operating under naval regulations"). Therefore—notwithstanding *Hicks II*—Plaintiff's claims against Officer Armstrong ("a military police officer working for the Department of Defense," Compl. ¶ 10) may nonetheless present a "new context" of *Bivens* liability.

However, the Court need not conclusively find *Bivens* applies here as any error committed by subjecting Officer Armstrong to *Bivens* liability under *Hicks II* is harmless. As explained below, the Court finds that the claims against Officer Armstrong are nonetheless blocked by his assertion of the qualified-immunity defense.

defense applies. *See* 533 U.S. 194 (2001). First: Determine whether, "[t]aken in the light most favorable to the party asserting the injury," the facts alleged by that party "show the officer's conduct violated a constitutional right." *Id.* at 201. Second: If a constitutional violation occurred, ask whether "it would be clear to an objectively reasonable officer that his conduct violated that right." *Id.* at 202. In undertaking that second inquiry, the court "must ascertain whether a reasonable [official] could have believed [the challenged conduct] to be lawful, in light of clearly established law." *Meeker v. Edmundson*, 415 F.3d 317, 323 (4th Cir. 2005) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

Applying that standard, the Court finds that Plaintiff has failed to establish that his Fourth Amendment rights were violated. And while Officer Armstrong correctly argues that Plaintiff's Fourth Amendment rights were not, the Court finds that the Fourth Amendment's protections were implicated by his interaction with Plaintiff. As the Supreme Court has explained, "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). And, in his Complaint, Plaintiff alleges that Officer Armstrong positioned his car in a manner that prevented him from being able to end the interaction by driving away. *See* Compl. ¶¶ 37, 39. The Court therefore finds that Plaintiff has sufficiently alleged that he was not free to leave, triggering his Fourth Amendment protections.

Those protections, however, are subject to several well-defined exceptions. Defendants argue that the so-called "community caretaker" exception applies to these facts. Dkt. No. 57 at 21. Under that exception, "a police officer serving as a community caretaker to protect persons and property is constitutionally permitted to make searches and seizures without a warrant." *Phillips*

*v. Peddle*, 7 F. App'x 175, 178 (4th Cir. 2001) (citing *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)). In other words—so long as the officer's actions were unrelated to "the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute"—the Constitution does not require either a warrant or a showing that the officer possessed the level of suspicion that would otherwise be needed to justify the intrusion. *Cady*, 413 U.S. at 441.

Here, the Second Amended Complaint and the incorporated materials reflect that Officer Armstrong approached Plaintiff because he was concerned from a community-caretaking standpoint, not because he suspected any criminal activity. *See* Compl. ¶ 38, n.3 (quoting Officer Armstrong's testimony at the state suppression hearing). According to his sworn statements—after witnessing Plaintiff move "erratically" while sitting in the vehicle, Dkt. No. 57-1 at 12:21-13:4— the officer "wasn't sure if it was a medical emergency" or "if maybe somebody was just upset that their car had broken down and they needed some kind of assistance," and that uncertainty "drew [his] attention to the vehicle." *See id.* at 14:2-12 (explaining that family members had a history of seizures, heightening his concerns). And, because it is unable to discredit that sworn testimony at this stage, the Court finds that Plaintiff has failed to allege that a constitutional violation occurred when Officer Armstrong approached his vehicle. *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013) (on a motion to dismiss: "In the event of conflict between the bare allegations of the complaint and any exhibit attached to the complaint, the exhibit prevails.") (cleaned up).

Thus—because the claims against him would extend *Bivens* liability to a new context and because the special factors surrounding those claims militate against such an extension—Plaintiff's claims against Detective Shepherd will be dismissed. And, because Plaintiff fails to allege a

constitutional violation against him, Officer Armstrong is entitled to qualified immunity, and the claims against him will be dismissed.

### 2.  The United States

The claims against the United States—Count III (false imprisonment), Count IV (malicious prosecution), and Count IX (vicarious liability)—will also be dismissed.

### a.  Can the United States be Held Vicariously Liable under the FTCA?

No. Skipping ahead, the Court starts by addressing Plaintiff's contention that the United States can be liable for Shepherd and Armstrong's conduct under the FTCA through the doctrine of *respondeat superior*. *See* Compl. ¶ 264 ("The United States is liable to [Plaintiff] under the doctrines of *respondeat superior* and vicarious liability for the wrongful conduct of Shepherd and Armstrong."). As the Federal Defendants point out, that claim is not cognizable. *See* Dkt. No. 57 at 22-23. Nor does it need to be. The FTCA applies exclusively to claims against federal employees that are "acting within the scope of [their] office or employment." 28 U.S.C. § 2674. In other words, "[a]ll FTCA liability is *respondeat superior* liability." *Johnson v. Sawyer*, 47 F.3d 716, 730 (5th Cir. 1995).

Thus—because FTCA liability and employer liability are one in the same—Count IX is not cognizable as a standalone claim and will therefore be dismissed. *See Thompson v. Dilger*, 696 F. Supp. 1071, 1072 n.1 (E.D. Va. 1988) ("[T]he FTCA subjects the United States to liability only for negligent or wrongful acts of a federal employee. Claims of vicarious or strict liability are, therefore, excluded.")

### b.  Does the Court Have Jurisdiction Over the Other FTCA Claims?

No. Turning to Counts III and IV, the United States argues (and the Court agrees) that Plaintiff's claims should be dismissed for lack of subject matter jurisdiction.

16

As the Supreme Court has explained, "[a]bsent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 474 (1994). The FTCA waives the United States' sovereign immunity with respect to certain damages actions based on "the negligent or wrongful act[s] or omission[s]" of federal employees. 28 U.S.C. § 1346(b)(1). However, the FTCA's waiver is limited by several exceptions, which, if applicable, preserve the federal sovereign's immunity from suit and deprive the district court of subject matter jurisdiction. *See Medina v. United States*, 259 F.3d 220, 223 (4th Cir. 2001); *Blanco Ayala v. United States*, 982 F.3d 209, 214 (4th Cir. 2020) (noting that the FTCA's "broad waiver of sovereign immunity is cabined by a list of exceptions").

At issue in this case is the so-called "discretionary-function exception." Under that exception, the United States preserves its immunity as to any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This exception "prevent[s] judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Williams v. United States*, 50 F.3d 299, 309 (4th Cir. 1995). A claim is based upon an agency's performance of a discretionary function when: (1) "the challenged governmental conduct involves an element of judgment or choice" because no "statute, regulation, or policy prescribes a specific course of action," and (2) "the judgment was one that the exception was designed to protect, namely a judgment based on considerations of public policy." *Rich v. United States*, 811 F.3d 140, 144 (4th Cir. 2015). Boiled down: "[f]or a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions

are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." *United States v. Gaubert*, 499 U.S. 315, 324-25 (1991).

*First*, there can be little doubt that the threshold requirement is satisfied here. Plaintiff is seeking to hold the United States liable for Shepherd and Armstrong's decisions to assist local law enforcement officers in the search of his vehicle and the investigation of his possession of the rifle plate. *See* Compl. ¶¶ 196-201 (lumping Armstrong in with ACPD officers for actions taken during the roadside search); Compl. ¶¶ 202-213, 201 (lumping Shepherd in with ACPD officers for actions taken during the subsequent investigation). As this Court has recognized, "[i]t is well-established that decisions by law enforcement regarding whom to investigate, how to investigate, and whether to prosecute constitute discretionary activity by government officials." *Blanco Ayala v. United States*, 386 F. Supp. 3d 635, 640 (E.D. Va. 2019), *aff'd*, 982 F.3d 209 (4th Cir. 2020). And while the Court finds that Plaintiff's constitutional rights were not violated during either series of events, that would not change the outcome. *Blanco Ayala*, 386 F. Supp. 3d at 640-41 ("[T]here is no requirement that the decisions made by law enforcement officers during the investigation or prosecution of a case must be correct to fall within the discretionary-function exception.") (citing *Hodgson v. United States*, No. SA:13-CV-702, 2014 WL 4161777, at *11 (W.D. Tex. Aug. 19, 2014)); *see also* 28 U.S.C. § 2680(a) (stating that the discretionary-function exception applies "whether or not the discretion involved be abused").

*Second*, the Court finds that the law enforcement decisions at issue were of the type that the exception was designed to protect. *See Gaubert*, 499 U.S. at 322-23. "The basis for the discretionary[-]function exception was Congress' desire to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988) (internal

quotation omitted). Both Armstrong and Shepherd's actions fall within the justifications of the exception. *See Blanco Ayala*, 386 F. Supp. 3d at 640. Indeed, as other courts within the Fourth Circuit have recognized, "claims of negligent investigation or negligent arrest by law enforcement officers are barred by the discretionary[-]function exception." *Burgess v. Watson*, 2014 WL 4540256, at *3 (M.D.N.C. Sept. 11, 2014) (citing *Suter v. United States*, 441 F.3d 306 (4th Cir. 2006)). And the Fourth Circuit itself has specifically applied the discretionary-function exception to claims arising out of military investigations. *See Blakey v. U.S.S. Iowa*, 991 F.2d 148, 153 (4th Cir. 1993).

Thus—because the claims fall within an exception to the waiver of sovereign immunity—Plaintiff's claims against the United States will be dismissed.

### B. Arlington County

Second, the Court will address Plaintiff's claims against Arlington County. Although the Second Amended Complaint is unclear, Plaintiff apparently seeks to hold the County Defendant liable for alleged violations of the Second and Fourth Amendments (Counts II and VIII, respectively). As to the Second Amendment claim, Plaintiff alleges that "Arlington County's widespread infringement upon Second Amendment rights has been evidenced by the historical practice of harassing law-abiding gun owners." Compl. ¶ 247. As to the Fourth Amendment claim, Plaintiff alleges that the "lack of supervision over the process of the officers searching Mr. Wells' car and seizing his property" and the "customary conduct of Wanek and Barnickle in their warrant application processes" resulted in the "numerous constitutional violations" he allegedly suffered. Compl. ¶¶ 252, 254. The County moved to dismiss both claims, arguing that Plaintiff has only pled conclusory statements that there was a countywide policy or custom that led to Plaintiff's alleged constitutional deprivation. *See* Dkt. No. 68. The Court agrees.

On its face, § 1983 does not reach local governments. *See* 28 U.S.C. § 1983 (imposing liability to "all *persons* acting under the color of law" (emphasis added)). However, for these purposes, a municipal entity can be considered a "person" (and thus subject to suit) "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Hunter v. Town of Mocksville*, 897 F.3d 538, 554 (4th Cir. 2018) (quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)). That said, "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. "To be sure,"  however, "official policy often refers to formal rules or understandings—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81.

The Fourth Circuit has identified four avenues through which a plaintiff asserting a § 1983 claim may demonstrate municipal liability for a policy or custom:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (cleaned up).

### 1.  Did Plaintiff Establish a Policy or Custom that Led to His Constitutional Harm?

No. Because each of Plaintiff's arguments regarding the existence of a policy fall short for similar reasons, the Court will analyze them together. Broadly, Plaintiff argues that the County is liable for Mr. Wells' injuries "because the routine or habitual unreasonable nature of the conduct

of the ACPD officers *on and after* February 9, 2020, evince a pattern of unconstitutional conduct and irrationality." Dkt. No. 77 (emphasis added). Specifically, to show a policy or custom of Second Amendment violations, Plaintiff relies on statistical data that, in his view, shows that Black gun owners are arrested at a disproportionate rate in Arlington County. Compl. ¶ 250. Plaintiff also relies on a county ordinance that prohibits possession of a firearm in certain county-owned buildings and at county-run events. Compl. ¶ 249 (citing Arlington County, Va. Code § 13-11). To show a policy or custom of Fourth Amendment violations, Plaintiff points to the "pattern" of alleged constitutional violations that were committed by the Defendants in this case. *See* Dkt. No. 77 (citing paragraphs of the Second Amended Complaint). Those arguments are unpersuasive.

Starting with the Second Amendment, the thrust of Plaintiff's argument is that Arlington County has an "irrational" "anti-gun" custom of "harassing gun owners." Dkt. No. 77 at 24-25. The Court notes that, even if that were true, Plaintiff's evidence (the ordinance and the statistics) is unavailing. First, the Supreme Court has never held that individuals have a right to possess a gun in government buildings and events. *See N.Y. State Rifle & Pistol Assoc. v. Bruen*, 142 S. Ct. 211, 2133 (2022) ("*Bruen*") (noting that schools and government buildings are "sensitive places" "where arms carrying could be prohibited consistent with the Second Amendment"). For that reason, the ordinance Plaintiff cites hardly evidences a policy that mandates unconstitutional violations. The statistical information is also unhelpful. While it may be true, according to the report provided, that Black men are approached by Arlington County officers at a disproportionate rate, that alone does not satisfy *Monell*'s requirement that plaintiffs show a pattern of *unconstitutional* (not just *undesirable*) conduct. *See Wren v. United States*, 517 U.S. 806, 813-14 (1996) (holding that "subjective intentions play no role" in the Fourth Amendment analysis).

As to the Fourth Amendment claim, Plaintiff provides no more than conclusory allegations that the officers "acted pursuant to the policies, practices, informal customs, or acted without sufficient training or supervision by their employers." Compl. ¶ 251. Indeed, Plaintiff fails to identify any of the policies, practices, or informal customs he contends are at issue here. Nor does he identify a specific area of training that the County failed to provide. At best, Plaintiff identifies the "pattern" of alleged violations that he endured. But, to hold the *county* liable he must do more. *Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 534 (4th Cir. 2022) (noting that, alone, a *respondeat superior* theory is "impermissible" to impose liability under *Monell*).

Thus—because the claims do not allege a policy or custom caused the alleged constitutional violations—Plaintiff's claims against the Arlington County will be dismissed.

### C. ACPD Officers (Fuentes, Lugasi, Soules, Kline, and Vanak)

Next, the Court turns to the claims against the local officers. Plaintiff claims that the ACPD Officers are liable for: (1) violating the Fourth Amendment and Virginia law when they continued the stop initiated by Officer Armstrong (Counts I and V); (2) violating the Fourth Amendment and Virginia law when they searched his Mustang (Counts I and V); (3) violating the Second Amendment when they took his firearms into safekeeping (Count II); (4) committing the tort of false imprisonment when they continued the detention initiated by Officer Armstrong (Count III); and (5) committing the tort of malicious prosecution when they cooperated with Detective Wanek's investigation (Count IV). The ACPD Officers moved for dismissal, asserting the defense of qualified immunity as to Counts I, II, and V. *See* Dkt. No. 60 at 19-28. The officers also argue that Plaintiff fails to state a claim as to Counts III and IV. *Id.* at 28-30. The Court agrees, and the claims against the local officers will be dismissed.

### 1.  Did Plaintiff Sufficiently Plead a Constitutional or Statutory Claim?

No. Because Plaintiff fails to establish that the search or seizure was unreasonable, his allegations do not overcome qualified immunity's first prong, nor do they amount to a claim under Virginia's state analog. The Court will take Plaintiff's four constitutional arguments in turn.

*First*, as to the claim that the ACPD Officers violated the Fourth Amendment when they continued Plaintiff's detention, the Court notes that it is well-settled that officers in one jurisdiction are "entitled to rely on the determination of [an officer from] another jurisdiction that there is reasonable suspicion to stop a person." *United States v. Avagyan*, 164 F. Supp. 3d 864, 884 (E.D. Va. 2016). Officers responding to a call for assistance are "not required to conduct an independent investigation of facts to come to their own determination"—indeed, "[s]uch a requirement would be unworkable in the environments in which the police operate." *Guerrero v. Deane*, 750 F. Supp. 2d 631, 652 (E.D. Va. 2010). Thus, even if Officer Armstrong's decision to stop Plaintiff was improper, the responding ACPD Officers would not be liable for the continuation of that detention. *See United States v. Hensley*, 469 U.S. 221, 232 (1985) (noting that officers who rely on information from another in good faith "may have a good-faith defense to any civil suit"). Here, the ACPD Officers were responding to Officer Armstrong's call for assistance with a stop already in progress. As such, the responding officers were permitted to (and did) rely on Armstrong's determination that the detention was warranted in good faith. And because Plaintiff alleges no facts that suggest otherwise, he has failed to show how the officers' conduct was unreasonable.

*Second*, as to the officers' decision to search the vehicle, the ACPD Officers argue that their conduct was reasonable under the inventory-search exception to the Fourth Amendment. The Court agrees.

Police officers frequently perform inventory searches when they impound vehicles or detain suspects. *See, e.g.*, *Illinois v. Lafayette*, 462 U.S. 640, 648 (1983); *South Dakota v. Opperman*, 428 U.S. 364, 376 (1976) (holding that evidence discovered during the impoundment of an illegally parked automobile is admissible at trial). Such searches "serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Colorado v. Bertine*, 479 U.S. 367, 372 (1987); *see also United States v. Banks*, 482 F.3d 733, 739 (4th Cir. 2007) ("A proper inventory search is merely an incidental administrative step.") (cleaned up). And for the inventory-search exception to apply, the search must have "be[en] conducted according to standardized criteria," such as a uniform police department policy, *Bertine*, 479 U.S. at 374 n.6, and performed in good faith, *Banks*, 482 F.3d at 739. *See United States v. Brown*, 787 F.2d 929, 932 (4th Cir. 1986).

Plaintiff argues that the exception does not apply for two reasons. His first argument—that the exception cannot apply when the officers did not inventory every item in the vehicle—is foreclosed by the law. While the officers did not remove all the property found for safekeeping, Plaintiff does not show how that failure brought the officers so out of step with the department's procedures as to deprive them of the exception's protection. *See United States v. White*, 707 F. App'x 766, 769-70 (4th Cir. 2017) (finding that, despite the officer's failure to list every item found in the vehicle, he generally complied with standard procedures in conducting the search and rejecting the argument that the inventory search was conducted in bad faith for the purpose of gathering evidence).

Plaintiff's second argument—that the search was "pretextual rummaging" since the officers never expected the car to be towed—is foreclosed by the facts. The audio directly refutes Plaintiff's suggestion that the search was a "ruse." *See* Dkt. No. 65-1 at 4:48:35 (Plaintiff is

informed that the vehicle had to be towed); *id.* at 4:48:12 (same); *id.* at 5:02:30 (Plaintiff is informed that the vehicle would be towed to the police impound lot and could not be towed to his home); *id.* at 5:15:29 (same).[6] Therefore, because the search was conducted while the officers were under the reasonable belief that the vehicle would be towed into police custody, the exception applies. *See United States v. Fort*, 313 F. App'x 665, 667 (4th Cir. 2009) (Table) (holding that an inventory search was valid even though the vehicle was never taken into police custody because the defendant's wife arrived to drive it away).

*Third*, as to the officers' decision to take some of Plaintiff's property into safekeeping, the Court's analysis begins and ends with Plaintiff's consent. As made clear in the video recording of the roadside encounter, the ACPD Officers gave Plaintiff the option to either have someone come pick him up and take all the property removed from the Mustang with him or to have the officers place the property into safekeeping to be retrieved from police custody at his convenience. Then— although the officers would have "prefer[red]" that he chose to be picked up and take his things, Dkt. No. 65-1 at 4:48:50 P.M.—Plaintiff ultimately decided that he did not want to hold the officers any longer and opted for the officers to take temporary possession of the items, signing a property safekeeping form to that effect. *Id.* at 4:50:20 P.M.; *see also* Dkt. No. 48-3 (signed property safekeeping form).[7]

And *fourth*, as to the Second Amendment claims, the Court again notes its skepticism toward the viability of Plaintiff's argument regarding his right to bear arms—even after the

---

[6] To the extent that the video evidence conflicts with the Plaintiff's allegations, the video controls. *See Goines v. Valle Community Servs. Bd.*, 822 F.3d. 159, 166 (4th Cir. 2016) ("[I]n the event of conflict between the bare allegations in the complaint and any exhibit attached, the exhibit prevails.").

[7] As to Plaintiff's claims made under Va. Code § 19.2-59, the Court recognizes that claims under that provision have "consistently been held to provide the same protections as the Fourth Amendment." *See Nazario v. Gutierrez*, No. 2:21-cv-169, 2022 WL 3213538 (E.D. Va. Aug. 9, 2022) (citing *Carter v. Virginia*, 163 S.E.2d 589, 592 (Va. 1968)). As such, those claims will be dismissed for the same reasons the Court dismisses those made under the federal Constitution.

Supreme Court's recent decision in *Bruen*, 142 S.Ct. 2111. *See Fort*, 313 F. App'x at 668 (holding that it was proper for officers to place an assault rifle, loaded magazines, tactical gear, and other items in safekeeping "to avert any danger . . . posed by the property"). However, the Court need not address the merits of that claim because, as with the other property discussed above, any encroachment on Plaintiff's gun rights was excused by his consent to the weapons' placement in safekeeping. *See* Dkt. No. 48-3.

Thus—because Plaintiff fails to allege a constitutional violation—the ACPD Officers are entitled to qualified immunity, and the constitutional claims against them will be dismissed. And—because the officers' conduct was reasonable—the statutory claims will be dismissed as well.

**2.   Did Plaintiff Sufficiently Plead a Tort Claim?**

No. Plaintiff failed to allege sufficient facts to sustain either his false-imprisonment or malicious-prosecution claim.

To start, as explained above, Plaintiff cannot reasonably argue that the fact of his detention was unlawful. Perhaps recognizing this fact, Plaintiff's opposition brief asserts (for the first time) that he is not challenging the fact of his detention—instead, he argues that the *length* of the detention made it unlawful. Dkt. No. 79 at 17. And—although the Court need not address his new argument at all, *see Porter v. Hamilton*, No. 1:20-cv-203, 2022 WL 619959, at *1 n.3 (E.D. Va. Mar. 2, 2022) (noting that plaintiffs may not amend their complaint by raising new arguments in a response to a motion to dismiss)—the Court finds that the argument fails on its merits. Without providing support, Plaintiff asserts that two hours was too long for the officers to hold him. Plaintiff, however, fails to account for the fact that the officers needed to perform a (valid, *see supra* pp. 23-25) inventory search of the vehicle, the fact that they all had to wait for the tow truck to arrive, and the fact that the officers also gave Plaintiff time to try to find a ride. Considering

26

those facts (along with Plaintiff's failure to allege why they do not justify the length of the stop), the Court finds that Plaintiff failed to state a claim for false imprisonment. *See Rodriguez v. United States*, 575 U.S. 348, 354 (holding that an officer's authority to continue a traffic stop "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed"); *United States v. Perez*, 30 F.4th 369, 376-77 (4th Cir. 2022) (citing *Rodriguez* and holding that a stop was not impermissibly extended by the need to wait on a tow truck's arrival).

Plaintiff's malicious-prosecution claim is equally deficient. To state a claim for malicious prosecution, Plaintiff would need to allege (among other things) that the prosecution was initiated without probable cause and with the cooperation of the defendants. *Lewis v. Kai*, 708 S.E.2d 884, 889 (Va. 2011). However, although Plaintiff states that the ACPD Officers "materially cooperated" with the prosecution by "providing misleading notes" about what they observed during their search of Plaintiff's vehicle, his Amended Complaint does not identify any specific statements. Nor does he explain how any of the statements were false. Nor does he explain how any of the alleged conduct or statements were a motivating factor in the Commonwealth Attorney's decision to prosecute Plaintiff for receipt of stolen property. Indeed, as is routine, the officers submitted their reports and copies of the notes found in Plaintiff's vehicle to prosecutors. *See* Dkt. No. 62-5. The Court finds that doing only that does not qualify as the "material involvement" required under Virginia law. *Cf. Lewis*, 708 S.E.2d at 889 ("Actions for malicious prosecution arising from criminal proceedings are not favored in Virginia and the requirements for maintaining such actions are more stringent.").

Thus—because Plaintiff fails to allege sufficient facts—his tort claims against the ACPD Officers will be dismissed.

### D. ACPD Officer Barnickle

The Court now turns to Plaintiff's claims against Officer Barnickle. In the Second Amended Complaint, Plaintiff asserts that Officer Barnickle violated both the Fourth Amendment (Count I) and the state statutory analog, Va. Code § 19.2-59 (Count V). Specifically, Plaintiff alleges that Officer Barnickle (1) searched his Pontiac before obtaining a warrant, (2) planted a bag of drugs in the car, and (3) submitted a falsified warrant application. *See* Compl. ¶¶ 118-33. Officer Barnickle moved for dismissal, also asserting the defense of qualified immunity. As such, the Court must again conduct the two-step inquiry laid out above. *See supra* pp. 13-14.

### 1. Did Plaintiff Sufficiently Plead a Constitutional Violation?

No. To make it past qualified immunity's first step, Plaintiff must allege that it is more than merely possible that Officer Barnickle violated his constitutional rights. He has not.

The Court starts by finding that Plaintiff's allegations that Officer Barnickle planted drugs in the Pontiac while it was in police custody—supported by only Plaintiff's statement that he had never seen nor possessed the drugs that were uncovered—fails to make out a claim for relief that is "plausible on its face." *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). That claim will therefore be dismissed.

Next, the Court rejects the claim that Officer Barnickle violated the Fourth Amendment when she (allegedly) searched the Pontiac prior to obtaining a signed warrant. Although the parties devote considerable portions of their briefing to discussions of the "automobile exception" to the warrant requirement, *see* Dkt. No. 62 at 7-9; Dkt. No. 81 at 6-7, the Court need not address that issue because a different doctrine guides its analysis.

As pointed out in Officer Barnickle's Reply (Dkt. No. 84), the "inevitable discovery doctrine" generally "allows the government to use evidence gathered in an otherwise unreasonable

search if it can prove by a preponderance of the evidence that law enforcement would have ultimately or inevitably discovered the evidence by lawful means." *United States v. Seay*, 944 F.3d 220, 223 (4th Cir. 2019) (internal quotations omitted); *Nix. v. Williams*, 467 U.S. 431, 444 (1984) (establishing the "inevitable discovery" exception to the exclusionary rule). For these purposes, "lawful means" include searches that fall into an exception to the warrant requirement, "such as an inventory search[ ] that would have inevitably uncovered the evidence in question." *Id.* Plaintiff was arrested upon his arrival at the ACPD station on February 18, 2020. Accordingly, all his belongings (including the Pontiac) would have been taken into police custody and subjected to an inventory search pursuant to department policy. Admittedly, that question is complicated by the fact that just because a legal exception allows ill-gotten evidence to be included at a criminal proceeding does not mean that a Fourth Amendment violation did not occur in the first instance. The Court, however, does not need to resolve that issue. Instead, the Court finds that, at a minimum, it has not yet been clearly established that officers can be held civilly liable for searching a vehicle that would have eventually been searched later pursuant to department policy. *Cf. Anderson v. Creighton*, 483 U.S. 635, 644 (1987) (holding that officers that act in an "objectively legally reasonable" manner "should no more be held personally liable in damages than should officials making analogous determinations in other areas of law").

The claim that Officer Barnickle intentionally misled the magistrate judge to obtain a warrant to search the Pontiac also fails. Officers are permitted to, in good faith, rely on information obtained from other members of law enforcement. *See United States v. Hensley*, 469 U.S. 221, 231 (1985). And as made clear in Officer Barnickle's warrant application, she relied on information obtained from both local and federal officers involved with the case. *See* Dkt. No. 62-4 at 16 (stating that the "Basis for Facts" included information from Detective Wanek, Officer Shepherd,

and an FBI task force agent). Plaintiff has not made any allegations that such reliance was in bad faith or was otherwise unreasonable. *Cf. United States v. Ventresca*, 380 U.S. 102, 111 (1965) ("Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number."); *Mom's, Inc. v. Williams*, 109 F. App'x 629, 636 (4th Cir. 2004) (holding that an officer's reasonable reliance on information from another severed the causal connection between their conduct and any underlying constitutional violation). For that reason, the Court finds that Plaintiff has not adequately alleged that Officer Barnickle violated his Fourth Amendment rights.

Thus—because Plaintiff fails to allege a clearly established constitutional violation—Officer Barnickle is entitled to qualified immunity, and the claims against her will be dismissed.

### E.  ACPD Detective Wanek

Finally, the Court addresses the claims against ACPD Detective Wanek. Plaintiff alleges that Detective Wanek is liable for: (1) violating the Fourth Amendment and the state analog when he opened the soft body armor to reveal the serial number on the seized rifle plate (Counts I and V); (2) violating the Second Amendment when the Detective decided to hold Plaintiff's firearms as evidence (Count II); (3) committing common law false imprisonment when he obtained a warrant for Plaintiff's arrest (Count III); and (4) committing the tort of malicious prosecution when he obtained a warrant for Plaintiff's arrest (Count IV). Detective Wanek moved for dismissal on the grounds that he was entitled to qualified immunity on the constitutional claims and that Plaintiff failed to adequately allege facts that would support his state law tort claims. *See* Dkt. No. 64. The Court will start with the constitutional claims and the now-familiar qualified-immunity inquiry.

**1. Did Plaintiff Sufficiently Plead a Constitutional Violation?**

No. Starting with Plaintiff's Fourth Amendment claims against Detective Wanek, the Court finds that no violation occurred. Plaintiff's first contention to the contrary is that Detective Wanek conducted an unreasonable search when he opened the soft body armor to inspect the serial number of the enclosed rifle plate on February 10, 2020. Compl. ¶ 80. However, once evidence is lawfully seized, officers do not violate the Fourth Amendment when they reexamine that evidence—even when that officer is examining the evidence for an entirely different purpose. *See United States v. Davis*, 690 F.3d 226, 254 n.30 (4th Cir. 2012) (citing *United States v. Thompson*, 837 F.2d 673, 674 (5th Cir. 1988) ("A person lawfully arrested has no reasonable expectation of privacy with respect to property properly taken from his person for inventory by the police. Later examination of that property by another law-enforcement officer is, therefore, not an unreasonable search within the meaning of the Fourth Amendment."); *see also United States v. Jenkins*, 496 F.2d 57, 73-74 (2d Cir. 1974) (holding that a person no longer has a reasonable expectation of privacy in the serial numbers of already-seized property). Because the contents of the Mustang (including the body armor and rifle plate) remained in continuous police custody, Detective Wanek's subsequent examination was lawful.

Plaintiff's second contention is that Detective Wanek violated the Fourth Amendment when he made misrepresentations in his warrant application. In Plaintiff's view, Detective Wanek made false statements about the value of the rifle plate and his belief that it was stolen from Fort Myer in his warrant application. Both allegations fail for the same reason: any inaccuracies were based on Detective Wanek's reliance on statements made by Detective Shepherd, the federal investigator. *See* Dkt. No. 64-6 at 1-3 (explaining that the information was based on interviews with personnel at Fort Myer, including Detective Shepherd). Again, Plaintiff has not made any

allegations that such reliance was in bad faith or was otherwise unreasonable. *Cf. Ventresca*, 380 U.S. at 111; *Mom's Inc.*, 109 F. App'x at 636. For that reason, the Court finds that Plaintiff has not adequately alleged that Detective Wanek violated his Fourth Amendment rights in this regard.

As to Plaintiff's Second Amendment claim against Detective Wanek, the Court notes that, even assuming the seizure of Plaintiff's firearms violated the Second Amendment, that right has not yet been clearly established by either the Fourth Circuit or the Supreme Court. Indeed, Plaintiff has not presented (nor has the Court been able to find) any cases that stand for the proposition that the right to bear arms is infringed when officers seize a firearm without probable cause that it was involved in a particular crime. And the Seventh Circuit's decision in *Sutterfield* supports the conclusion that Plaintiff cannot overcome qualified immunity's second hurdle. *See Sutterfield v. City of Milwaukee*, 751 F.3d 542 (7th Cir. 2014). There, the court noted that "[w]hether and to what extent the Second Amendment protects an individual's right to possess a particular gun (and limits the power of the police to seize it absent probable cause to believe it was involved in a crime) is an issue that is just beginning to receive judicial attention." *Id.* at 571. And while that court reasoned that "the seizure of a particular firearm did not otherwise interfere with [the] Second Amendment interest," *id.*, this Court need only recognize that neither the Fourth Circuit nor the Supreme Court has joined the Seventh Circuit in addressing that issue. And because those courts have not, neither will this one. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that courts need not decide whether a constitutional violation occurred when it is evident that the right at issue has not been clearly established by prior precedent").

Thus—because Plaintiff fails to allege the violation of a clearly established constitutional right—Detective Wanek is entitled to qualified immunity, and the claims against him will be dismissed.

### 2.   Did Plaintiff Sufficiently Plead a Tort Claim?

No. Both the false imprisonment and malicious prosecution claims are based on the same allegations about Detective Wanek's warrant application discussed above. Because the Court already found that the warrant application was constitutionally sound, these claims must also be rejected.

Thus—because the detective's conduct was reasonable—Plaintiff's state law claims will be dismissed.

## III.   CONCLUSION

To end, the Court acknowledges Plaintiff's assertion that there is an ongoing epidemic of undesirable and unfortunate police-citizen interactions happening nationwide. *See Jamison v. McClendon*, 476 F. Supp. 3d 386, 390-91 nn.1-19 (S.D. Miss. 2020) (Reeves, J.) (collecting cases). However, as explained above, the officers in this case did not commit the types of abuses at issue in those cases. As such, they are entitled to the various defenses afforded them by binding precedent. For those reasons, the Court is not free to come to any conclusion other than the one reached today. Accordingly, it is hereby

**ORDERED** that Plaintiff's Motion to Strike Substitution (Dkt. No. 71) is **DENIED**; it is further

**ORDERED** that the Motion to Dismiss filed on behalf of Michael Armstrong, Keith Shepherd, and the United States (Dkt. No. 56) is **GRANTED**; it is further

**ORDERED** that the Motion to Dismiss filed on behalf of Arlington County (Dkt. No. 68) is **GRANTED**; it is further

**ORDERED** that the Motion to Dismiss filed on behalf of Javier Fuentes, Austin Kline, Lauren Lugasi, Kimberly Soules, and John Vanak (Dkt. No. 59) is **GRANTED**; it is further

**ORDERED** that the Motion to Dismiss filed on behalf of Ashley Barnickle (Dkt. No. 61)

is **GRANTED**; and it is further

**ORDERED** that the Motion to Dismiss filed on behalf of Scott Wanek (Dkt. No. 63) is

**GRANTED**.

/s/
Hon. Michael S. Nachmanoff
United States District Judge

May 31, 2023
Alexandria, Virginia